IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————— X
                                                          :
STATE OF NEW YORK, STATE OF ARIZONA,                      :
STATE OF CALIFORNIA, STATE OF                             :
CONNECTICUT, STATE OF ILLINOIS, STATE                    :
OF MAINE, COMMONWEALTH OF                                 :
MASSACHUSETTS, STATE OF MINNESOTA,                       :     Case No. 1:07 cv 10632 (BSJ) (DCF)
STATE OF NEW HAMPSHIRE, STATE OF NEW                     :
JERSEY, COMMONWEALTH OF                                   :     ECF Case
PENNSYLVANIA, DEPARTMENT OF                               :
ENVIRONMENTAL PROTECTION, and STATE                      :
OF VERMONT,                                               :
                                                          :
                          Plaintiffs,                     :
                                                          :
             v.                                           :
                                                          :
STEPHEN L. JOHNSON, in his official capacity as          :
Administrator of the U.S. Environmental Protection        :
Agency, and the U.S. ENVIRONMENTAL                       :
PROTECTION AGENCY,                                        :
                                                          :
                          Defendants.                     :
—————————————————————— X


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>THEIR MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

REGULATORY AND FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Toxics Release Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The December 2006 Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    EPA's Rationale for the Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    EPA's 2003 TRI Reporting Burden Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    EPA's 2005 TRI Reporting Burden Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    The Plaintiff States' Eleventh Claim in This Action . . . . . . . . . . . . . . . . . . . . . . . 9

    The Administrative Record as Designated by EPA and This Motion . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    THE COURT SHOULD ORDER THAT THE ADMINISTRATIVE
    RECORD BE SUPPLEMENTED WITH DOCUMENTS SHOWING
    THE FULL RANGE OF INFORMATION REGARDING BURDEN
    ESTIMATES THAT WAS BEFORE THE AGENCY . . . . . . . . . . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### FEDERAL CASES

*Ad Hoc Metals Coalition v. Whitman*,
    227 F. Supp. 2d 134 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Asarco, Inc. v. EPA*,
    616 F.2d 1153 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Conservation Law Foundation of New England, Inc. v. Clark*,
    590 F. Supp. 1467 (D. Mass 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Dopico v. Goldschmidt*,
    687 F.2d 644 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Environmental Defense Fund, Inc. v. Blum*,
    458 F. Supp. 650 (D.D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Esch v. Yeutter*,
    876 F.2d 976 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Pension Benefit Guaranty Corp. v. LTV Steel Corp.*,
    119 F.R.D. 339 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Public Citizen v. Heckler*,
    653 F. Supp. 1229 (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Schicke v. Romney*,
    474 F.2d 309 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

### FEDERAL STATUTES

Emergency Planning and Community Right-to-Know Act,

    42 U.S.C. § 11023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Paperwork Reduction Act,

    44 U.S.C. §§ 3501-3521 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    44 U.S.C. § 3507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Page

Pollution Prevention Act,

    42 U.S.C. § 13106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

## FEDERAL REGULATIONS AND REGULATORY NOTICES

*Agency Information Collection Activities, etc.*,
    68 Fed. Reg. 62069 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7

*Agency Information Collection Activities, etc.,*
    68 Fed. Reg. 62070 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7

*Toxics Release Inventory Burden Reduction Final Rule*,
    71 Fed. Reg. 76932  (Dec. 22, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3-5

Plaintiffs the State of New York, the State of Arizona, the State of California, the State of

Connecticut, the State of Illinois, the State of Maine, the Commonwealth of Massachusetts, the

State of Minnesota, the State of New Hampshire, the State of New Jersey, the Commonwealth of

Pennsylvania, Department of Environmental Protection, and the State of Vermont (collectively,

the "Plaintiff States") respectfully submit this memorandum of law in support of their motion to

supplement the administrative record.

## PRELIMINARY STATEMENT

In this action, the Plaintiff States challenge the Toxics Release Inventory Burden

Reduction Final Rule (the "Rule"), 71 Fed. Reg. 76932/1 (Dec. 22, 2006), which defendant

Stephen L. Johnson, as Administrator of defendant U.S. Environmental Protection Agency

(collectively, "EPA"), signed in December 2006. Among other things, the Plaintiff States assert

that this "burden reduction" Rule is arbitrary and capricious because EPA never demonstrated

the accuracy of its estimates of the amount of time that facilities need to comply with Toxics

Release Inventory ("TRI") reporting requirements – the very estimates that EPA employed as the

basis for the burden reduction calculations it used to justify the Rule. As part of that claim, the

Plaintiff States rely on the fact that in 2003, EPA developed time estimates that were

significantly lower than the estimates used in the 2006 rulemaking. Had EPA used the 2003

estimates in the rulemaking, the Rule's purported burden reduction benefit would almost

certainly have been much lower.

In the administrative record for the Rule that EPA designated for the purpose of this

litigation on April 21, 2008, EPA did not include the documents in which it set and explained

those 2003 estimates, thus excluding highly probative materials regarding the reasonableness –

or lack thereof – of the fundamental rationale for the Rule. The case law does not allow EPA to

skew the administrative record in this way, and does allow this Court to order supplementation

of the record for the purpose of determining if EPA examined all of the factors it should have examined, such as the accuracy of the burden estimates. Accordingly, to ensure the Court has before it the documents necessary to evaluate the Plaintiff States' claim, the Court should order that the administrative record be supplemented by adding the following six documents described in more detail below: EPA's two October 2003 information collection request supporting statements, EPA's September 2003 and January 2004 memoranda discussing the burden estimates found in those two October 2003 information collection request supporting statements, and EPA's two October 2005 information collection request supporting statements.

## **REGULATORY AND FACTUAL BACKGROUND**

The Toxics Release Inventory

The TRI is a publicly available EPA database containing information about the use and disposal of over 600 toxic chemicals at industrial facilities across the nation. The information in the database comes from the facilities themselves: under the TRI regulations, certain facilities that use or dispose of one or more of the TRI chemicals must file annual reports with EPA and the facilities' home states that disclose information about the facilities' use and disposal of those chemicals. Thus, the TRI program does not impose limits on the amount of pollution a facility can generate, but is purely an information reporting requirement. Congress created the TRI program in 1986 when it enacted the governing statute, section 313 of the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11023, after the Bhopal disaster in India and several chemical release incidents in the United States. EPA, Office of Environmental Information, *Economic Analysis of the Toxics Release Inventory Phase 2 Burden Reduction Rule*, Admin. Dkt. Item EPA-HQ-TRI-2005-0073-4989, -4990, -4991 -4994,[1] at 1-2 (Sept. 22,

---

[1] Documents in the administrative record as filed by EPA in this action on April 21, 2008 are identified as "Admin. Dkt. Item EPA-HQ-TRI-2005-0073-___." Pertinent excerpts from the

2006) (Brief Ex. 1).   Since then, as EPA itself has concluded, the TRI database has "proven to be one of the most powerful forces in empowering the federal government, state and local governments, industry, environmental groups and the general public to fully participate in an informed dialogue about the environmental impacts of toxic chemicals in the United States." Brief Ex. 1 at 5-1.  In 1990, Congress expanded the TRI reporting requirements to include information about the facilities' pollution prevention efforts.  *See* Pollution Prevention Act, 42 U.S.C. § 13106.

A facility becomes subject to TRI reporting requirements if it manufactures, processes or uses a TRI chemical in excess of certain threshold amounts and satisfies certain other criteria. *Toxics Release Inventory Burden Reduction Final Rule*, 71 Fed. Reg. 76932/1, 76933/2 (Dec. 22, 2006).  A facility can satisfy its TRI reporting requirements by filing a Form R report.  *Id.* at 76933/2.  On Form R, the facility provides specific information regarding the quantity and fate of the chemical waste generated at the facility, namely, the amount of the TRI chemical waste released to the air, water and land, as well as the amount of the chemical waste recycled, treated, or used for energy recovery.  *Id.* at 76934/1-2.

EPA allows some facilities to file a Form A certification in place of the Form R report. *Id.* at 76933/2-3.  Form A does not require reporting of the Form R information identified above, but instead obliges the facility to make certain representations.  Specifically, before December 2006, Form A required that the facility certify (1) that it did not manufacture, process or otherwise use more than 1,000,000 pounds of the TRI chemical and (2) that it did not generate more than 500 pounds of the chemical as waste.  *Id.* at 76934/1.  In addition, before December 2006, facilities could not use Form A for the worst TRI chemicals, such as lead and mercury,

---

three such documents referenced in this brief are included as exhibits to this brief and denoted as "Brief Ex. ___").

which are known as "persistent, bioaccumulative and toxic" or "PBT" chemicals. *Id.* at 76934/2. A facility that could make the two representations set out above about its use and waste quantities for a *non*-PBT chemical could file Form A rather than Form R for that chemical. *Id.* at 76934/1.

The December 2006 Rule

In December 2006, EPA promulgated the Rule. *Id.* at 76932/1. The Rule relaxed the then-existing criteria for use of the Form A certification in two ways, allowing more facilities to file Form A instead of Form R. First, as regards use of Form A for non-PBT chemicals, the Rule did not change the 1-million-pound *manufacturing, processing or use* threshold, but did (1) raise the *waste* threshold tenfold, from 500 pounds to 5,000 pounds, and (2) add a new 2,000 pound threshold regarding actual *releases* to the environment, so that a facility could only use Form A if it discharged no more than 2,000 pounds of the chemical.[2] *Id.* at 76937/3. Thus, as an illustrative example, a facility that (1) used 500,000 pounds of a non-PBT chemical such as toluene diisocyanate, (2) generated 3,000 pounds of waste of that chemical, and (3) released 1,500 pounds of that chemical waste to the air, water or land, would not have been able to use Form A before EPA promulgated the Rule because the facility exceeded the then-existing 500-pound waste threshold. Under the Rule, that facility would now be able to file Form A, however, because it would not exceed the 1,000,000-pound use threshold, the 5,000-pound waste threshold, or the 2,000-pound release threshold.

Second, the Rule now allows a facility to use Form A for many PBT chemicals. A facility can do so if it can certify (1) that it did not manufacture, process or use more than

---

[2] As noted above, the TRI regulations distinguish between the amount of waste released to the air, land or water, and the amount of waste that is recycled, destroyed or otherwise disposed of.

4

1,000,000 pounds of the PBT chemical, (2) that it did not generate more than 500 pounds of the chemical as waste, and (3) that it did not release any amount of the chemical to the environment. *Id.* at 76937/2.

EPA's Rationale for the Rule

As the Rule's name suggests, EPA's principal justification for the Rule was that it would reduce the burden of complying with TRI reporting requirements.  In a nutshell, the logic was that the Rule would allow greater use of Form A instead of Form R, and because facilities would need less time to complete Form A than Form R, they would be less burdened.  *Id.* at 76934/2-3. To calculate the putative reduced burden, EPA relied on estimates of the amount of time a facility would need to complete each form.  In particular, EPA relied on the following estimates of the time needed to complete the relevant form by a "subsequent-year filer," that is, a facility that had previously filed a TRI report:  46.3 hours for Form R for a PBT chemical; 24.6 hours for Form R for a non-PBT chemical; and 17.5 hours for Form A for a non-PBT chemical.  Brief Ex. 1 at 2-4 (Table 2-1).  Approximately 96 percent of TRI reports are subsequent-year reports.  *See* Brief Ex. 1 at ES-3.  Based on these and other time estimates, EPA calculated that the final Rule would reduce form-completion time by 13.5 hours for facilities switching to Form A for a PBT chemical and by 7.1 hours for facilities switching to Form A for a non-PBT chemical.  Brief Ex. 1 at 2-5 (Table 2-3, column entitled "Total" and rows entitled "Form Completion - PBT Chemicals" and "Form Completion – Non-PBT Chemicals").

The only rationale EPA provided for using the 46.3, 24.6 and 17.5 hour form-completion time estimates was that they had been approved by the White House Office of Management and Budget ("OMB").  Brief Ex. 1 at 2-2; EPA, Office of Environmental Information, *Response to Comments*, Admin. Dkt. Item EPA-HQ-TRI-2005-0073-5008 (excerpts), at 155 (Dec. 18, 2006) (Brief Ex. 2).  By way of background, pursuant to the Paperwork Reduction Act, 44 U.S.C.

§§ 3501-3521, federal agencies such as EPA must have approval from OMB before gathering information, including TRI data, from the public. *See*, *e.g.*, 44 U.S.C. § 3507(a)(2). To obtain approval, EPA submits an information collection request supporting statement ("ICR") to OMB in which EPA identifies the nature of the information collection and its estimated burden and cost. *See*, *e.g.,* 44 U.S.C. § 3507(a)(1)(C); *Agency Information Collection Activities, etc.*, 68 Fed. Reg. 62069, 62069 (Oct. 31, 2003); *Agency Information Collection Activities, etc.*, 68 Fed. Reg. 62070, 62070 (Oct. 31, 2003).

EPA's 2003 TRI Reporting Burden Estimates

Three years before EPA promulgated the Rule, EPA had developed a set of burden estimates that were much lower than those used to support the Rule. As of October 2003, the OMB-approved form-completion estimates for subsequent-year TRI filings were 47.1 hours for Form R and 30.2 hours for Form A. Memorandum from Cody Rice, EPA, to Amy Newman, EPA, at 4 (Jan. 20, 2004) (column entitled "Existing Estimate") (Declaration Ex. A[3]).

By 2003, however, EPA had developed significantly lower time estimates for subsequent-year reporting: 14.5 hours for Form R and 10.7 hours for Form A. Accordingly, in October 2003, EPA submitted two ICRs to OMB to seek approval of those new Form R and Form A estimates (the "October 2003 ICRs"). *See Toxic Chemical Release Reporting; Information Collection Request Supporting Statement*, OMB Control No. 2070-0093, EPA ICR #1363.13, at 70 (Table 1, column entitled "Total Hours," second row from bottom) (Oct. 2003) (Declaration Ex. B); *Alternate Threshold for Low Annual Reportable Amounts; Toxic Chemical Release Reporting; Information Collection Request Supporting Statement*, OMB Control No.

---

[3] Documents identified as "Declaration Ex. ___" are exhibits to the Declaration of Andrew G. Frank in Support of Plaintiffs' Motion to Supplement the Administrative Record (June 6, 2008), filed herewith.

2070-0143, EPA ICR #1704.07, at 15[4] (Oct. 2003) (Declaration Ex. C).  A September 2003 EPA

memorandum (the "September 2003 memorandum") indicated that EPA based those new

estimates on a statistical analysis of actual data and information from reporting facilities.

Memorandum from Cody Rice, EPA to Judith Kendall, EPA, at 3, 4 and Appendix A (Sept. 24,

2003) (Declaration Ex. D).  The September 2003 memorandum concluded that the new 14.5 and

10.7 hour estimates:

> represent an improvement over the previous estimates . . .  and their use would
> provide a more accurate representation of the burden of the TRI program on
> reporting facilities.  *The revised estimates would also provide a more accurate
> baseline for evaluation of potential investments in future TRI burden reduction
> initiatives*.

*Id.* at 9 (emphasis added).  EPA put the October 2003 estimates through a public notice-and-

comment process before finalizing them and submitting them to OMB.  *See* 68 Fed. Reg. at

62069 (Form R); 68 Fed. Reg. at 62071 (Form A).

A January 2004 EPA memorandum (the "January 2004 memorandum") reported that

OMB did not accept EPA's new estimates.  Declaration Ex. A at 1-2.  Instead, OMB and EPA

management "negotiated" regarding the burden estimates, with the end result of retaining the

47.1 hour estimate for subsequent-year Form R completion for PBT chemicals, and establishing

a new estimate of 25.2 hours for subsequent-year Form R completion for non-PBT chemicals.

*Id.*  OMB and EPA also agreed to a 17.6 hour estimate for subsequent-year completion of Form

A.  *Id.* at 2 (sum of 16.2 hour "Calculation/Certification" figure and 1.4 hour "Form Completion"

figure); *see also id.* at 4 (column entitled "Revised Estimate"; sum of "Form A" rows entitled

"Calculations/ Certification" and "Form Completion").

---

[4]  The 10.7 hour figure for Form A can be calculated by looking at the column entitled
"Total Hours" on page 15 and summing the 9.3 and 1.4 hour figures in the third and fourth rows
from the bottom.

The January 2004 Memorandum notes at the outset that the agreed-to figures "bear little resemblance to the estimates in the [October 2003 ICRs] based on the full set of respondent data." *Id.* at 1. More specifically, with regard to Form R reporting for non-PBT chemicals, the memorandum explains that the agreed-to 25.2 hour figure was based on *incomplete data*: 18 observations from 1998 were used, and 106 observations from 2000 and 2001 were excluded. *Id.* The only reason that the memorandum gives for excluding the more recent data is that "OMB did not like [the] result" that obtained when the excluded data were included, namely, a 12.5 hour estimate. *Id.*

As for Form R reporting for PBT chemicals, the January 2004 memorandum provides no support for the 47.1 hour figure. The memorandum states that EPA had argued that "the activities of reporting on PBT and non-PBT chemicals are similar enough that the same burden hour estimate should be used," *id.* at 2, and further states that the difference between the 47.1 hour figure and the 25.2 hour figure "creates the appearance of a rather large relative difference in the burden of reporting a PBT chemical versus a non-PBT chemical . . . which is *not supported by data*," *id.* (emphasis added).

With regard to Form A reporting, the memorandum notes that "[u]nlike the estimate in the ICR . . ., the revised estimate [*i.e.*, the 17.6 hour figure] is *not corroborated by data* from reporting facilities." *Id.* at 2 (emphasis added). These "negotiated" 47.1, 25.2 and 17.6 hour figures were the estimates EPA used in its analyses supporting the proposed Rule. *See* EPA, Office of Environmental Information, *Economic Analysis of the Proposed Toxics Release Inventory Phase II Burden Reduction Rule*, Admin. Dkt. Item EPA-HQ-TRI-2005-0073-0005, at 2-4 (Table 2-1, column entitled "Total Time") (Sept. 19, 2005) (Brief Ex. 3).

EPA's 2005 TRI Reporting Burden Estimates

In 2005, EPA requested, and OMB subsequently approved, a small reduction in the reporting burden estimates for Form R:  from 47.1 to 46.3 hours for PBT chemicals, and from 25.2 to 24.6 hours for non-PBT chemicals. *See Toxic Chemical Release Reporting; Information Collection Request Supporting Statement*, OMB Control No. 2070-0093, EPA ICR #1363.14, at 73 (Oct. 2005) (Declaration Ex. E)   This reduction was based on modifications EPA had made to the form to make it somewhat easier to complete.  *See id.* at 34-35, 72-73.  Similarly, EPA requested and OMB approved a small reduction in the reporting burden estimate for Form A from the preexisting 17.6 hour estimate to 17.5 hours.  *See Alternate Threshold for Low Annual Reportable Amounts; Toxic Chemical Release Reporting; Information Collection Request Supporting Statement*, OMB Control No. 2070-0143, EPA ICR #1704.08, at 15 & 16 (Table 1, column entitled "Total Hours," sum of third and fourth rows from the bottom) (Oct. 2005) (Declaration Ex. F).  In sum, these slightly reduced 2005 OMB-approved figures are substantially the same as the previous OMB-approved figures.  EPA used these slightly reduced figures in its December 2006 analyses supporting the final Rule.  Brief Ex. 1 at 2-4 (Table 2-1).

The Plaintiff States' Eleventh Claim in This Action

On November 28, 2007, the Plaintiff States filed this action.  The eleventh claim of their complaint alleges that the Rule is arbitrary and capricious because EPA failed to provide a reasoned response to the assertion that EPA had developed "widely-varying" estimates of TRI reporting burden but had not explained (1) whether any of those estimates was accurate or (2) why EPA should have promulgated a "burden reduction" rule when the agency had not determined whether it had accurate burden estimates.   Court Dkt. Item 1[5] ¶¶ 351-368.   In

_____

[5]  Documents in this Court's docket are identified as "Court Dkt. Item ___."

9

particular, in paragraph 354 of the complaint, the Plaintiff States alleged facts regarding the

October 2003 EPA estimates. *Id.* ¶ 354. In responding to that paragraph in its answer, EPA

referred the Court to the administrative record. Court Dkt. Item 15 ¶ 354.

The Administrative Record as Designated by EPA and This Motion

On April 21, 2008, EPA designated what it considers to be the complete administrative

record in this case. That designated record did not include any of the following documents

regarding EPA's burden estimates: the September 2003 memorandum (Declaration Ex. D); the

October 2003 ICRs (Declaration Exs. B & C); the January 2004 memorandum (Declaration Ex.

A) or the October 2005 ICRs (Declaration Exs. E & F). Plaintiffs file this motion to seek to

supplement the designated record with those six documents, all of which relate to the extent to

which EPA's reliance on the burden estimates approved by OMB for the purpose of the

Paperwork Reduction Act is arbitrary and capricious, as alleged in the Plaintiff States' eleventh

claim.

## ARGUMENT

### THE COURT SHOULD ORDER THAT THE ADMINISTRATIVE RECORD BE SUPPLEMENTED WITH DOCUMENTS SHOWING THE FULL RANGE OF INFORMATION REGARDING BURDEN ESTIMATES THAT WAS BEFORE THE AGENCY

The Court should supplement the administrative record with the documents regarding the

2003 and 2005 reporting burden estimates to prevent EPA from "skew[ing] the 'record' for

review in its favor by excluding from that 'record' information in its own files which has great

pertinence to the proceeding in question." *Environmental Defense Fund, Inc. v. Blum*, 458 F.

Supp. 650, 661 (D.D.C. 1978). Courts have repeatedly granted supplementation of an agency-

designated administrative record when "the agency failed to consider factors which are relevant

to its final decision." *Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 137 (D.D.C.

2002) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)); *see also Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantive merits of the agency action only for background information . . . or for the limited purpose of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision."); *Schicke v. Romney*, 474 F.2d 309, 317, 319 (2d Cir. 1973) (reversing judgment and suggesting that district court allow discovery to supplement the record when there was no evidence in the record that the agency had conducted an independent analysis of a key plan); *Public Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) (court is "free to include in its review the challenged document to ascertain whether the Secretary considered all of the relevant factors she should appropriately have considered"); *Conservation Law Foundation of New England, Inc. v. Clark*, 590 F. Supp. 1467, 1474 (D. Mass. 1984) (supplementation of the record allowed "when the record submitted by the agency is self-serving, incomplete or unclear" or "to show factors the agency should have considered, but did not").

In *Public Citizen*, the court noted that supplementation was appropriate when petitioners "made a prima facie showing that the agency excluded from the record evidence adverse to its position." 653 F. Supp. at 1237. The court then supplemented the record with adverse documents that "were known to [the agency] at the time of [its] decisionmaking, [and were] directly related to the decision made" because the documents were "indicative of a lack of rationality on the part" of the agency. 653 F. Supp. at 1237. Similarly, in *Conservation Law Foundation*, the court allowed supplementation of the record with evidence on off-road vehicle use when "it [was] arguable that the [agency] failed to consider adequately whether extensive

11

[off-road vehicle] use of the Seashore, even if ecologically compatible, was an 'appropriate public use' as mandated by the Seashore Act."  590 F. Supp. at 1475.

In *Dopico v. Goldschmidt*, 687 F.2d 644 (2d Cir. 1982), the Second Circuit emphasized the importance of placing before the Court relevant evidence that had been before the agency but not included by the agency in the administrative record.  In that case, the Second Circuit reversed this Court's resolution of a factual issue on summary judgment because the Court had denied a request to supplement the record.  *Id.* at 646.  The Second Circuit reasoned that:  "[t]he fact that defendants presented documents that seemed to support the rationality of their actions does not mean that the same conclusion would have been reached if the Court had been aware of other information that was before the agency."  *Id.* at 654.  *See also Pension Benefit Guaranty Corp. v. LTV Steel Corp.*, 119 F.R.D. 339, 342 (S.D.N.Y. 1988) ("[A]t minimum the adequacy of the PBGC's deliberations, in terms of process if not substance, will be at issue.  A full and complete administrative record is essential to meaningful judicial review of that issue.").

Applying this authority, this Court should grant this motion.  By the Rule's name alone, EPA indicates that reducing reporting burden is the Rule's principal purpose.  It necessarily follows that one of the factors – if not the main factor – that EPA should have considered was whether the burden estimates that it used were accurate.  EPA has stated that, for the purpose of this Rule, it used burden estimates approved by OMB for the purposes of a separate statute, the Paperwork Reduction Act.  EPA did not, however, indicate in the administrative record, through inclusion of the documents at issue in this motion or otherwise, that it had generated a separate set of reporting burden estimates in 2003 after a notice-and-comment process.  Unless that gap in the record is filled, the Court will not be able fully to evaluate the rationality of EPA's decision to use the higher estimates it "negotiated" with OMB rather than the lower 2003 estimates based on data from reporting facilities.  For example, EPA's estimate in the 2006 rulemaking that 13.5

hours would be *saved by completing Form A and not completing Form R* for PBT chemicals is virtually identical to EPA's 2003 estimate that it takes 14.5 hours to *complete Form R*. Use of the much smaller 2003 estimates would almost certainly have significantly reduced the burden reduction allegedly resulting from the Rule. As in *Public Citizen*, this Court should supplement the record in this case with these documents that are relevant to a key issue – here, reporting burden – and were before EPA at the time it was making its decision to promulgate the Rule.

EPA may argue that it has certified that the administrative record is complete, *see* Court Dkt. Item 27-2, and that its certification alone is sufficient to defeat any attempt to supplement the record. The Second Circuit has already rejected that argument, however: "defendants' assurances that they have submitted the full record will not substitute for the Court's independent consideration of that issue . . . . This is particularly true in a case like this, where there is a strong suggestion that the record before the Court was not complete . . . ." *Dopico*, 687 F.2d at 654. Moreover, EPA in fact invited the Court to examine the documents relating to the 2003 estimates when, in its answer, it referred the Court to the administrative record for information about those 2003 estimates. *See* Court Dkt. Item 15 ¶ 354. To the Plaintiff States' knowledge, however, there are no documents regarding the 2003 estimates in the administrative record that EPA designated, so unless the Court grants this motion, EPA's referral to the record will be meaningless.

## **CONCLUSION**

For the reasons set out above, the Court should grant this motion and supplement the administrative record with the following six documents relating to burden estimates: the September 2003 memorandum (Declaration Ex. D); the October 2003 ICRs (Declaration Exs. B & C); the January 2004 memorandum (Declaration Ex. A) and the October 2005 ICRs (Declaration Exs. E & F).

Dated: June 6, 2008

Respectfully submitted,

ANDREW M. CUOMO,
ATTORNEY GENERAL OF
THE STATE OF NEW YORK

By: _/s/ Andrew G. Frank_____
      Andrew G. Frank
      Assistant Attorney General
      New York State Office of the Attorney General
      120 Broadway
      New York, New York  10271
      (212) 416-8446
      andrew.frank@oag.state.ny.us

*Counsel for Plaintiff State of New York*

TERRY GODDARD,
ATTORNEY GENERAL OF
THE STATE OF ARIZONA

By: _/s/ James T. Skardon/AGF by permission___
      James T. Skardon (admitted *pro hac vice*)
      Assistant Attorney General
      Arizona Office of the Attorney General
      1275 West Washington Street
      Phoenix, Arizona  85007
      (602) 542-8535
      james.skardon@azag.gov

*Counsel for Plaintiff State of Arizona*

EDMUND G. BROWN JR.,
ATTORNEY GENERAL OF
THE STATE OF CALIFORNIA


By:  /s/ James R. Potter/AGF by permission
     James R. Potter  (admitted *pro hac vice*)
     Deputy Attorney General
     California Office of the Attorney General
     300 South Spring Street
     Los Angeles, California  90013-1230
     (213) 897-2637
     james.potter@doj.ca.gov


*Counsel for Plaintiff State of California*


RICHARD BLUMENTHAL
ATTORNEY GENERAL OF
THE STATE OF CONNECTICUT


By:  /s/ Mary K. Lenehan/AGF by permission
     Mary K. Lenehan
     Assistant Attorney General
     Connecticut Office of the Attorney General
     55 Elm Street, P.O. Box 120
     Hartford, Connecticut  06141-0120
     (860) 808-5250
     mary.lenehan@po.state.ct.us


*Counsel for Plaintiff State of Connecticut*


LISA MADIGAN
ATTORNEY GENERAL OF
THE STATE OF ILLINOIS


By:  /s/ Gerald T. Karr/AGF by permission
     Gerald T. Karr (admitted *pro hac vice*)
     Senior Assistant Attorney General
     Illinois Attorney General's Office
     69 West Washington Street, Suite 1800
     Chicago, Illinois  60602
     (312) 814-3369
     gkarr@atg.state.il.us


*Counsel for Plaintiff State of Illinois*


15

G. STEVEN ROWE
ATTORNEY GENERAL OF
THE STATE OF MAINE

By:  Janet M. McClintock/AGF by permission
    Janet M. McClintock (admitted *pro hac vice*)
    Assistant Attorney General
    Maine Office of the Attorney General
    6 State House Station
    Augusta, Maine  04333-0006
    (207) 626-8566
    jan.mcclintock@maine.gov

*Counsel for Plaintiff State of Maine*


MARTHA COAKLEY
ATTORNEY GENERAL OF
THE COMMONWEALTH OF MASSACHUSETTS

By:  /s/ I. Andrew Goldberg/AGF by permission
    I. Andrew Goldberg
    Assistant Attorney General
    Massachusetts Office of the Attorney General
    One Ashburton Place
    Boston, Massachusetts  02108
    (617) 727-2200
    andy.goldberg@state.ma.us

*Counsel for Plaintiff Commonwealth of Massachusetts*


LORI SWANSON
ATTORNEY GENERAL OF
THE STATE OF MINNESOTA

By:  /s/ Carla Heyl/AGF by permission
    Carla Heyl (admitted *pro hac vice*)
    Assistant Attorney General
    Minnesota Office of the Attorney General
    900 Bremer Tower
    445 Minnesota Street
    St. Paul, Minnesota  55101
    (651) 296-7341
    carla.heyl@state.mn.us

*Counsel for Plaintiff State of Minnesota*

16

KELLY A. AYOTTE
ATTORNEY GENERAL OF
THE STATE OF NEW HAMPSHIRE

By:  /s/ Maureen D. Smith/AGF by permission

    Maureen D. Smith (admitted *pro hac vice*)
    Senior Assistant Attorney General
    New Hampshire Office of the Attorney General
    33 Capitol Street
    Concord, New Hampshire  03301-6397
    (603) 223-6270
    maureen.smith@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*


ANNE MILGRAM
ATTORNEY GENERAL OF
THE STATE OF NEW JERSEY

By:  /s/ Michael Schuit/AGF by permission

    Michael Schuit (admitted *pro hac vice*)
    Deputy Attorney General
    New Jersey Office of the Attorney General
    Richard J. Hughes Justice Complex
    25 Market Street, P.O. Box 093
    Trenton, New Jersey  08625-0093
    (609) 633-2038
    michael.schuit@dol.lps.state.nj.us

*Counsel for Plaintiff State of New Jersey*

SUSAN SHINKMAN
CHIEF COUNSEL, COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION

By:  /s/ Robert A. Reiley/AGF by permission
    Robert A. Reiley (admitted *pro hac vice*)
    Assistant Counsel
    Pennsylvania Department of Environmental
     Protection
    400 Market Street
    Harrisburg, Pennsylvania  17105
    (717) 787-0478
    rreiley@state.pa.us

*Counsel for Plaintiff Commonwealth of Pennsylvania,*
*Department of Environmental Protection*


WILLIAM H. SORRELL
ATTORNEY GENERAL OF
THE STATE OF VERMONT

By:  /s/ Kevin O. Leske/AGF by permission
    Kevin O. Leske (admitted *pro hac vice*)
    Assistant Attorney General
    Vermont Office of the Attorney General
    109 State Street
    Montpelier, Vermont 05609-1001
    (802) 828-6902
    kleske@atg.state.vt.us

*Counsel for Plaintiff State of Vermont*

*New York v. Johnson*, Case No. 1:07 cv 10632 (BSJ) (DCF)

**Exhibit 1**
**to**
**Plaintiffs' Memorandum of Law in Support of Their**
**Motion to Supplement the Administrative Record**

# EXECUTIVE SUMMARY

The Emergency Planning and Community Right-to-Know Act (EPCRA), also known as Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA), created a broad range of emergency response planning and reporting requirements for manufacturers, processors, and users of toxic chemicals in the United States. Under section 313 of EPCRA, certain facilities are required to submit annual reports to the United States Environmental Protection Agency (EPA) and to States on their release(s), transfer(s), and waste management activities for certain toxic chemicals if they are manufactured, processed, or otherwise used above thresholds amounts. In addition, the Pollution Prevention Act (PPA) of 1990 requires these same facilities to report prevention, recycling, and other waste management information for these same chemicals. EPA maintains the data collected under EPCRA section 313 and the PPA in a database known as the Toxics Release Inventory (TRI).[1]

Since the inception of the TRI Program, EPA has implemented measures to reduce the reporting burden on the regulated universe of facilities, and make TRI reporting as user friendly as possible. These measures include compliance assistance activities, such as industry-specific guidance and annual training workshops. EPA also reduced the time spent completing the required TRI forms by developing the Toxics Release Inventory–Made Easy (TRI-ME) software and adding the Form A certification. In July 2005, EPA finalized the TRI Reporting Forms Modification Rule (70 FR 3991, July 12, 2005) that included general options for reducing the time, cost, and complexity of the reporting requirements imposed on facilities. (EPA refers to this rulemaking as the "Phase 1" burden reduction rulemaking.)

EPA is adding options for streamlining TRI reporting. The purpose of this rule is to provide additional burden reduction options without significantly compromising the quality of toxic chemical release data and of other waste management information. This additional set of burden reduction options will be referred to hereafter as the "Phase 2" burden reduction rulemaking.

## ES.1    CHANGES TO THE TRI REPORTING REQUIREMENTS

As described above, EPA has implemented a number of burden reduction measures. To build upon these efforts, EPA conducted a TRI Stakeholder Dialogue between Fall 2002 and early 2004. During this dialogue, improvements to the TRI reporting process were identified and a number of burden reduction options associated with TRI reporting were explored. After reviewing these improvements and reporting options, EPA has decided to divide the burden

---

[1]    The term *EPCRA section 313* properly refers to only the statutory requirements, while the term *TRI* properly refers to the database where the information collected under section 313 and under section 6607 of the PPA is stored. However, the terms have often been used interchangeably by the public to refer to the statute, the regulatory requirements, the reporting form, the database, and EPA's program to manage the data. In deference to common usage, the terms EPCRA section 313 and TRI are sometimes used interchangeably in this report where doing so will make the report simpler and easier to read.

reduction effort into phases: Phase 1) relatively simple modifications to the reporting forms and Phase 2) new and expanded eligibility for Form A. This economic analysis reflects the costs and impacts of the Phase 2 burden reduction rulemaking.  EPA is adopting the following two options that it believes may reduce reporting burden for TRI facilities:

- New Eligibility for Form A: PBT Chemicals -- allows a facility reporting on PBT chemicals, except dioxin and dioxin-like compounds, with zero disposal or other releases to use Form A, provided they meet the 1,000,000 pound alternate reporting threshold and have 500 pounds or less of total other waste management quantities.[1]  (Sections 8.2 – 8.8)
- Expanded Eligibility for Form A: Non-PBT Chemicals -- allows a facility reporting on Non-PBT chemicals with an annual reportable amount (ARA) (Sections 8.1 – 8.8) of 5,000 lbs or less and 2,000 lbs or less of disposal or other releases to use Form A, provided they meet the 1,000,000 pound alternate reporting threshold.

The definition of ARA has changed from the proposed rule.  In the proposal, ARA was defined as Sections 8.1 to 8.8 for PBTs, and as Sections 8.1 to 8.7 for non-PBTs.  Under the final rule, Section 8.8 has been added to the definition of non-PBTs, so that the definitions are consistent for all chemicals.  In addition, in consideration of the value of TRI information that would otherwise be lost, the Agency modified the proposal to restrict releases (as reported in Sections 5 and 6, Section 8.1 and Section 8.8) under the non-PBT option to 2,000 lbs.

## ES.2   ESTIMATED REPORTING ACTIVITY

The rule will affect only those forms (and the facilities that file them) that meet the criteria associated with each option. EPA is finalizing a combination of the two options.  These options do not overlap as one applies only to non-PBT chemicals while the other applies only to PBT chemicals. Note that there may be new facilities filing to TRI for the first time that may experience burden reduction due to the rule.  Without information on their reportable chemicals and amounts, however, it is not possible to determine the option for which they would qualify and they are thus not accounted for in this analysis.  Table ES-1 summarizes the number of affected facilities and forms when the options are combined.

In addition, as a result of the changes in the definition of the ARA described above, a limited number of facilities currently eligible to report non-PBT chemicals using the Form A may lose eligibility under the final rule.  The forms that may lose eligibility are those for which total production related waste reported is less than or equal to 500 pounds, but for which total production related and non-production related waste is greater than 5,000 pounds *or* total production related and non-production related disposal and other releases are greater than 2,000 pounds.  A discussion of the forms that may no longer be eligible to report using a Form A and associated burden and impacts is presented in Chapter Six.

---

[1] Non-PBTs are already qualified to certify on a Form A in lieu of completing a Form R if they meet applicable criteria.

**TABLE ES-1**
**UNIVERSE OF AFFECTED FACILITIES AND FORMS**
**BY OPTION**

|  | New Eligibility for Form A: PBT Chemicals Option | Expanded Eligibility for Form A: Non-PBT Chemicals Option[a] | Combined Options |
|---|---|---|---|
| Total Number of Affected Facilities | 1,796 | 5,317 | 6,670 |
| Total Number of Affected Forms | 2,360 | 9,501 | 11,861 |

*[a] The number of affected non-PBT forms in this analysis does not include the non-PBT Form Rs that are currently likely eligible for Form A based on an ARA (currently defined as the sum of Sections 8.1-8.7) of less than or equal to 500 pounds.*

*Note: In this analysis, all TRI data are summed at the facility-chemical level.*

*Source: Frozen RY2004 TRI data.*

## ES.3   BURDEN AND COST SAVINGS POTENTIALLY ASSOCIATED WITH THE RULE

As shown in Table ES-2 the total potential national burden savings estimated for the combined options is 123,404 hours for TRI reporters submitting first and subsequent year reports.  First year TRI reporters have greater form calculation and completion burden than subsequent year TRI reporters because of a variety of factors including the absence of prior year calculations and lack of familiarity with chemical use and management at the reporting facility.  Approximately 96 percent of all TRI reports are subsequent year reports.   Table ES-2 also shows an estimated total national cost savings of $5,925,208 in the first and subsequent years when the options are combined.  EPA notes that approximately 50 percent of non-PBT chemical reports that currently appear to qualify for Form A under the 500 lb Annual Reportable Amount (ARA) threshold are still reported on Form R.  These may be facilities that exceed the 1,000,000 alternate manufacture, processing or otherwise use threshold, or they may choose to report on Form R for some other reason (e.g., minimal burden reduction from use of Form A, desire to be seen as "good environmental stewards").  EPA assumes that, similarly, not all newly eligible facilities under today's rule will choose to use Form A, and that the actual burden reduction and impacts of the rule will thus be less than the potential estimates presented below.

**TABLE ES-2**
**ANNUAL BURDEN AND COST SAVINGS**

| | New Eligibility for Form A: PBT Chemicals Option | Expanded Eligibility for Form A: Non-PBT Chemicals Option[a] | Combined Options |
|---|---|---|---|
| *Number of Affected Facilities* | *1,796* | *5,317* | *6,670* |
| *Number of Affected Forms* | *2,360* | *9,501* | *11,861* |
| *Average Annual Burden Savings in the First and Subsequent Years of the Rule (Hours)* | | | |
| Form Completion - non-PBT chemicals | N/A | 67,922 | 67,922 |
| Form Completion - PBT chemicals | 31,760 | N/A | 31,760 |
| Recordkeeping/Mailing | 4,720 | 19,002 | 23,722 |
| **Total** | **36,480** | **86,924** | **123,404** |
| *Average Annual Cost Savings in the First and Subsequent Years of the Rule* | | | |
| Form Completion - non-PBT chemicals | N/A | $3,335,628 | $3,335,628 |
| Form Completion - PBT chemicals | $1,560,140 | N/A | $1,560,140 |
| Recordkeeping/Mailing | $204,829 | $824,611 | $1,029,440 |
| **Total** | **$1,764,969** | **$4,160,239** | **$5,925,208** |

[a] *The number of affected facilities and forms in this analysis does not include the non-PBT Form Rs that are currently likely eligible for Form A based on an ARA of less than or equal to 500 pounds.*

*The number of facilities cannot be summed across form types because some facilities filed both PBT and non-PBT forms.*

*Source: Frozen RY2004 TRI data and Wage Rates from the U.S. Department of Labor (see Chapter 2).*

## ES.4   BENEFITS OF THE RULE

EPA believes that the changes addressed in this rulemaking will reduce reporting burden and save resources for regulated entities without significantly compromising the usefulness of TRI information to the public. Estimated savings are reported above. In addition, the rule will provide incentives to reduce or eliminate releases (especially for PBT chemicals) and encourage source reduction. While EPA believes this benefit could be significant, EPA is not able to quantitatively estimate the volume of releases that would be eliminated, or other waste management activities replaced by source reduction, due to lack of data.

## ES.5  IMPACTS OF THE RULE ON REPORTING

Under the New Eligibility for Form A: PBT Chemicals Option, only reports with zero pounds disposed or otherwise released would be eligible for Form A reporting. Therefore, no data would no longer be reported on disposal or other releases. Information would not be reported, however, regarding the use(s) of the chemical (i.e., was the chemical manufactured, processed, or otherwise used), the maximum amount of the chemical on site at any time during the calendar year, and the production ratio. Examples of additional information that would not be reported on Form R includes information on recycling small amounts of lead and lead compounds and mercury and mercury compounds and information on recycling, energy recovery, or treatment of PACs, including benzo(g,h,i)perylene, and other organic chemicals.

For this information, however, the Form A provides a range (zero to 500 lbs) estimate of the ARA. In total, less than 0.01 percent of total production related waste and 0.01 percent total non-production related waste (Table ES-3) would no longer be reported on Form R as a result of this option, even if all eligible facilities used Form A. Since it is unlikely that this will happen, the actual impacts will likely be even smaller. In addition, Table ES-4 shows that for the majority of chemicals (95%) less than 10% of their total production related waste may no longer be reported on Form R. For 91% of chemicals, less than 10% of their total non-production related waste may no longer be reported on Form R.

**TABLE ES-3**
**PERCENTAGE OF TOTAL RELEASES AND OTHER WASTE MANAGEMENT POUNDS NOT REPORTED DUE TO NEW AND EXPANDED FORM A ELIGIBILITY**

|  | Total Releases Not Reported | | Total Production Related Waste Not Reported | | Total Non-Production Related Waste Not Reported | |
|---|---|---|---|---|---|---|
|  | Lbs | Percentage | Lbs | Percentage | Lbs | Percentage |
| **New Eligibility for Form A: PBT Chemicals Option** | 0 | 0.00% | 83,129 | 0.01% | 283 | 0.01% |
| **Expanded Eligibility for Form A: Non-PBT Chemicals Option** | 5,713,104 | 0.14% | 16,052,663 | 0.06% | 83,832 | 0.48% |

The Expanded Eligibility for Form A: Non-PBT Chemicals Option extends the existing alternate reporting threshold from 500 pounds to 5,000 pounds, including quantities reported to Section 8.8 (non-production related waste) for reports with less than or equal to 2,000 pounds of on- and off-site disposal and other releases. For forms qualifying under this option, specific release and other waste management information will no longer be reported on Form R as well as information regarding the use(s) of the chemical (i.e. was the chemical manufactured, processed, or otherwise used), the maximum amount of the chemical on site at any time during the calendar year, and the production ratio. To evaluate the extent of data that may no longer be reported on Form R, EPA examined the volume of total releases, total production related waste, total non-production related waste and total combined production and non-production related waste that are currently reported on Form Rs that would qualify for this option. In total, approximately 0.14% of total releases, 0.06% of total production related waste and 0.48% of total non-production related waste may no longer be reported on Form R (Table ES-3). At the chemical-specific level, Table ES-5 shows that for the majority of chemicals (82%), less than 10% of their total releases may no longer be reported on Form R. For 5% of chemicals, between 50% and 99% of their releases pounds may no longer be reported on Form R and for 6% of chemicals, 100% of their release pounds may no longer be reported on Form R. Table ES-5 shows similar results for total production related waste. Specifically, for 91% of chemicals, less than 10% of their total production related waste may no longer be reported on Form R. For 6% of chemicals, 100% of their total production related waste pounds may no longer be reported on Form R. For 95% of chemicals, less than 10% of their total non-production related waste may no longer be reported on Form R. For 1% of chemicals, 100% of their total non-production related waste

pounds may no longer be reported on Form R. Those chemicals for which a large share of releases and/or production related waste may not be reported on Form R are those with relatively few Form Rs and/or relatively small quantities per form (see Table A-3 in Appendix A for chemicals where 100% of total releases may not be reported). EPA again emphasizes that Form A serves as a range report of 0 to 2,000 lbs for the release information and 0 to 5,000 lbs for the total waste management information no longer reported on Form R. This range is wider than for PBT chemicals because of the broader eligibility requirements.

Extending the alternate reporting threshold will also affect the distribution of TRI reporting at the community level. EPA evaluated the impact of this option on local communities using a postal zip code analysis. As shown in Table ES-6, under the final rule, 47% of all zip codes with Form R reports would have at least one Form R eligible for Form A reporting and 6% of zip codes would have all current Form Rs eligible for Form A reporting. As can also be seen from the table, those zip codes where all Form Rs would be eligible tend to have only a small number of Form Rs to start.

**TABLE ES-4**
**PERCENT OF CHEMICALS WITHIN VARIOUS RANGES OF RELEASES AND OTHER WASTE MANAGEMENT THAT WOULD BE ELIGIBLE FOR FORM A REPORTING (PBT OPTION)**

| Percent of Pounds Eligible for Form A Reporting | Total Releases (Sections 5&6) | Total Production Related Waste (Sections 8.1-8.7) | Non-Production Related Waste (Section 8.8) | Total Waste (Sections 8.1-8.8) |
|---|---|---|---|---|
| 100% of pounds | 0% | 0% | 0% | 0% |
| 99 - 50% of pounds | 0% | 0% | 0% | 0% |
| 49 - 10% of pounds | 0% | 5% | 9% | 5% |
| 9 - >0% of pounds | 0% | 65% | 45% | 65% |
| 0% of pounds | 100% | 30% | 45% | 30% |
| Note: Percentages above do not always add to 100% due to rounding. | | | | |

**TABLE ES-5**
**PERCENT OF CHEMICALS WITHIN VARIOUS RANGES OF RELEASES AND OTHER**
**WASTE MANAGEMENT THAT WOULD BE ELIGIBLE FOR FORM A REPORTING**
**(NON-PBT OPTION)**

| Percent of Pounds Eligible for Form A Reporting | Total Releases (Sections 5&6) | Total Production Related Waste (Sections 8.1-8.7) | Non-Production Related Waste (Section 8.8) | Total Waste (Sections 8.1-8.8) |
|---|---|---|---|---|
| 100% of pounds | 6% | 6% | 1% | 6% |
| 99 - 50% of pounds | 5% | 0% | 2% | 0% |
| 49 - 10% of pounds | 8% | 3% | 3% | 3% |
| 9 - >0% of pounds | 44% | 56% | 12% | 56% |
| 0% of pounds | 38% | 35% | 83% | 35% |
| Note: Percentages above do not always add to 100% due to rounding. | | | | |

**TABLE ES-6**
**ZIP CODES ELIGIBLE FOR FORM A REPORTING**
**(PBT AND NON-PBT OPTIONS)**

| | Number of Zip Codes | Percent of Total Zip Codes Containing Form Rs | Average Number of Form Rs per Zip Code |
|---|---|---|---|
| Zip codes with at least one Form R newly eligible for Form A | 4,246 | 47.4% | 13.55 |
| Zip codes with all Form Rs newly eligible for Form A | 557 | 6.2% | 2.04 |
| Note: Based on the RY2004 Frozen TRI data, there are 8,961 five-digit zip codes with TRI Form R data. Source: Frozen RY2004 TRI data. | | | |

## ES.6  REDUCED FORM A ELIGIBILITY FOR NON-PBTS

In response to comments on the proposed rule, the definition of the ARA (e.g. the eligibility criteria for use of Form A) for both PBTs and non-PBTs is now defined as the sum of Sections 8.1-8.8, as opposed to Sections 8.1-8.7 as it is currently defined for non-PBTs. As a result of this change, a limited number of facilities previously eligible to use Form A for non-PBT chemicals will lose eligibility under the final rule and would, therefore, experience an increase in reporting burden. Forms that may lose eligibility are those for which total production related waste is less than or equal to 500 pounds, but for which total production related and non-production related waste is greater than 5,000 pounds *or* total production related and non-production related disposal and other releases are greater than 2,000 pounds. The exact number of newly ineligible Form As and affected facilities cannot be calculated because waste management and one-time release quantities are unknown for current Form A users. However, a reasonable estimate can be made if it is assumed that the approximately 10,000 Form Rs that appear to be eligible for Form A at the 500-pound ARA are representative of the approximately 11,000 Form As currently filed under the 500-pound ARA.

EPA estimated that approximately 95 Form As filed by 63 facilities will be newly ineligible as a result of the final rule. Table ES-7 shows the national burden and cost estimates for first and subsequent year reporters associated with newly ineligible Form As. The table shows an estimated total potential burden increase of 869 hours and total cost increase of $41,598 as a result of the rule.

**TABLE ES-7**
**ANNUAL BURDEN AND COSTS**

|  | New Ineligibility for Form A: Non-PBT Chemicals Option |
|---|---|
| *Number of Affected Facilities* | *63* |
| *Number of Affected Forms* | *95* |
| *Average Annual Burden Increase in the First and Subsequent Years of the Rule (Hours)* | |
| Form Completion - non-PBT chemicals | 679 |
| Recordkeeping/Mailing | 190 |
| **Total** | **869** |
| *Average Annual Burden Cost Increase in the First and Subsequent Years of the Rule* | |
| Form Completion - non-PBT chemicals | $33,353 |
| Recordkeeping/Mailing | $8,245 |
| **Total** | **$41,598** |
| *Source: Frozen RY2004 TRI data and Wage Rates from the U.S. Department of Labor (see Chapter 2).* | |

To evaluate the potential data gain, EPA examined the volume of total production related waste and total non-production related waste that would be newly reported under the rule. Since Form A does not provide specific waste management quantities, pounds associated with Form As that may become newly ineligible as a result of today's rule were extrapolated using data from Form Rs that appear to be eligible for Form A at the 500-pound ARA. In total, EPA estimates that less than 0.00003% of total production related waste would be newly reported as a result of new ineligibility for Form A under the non-PBT option. However, there would be an estimated 20% increase in total non-production related waste newly reported.

**TABLE ES-8**
**POUNDS AND PERCENTAGE OF TOTAL PRODUCTION RELATED AND NON-PRODUCTION RELATED WASTE POUNDS NEWLY REPORTED**

|  | Total Production Related Waste Newly Reported | | Total Non-Production Related Waste Newly Reported | |
|---|---|---|---|---|
|  | Lbs | Percentage | Lbs | Percentage |
| **New Ineligibility for Form A: Non-PBT Chemicals Option** | 8,276 | 0.00003% | 3,514,380 | 20.3% |
| *Source: Frozen RY2004 TRI data* | | | | |

# CHAPTER ONE
## BACKGROUND AND OVERVIEW OF ANALYSIS

The Emergency Planning and Community Right-to-Know Act (EPCRA), also known as Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA), created a broad range of emergency response planning and reporting requirements for manufacturers, processors, and users of toxic chemicals in the United States. 42 U.S.C. §§ 11001-11050. Under section 313 of EPCRA, certain facilities are required to submit annual reports to the United States Environmental Protection Agency (EPA) and to States on their release, transfer, and waste management activities of certain toxic chemicals if they are manufactured, processed, or otherwise used above thresholds amounts. In addition, the Pollution Prevention Act (PPA) of 1990 requires these same facilities to report pollution prevention, recycling, and other waste management information for these same chemicals. EPA maintains the data collected under EPCRA section 313 and the PPA in a database known as the Toxics Release Inventory (TRI).[1]

Since the inception of the TRI Program, EPA has implemented measures to reduce the reporting burden on the regulated universe and to make TRI reporting as user friendly as possible. These measures include compliance assistance activities, such as industry-specific guidance and annual training workshops. EPA also reduced the time spent completing the required TRI forms by developing the Toxics Release Inventory–Made Easy (TRI-ME) software and adding the Form A certification. In January 2005, EPA promulgated the TRI Reporting Forms Modification Rule (70 FR 39931, July 12, 2005) that included general options for reducing the time, cost, and complexity of the reporting requirements imposed on facilities. (EPA refers to this rulemaking as the "Phase 1" burden reduction rulemaking.)

EPA is now adding options for streamlining TRI reporting. The purpose of this rule is to provide additional burden reduction options without significantly compromising the quality of toxic chemical release data and of other waste management information. This additional set of burden reduction options will be referred to hereafter as the "Phase 2" burden reduction rulemaking.

This report analyzes economic effects of the Phase 2 burden reduction options. To understand the effects of the rule, however, it is first necessary to understand how EPCRA section 313 and TRI currently operate. This chapter provides an overview of TRI followed by a description of the rule and organization of the report.

---

[1] The term "EPCRA section 313" properly refers to only the statutory requirements, while the term "TRI" properly refers to the database that stores the information collected both under EPCRA section 313 and under section 6607 of the PPA. However, the terms are have often been used interchangeably by the public to refer to the statute, the regulatory requirements, the reporting form, the database, and/or and EPA's program to manage the data. In deference to common usage, the terms EPCRA section 313 and TRI are sometimes used interchangeably in this report where doing so will make the report simpler and easier to read.

## 1.1    OVERVIEW OF TRI

In 1986, Congress passed the Emergency Planning and Community Right-to-Know Act (EPCRA). The law was passed in response to the accidental release of methyl isocyanate gas in Bhopal, India, in December 1984, and to a number of chemical accidents in the United States, including one in Institute, West Virginia. These accidental releases highlighted the lack of information readily available to the public about toxic chemicals being manufactured, processed, used, and transported within their communities. EPCRA is based on the premise that the public has the right to know about the use of chemicals, as well as their routine and accidental releases. The broad purposes are to encourage planning for response to accidental chemical releases as well as daily management of routine releases, and to provide the public and government agencies with information about the presence, release, and management of toxic chemicals.

EPCRA contains four main provisions:

- Planning for chemical emergencies (sections 301-303),
- Emergency notification of chemical accidents and releases (section 304),
- Reporting of hazardous chemical inventories (sections 311-312), and
- Toxic chemical release reporting (section 313).

Because this rule falls under section 313 (and not the other sections of EPCRA), the remainder of this overview deals only with the TRI provisions of section 313.

The first regulations implementing EPCRA section 313 were promulgated on February 16, 1988 (53 FR 4500), and are codified at 40 CFR part 372. Under these original regulations, owners or operators of regulated facilities must complete the Toxic Chemical Release Inventory Reporting Form R, which includes information on releases to air, water, and land, as well as on-site waste treatment and transfers of the chemical to off-site locations.

A facility must report under section 313 if it meets all of the following three criteria:

(1)    It is in an Industrial Classification code covered by the regulations;
(2)    It has ten or more full-time employees (or the hourly equivalent of 20,000 hours); and
(3)    It manufactures, processes, or otherwise uses any of the listed toxic chemicals or chemical categories above the applicable reporting threshold.

Facilities must submit the forms each calendar year to both EPA and the State in which the facility is located by July 1 of the following year.

A completed Form R must be submitted for each toxic chemical manufactured, processed, or otherwise used over threshold levels at each regulated facility as described in 40 CFR part 372. For most chemicals, threshold levels are set at 25,000 lbs for manufacturing and processing and 10,000 lbs for otherwise use. 40 C.F.R. § 372.25. Over 600 toxic chemicals and chemical compound categories are currently on the list of TRI chemicals.

TRI is unique among environmental databases because of the multimedia data it collects, and because it was designed for public access. EPCRA requires that EPA "establish and maintain in a computer database a national toxic chemical inventory based on data submitted to the Administrator." 42 U.S.C. § 11023(j). EPA maintains the section 313 data in the national TRI database. TRI data are available to the public in a variety of formats, including on-line and CD-ROM. With its broad dissemination, TRI data is used extensively by the public. Facilities use the data obtained through TRI to better understand their operations, and make better use of pollution prevention opportunities. Public-interest groups use the data to educate themselves on the presence of toxic chemicals in the environment, and use that improved information to engage in a meaningful, productive dialogue with industry and with all levels of government. In general, TRI data have proven to be a powerful tool in environmental decision-making.

### 1.1.1   Pollution Prevention Act

In 1990, Congress passed the Pollution Prevention Act (PPA), which adopted as national policy an environmental hierarchy that establishes pollution prevention as the first choice among waste management options. 42 U.S.C. §§ 13101-13109. For waste that cannot be prevented at the source, recycling is considered the next best option. Treatment or disposal should be considered only after source reduction and recycling have been eliminated as options. Section 6607 of the PPA supplemented the information reported under EPCRA section 313 by requiring facilities to also report information on their pollution prevention, recycling, and other waste management activities. The data elements required by the Pollution Prevention Act are included as Section 8 of Form R.

### 1.1.2   Changes to the List of Chemicals

When Congress passed EPCRA it provided an initial list of approximately 300 chemicals and chemical categories subject to TRI reporting. The statutory list was derived from chemical lists used in New Jersey and Maryland. Congress also included a provision in EPCRA that EPA may amend the list of chemicals subject to TRI reporting. Under section 313(d), EPA has the authority to add a chemical to the list if it determines that the chemical can cause or can be reasonably anticipated to cause:

- Adverse acute human health effects at concentration levels reasonably likely to exist beyond facility site boundaries as a result of continuous or frequently recurring releases;
- In humans, cancer or teratogenic effects, serious or irreversible reproductive dysfunctions, neurological disorders, heritable genetic mutations, or other chronic health effects; or
- A significant adverse effect on the environment. See, 42 U.S.C.§ 11023(d).

EPA has added chemicals to the list through its authority under section 313(d). Most notably, EPA added 286 chemicals and chemical categories to the list of toxic chemicals subject to TRI on November 30, 1994 (59 FR 61432). The majority of these chemicals are pesticides. Many of the remainder are chemicals either regulated or identified as concerns under other environmental statutes such as the Clean Air Act, the Clean Water Act, and the Safe Drinking Water Act.

EPA may delete a chemical from the list if it does not meet any of the above criteria found in 313(d). According to section 313(e) of EPCRA, any person may petition EPA to add or delete a chemical from the list on the basis of whether or not it meets the above criteria. See 42 U.S.C. § 11023(e). All changes to the list are made through rulemaking under the Administrative Procedure Act (APA).

### 1.1.3   Alternate Threshold

On November 30, 1994, EPA finalized the "TRI Alternate Threshold for Facilities with Low Annual Reportable Amounts" (59 FR 61488). This rule was intended to reduce the compliance burden associated with EPCRA section 313. It established a streamlined reporting option for facilities where the annual reportable amount of a listed chemical released or managed does not exceed 500 pounds.[2] Such facilities have the option of applying an alternate manufacture, process, or otherwise use threshold of 1 million pounds to that chemical, instead of the standard thresholds of 10,000 or 25,000 pounds. If a facility does not exceed the 1 million-pound threshold, then that facility is eligible to submit Form A for that chemical instead of Form R. Form A is a simplified reporting form that includes facility identification information and identifies the chemical or chemical category being reported. The form must be submitted on an annual basis.

### 1.1.4   Executive Order 12856

On August 3, 1993, Executive Order 12856, "Federal Compliance with Right-to-Know Laws and Pollution Prevention Requirements" was signed by the President (58 FR 41981). The Executive Order requires federal facilities to comply with EPCRA requirements beginning with the 1994-reporting year. The Executive Order also asks all federal agencies to set a voluntary goal of 50% reduction from baseline quantities of their releases and transfers by 1999.

### 1.1.5   Changes to the List of Industries

On May 1, 1997, EPA added facilities in seven industry groups to the list of facilities subject to the reporting requirements of section 313 (62 FR 23833). Prior to this action, reporting was limited to facilities in the manufacturing sector (SIC codes 20-39) and federal facilities. This action added facilities in the following sectors:

- Metal mining,
- Coal mining,
- Electric utilities,
- Commercial hazardous waste treatment, storage, and disposal facilities
- Chemicals and allied products-wholesale,
- Petroleum bulk terminals and plants-wholesale, and

---

[2]  The annual reportable amount is equal to the combined total quantities recycled, combusted for energy recovery, treated, or released. It can be calculated as is the sum of data elements 8.1 through 8.7 on Form R.

- Solvent recovery services.

The first reports from these facilities were submitted in 1999 for reporting year 1998.

### 1.1.6    Changes for Certain PBT Chemicals

On October 29, 1999, EPA lowered reporting thresholds to 10 or 100 pounds for certain TRI chemicals (persistent, bioaccumulative and toxic chemicals, or PBT chemicals) that are of concern because of their tendency to persist and bioaccumulate (64 FR 58666). EPA also added to TRI certain PBT chemicals that were not already listed including a dioxin category with a reporting threshold of 0.1 gram. At this time EPA made other changes to PBT chemical reporting, such as disallowing the use of the *de minimis* exemption, range reporting, and Form A reporting for PBT chemicals. 40 CFR § 372.28(b). On January 17, 2001, EPA lowered the reporting threshold for lead and lead compounds to 100 pounds and applied the same limitations as are applied to other PBT chemicals. 40 CFR § 372.28.

### 1.2    DESCRIPTION OF THE RULE

As described above, EPA has implemented a number of burden reduction measures. To build upon these efforts, EPA conducted a TRI Stakeholder Dialogue between Fall 2002 and early 2004. During this dialogue, improvements to the TRI reporting process were identified and a number of burden reduction options associated with TRI reporting were explored. After reviewing these improvements and reporting options, EPA has decided to divide the burden reduction effort into phases: Phase 1) relatively simple modifications to the reporting forms, and Phase 2) new and expanded eligibility for Form A.

EPA is adopting two options that it believes may reduce reporting burden for TRI facilities. Some facilities may qualify for both options, however, for different chemicals. Although these options could be promulgated separately, EPA is combining the options in this rule. The following sections outline the specific options that are being promulgated.

### 1.2.1    New Eligibility for Form A: PBT Chemicals

This option allows facilities reporting on PBT chemicals (except dioxin and dioxin-like compounds) with no on- or off-site disposal or other releases (as reported in Sections 5 and 6, Section 8.1 and Section 8.8) and positive other waste management quantities in Sections 8.2 - 8.8, to use Form A. Facilities must also not manufacture, process, or otherwise use more than 1,000,000 pounds of the chemical and must have less than or equal to 500 pounds of total non-release waste management quantities in Sections 8.2 through 8.8. Note that the 500 pound annual reportable amount (ARA) is calculated differently under this rule than the current approach for Form A. For this option, reporting facilities will sum the other waste management activities in Sections 8.2 through 8.8 (8.8 is non-production related waste) to determine if their annual reportable amount (ARA) is less than or equal to 500 pounds. To use the New Eligibility for Form A: PBT Chemicals Option, Section 8.8 quantities cannot include release or disposal quantities. This approach differs from the current Form A reporting requirements in that reporters must also include Section 8.8 non-release quantities when calculating the ARA. If this

calculation totals less than or equal to 500 pounds, the reporting facility may use Form A to report in lieu of Form R.[1]

### 1.2.2  Expanded Eligibility for Form A: Non-PBT Chemicals

TRI reporters are currently able to take advantage of the alternate reporting threshold if they have an ARA (defined currently as the sum of Sections 8.1-8.7) of 500 pounds or less. Under this rule, the ARA is defined as the total of all production related and non-production related quantities released (on- and off-site), treated, recycled, and combusted for energy recovery at the facility, plus all amounts transferred off-site from the facility for the purpose of recycling, energy recovery, treatment, and/or disposal. This option extends the existing Form A eligibility criteria and allows a facility reporting on Non-PBT chemicals with less than or equal to 2,000 lbs of on- and off-site disposal and other releases in Sections 5 and 6, Section 8.1 and Section 8.8 and with an ARA of 5,000 lbs or less to use Form A, provided they meet the 1,000,000 pound alternate reporting threshold.  As noted above, the 5,000 pound ARA is calculated differently under this rule than under the previous approach for calculating Form A eligibility.  For this option, reporting facilities will sum Sections 8.1 through 8.8 (8.8 is non-production related waste) to determine if their annual reportable amount (ARA) is less than or equal to 5,000 pounds.[2]

### 1.3     ORGANIZATION OF THIS REPORT

This report examines the potential burden and cost savings to industry that would result from the broad, comprehensive set of regulatory burden reduction options described above.  This report also estimates the other impacts of the rule.  The remainder of the report is organized as follows:

> **Chapter 2** presents the methodology used to estimate the unit burden, unit costs, and impacts of the Phase 2 rule.
> **Chapter 3** presents the total burden and cost savings associated with the rule.
> **Chapter 4** summarizes the benefits of the rule.
> **Chapter 5** presents the impacts of the rule on reporting.
> **Chapter 6** discusses the impact of adding Section 8.8 to the ARA.
> **Chapter 7** addresses small business impacts.

---

[1] The New Eligibility for Form A: PBT Chemicals Option did not change between the proposed and final rulemakings.
[2] Under the proposed rulemaking, the Expanded Eligibility for Form A: Non-PBT Option applied to all forms with less than or equal to 5,000 pounds of total production related waste as reported in Sections 8.1-8.7.

# CHAPTER TWO
# METHODOLOGY

For the Phase 2 burden reduction rule, EPA must estimate the burden and cost savings, as well as other impacts associated with the options adopted. This chapter presents the methodologies used to estimate: 1) the unit time and cost savings experienced by TRI reporters as a result of the rule, and 2) the number of facilities and forms that would be able to take advantage of each option separately and combined.

As explained in more detail in Chapter One, EPA is adopting two options that it believes may reduce reporting burden for TRI facilities. The New Eligibility for Form A: PBT Chemicals Option allows a facility reporting on PBT chemicals (except for dioxin and dioxin-like compounds) with no on- or off-site disposal or other releases (as reportable in Sections 5 and 6, Section 8.1 and Section 8.8) to use Form A, provided they meet the 1,000,000 pound alternate reporting threshold and have no more than 500 pounds in Sections 8.2 through 8.8. The Expanded Eligibility for Form A: Non-PBT Chemicals Option extends the existing Form A eligibility criteria and allows a facility reporting on Non-PBT chemicals with less than or equal to 2,000 pounds of on- and off-site disposal or other releases (as reportable in Sections 5 and 6, Section 8.1 and Section 8.8) and with an annual reportable amount (Sections 8.1 – 8.8) of 5,000 lbs or less to use Form A, provided the facility meets the 1,000,000 pound alternate reporting threshold.

Some facilities may qualify for both options, however, for different chemicals. Although these options could be promulgated separately, EPA is combining the options in this rule.

Industry burden and cost savings were calculated using the following four-step procedure:

Step 1:   Estimate the typical total number of hours of managerial, technical, and clerical labor needed to complete each task for each type of form.

Step 2:   Calculate the hours saved by each labor category for each task due to filing a less burdensome form. Based on typical labor rates, calculate the average unit savings in the first and subsequent years of compliance.

Step 3:   Estimate the universe of affected forms and facilities that would qualify for each of the burden reduction options.

Step 4:   For each task, multiply the unit savings by the number of facilities and/or forms, and then sum the results to calculate the total industry savings.

## 2.1     UNIT BURDEN SAVINGS ESTIMATES

The rule will result in burden savings by reducing reporting requirements for forms that meet certain criteria.  The tasks associated with TRI reporting under the rule include:

- **Report Completion:** Facilities must gather data and perform calculations to provide the information required on Form R or Form A.
- **Mailing and Recordkeeping:** Facilities must maintain recordkeeping systems and mail their reports to EPA and the State.

To estimate the total burden and cost savings, EPA first calculated the unit burden savings as the difference between the facility's current activity (i.e., filing a Form R) and the post-regulation activity (i.e., filing a Form A).  Unit burden and cost savings are then multiplied by the estimated number of forms newly eligible for Form A reporting under each option to obtain total burden and cost savings.  Total burden and cost savings are presented in Chapter Three.

### 2.1.1     Form R and Form A Unit Burden Estimates

The current burden estimates for form completion estimates, which are approved by the Office of Management and Budget (OMB), reflect the total time required by facilities to complete either a Form R or a Form A.  The OMB-approved reporting burden estimates are presented in Table 2-1.  The estimate of total burden savings due to the rule is developed by combining the estimated unit burden savings under each option with the number of potentially affected forms under each option. Unit burden savings are calculated by subtracting the unit reporting burden associated with filling out a Form A from the unit reporting burden associated with filing a Form R.  The unit reporting burden estimates used in this analysis have been adjusted to reflect burden savings associated with Phase 1.  In the analysis, Form A calculations and report completion burden is assumed to be 17.5 hours for non-PBT chemicals and 32.9 hours for PBT chemicals.  The 17.5 hours is based on the current OMB approved burden estimate. Since there is no approved estimate for using Form A for PBT chemicals, the 17.5 hours was adjusted proportionately to the difference between the OMB approved burden estimates for Form R calculations and report completion for non-PBT chemicals and PBT chemicals (i.e., 24.6 hours and 46.3 hours, respectively).  This resulted in an adjustment of the current 17.5 hours for Form A for non-PBT chemicals to 32.9 hours for Form A for PBT chemicals.

### 2.1.2     Hourly Labor Rate Estimate

Each cost savings estimate has two components: the unit time savings estimates (i.e., number of labor hours saved by each type of personnel), and the hourly wage rate of each level of personnel.  There are three categories of hourly wage rates: managerial, technical, and clerical. EPA developed updated 2006 hourly wage rates, including fringe benefits and overhead, for each of these categories.  Average wage data for these categories were taken from the Employer Costs for Employee Compensation (ECEC) report by the Bureau of Labor Statistics (BLS) for all goods-producing, private industries.[3]  The managerial labor rate is defined as the average hourly

---

[3]  Employer Costs for Employee Compensation, Private industry workers, Goods-producing industries, white-collar occupations, as published by the U.S. Department of Labor, Bureau of Labor Statistics. The March 2006 values for

wages and salaries for the "Management, business, and financial" occupational category. The technical labor rate is defined as the average hourly wages and salaries for the "Professional and related" occupational category. The clerical labor rate is defined as the average hourly wages and salaries for the "Office and administrative support" occupational category.

The additional cost of benefits, such as paid leave and insurance, is also derived from the ECEC data. Loading factors for benefits are calculated separately for managerial, technical, and clerical labor by dividing the benefits percentage of total compensation by the wage percentage of total compensation (e.g., 0.29/0.71 = 0.4085).

An additional loading factor of 17 percent is applied for general overhead. This loading factor is added to the benefits loading factor, then applied to the base wage (e.g., $33.61/hr x [1 + (0.4085 + 0.17)] = $53.05/hr). The total loading for indirect costs is within the range of 50 to 70 percent suggested in EPA guidance.[4] The results of this method are shown in Table 2-2.

---

these series are listed in Table 11 of the *Employer Costs for Employee Compensation Summary*, released June 21, 2006.
[4] U.S. Environmental Protection Agency, *EPA Air Pollution Control Cost Manual, Sixth Edition*, EPA-452-02-001, January 2002, pg. 2-34.

**TABLE 2-1**
**OMB-APPROVED FORM R AND FORM A UNIT BURDEN ESTIMATES**

| Activity | Unit Time Estimates (hours) (per form) | | | Total Time |
|---|---|---|---|---|
| | Managerial | Technical | Clerical | |
| **Form R** | | | | |
| *Subsequent Years* | | | | |
| Calculations and Report Completion - PBT Chemicals | 14.1 | 30.4 | 1.9 | 46.3 |
| Calculations and Report Completion - Non-PBT Chemicals | 7.5 | 16.1 | 1.0 | 24.6 |
| Recordkeeping/Submission | 0.0 | 4.0 | 1.0 | 5.0 |
| **Form A** | | | | |
| *Subsequent Years* | | | | |
| Calculations and Report Completion - PBT Chemicals | 11.3 | 20.2 | 1.4 | 32.9 |
| Calculations and Report Completion – Non-PBT Chemicals | 6.0 | 10.7 | 0.8 | 17.5 |
| Recordkeeping/Submission | 0.0 | 2.4 | 0.6 | 3.0 |
| *Note: Due to rounding, the total may not equal the sum of the row.* | | | | |
| *Sources: 2006 TRI ICR - "Toxic Chemical Release Reporting"; October, 2005* | | | | |
| *2006 TRI ICR - "Toxic Chemical Release Inventory Alternate Threshold for Low Annual Reportable Amounts"; August, 2005* | | | | |

**TABLE 2-2**
**DERIVATION OF LOADED HOURLY RATES FOR TRI FORM COMPLETION**

| Labor Category | 2006 Average Wages | 2006 Benefits and Overhead Loading Factor | 2006 Loaded Hourly Rate |
|---|---|---|---|
| Managerial | $35.15 | 1.61 | $56.48 |
| Technical | $30.37 | 1.58 | $48.12 |
| Clerical | $15.17 | 1.62 | $24.50 |
| *Source: Employer Costs for Employee Compensation (ECEC) report by the Bureau of Labor Statistics (BLS).* | | | |

Total cost savings are presented in Chapter Three.

### 2.1.3  Summary of Unit Burden Savings

As discussed in Section 2.1, the unit burden savings are calculated as the difference between the facility's current activity (i.e., filing a Form R) and the post-regulation activity (i.e., filing a Form A).  Because facilities are already familiar with Form A, there will be little difference between the average burden they incur in the first year of the rule and all subsequent years of the rule. Furthermore, since these facilities are already reporting to TRI, they are not expected to incur any significant rule familiarization burden. The unit burden savings in the two options differs because the Form R and Form A form completion estimates are higher for PBT chemicals than Non-PBT chemicals. Table 2-3 summarizes the unit burden savings associated with the two options.

**TABLE 2-3**
**UNIT BURDEN AND COST SAVINGS FOR ACTIVITIES PERFORMED BY INDUSTRY**

| Activity | Unit Time Estimates (hours) (per form) | | | | Unit Cost (2006 Dollars) |
|---|---|---|---|---|---|
| | **Managerial** | **Technical** | **Clerical** | **Total** | |
| *Average Annual Burden and Cost Savings in the First and Subsequent Years* | | | | | |
| Form Completion –PBT Chemicals | 2.8 | 10.2 | 0.4 | 13.5 | $661.08 |
| Form Completion – Non-PBT Chemicals | 1.5 | 5.4 | 0.2 | 7.1 | $351.08 |
| Recordkeeping/Mailing | 0.0 | 1.6 | 0.4 | 2.0 | $86.79 |
| *Note:  Because facilities are already familiar with Form A, there is no rule familiarization cost.* | | | | | |
| *Due to rounding, the total may not equal the sum of the row.* | | | | | |

## 2.2    ESTIMATES OF FORMS AND FACILITIES BY OPTION

Because the rule primarily affects facilities that are already reporting to TRI, it was possible to query the most current frozen TRI data (RY2004 at the time of this analysis) to determine the number of forms and facilities meeting the eligibility criteria for the two options.[6] For the New Eligibility for Form A: PBT Chemicals Option, EPA estimated that 2,360 forms filed by 1,796 facilities would qualify for this option.  For the Expanded Eligibility for Form A: Non- PBT Chemicals Option, EPA estimated that 9,501 forms filed by 5,317 facilities would qualify for this option.

Table 2-4 summarizes the number of affected facilities and forms when the options are analyzed separately and combined.

---

[6] Note that there may be new facilities filing to TRI for the first time that may experience burden reduction due to the rule.  Without information on their reportable chemicals and amounts, however, it is not possible to determine the option for which they would qualify and they are thus not accounted for in this analysis.

**TABLE 2-4: UNIVERSE OF AFFECTED FACILITIES AND FORMS BY OPTION**

| | New Eligibility for Form A: PBT Chemicals Option | Expanded Eligibility for Form A: Non-PBT Chemicals Option[a] | Combined PBT and Non-PBT Options |
|---|---|---|---|
| Total Number of Affected Facilities | 1,796 | 5,317 | 6,670 |
| Total Number of Affected Forms | 2,360 | 9,501 | 11,861 |

[a] *The number of affected non-PBT forms in this analysis does not include the non-PBT Form Rs that are currently likely eligible for Form A based on an ARA (previously defined as the sum of Sections 8.1-8.7) of less than or equal to 500 pounds.*

*Note: In this analysis, all TRI data are summed at the facility-chemical level.*

*Source: Frozen RY2004 TRI data.*

Total burden savings are presented in Chapter Three.

## 2.3    ESTIMATION OF IMPACTS OF THE RULE ON REPORTING

To evaluate the impacts of the rule on reporting, EPA looked at the total release pounds, total production related waste pounds, total non-production related waste pounds and total combined production and non-production related waste pounds on a chemical by chemical basis that would not be reported if Form As were substituted for Form Rs for chemical submissions. The EPA also conducted an analysis of zip codes affected by new and expanded Form A eligibility.

# CHAPTER FIVE
# IMPACTS OF THE RULE ON REPORTING

In enacting the Emergency Planning and Community Right-to-Know Act (EPCRA) of 1986 and the Pollution Prevention Act (PPA) of 1990, Congress recognized the significant benefits of providing information on the presence, releases, and waste management of toxic chemicals. The Toxics Release Inventory (TRI) has proven to be one of the most powerful forces in empowering the federal government, state and local governments, industry, environmental groups and the general public to fully participate in an informed dialogue about the environmental impacts of toxic chemicals in the United States. TRI's publicly available database provides quantitative information on toxic chemical releases and other waste management activities. With the collection of this information starting in 1987 came the ability for the public, government, and the regulated community to understand the magnitude of chemical releases in the United States, and to assess the need to reduce the releases and transfers of toxic chemicals. TRI enables all interested parties to establish credible baselines, to set realistic goals for environmental progress, and to measure progress in meeting these goals over time. As such, the TRI system has become a neutral yardstick by which progress can be measured by all stakeholders.

EPA believes that the changes included in this rulemaking will reduce reporting burden and save resources for regulated entities without significantly compromising the usefulness of TRI information provided to the public. As a consequence of this rulemaking, a number of TRI reporting forms will change from Form R to Form A. For PBT chemicals this change will be limited to regulated entities that have no production and non-production related releases to air, land or water on-site and no transfers off-site for disposal for both production and non-production related waste. These same forms will be limited to 500 lbs for recycling, energy recovery and/or treatment for destruction in order to qualify for the new Form A eligibility. For non-PBT chemicals, expanded Form A eligibility will be extended to reports with total production and non-production related releases to air, land or water on-site and transfers off-site for disposal for both production and non-production related waste of less than or equal to 2,000 lbs and total production and non-production related waste less than or equal to 5,000 lbs per chemical. These changes in the non-PBT eligibility criteria result in a reduction of total release pounds reported of approximately 0.14 percent, a reduction of total production related waste pounds of approximately 0.06 percent, a reduction of total non-production related waste pounds of approximately 0.48 percent, and a reduction of total combined production and non-production related waste pounds of approximately 0.06 percent.

For both PBT and non-PBT chemical reporting forms, use of Form A will result in information that would no longer be reported, specifically, on the maximum amount of the chemical reported on-site at any one time and the production ratio of the chemical. Form A retains facility specific information such as location, technical contact as well as the chemical reported and the ARA range for eligibility.

The likely impacts of the New and Expanded Eligibility for Form A Options are discussed below.

## 5.1    NEW ELIGIBILITY FOR FORM A: PBT CHEMICALS

This option allows facilities reporting on PBT chemicals, except dioxin and dioxin-like compounds, with zero disposal or other releases to use Form A, provided they meet the 1,000,000 pound alternate reporting threshold and have 500 pounds or less of total other production and non-production related waste management quantities (i.e., ARA). Under this option, 1,796 facilities could convert 2,360 Form Rs to Form As. Eligible facilities would have zero disposal or other release quantities for a PBT chemical, therefore, no data on releases would no longer be reported. Information would not be reported, however, regarding the use(s) of the chemical (i.e. was the chemical manufactured, processed, or otherwise used), the maximum amount of the chemical on site at any time during the calendar year, and the production ratio. With regard to the maximum amount of the chemical on site, information would not be reported that, in the past, has been useful in:

- emergency planning (equivalent data may also be available on Tier II reports required under EPCRA section 312);
- environmental data analyses (e.g. as a proxy for throughput); and
- compliance targeting analyses (e.g. identifying facilities that are not compliant with other EPA regulatory programs).

Based on an analysis of the RY2004 data, EPA determined that the majority of the forms eligible under this option would be for lead and lead compounds, mercury and mercury compounds, and polycyclic aromatic compounds (PACs), including benzo(g,h,i)perylene. Information not reported would, therefore, also include:

- *information on recycling small amounts of lead and lead compounds and mercury and mercury compounds* - eligible facilities would not be reporting other waste management quantities for lead and lead compounds or mercury and mercury compounds since for TRI reporting purposes most metals cannot be combusted for energy recovery or treated for destruction. Using RY2004 TRI data, EPA conducted an analysis of lead and mercury reporters that suggested that the amount recycled by eligible facilities is less than 0.01% of total lead or mercury recycled.  Moreover, based on the Form A certification statement, data users will know that an eligible facility is recycling 500 pounds or less of lead or lead compounds or mercury or mercury compounds.
- *information on recycling, energy recovery, or treatment of PACs, including benzo(g,h,i)perylene, and other organic chemicals* - eligible facilities would be reporting recycling, energy recovery (typically via burning in a boiler or industrial furnace), or treatment for destruction (typically via incineration). Using RY2004 TRI data, EPA conducted an analysis of PACs, including benzo(g,h,i)perylene, reporters that suggested that the amount recycled, recovered for energy or treated by eligible facilities is less than 0.03% of total PACs, including benzo(g,h,i)perylene, recycled, recovered for energy or treated. Moreover, based on the Form A certification statement, data users will know that the facility is recycling, treating, or recovering for energy 500 pounds or less of PACs.

For this information, however, the Form A provides a range (zero to 500 lbs) estimate of the ARA.  In total, less than 0.01 percent of total production related waste and less than 0.01

percent of total non-production related waste (Table 5-1) would no longer be reported on Form R as a result of this option, even if all eligible facilities used Form A. Since it is unlikely that this will happen, the actual impacts will likely be even smaller.

Table 5-2 shows that for the majority of PBT chemicals (95%), less than 10% of their total production related waste would no longer be reported. However, for 5% of chemicals, between 10 and 49% of their total production related waste pounds would no longer be reported. Similarly, for total non-production related waste, for 91% of chemicals, less than 10% of their total non-production related waste would no longer be reported. However, for 9% of chemicals, between 10 and 49% of their total non-production related waste pounds would no longer be reported. A complete listing of the pounds of total releases and total production related waste that would no longer be reported by chemical is presented in Table A-1 in Appendix A.

## 5.2    EXPANDED ELIGIBILITY FOR FORM A: NON-PBT CHEMICALS

The Expanded Eligibility for Form A: Non-PBT chemicals option extends the alternate reporting threshold from 500 pounds to 5,000 pounds for reports with on- and off-site disposal or other releases less than or equal to 2,000 pounds. Under this option, 5,317 facilities could convert 9,501 Form Rs to Form As. For forms qualifying under this option, specific release and other waste management information will no longer be reported to TRI as well as information regarding the use(s) of the chemical (i.e. was the chemical manufactured, processed, or otherwise used), the maximum amount of the chemical on site at any time during the calendar year, and the production ratio. However, data users will know that an eligible facility has no more than 2,000 pounds of total production and non-production related on- and off-site disposal and other releases, as well as no more than 5,000 pounds of total production related and non-production related waste for each eligible Non-PBT chemical.

To evaluate the extent of data not reported, EPA examined the volume of total releases and total production related waste that would no longer be reported. In total, approximately 0.14% of total releases, 0.06% of total production related waste and 0.48% of total non-production related waste would no longer be reported to TRI. At the chemical-specific level, Table 5-3 shows that for the majority of chemicals (82%), less than 10% of their total releases would no longer be reported. However, for 5% of chemicals, between 50% and 99% of their releases pounds would no longer be reported and for 6% of chemicals, 100% of their release pounds would no longer be reported. Table 5-3 shows similar results for total production and non-production related wastes. Specifically, for 91% of chemicals, less than 10% of their total production related waste would no longer be reported. However, for 6% of chemicals, 100% of their total production related waste pounds would no longer be reported. For total non-production related waste, for 95% of chemicals, less than 10% of their total production related waste would no longer be reported. However, for 1% of chemicals, 100% of their total non-production related waste pounds would no longer be reported. A complete listing of the pounds of total releases and total production related waste that would no longer be reported by chemical is presented in Table A-2 in Appendix A.

## 5.3    COMMUNITY IMPACTS

Extending the alternate reporting threshold will also affect the distribution of TRI reporting at the community level.  EPA evaluated the impact of this option to local communities using a postal zip code analysis. As shown in Table 5-4, 6% of all zip codes containing TRI reporters may not have any TRI information reported on Form R, and 47% of all zip codes containing TRI reporters would expect to see eligibility of at least one Form R change to Form A.

**TABLE 5-1**
**PERCENTAGE OF TOTAL RELEASE AND TOTAL PRODUCTION RELATED WASTE POUNDS NOT REPORTED DUE TO NEW AND EXPANDED FORM A ELIGIBILITY**

|  | Total Releases Not Reported | | Total Production Related Waste Not Reported | | Total Non-Production Related Waste Not Reported | |
|---|---|---|---|---|---|---|
|  | Lbs | Percentage | Lbs | Percentage | Lbs | Percentage |
| **New Eligibility for Form A: PBT Chemicals Option** | 0 | 0.00% | 83,129 | 0.01% | 283 | 0.01% |
| **Expanded Eligibility for Form A: Non-PBT Chemicals Option** | 5,713,104 | 0.14% | 16,052,663 | 0.06% | 83,832 | 0.48% |

**TABLE 5-2**
**PERCENT OF CHEMICALS WITHIN VARIOUS RANGES OF RELEASES AND OTHER WASTE MANAGEMENT THAT WOULD BE ELIGIBLE FOR FORM A REPORTING (PBT OPTION)**

| Percent of Pounds Eligible for Form A Reporting | Total Releases (Sections 5&6) | Total Production Related Waste (Sections 8.1-8.7) | Non-Production Related Waste (Section 8.8) | Total Waste (Sections 8.1-8.8) |
|---|---|---|---|---|
| 100% of pounds | 0% | 0% | 0% | 0% |
| 99 - 50% of pounds | 0% | 0% | 0% | 0% |
| 49 - 10% of pounds | 0% | 5% | 9% | 5% |
| 9 - >0% of pounds | 0% | 65% | 45% | 65% |
| 0% of pounds | 100% | 30% | 45% | 30% |
| *Note:  Percentages above do not always add to 100% due to rounding.* | | | | |

**TABLE 5-3**
**PERCENT OF CHEMICALS WITHIN VARIOUS RANGES OF RELEASES AND OTHER**
**WASTE MANAGEMENT THAT WOULD BE ELIGIBLE FOR FORM A REPORTING**
**(NON-PBT OPTION)**

| Percent of Pounds Eligible for Form A Reporting | Total Releases (Sections 5&6) | Total Production Related Waste (Sections 8.1-8.7) | Non-Production Related Waste (Section 8.8) | Total Waste (Sections 8.1-8.8) |
|---|---|---|---|---|
| 100% of pounds | 6% | 6% | 1% | 6% |
| 99 - 50% of pounds | 5% | 0% | 2% | 0% |
| 49 - 10% of pounds | 8% | 3% | 3% | 3% |
| 9 - >0% of pounds | 44% | 56% | 12% | 56% |
| 0% of pounds | 38% | 35% | 83% | 35% |
| Note:  Percentages above do not always add to 100% due to rounding. | | | | |

**TABLE 5-4**
**ZIP CODES ELIGIBLE FOR FORM A REPORTING**
**(PBT AND NON-PBT OPTIONS)**

| | Number of Zip Codes | Percent of Total Zip Codes Containing Form Rs | Average Number of Form Rs per Zip Code |
|---|---|---|---|
| Zip codes with at least one Form R newly eligible for Form A | 4,246 | 47.4% | 13.55 |
| Zip codes with all form R's newly eligible for Form A | 557 | 6.2% | 2.04 |
| Note: Based on the RY2004 Frozen TRI data, there are 8,961 five-digit zip codes with TRI Form R data. | | | |
| Source: Frozen RY2004 TRI data. | | | |

*New York v. Johnson*, Case No. 1:07 cv 10632 (BSJ) (DCF)

**Exhibit 2**
**to**
**Plaintiffs' Memorandum of Law in Support of Their**
**Motion to Supplement the Administrative Record**

**RESPONSE TO COMMENTS**

**TOXICS RELEASE INVENTORY
PHASE 2 BURDEN REDUCTION RULE**

Office of Information Analysis and Access
Office of Environmental Information
U.S. Environmental Protection Agency

December 18, 2006

## BURDEN ESTIMATION METHODOLOGY

***Comments submitted on burden estimation methodology (by Abt):***

**1. Comments on the methodology used in the engineering estimates (by Abt):**

EPA did not measure the actual time the tasks take for actual people in actual industries. Nor, in this analysis, does EPA report that it asked TRI reporters how much time the tasks took them. No effort seems to have been made to determine whether EPA's time estimates are representative of time actually needed on the average among TRI-reporting industries as a whole. And no effort seems to have been made to determine whether time needed for particular tasks might vary according to industry category. There is, in fact, no real explanation in the supporting materials in EPA's docket of how the estimates were derived. Without an understanding of this, there can be no meaningful assertion by EPA that they are accurate.

**A. Burden should be estimated using survey data (by Abt):**

A new, statistically robust burden survey is warranted to produce a reliable and accurate estimate of TRI reporting burden under the current regulations and using current reporting tools (i.e., TRIME). [For details, see p. 2,12; Document ID 1961]

EPA's proposal to reduce the burden to industrial facilities of compiling and reporting TRI data is compelling. To the extent that most facilities do indeed face a burden in complying with TRI requirements for data submission, reducing unnecessary costs to industry should be considered seriously. A first step would be to consider empirical evidence of the existence and magnitude of any burden related to data collection and reporting beyond that provided by EPA's meetings with stakeholders. That burden would be measured most directly by the time and other costs for facility personnel to measure or estimate releases of listed chemicals, and to report the data to EPA and other parties, including duplicate efforts where states require a similar kind of reporting.

First, OMB Watch questions the calculations of overall burden for reporting TRI information used by EPA in the proposed rule. The numbers used are the third or forth set of burden estimates that EPA has referenced over the past few years. It is unclear why these numbers are accurate, and, furthermore, it is unclear why previous burden estimates EPA has generated are not used. In EPA's 2003 Information Collection Requests (ICR) for the Form R and Form A, EPA significantly revised the burden estimates for reporting TRI downward, based on the actual reporting times reported by companies. The 2003 ICR notice for Form R includes several reasons for dramatically reducing the burden estimate including a drop in the burden for calculating and reporting from 47.1 to 14.5 burden hours. Overall, the ICR made adjustments that decreased the total burden about 2.68 million hours. These lower burden numbers indicate that there is no undue reporting burden on companies and would provide less reason for pursuing

burden reduction rulemaking.  However, in the proposed rule, EPA appears to be using numbers which are closer to the older, inflated numbers.  The proposed rule claims the baseline burden for Form R is 47.1 hours for PBTs and 25.2 hours for non-PBTs.  Both figures are much higher than the estimates from the 2003 ICR, which were based on "actual TRI reporting facilities." ... Additionally, the burden reduction depends greatly upon the baseline burden.  If the baseline burden used in the proposed rule is inflated, as OMB Watch believes it is, then the agency may list an inflated reduction of burden as a benefit of the proposed rule.  However, this "benefit" would never be realized if the burden-revised figures from the 2003 Information Collection Request, which appears to be the more correct analysis of burden, are used.  If the more-accurate 2003 ICR numbers replace the inflated numbers EPA used in the analysis it has prepared to justify the proposals, then the burden reduction is much less than what EPA purports.

## 2. Comments on the reasonableness and accuracy of the July, 2004 engineering estimates (by Abt):

The disparity between burden estimates presented in the proposed rule indicates an inadequate understanding of the true burden associated with TRI reporting.  Without an adequate understanding of the true burden, attempts to quantify burden reductions are very questionable.  Results from EPA's alternate methodology proposed in the rule for calculating the form completion burden vary significantly from previous estimates. ... The new engineering estimates are notably different from current calculation results, so we do not know what the true burden or burden reduction is, if any. [For details, see p. 2, Document ID 1569]

EEI has reviewed the Abt Associates report, which estimates the time needed to complete a Form R report, and believes that the Abt report presents only a best case estimate of the time needed to complete a Form R.  For many power plants, the actual time needed to complete a Form R can be much longer than those estimated by Abt Associates.  First, the Abt estimates assume a "typical" facility where there are no significant changes in a facility's operations or waste management practices from one year to the next.  Many coal-fired power plants do not fit this definition. ... The time needed to collect the appropriate information and to make the calculations is far greater than the time estimated by Abt.  In addition, waste management practices can change from one year to the next at coal-fired power plants.  These changes require time to analyze and estimate releases to the various media. ... The time estimates in the Abt report also rely heavily on a plant using the same methodologies and calculations as the previous year and on having persons with detailed knowledge and experience with EPA's TRI requirements available to prepare the reports.  These assumptions are optimistic and, as a result, produce time estimates that are too short. ... For all these reasons, EEI believes that implementation of the proposed revisions to Form A reporting would have an even greater economic benefit than EPA has estimated. [For details, see p. 4-5, Document ID 2720]

EPA asks for comment regarding the alternate burden estimation methodology that it recently commissioned.  The States believe that this alternative methodology, which is discussed in Part IV.C [see comment in outline topic VIII.1] above, is more accurate than

the existing OMB-approved methodology. We are not convinced that the peer review panel is correct that EPA overestimated the experience and knowledge that a typical TRI reporting facility would have. TRI has been in place for nearly two decades, and anecdotal evidence in many states indicates that TRI reporting facilities have developed sufficient experience and knowledge to make reporting a relatively routine matter.

**3. Comments on the external Peer Review Panel conclusions (by Abt):**

Under the current approved ICR methodology, the Form R burden estimates for PBT and non-PBT chemicals for form completion and calculation are 47.1 and 25.2 hours respectively. ... These estimates are low compared with our members' experience with TRI reporting. The peer reviewers of the document offered some possible reasons for the estimates being too low including those listed below. ·TRI reporting experts ("three staff with nearly 40 years of combined experience") were used to do the estimates. The time it would take these experts to complete the form is not typical of most people who are actually completing the forms. ·EPA assumes too much burden reduction after the first year of reporting (i.e., in "subsequent years.") EPA fails to recognize changes in personnel, changes to instructions and guidance, and the fact that rule familiarization is necessary each year. ·EPA does not adequately account for the time that goes into making threshold determinations, which is often necessary for chemicals for which forms are not even filed (when they are determined to be manufactured, processed, and otherwise used below the thresholds). ·EPA does not adequately account for activities in areas of data gathering, management involvement, quality assurance, and others that are not directly part of form completion. ·EPA's assumption that facilities are "modern and well-organized" may not hold true for many facilities. ·The analysis seems to seriously underestimate the time necessary to conduct some tasks such as reviewing complex technical guidance materials, identifying fugitive release points, identifying relevant process operating conditions, determining materials usages, obtaining waste management information, review of forms by management, data entry (i.e., typing) and others. Many of the peer reviewers provided useful insights into specific instances in which the engineering estimates are unrealistically low. API urges EPA to address these peer reviewer comments in any new methodology for estimating TRI burden.

The peer review does not in any case address the validity of the key assumptions of the burden or burden reduction estimates. The main qualification presented for the reviewers is that they are external to EPA and experienced at filling out TRI forms. Not being EPA employees, however, is hardly tantamount to independence or disinterestedness. The proposed Form A threshold change is not something that arises from the interests of EPA itself, but from the desires and interests of reporting industries. The individuals doing the "peer" review, it must be noted, all come from the business sector. The assertion that the group is "diverse" isn't accurate. It represents only business interests, not public interests or environmental health interests. It represents only the interests of TRI reporters, not the interests of TRI data users.

The Form A is not as lengthy as the Form R, and thus will conceivably reduce the time required to complete a TRI Report. However, Peabody agrees with the external peer

review in that EPA has overestimated the experience of a typical TRI reporting facility, and consequently, has underestimated the time it takes to complete a Form A or Form R.

### 4. Comments on the current OMB-approved reporting burden estimates (by Abt):

EPA's unit burden estimates are the same as those used in the most recent approved Information Collection Request (ICR). API submitted comments on that ICR, which we incorporate by reference.8 We found several shortcomings in the methodology used to derive these estimates. First, by deriving a "per form" estimate from all facilities and then applying it to an assumed 3 forms per facility for the entire reporting universe, EPA is not adequately portraying burden. ... Second, EPA does not acknowledge the time required for rule familiarization (except in the year after a new final rule) and does not adequately consider time spent for training. [For details, see p. 9-10, Document ID 1961]

If the burden estimates were merely dictated by the White House Office of Management and Budget (OMB), then the public could make a rebuttable presumption that they were politically imposed, rather than based on sound science, objective observation, or economic reality. Good rulemaking under the Administrative Procedures Act requires an agency to document on the record the facts and justifications supporting its proposed action. Yet simply saying that burden estimates were handed down by OMB removes this key and fundamental issue from the rulemaking record altogether. OMB is not bound to follow the transparency requirements of the Administrative Procedures Act as it intervenes in agency rulemaking -- nor is it obligated to disclose the substance or detail of its ex parte communications with industry groups who often have a financial interest in the outcome of the rulemaking, and often have also made large campaign contributions to the current occupant of the White House. This is a recipe for the corruption of government, and certainly a reason for concern that the present TRI proposal may be seriously flawed. OMB itself has no original expertise in this area. OMB officials do not fill out TRI forms. They do not report publicly having ever done research on how much time it takes industry to fill out the forms. The EPA docket includes no information on how OMB's prescribed estimates were derived. In fact, the EPA docket does not even try to assert that the burden estimates are accurate or justified by a factual record. It simply reflects the reality that EPA used the estimates because OMB told it to, and that OMB has the power to dictate agency actions. In other words, the regulatory record shows on its face that the burden estimates are arbitrary and capricious. Furthermore, information in the docket for this rulemaking actually suggests that OMB imposed inaccurate or unrealistic burden estimates on EPA. The July 16, 2004, memo from Abt Associates to Paul Borst at EPA (EPA-HQ-TRI-2005-0073-0011) states that OMB imposed higher burden estimates than EPA originally proposed. Overestimating the burden, of course, overstates the case for EPA's proposed data cutbacks, without following the rules of transparency and offering the factual justifications that are supposed to make fair rulemaking possible.

### 5. Any other comments on the methodology and results as well as any data that the public feels would be useful in a revised analysis (by Abt):

First, it is not entirely clear there is a sense of "burden" felt by most TRI reporting facilities.  Based on our survey of facility TRI contacts across the country, the average amount of time it takes employees yearly to fill out and submit the TRI reporting form was just under five weeks.  This figure does vary considerably, however, across the range of facilities. When asked whether their experience with the TRI program was positive, neutral, or negative, only 14% expressed a clearly negative assessment.  In contrast, 36 percent reported either strongly positive or positive experience with the TRI, and 50 percent indicated a neutral or mixed position on the issue.  Consistent with these findings of either positive or neutral experience with the TRI program, a number of the facility contacts commented that filling out the Form R had become easier in recent years and some made positive comments about the EPA's software that has allowed for an easier reporting of data.  The variations in perspectives across these facilities suggest, at a minimum, that the TRI program is not seen uniformly as a burden. ... A very high percentage of respondents (73 percent) also indicated that as a result of this experience with the program they are better able to understand what they need to do for subsequent TRI reports.  That is, with experience, the burden of TRI reporting seems to decline. ... Any assumption of a burden to the business sector should be backed with empirical data.  It is not enough for EPA to believe in the abstract that there is a burden among TRI reporting facilities.  Rather, arguments for reducing burden should be based on the best available data as to whether a substantial burden actually exists.  It may be that the burden varies by industrial sector or other key characteristics such as size of facility, in which case greater efforts may be needed to assist selected facilities in complying with TRI requirements. [Results and suggestions based on 3-year study of the effects of TRI on corporate and community decision-making, including two national surveys. See Document Number 900.1 for details.]

The burden reduction estimates compiled by EPA fail to account for several additional issues.  They do not appear to account for additional activities necessary to update/train facility representatives on the changing requirements.  Even more importantly, for states and other organizations which actively compile, analyze and distribute the data, the burden reduction estimates do not account for additional efforts necessary to track and convey the changes in the reporting requirements to citizens and other public groups who make use of the data.  Changes to the reporting requirements can cause significant complications when evaluating overall trends and conducting cross-year analyses.  In many cases, re-programming databases to account for changes in the basis on which data is reported requires significant time and effort.  When these additional aspects are considered, there may be no positive burden reduction at all.

The TRI reporting burden results from the lengthy analysis of materials that a facility manufactures, processes, or otherwise uses, and the tedious calculations that accompany this process.  Such calculations pertinent to the coal mining industry include, but are not limited to, the detailed exploration of products used at a facility for applicable TRI chemicals and quantities, the coincidental manufacture of chemicals through storm-water runoff, and the otherwise use of beneficially used coal combustion waste (CCW).  The TRI analysis results in many hours of work often ending in the conclusion that no TRI chemicals exceed any applicable threshold.

Over the years, SC Johnson has submitted Form Rs for a range of 8 to approximately 20 SARA reportable chemicals. In 2004, we submitted 11 Form Rs. In recent years, our TRI filings have required about 400 hours of labor and up to $35,000 in consultant support.

OMB Watch is troubled about the lack of clarity surrounding the burden estimates. Considering that burden is why EPA is submitting the proposed rule, the figures are critical to determining if the rule is justified. The first issue is whether the burden on companies filing TRI forms is unduly high. The second issue is that the burden estimates constitute the entire benefit that EPA argues will be gained by making these reporting changes. OMB Watch questions both aspects of EPA's justification. ... In other words, OMB Watch believes the proposed rule fails in two respects. First, it fails to establish a realistic baseline burden estimate and, instead, presents figures which are remarkably close to an estimate previously rejected by EPA. Second, the agency overestimates the burden reduction that will be gained by the proposed changes, in part, because EPA fails to consider that companies will have to calculate releases to determine whether or not they are eligible for Form A and, in part, because of the inflated baseline. The combination of these two factors leads to an unreasonable and inaccurate estimate of the impact that the proposed changes to TRI will have on burden. EPA should have a clearly establish baseline burden and reliable estimate of the burden reduction before moving forward with the drastic reporting reductions that EPA is currently proposing. ... It is clear from these statements that the burden posed by TRI, even from an industry perspective, is at best questionable. Before the EPA moves forward with the proposed changes to the TRI program, OMB Watch believes that EPA should reach a consensus on a reliable way to calculate the burden that TRI places on companies. The proposed rule even mentions that there is some disagreement even among the peer reviewers on the methodology for calculating burden. OMB Watch believes that the issue of burden calculation must be settled before moving forward with a burden reduction rule. The agency asks for input on the issues and questions raised by burden peer reviewers. However, the agency should have received public input and response before moving forward with the proposed rule. Instead, the agency appears to be rushing through the process and proposing a burden reduction alongside acknowledgements that the burden estimates are still in question. Given the constantly changing numbers put forward by EPA, OMB Watch recommends that EPA withdraw or suspend the proposed rule change until an accurate assessment of the burden placed on companies is calculated. Such a study should be able to explain why, in the past, a wide range of calculations were reached, why EPA is choosing not to use estimates that differ from its current calculations, and why companies across the United States do not agree with the finding that the TRI program is unreasonably burdensome.

**EPA Response to all comments submitted on burden estimation methodology:**
Several comments addressed the Agency's proposed methodology for improving the estimation of calculation and form completion burden. As discussed in the preamble to the proposed rule, EPA used the proposed rule as a means to seek comment on this proposed methodology. The preamble explained that the approach taken by the Agency

in developing the new burden estimation methodology was to assemble a team of persons with knowledge or experience related to the preparation of TRI reports who then applied their best professional judgment to break down the reporting requirements into separate item-specific tasks, and then estimate the average time required to complete each task. The report was internally vetted through Agency TRI program personnel in the Regions and at Headquarters. The Agency also conducted an external peer review of this new analysis to assess the reasonableness of the new methodology and specific burden estimates. The engineering estimate and the peer review summary were placed in the docket. In the preamble to the proposed rule the Agency solicited comment on the reasonableness and accuracy of the methodology, form completion steps and specific burden estimates as well as on the conclusions of the external peer review.

In response to this request for comment, several commenters addressed the engineering estimates. Some commenters questioned the accuracy of the estimates. One commenter noted that EPA did not measure the actual time the tasks take for actual people in actual industries. Another commenter suggested that a new, statistically robust burden survey is warranted to produce a reliable and accurate estimate of TRI reporting burden. Some commenters claimed that the engineering estimates of TRI reporting burden are too low because EPA overestimated the experience of a typical TRI reporting facility in completing its TRI reporting obligations. One commenter asserted that the notable difference between the burden estimates of the engineering analysis and the OMB-approved information collection request (ICR) burden estimates calls in question the true burden associated with TRI reporting. Aside from the engineering estimates, in its comment OMB Watch compared the burden estimates in the current and previous OMB-approved ICR figures to question the validity of the baseline burden estimates relied upon by EPA in this rulemaking. API's comment stated that it submitted comments on the current ICR, for which it found several shortcomings in the methodology used to derive estimates.

While EPA greatly appreciates the comments provided on the proposed methodology for estimating TRI reporting burden, and will preserve these comments and may consider them in future ICR renewals, as stated in the preamble to the proposed rule, the burden methodology relied upon in the proposal was based on the currently approved estimates of the time required to complete a Form R or Form A and is summarized in the economic analysis contained in the docket for the proposed rule. Similarly, the burden methodology relied upon for the final rule is based on the current OMB-approved ICR. For more information on the burden estimates please refer to the economic analysis for the final rule, which has been placed in the docket. For more information about the currently approved ICR, please access the following Agency website: **http://www.epa.gov/tri/lawsandregs/index.htm#icr**

*New York v. Johnson*, Case No. 1:07 cv 10632 (BSJ) (DCF)

**Exhibit 3**
**to**
**Plaintiffs' Memorandum of Law in Support of Their**
**Motion to Supplement the Administrative Record**

# CHAPTER TWO
# METHODOLOGY

For the proposed Phase 2 burden reduction rule, EPA must estimate the burden and cost savings, as well as other impacts associated with the options considered. This chapter presents the methodologies used to estimate: 1) the unit time and cost savings experienced by TRI reporters as a result of the proposed rule, 2) the number of facilities and forms that would be able to take advantage of each option separately and combined, and 3) the impacts on small entities. Total reporting burden and cost savings are presented in Chapter Three. The benefits of the proposed rule are discussed in Chapter Four. The impacts of the proposed rule on reporting are discussed in Chapter 5

As explained in more detail in Chapter One, EPA is proposing two options that it believes may reduce reporting burden for TRI facilities. The New Eligibility for Form A: PBT Chemicals Option allows a facility reporting on PBT chemicals (except for dioxin and dioxin-like compounds) with no disposal or other releases to use Form A, provided they meet the 1,000,000 pound alternate reporting threshold and have no more than 500 pounds in Sections 8.2 through 8.8 and do not include any releases or disposal in their Section 8.8 quantities. The Expanded Eligibility for Form A: Non-PBT Chemicals Option extends the existing Form A eligibility criteria and allows a facility reporting on Non-PBT chemicals with an annual reportable amount (sections 8.1 – 8.7) of 5,000 lbs or less to use Form A, provided they meet the 1,000,000 pound alternate reporting threshold.

Some facilities may qualify for both options, however, for different chemicals. Although these options could be proposed separately, EPA is combining the options in the proposed rule.

Industry burden and cost savings were calculated using the following four-step procedure:

Step 1:   Estimate the typical total number of hours of managerial, technical, and clerical labor needed to complete each task for each type of form.

Step 2:   Calculate the hours saved by each labor category for each task due to filing a less burdensome form. Based on typical labor rates, calculate the average unit savings in the first year of compliance as staff becomes familiar with the regulations and in subsequent years, when less time is needed because staff is more familiar with the regulations.

Step 3:   Estimate the universe of affected forms and facilities that would qualify for each of the burden reduction options.

Step 4:   For each task, multiply the unit savings by the number of facilities and/or forms, and then sum the results to calculate the total industry savings.

## 2.1     UNIT BURDEN SAVINGS ESTIMATES

The proposed rule will result in burden savings by reducing reporting requirements for forms that meet certain criteria.  The tasks associated with TRI reporting under the proposed rule include:

- **Report Completion:** Facilities must gather data and perform calculations to provide the information required on Form R or Form A.
- **Mailing and Recordkeeping:** Facilities must maintain recordkeeping systems and mail their reports to EPA and the State.

To estimate the burden savings, EPA calculated the unit burden savings as the difference between the facility's current activity (i.e., filing a Form R) and the post-regulation activity (i.e., filing a Form A).

### 2.1.1     Form R and Form A Unit Burden Estimates

The current burden estimates for form completion estimates, which are approved by the Office of Management and Budget (OMB), reflect the total time required by facilities to complete either a Form R or a Form A.  The OMB-approved reporting burden estimates are presented in Table 2-1.  The estimate of total burden savings due to the proposed rule is developed by combining the estimated unit burden savings under each option with the number of potentially affected forms under each option. Unit burden savings are calculated by subtracting the unit reporting burden associated with filling out a Form A from the unit reporting burden associated with filing a Form R.  In the analysis associated with the New Eligibility for Form A: PBT Chemicals Option, Form A calculations and report completion burden is assumed to be 17.6 hours for non-PBT chemicals and 31.6 hours for PBT chemicals.  The 17.6 hours is based on the current OMB approved burden estimate.  Since there is no approved estimate for using Form A for PBT chemicals, the 17.6 hours was adjusted proportionately to the difference between the OMB approved burden estimates for Form R calculations and report completion for non-PBT chemical and PBT chemicals (i.e., 25.2 hours and 47.1 hours respectively).  This resulted in a 64% adjustment of the current 17.6 hours for Form A for non-PBT chemicals to 31.6 hours for Form A for PBT chemicals.

### 2.1.2     Hourly Labor Rate Estimate

Each cost savings estimate has two components: the unit time savings estimates (i.e., number of labor hours saved by each type of personnel), and the hourly wage rate of each level of personnel.  There are three categories of hourly wage rates: managerial, technical, and clerical. EPA developed updated 2004 hourly wage rates, including fringe benefits and overhead, for each of these categories.  Average wage data for these categories were taken from the Employer Costs for Employee Compensation (ECEC) report by the Bureau of Labor Statistics (BLS) for all goods-producing, private industries.[3]  The managerial labor rate is defined as the average hourly

---

[3] Employer Costs for Employee Compensation, Private industry workers, Goods-producing industries, white-collar occupations, as published by the U.S. Department of Labor, Bureau of Labor Statistics. The December 2004 values for these series are listed in Table 11 of the *Employer Costs for Employee Compensation Summary*, released March 16, 2005.

wages and salaries for the "Management, business, and financial" occupational category. The technical labor rate is defined as the average hourly wages and salaries for the "Professional and related" occupational category. The clerical labor rate is defined as the average hourly wages and salaries for the "Office and administrative support" occupational category.

The additional cost of benefits, such as paid leave and insurance, is also derived from the ECEC data. Loading factors for benefits are calculated separately for managerial, technical, and clerical labor by dividing the benefits percentage of total compensation by the wage percentage of total compensation (e.g., 0.29/0.71 = 0.4085).

An additional loading factor of 17 percent is applied for general overhead. This loading factor is added to the benefits loading factor, then applied to the base wage (e.g., \$33.61/hr x [1 + (0.4085 + 0.17)] = \$53.05/hr). The total loading for indirect costs is within the range of 50 to 70 percent suggested in EPA guidance.[4] The results of this method are shown in Table 2-2.

---

[4] U.S. Environmental Protection Agency, *EPA Air Pollution Control Cost Manual, Sixth Edition*, EPA-452-02-001, January 2002, pg. 2-34.

**TABLE 2-1**
**OMB-APPROVED FORM R AND FORM A UNIT BURDEN ESTIMATES**

| Activity | Unit Time Estimates (hours) (per form) | | | Total Time |
|---|---|---|---|---|
| | Managerial | Technical | Clerical | |
| **Form R** | | | | |
| *Subsequent Years* | | | | |
| Calculations and Report Completion - PBT Chemicals | 14.3 | 30.8 | 2 | 47.1 |
| Calculations and Report Completion - Non-PBT Chemicals | 7.7 | 16.4 | 1.1 | 25.2 |
| Recordkeeping/Submission | 0 | 4 | 1 | 5 |
| **Form A** | | | | |
| *Subsequent Years* | | | | |
| Calculations and Report Completion - PBT Chemicals | 11.2 | 18.9 | 1.5 | 31.6 |
| Recordkeeping/Submission – PBT Chemicals | 0 | 2.4 | 0.6 | 3 |
| Calculations and Report Completion – Non-PBT Chemicals | 6.05 | 10.7 | 0.85 | 17.6 |
| Recordkeeping/Submission – Non-PBT Chemicals | 0 | 2.4 | 0.6 | 3 |

*Note: Due to rounding, the total may not equal the sum of the row.*
*Source: Rice, Cody. Memo: Terms of Clearance for TRI ICR Renewal. Jan 20, 2004.*
         *EPA, 2000 Form A Information Collection Request.*

**TABLE 2-2**
**DERIVATION OF LOADED HOURLY RATES FOR TRI FORM COMPLETION**

| Labor Category | 2004 Average Wages | 2004 Benefits and Overhead Loading Factor | 2004 Loaded Hourly Rate |
|---|---|---|---|
| Managerial | $33.61 | 1.578 | $53.05 |
| Technical | $28.52 | 1.571 | $44.79 |
| Clerical | $14.70 | 1.607 | $23.62 |
| Source: Employer Costs for Employee Compensation (ECEC) report by the Bureau of Labor Statistics (BLS). | | | |

Total cost savings are presented in Chapter Three.

### 2.1.3  Summary of Unit Burden Savings

As discussed in Section 2.1, the unit burden savings are calculated as the difference between the facility's current activity (i.e., filing a Form R) and the post-regulation activity (i.e., filing a Form A). Because facilities are already familiar with Form A, there will be no difference between the average burden they incur in the first year of the proposed rule and all subsequent years of the rule. Furthermore, since these facilities are already reporting to TRI, they are not expected to incur any rule familiarization burden. The unit burden savings in the two options differs because the Form R and Form A form completion estimates are higher for PBT chemicals than Non-PBT chemicals. Table 2-3 summarizes the unit burden savings associated with the proposed options.

**TABLE 2-3**
**UNIT BURDEN AND COST SAVINGS FOR ACTIVITIES PERFORMED BY INDUSTRY**

| Activity | Unit Time Estimates (hours) (per form) | | | | Unit Cost (2004 Dollars) |
|---|---|---|---|---|---|
| | Managerial | Technical | Clerical | Total | |
| Average Annual Burden and Cost Savings in the First and Subsequent Years | | | | | |
| Form Completion – Non-PBT Chemicals | 1.7 | 5.7 | 0.3 | 7.6 | $348.74 |
| Form Completion – PBT Chemicals | 3.1 | 11.9 | 0.5 | 15.5 | $709.27 |
| Recordkeeping/Mailing | 0.0 | 1.6 | 0.4 | 2.0 | $81.11 |
| Note:  Because facilities are already familiar with Form A, there is no rule familiarization cost. Due to rounding, the total may not equal the sum of the row. | | | | | |

## 2.2    ESTIMATES OF FORMS AND FACILITIES BY OPTION

Because the proposed rule primarily affects facilities that are already reporting to TRI, it was possible to query the most current frozen TRI data (RY2002 at the time of this analysis) to determine the number of forms and facilities meeting the eligibility criteria for the two proposed

options.[6]   For the New Eligibility for Form A: PBT Chemicals Option, EPA estimated that 2,703 forms filed by 2,064 facilities would qualify for this option.[7]   For the Expanded Eligibility for Form A: Non- PBT Chemicals Option, EPA estimated that 12,201 forms filed by 6,461 facilities would qualify for this option.

Table 2-4 summarizes the number of affected facilities and forms when the options are analyzed separately and combined.

**TABLE 2-4: UNIVERSE OF AFFECTED FACILITIES AND FORMS BY OPTION**

|  | New Eligibility for Form A: PBT Chemicals Option | Expanded Eligibility for Form A: Non-PBT Chemicals Option[a] | Combined Options |
|---|---|---|---|
| Total Number of Affected Facilities | 2,064 | 6,461 | 7,958 |
| Total Number of Affected Forms | 2,703 | 12,201 | 14,904 |

[a] *The number of affected non-PBT forms in this analysis does not include the non-PBT forms that are currently likely eligible for Form A based on an ARA of less than or equal to 500 pounds.*
*Note: In this analysis, all TRI data are summed at the facility-chemical level.*
*Source: Frozen RY2002 TRI data.*

Total burden savings are presented in Chapter Three.

## 2.3      ESTIMATION OF IMPACTS OF THE PROPOSED RULE ON REPORTING

To evaluate the impacts of the proposed rule on reporting, EPA looked at both the total release pounds and total production related waste pounds on a chemical by chemical basis that would not be reported if Form As were substituted for Form Rs for chemical submissions. The EPA also conducted an analysis of zip codes affected by new and expanded Form A eligibility.

---

[6] Note that there may be new facilities filing to TRI for the first time that may experience burden reduction due to the proposed rule.  Without information on their reportable chemicals and amounts, however, it is not possible to determine the option for which they would qualify and they are thus not accounted for in this analysis.

[7] Any positive values reported in Section 8.8 are assumed to be a release or disposal quantity if a positive value was also reported in Section 5, Section 6.1 when the chemical is a metal, Section 6.2 for disposal M codes, or Section 6.2 for M40 (Solidification/Stabilization) and M61 (Wastewater treatment (Excluding POTW)) when the chemical is a metal.