MICHAEL J. GARCIA                                                    **ECF CASE**
United States Attorney for the
Southern District of New York
By: SARAH E. LIGHT
Assistant United States Attorney
86 Chambers Street -- 3rd Floor
New York, New York  10007
Telephone:  (212) 637-2774
Facsimile:  (212) 637-2686
Email: sarah.light@usdoj.gov


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
STATE OF NEW YORK, STATE OF ARIZONA,  :
STATE OF CALIFORNIA, STATE OF             :
CONNECTICUT, STATE OF ILLINOIS,        :
STATE OF MAINE, COMMONWEALTH OF   :
MASSACHUSETTS, STATE OF MINNESOTA,  :
STATE OF NEW HAMPSHIRE, STATE OF      :
NEW JERSEY, COMMONWEALTH OF            :
PENNSYLVANIA, DEPARTMENT OF             :
ENVIRONMENTAL PROTECTION, STATE      :
OF RHODE ISLAND, and                             :
STATE OF VERMONT,                                  :
                                                                    :
                        Plaintiffs,                             :
                                                                    :
            v.                                                      :
                                                                    :    07 Civ. 10632 (BSJ) (DCF)
                                                                    :
STEPHEN L. JOHNSON, in his official capacity  :
As Administrator of the U.S. Environmental        :    **NOTICE OF FILING OF**
Protection Agency, and the U.S.                         :    **SUPPLEMENTAL**
ENVIRONMENTAL PROTECTION AGENCY,    :    **ADMINISTRATIVE RECORD**
                                                                    :
                        Defendants.                          :
------------------------------------------------------------x


        PLEASE TAKE NOTICE that on July 1, 2008, Defendants Stephen L. Johnson and the

United States Environmental Protection Agency (collectively, "EPA"), by their attorney Michael

J. Garcia, United States Attorney for the Southern District of New York, filed with the Court the

Supplemental Index to the Certified Administrative Record (in hard copy format), the

Supplemental Administrative Record on one CD-ROM, and the attached Supplemental

Certification of Administrative Record by Michael P. Flynn.

Dated:  New York, New York
        July 1, 2008


                                    MICHAEL J. GARCIA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for Defendants


                        By:     _/s/_____
                                SARAH E. LIGHT
                                Assistant United States Attorney
                                86 Chamber Street, 3rd Floor
                                New York, New York 10004
                                Telephone:  (212) 637-2774
                                Facsimile:  (212) 637-2686
                                Email: sarah.light@usdoj.gov

2

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: SARAH E. LIGHT
Assistant United States Attorney
86 Chambers Street -- 3rd Floor
New York, New York 10007
Telephone: (212) 637-2774
Facsimile: (212) 637-2686
Email: sarah.light@usdoj.gov

**ECF CASE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

STATE OF NEW YORK, STATE OF ARIZONA, :
STATE OF CALIFORNIA, STATE OF :
CONNECTICUT, STATE OF ILLINOIS, :
STATE OF MAINE, COMMONWEALTH OF :
MASSACHUSETTS, STATE OF MINNESOTA, :
STATE OF NEW HAMPSHIRE, STATE OF :
NEW JERSEY, COMMONWEALTH OF :
PENNSYLVANIA, DEPARTMENT OF :
ENVIRONMENTAL PROTECTION, :
STATE OF RHODE ISLAND and :
STATE OF VERMONT, :
                                                          :
                    Plaintiffs,          :
                                                          :
          v.                                      :
                                                          :  07 Civ. 10632 (BSJ) (DCF)
                                                          :
STEPHEN L. JOHNSON, in his official capacity :
As Administrator of the U.S. Environmental :  **SUPPLEMENTAL**
Protection Agency, and the U.S. :  **CERTIFICATION OF**
ENVIRONMENTAL PROTECTION AGENCY, :  **ADMINISTRATIVE RECORD**
                                                          :
                    Defendants.          :

------------------------------------------------------------x


**SUPPLEMENTAL CERTIFIED INDEX TO THE ADMINISTRATIVE RECORD**

The U.S. Environmental Protection Agency ("EPA") hereby supplements the certified Administrative Record related to EPA's Burden Reduction Rule, published at 71 Fed. Reg. 76932 with the documents listed below:

1.    October 2003, Information Collection Request Supporting Statement; Toxic Chemical Release Reporting (Form R); Docket ID EPA-HQ-OEI-2003-0025-0068.

2.    October 2003, Information Collection Request Supporting Statement; Alternate Threshold for Low Annual Reportable Amounts (Form A); Docket ID EPA-HQ-OEI-2003-0026-0016.

3.    October 2005, Information Collection Request Supporting Statement; Toxic Chemical Release Reporting (Form R); Docket ID EPA-HQ-OEI-2004-0006-0018.

4.    October 2005, Information Collection Request Supporting Statement; Alternate Threshold for Low Annual Reportable Amounts (Form A); Docket ID EPA-HQ-OEI-2005-0007-0005.

5.    September 24, 2003 Memorandum from Cody Rice to Judith Kendall; Terms of Clearance for TRI ICR Renewal; Docket ID EPA-HQ-OEI-2003-0026-0019.

6.    January 20, 2004 Memorandum from Cody Rice to Amy Newman; Terms of Clearance for TRI ICR Renewal; Docket ID EPA-HQ-OEI-2004-0006-0004.

EPA is providing the record documents in electronic format as attachments to this certification. A copy of the Administrative Record is available for inspection at Room 3334, West Building, 1301 Constitution Avenue, N.W., Washington, DC 20460. The supplemental documents are also available at regulations.gov under their associated Docket IDs. For further information, contact the Office of Environmental Information (OEI) Docket at (202) 566-1752.

By the Environmental Protection Agency:

In witness whereof I have subscribed my name this _26_ day of June 2008 at Washington, DC.


Michael P. Flynn
Director
Office of Information Analysis and Access
Office of Environmental Information
U.S. Environmental Protection Agency

# TOXIC CHEMICAL RELEASE INVENTORY

## TOXIC CHEMICAL RELEASE REPORTING

## INFORMATION COLLECTION REQUEST
## SUPPORTING STATEMENT

## OMB CONTROL NO. 2070-0093
## EPA ICR #1363.13

## October, 2003

1    IDENTIFICATION OF THE INFORMATION COLLECTION . . . . . . . . . . . . . . . . . 3
     1(a)  Title of the Information Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     1(b)  Short Characterization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2    NEED FOR AND USE OF THE COLLECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     2(a)  Need/Authority for the Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     2(b)  Use/Users of the Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3    THE RESPONDENTS AND THE INFORMATION REQUESTED . . . . . . . . . . . . . 23
     3(a)  Respondents/SIC Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     3(b)  Information Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

4    THE INFORMATION COLLECTED--AGENCY ACTIVITIES, COLLECTION
     METHODOLOGY, AND INFORMATION MANAGEMENT . . . . . . . . . . . . . . . . . . 28
     4(a)  Agency Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
     4(b)  Collection Methodology and Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     4(c)  Small Entity Flexibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     4(d)  Collection Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5    NONDUPLICATION, CONSULTATIONS, OTHER COLLECTION CRITERIA . . . 33
     5(a)  Nonduplication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     5(b)  Consultations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
     5(c)  Effects of Less Frequent Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
     5(d)  General Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
     5(e)  Confidentiality and Sensitive Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

6    ESTIMATING THE BURDEN AND COST OF THE COLLECTION . . . . . . . . . . . 68
     6(a)  Estimating Respondent Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

October, 2003

6(b)  Estimating Respondent Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
6(c)  Estimating Agency Burden and Cost  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
6(d)  Bottom Line Burden Hours and Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
6(e)  Reasons for Change in Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
6(f)  Burden Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

ATTACHMENT A
     Toxic Chemical Release Inventory Reporting Form R (EPA Form # 9350-1)  . . . . . . . A-1

ATTACHMENT B
     TRI Chemicals Reported to Non-TRI Databases  . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1

ATTACHMENT C
     Emergency Planning and Community Right to Know Act of 1986, Section 313
     (42 U.S.C.A. Section 1023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

ATTACHMENT D
     Pollution Prevention Act (42 U.S.C.A. Sections 13101-13109)  . . . . . . . . . . . . . . . . D-1

ATTACHMENT E
     40 CFR Part 372
     Toxic Chemical Release Reporting: Community Right-to-Know . . . . . . . . . . . . . . . . E-1

ATTACHMENT F
     Toxic Chemical Release Inventory Reporting Forms and Instructions
     Revised 2001 Version (EPA 260-B-02-001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-1

ATTACHMENT G
     Proposed Form R (OMB No. 2070-0093)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G-1

October, 2003

# 1    IDENTIFICATION OF THE INFORMATION COLLECTION

## 1(a)  Title of the Information Collection

TITLE:        Toxic Chemical Release Reporting, Recordkeeping, Supplier
              Notification and Petitions under Section 313 of the Emergency
              Planning and Community Right-to-Know Act

EPA ICR No.:      1363.13

OMB Control No.:    2070-0093

## 1(b)  Short Characterization

This Information Collection Request (ICR) is for the information collection requirements for toxic chemical release reporting under section 313 of the Emergency Planning and Community Right-to-Know Act (EPCRA) (42 U.S.C. 11001 et seq.) and the information collection in section 6607 of the Pollution Prevention Act (PPA) (42 U.S.C. 11071 to 11079). In short, EPCRA §313 requires certain owners or operators of certain facilities (i.e., currently manufacturing facilities in Standard Industrial Classification (SIC) codes 20 through 39, and facilities in SIC codes 10 (except 1011, 1081, and 1094), 12 (except 1241), 4911, 4931, 4939 (limited to facilities that combust coal and /or oil for the purpose of generating power), 4953 (limited to facilities regulated under the Resource Conservation and Recovery Act, subtitle C, 42 U.S.C. section 6921 et. seq.), 5169, 5171, 7389 (limited to facilities primarily engaged in solvent recovery services on a contract or fee basis)) manufacturing, processing, or otherwise using any of over 600 listed toxic chemicals and chemical categories (hereafter "toxic chemicals") in excess of the applicable threshold quantities to report on their environmental releases and transfers of and waste management activities for such chemicals annually. Under section 6607 of the PPA, facilities must provide information on the quantities of the toxic chemicals in waste streams and the efforts made to reduce or eliminate those quantities.

Currently, facilities subject to the Toxics Release Inventory (TRI) reporting requirements may either use the EPA Toxic Chemical Release Inventory Form R (EPA Form #9350-1), or the EPA Toxic Chemical Release Inventory Form A Certification Statement (EPA Form #9350-2), which is approved under OMB Number 2070-0143. The Form R must be completed if a facility manufactures, processes, or otherwise uses any listed chemical above threshold quantities. For the Form A Certification Statement, EPA established an alternate threshold for those facilities with low annual reportable amounts of a listed toxic chemical. A facility that meets the appropriate reporting thresholds, but estimates that the total annual reportable amount of the chemical does not exceed 500 pounds per year, can take advantage of an alternate manufacture, process, or otherwise use threshold of 1 million pounds per year for that chemical, provided that

certain conditions are met, and submit the Form A Certification Statement instead of the Form R. Facilities may submit information on multiple chemicals on a single Form A Certification Statement.

Pursuant to EPCRA section 313 (and PPA section 6607 because of its linkage to EPCRA), EPA's Office of Environmental Information (OEI) collects, processes, and makes available to the public all of the information collected. The information gathered under these authorities is stored in a database maintained at EPA and is available through the Internet. The TRI is used extensively by EPA, other federal, state and local government agencies, industry, and the public. Program offices within EPA and other government agencies have used the TRI, along with other sources of data, to establish priorities, evaluate potential exposure scenarios, and for enforcement activities. Industries use TRI data to identify pollution prevention opportunities, and set goals for emissions reductions. Environmental and public interest groups use TRI data to make the public more aware of releases of chemicals in their communities, and to initiate direct negotiation and risk reduction with facilities.

EPA has developed EPA Information Quality Guidelines to ensure the utility, objectivity and integrity of information that is disseminated by the Agency. The information supporting this ICR is consistent with all appropriate EPA policies, including EPA's Information Quality Guidelines. In particular, the EPA Agency-wide Quality System helps ensure that EPA organizations maximize the quality of information disseminated by the Agency. The Quality System is documented in EPA Order 5360.1 A2, *Policy and Program Requirements for the Mandatory Agency-wide Quality System* and the *EPA Quality Manual for Environmental Programs* 5360 A1, May 2000. The information supporting this action is also consistent with *EPA's Guide to Writing Information Collection Requests Under the Paperwork Reduction Act of 1995,* revised 2/99. It is EPA's intention that collection of information under this ICR will result in information that will be collected, maintained, and used in ways consistent with both EPA's Information Quality Guidelines and the OMB Information Quality Guidelines.

With TRI, and the real gains in understanding it has produced, communities and governments know what listed toxic chemicals many industrial facilities in their area release, transfer, or otherwise manage as waste. In addition, industries have an additional tool for evaluating efficiency and progress on their pollution prevention goals.

OMB last approved this Information Collection request on March 10, 2003 with an expiration date of October 31, 2003. A revised draft Form R is included in this ICR as Attachment G. EPA sought comment on proposed changes to the Form R to collect information in a more logical and easier manner. However, in light of extensive comment from states and the regulated community concerning the implementation of so many changes at once, EPA is deferring most of these changes for now, however, some of the proposed changes remain in this version of the Form R. For example, section 8.1 is subdivided into four subsections: section 8.1.a. Total onsite disposal to Underground Injection to Class I Wells, RCRA Subtitle C landfills, and other landfills;

October, 2003

section 8.1.b. Total other onsite disposal or other releases; section 8.1.c. Total offsite disposal to Underground Injection to Class I Wells, RCRA Subtitle C landfills, and other landfills; and section 8.1.d. Total other offsite disposal or other releases. These changes as well as others are described in more detail in section 3(b) of this document. The existing reporting and recordkeeping requirements associated with Form R, supplier notification and petitions are discussed in this ICR (EPA ICR #1363), which is separate from the ICR related to the alternate threshold reporting requirement for the Form A Certification Statement. The reporting and recordkeeping requirements associated with the alternate threshold reporting requirement using the Form A Certification Statement are contained in a separate ICR and are approved under OMB Control #2070-0143 (EPA ICR #1704). OMB last approved the Form A Certification Statement ICR on March 10, 2003 for use through October 31, 2003. Please note that these two ICRs are independent of each other, such that the OMB action taken with regard to EPA ICR #1704 applies only to the alternate reporting requirements and the Form A Certification Statement.


## 2     NEED FOR AND USE OF THE COLLECTION

### 2(a)  Need/Authority for the Collection

This information collection activity is a statutory requirement pursuant to sections 313 of EPCRA (42 U.S.C. 11001 et seq.) and section 6607 of the PPA (42 U.S.C. 11071 to 11079). According to EPCRA section 313(h), the data submitted in the forms are intended to "inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; to aid in the development of appropriate regulations, guidelines, and standards; and for other similar purposes."

Section 6602 of the PPA establishes a national policy that pollution should be prevented or reduced at the source whenever feasible. To further this goal, EPA is to establish a source reduction program which, among other responsibilities, is to collect and disseminate information. The information collected under section 6607 is intended to fulfill that responsibility in part and to provide a basis for measuring progress in pollution prevention in certain industrial groups.

Annual reporting under EPCRA section 313 of toxic chemical releases and other waste management information provides citizens with a more complete picture of the total disposition of chemicals in their communities and helps focus industries' attention on pollution prevention and source reduction opportunities. EPA believes that the public has a right to know about the disposition of chemicals within communities and the management of such chemicals by facilities in covered industries subject to EPCRA section 313 reporting.

Current TRI reporting has been successful in providing communities with important information regarding the disposition of toxic chemicals, and other waste management information on toxic chemicals from manufacturing facilities in their communities.

October, 2003

The information collected under EPCRA section 313, and subsequently distributed through EPA outreach and awareness programs, is provided at relatively low cost compared to the value it represents to the general public.  Through mass mailings to all facilities within the manufacturing sector of the economy, work with a wide variety of trade associations representing covered industries, local and national seminars, training courses, and enforcement activities, EPA has endeavored to locate all facilities required to report under section 313 of EPCRA and inform them of their obligations.  In addition, EPA has prepared various tools to assist facilities in complying with EPCRA.  These materials include detailed reporting instructions, a questions and answer document, magnetic media reporting instructions, general technical guidance, and 24 industry and chemical specific guidance documents.  In addition, EPA maintains a toll-free hotline to answer regulatory and technical questions to assist facilities in preparing TRI reports.

Furthermore, TRI reporting does not require a rigid, one-size fits all approach to estimating and reporting release information. EPA believes the submitters of the TRI data are best informed to honestly and accurately report information, within certain parameters provided by EPA.  The Agency believes in the good intent of the reporters to use the most appropriate means to accurately estimate the release information.  EPA does, however, also invest in enforcement and compliance efforts to insure that reporting is being done consistently and thoroughly by regulated industries.

### 2(b) Use/Users of the Data

According to many, the TRI program is one of the most effective environmental programs ever legislated by Congress and administered by EPA.  Its success is due, in large part, to the right-to-know provisions contained in the legislation itself.  By requiring that the resulting data be made publicly available "by electronic and other means," Congress ensured that citizens, the media, environmental advocates, researchers, the business community, and others could influence and evaluate industry's efforts to manage toxic emissions.  Consequently, data collected under EPCRA section 313 and section 6607 of the PPA is made available through EPA's Envirofacts and TRI Explorer databases.  In addition, the public may also obtain TRI information through OMB Watch's Right-to-Know Network (RTK NET) at http://www.rtk.net.  RTK NET provide free public access to numerous databases, text files and conferences on the environment, housing, and sustainable development.

In addition to providing information to the public via electronic means, EPA also conducts outreach activities to make key groups and the public aware of TRI.  Journalists, educators, public interest, labor, and environmental groups, trade associations, and state governments continue to be key targets in these outreach efforts.  In addition, libraries in communities all across the U.S. (in particular, members of the Federal Depository Library Program), are committed to providing public access to TRI data in a variety of formats.  Educators are also using the data to conduct studies and courses on the environment.  Labor unions are using the TRI data to improve conditions for workers. Businesses are using the data in many ways -- as a

6

basis for reducing emissions, to cut costs, to improve operations, and for a variety of other reasons. Concerned citizens are a growing user group. These individuals, on their own and through organized groups, are using TRI to address concerns about the management and release of chemicals in their communities. Finally, states use the national data to compare chemical management and releases within industries and to set environmental priorities at the state level.

Because the value of TRI increases as more people use it, EPA encourages these organizations to acquaint new users with TRI, help people who already know about TRI to better use and understand the data, and, whenever possible, provide feedback on how to improve TRI products and services. The following are some examples of how the TRI data are used, both by EPA and others. As examples, the following information is not intended to be all inclusive.

## Use Within EPA

### Use of the Data by the Office of Pollution Prevention and Toxics

With the voluntary cooperation of respondent facilities, EPA established the Industrial Toxics Project, also known as the 33/50 Program. EPA's 33/50 Program targeted 17 priority TRI chemicals for emissions reductions from 1988 reported levels of 33% by 1992 and 50% by 1995. More than 1300 companies nationwide joined the program which provided recognition to participating companies, including Certificates of Appreciation to all companies upon enrollment, as well as Certificates of Environmental Achievement to a select group of facilities that achieved noteworthy reductions. Through collaborative partnerships between government, industry and the public, the program met its goals a year early and went on to exceed expectations by the end of 1995. EPA celebrated the program's success by hosting a national conference in September, 1996 and explored ways of building even more successful partnerships in the future with the use of the TRI data.

The Office of Pollution Prevention and Toxics (OPPT) has completed development of the Risk-Screening Environmental Indicators model which provides comparative information regarding the risk-related potential impacts of toxic chemical releases on human health and the environment. This multi-media, screening-level tool considers TRI release and transfer volumes, toxicity, exposure potential, and the size of receptor populations. Both generic and site-specific exposure characteristics are incorporated into the Indicators model. The Indicators may be used for trends analysis, as well as targeting and prioritization of TRI releases by chemical, release medium, industrial sector, individual facilities, geographic area, or a combination of these and other variables.

OPPT's Pollution Prevention Division (PPD) has used TRI data as a screening tool to prioritize proposed regulations and industrial source categories to promote pollution prevention in rulemaking. As a result, the Pollution Prevention Senior Policy Council identified a number of regulatory development efforts that should consider inclusion of pollution prevention measures.

October, 2003

**Use of the Data by the Office of Air and Radiation**

The Office of Air and Radiation (OAR) has used the TRI data for a variety of tasks related to the implementation of the Clean Air Act (CAA). Section 112 of the CAA, as amended in 1990, requires EPA to develop Maximum Achievable Control Technology (MACT) standards for major sources of 189 hazardous air pollutants, all but 8 of which were on the TRI list of toxic chemicals prior to EPA's expansion of the EPCRA section 313 list of toxic chemicals. TRI was used to estimate the number of major sources (greater than 10 tons per year of any single hazardous air pollutant or 25 tons per year of total toxics) of hazardous air pollutants in each of 700 source categories. This information helped to prioritize the source categories for regulatory development. In addition, the impacts of a potential lower major source definition for 47 highly toxic compounds were analyzed using TRI data.

TRI was used to help identify the 30 hazardous air pollutants to be included in the Urban Area Source Program mandated by Section 112(k) of the CAA. OAR also has used TRI to expand the coverage of the "Locating and Estimating" series of documents, which help State and local air agencies identify potential source categories of air toxics in their communities. Similar data have been incorporated into the Crosswalk database, which identifies which source categories emit which toxic compounds. OAR is developing a series of air quality indicators to track progress in implementing the CAA. Trends in the TRI data are envisioned to be a part of those indicators.

**Use of the Data in Enforcement Activities**

Because TRI data include detailed facility identification information, as well as releases to all media and transfers to off-site locations, the Office of Enforcement and Compliance Assurance (OECA) has found that TRI is particularly well-suited to multi-media enforcement and compliance planning, priority setting and inspection targeting. The OECA and the Office of Research and Development (ORD) are developing a "Multi-Media Ranking System" to prioritize sites for enforcement actions and to evaluate the effectiveness of environmental laws in reducing risks from sites. The system ranks sites based on their multi-media releases of pollutants, their potential risk to human health and the environment, and the history of legal violations by the facility. The system combines TRI data with data from EPA air and water databases.

OECA cross-checks data collected under EPCRA and other environmental statutes to identify those facilities or types of businesses which reported for some but not all of the reporting rules. Enforcement personnel are able to identify additional facilities owned by the same corporation or by the same parent company that may be subject to liability, by using TRI data and the Facility and Company Tracking System (FACTS).

In addition, OECA uses the TRI data in its EPCRA Targeting System (ETS), which provides local access to TRI and FACTS data for all facilities subject to EPCRA section 313 requirements. ETS supports creation of prioritized inspection targeting lists, generated from a wide array of

8

October, 2003

selection criteria, and daily targeting activities such as contacts with facilities and tracking tips and complaints.

OECA also uses TRI data in the Integrated Data for Enforcement Analysis (IDEA) System. IDEA provides integrated data on individual facilities' compliance records for most of the statutes administered by EPA through access to approximately ten separate databases, including the Toxic Release Inventory System (TRIS). The TRI data aid OECA in developing enforcement initiatives by providing a point of departure for distinguishing between industrial sectors based on their potential for exceeding permits as indicated by the amounts of chemicals reported as managed in waste.

TRI data continue to be extremely helpful in identifying pollution prevention projects. Enforcement staff use data on releases and transfers to identify (or evaluate) projects that will significantly reduce emissions, or those that will help prevent or minimize the release of extremely hazardous substances under EPCRA section 302.

OECA places a high priority on enhancing the use of TRI data among Regional field personnel. Guidance has been provided to the field offices on the resources available to their inspectors in identifying non-reporters, late reporters and data quality errors. These resources provide the inspectors with valuable information extrapolated from the TRI, such as facility reporting rates, processes, and releases.

**Use of the Data by the Office of Solid Waste and Emergency Response**

TRI data assist in priority setting for waste minimization efforts by the Office of Solid Waste and Emergency Response (OSWER). In combination with other information OSWER collects on waste minimization, TRI data are useful in analyzing long-term trends and identifying particular industry practices that warrant attention by the program, serving OSWER pollution prevention goals.

With respect to enforcement, TRI data supplement other existing data sources and can be called on to assist in the development of OSWER enforcement priorities. TRI data also are valuable as a means to assist in establishing liability under both the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and the Resource Conservation and Recovery Act of 1976 (RCRA) statutory authorities.

Another site-specific function of the TRI database relates to its role in providing emission information that can be used when developing emission inventories for the Superfund site discovery program and when undertaking Superfund preliminary assessments of sites. In the reportable quantity (RQ) program, TRI data could be used in analyses to support future rulemaking under CERCLA (e.g., designation of additional hazardous substances). In addition, states use TRI data in conjunction with other data obtained under EPCRA for local accident

9

October, 2003

prevention planning.

## Use of the Data by the Office of Water

The Office of Water (OW) is using the TRI information to support the planning process required under Section 304(m) of the Clean Water Act. As part of that planning process, OW is using the TRI data as one way of evaluating the likelihood of risk to humans (i.e., adverse human health impacts) resulting from exposure to pollutant discharges associated with a source category.

OW has used TRI data for identifying candidates for the National Primary Drinking Water Regulations. Chemicals were identified that had a dramatic overall increase (doubling or more) of discharges and releases. These discharges and releases were considered to have direct potential for drinking water contamination and are good candidates for development of regulatory controls.

TRI data were used as a screening mechanism for possible sources of wellhead contamination. Using TRI and other relevant data in a Geographic Information System (GIS), potential contamination sources have been identified. These sources may affect community ground-water systems in the development and implementation of wellhead protection programs. Regions are continuing to coordinate ground-water programs using GIS and TRI data as a cross-program tool.

OW has also used the TRI data in the development of management plans to identify the sources of toxic discharges into selected estuaries and coastal waters. In addition, the data have been used to identify sources of toxic discharges that may contaminate sediments that are proposed for ocean dumping.

Under the Watershed Protection Approach, the Regions are using TRI data along with other data in assessing loadings to their watersheds. They are identifying multi-media sources of toxic discharges to receiving waters.

The Office of Wastewater Management (OWM) used TRI data to identify industrial users that contributed the greatest amount of toxic pollutants to city sewer systems. Facility names were provided to the Regions for further evaluation.

OW used TRI data to identify which pollutants are released from pesticide manufacturing facilities and the pattern of releases when developing effluent limitations guidelines and standards for an industrial category. While many pollutants and industries that will be addressed by effluent guidelines are currently reported in TRI, the Effluent Guidelines Program screens for a number of pollutants not in listed in the TRI database.

OW used TRI data and other water emissions data in its National Sediment Contaminant Source Inventory, an evaluation of sources of sediment contamination in the U.S. This project identified

10

point source pollutant discharges that may result in sediment contamination and analyzed these releases based on their potential sediment hazard. Chemical release amounts were weighted by the relative toxicity of a compound to aquatic or human health, as well as relevant fate and transport factors. The study identified chemicals, geographic areas, and industrial categories of greatest concern for sediment contamination.

## Other Government Uses

**Environmental Solutions**

Government agencies can take a variety of actions when TRI data reveal an environmental problem in a specific state or region. Some of these actions involve voluntary incentive programs for companies. Although these programs are not binding commitments, they offer good publicity for participating companies. Examples include:

Governor Frank O'Bannon of Indiana announced the Indiana Governor's Toxics Reduction Challenge in 1998. The challenge pledged to "support the state's goal to reduce toxic chemical releases to the air and water from 1995 levels: 50% by December 31, 2000, in large urban areas for carcinogens and persistent bioaccumulative toxic chemicals; 60% by December 31, 2002 statewide for these chemicals; and, 50% by December 31, 2002, statewide for all toxic chemicals reported in the Toxics Release Inventory." The Challenge also pledged to "energetically help the state reach these goals through efforts emphasizing pollution prevention within your organization and/or in cooperation with other organizations." As of mid-April 2000, 67 companies in Indiana had committed to the Challenge. A list of the companies and an update on their progress is available on the Indiana state website: (http://www.in.gov/idem/).

The P2 Program of the Colorado Department of Public Health and the Environment used TRI data, in combination with other data about hazardous waste and toxic chemical releases to air and water, to identify the ten industry organizations responsible for the largest quantities of hazardous waste generation or toxic chemical releases in the state. This research served as the basis for establishing priorities for P2 activities and for distribution of technical assistance grants. The report also aided in targeting large companies for participation in the "Governor's P2 Challenge Program" to reduce toxic chemical releases and hazardous waste generation.

Due to the TRI reporting requirements for dioxin, the Delaware Department of Natural Resources and Environmental Control became aware of dioxin-tainted waste at DuPont's Edge Moor, DE titanium dioxide ($TiO_2$) plant. Subsequently, DuPont agreed to pay an estimated $15 million to remediate dioxin-tainted waste at this facility. DuPont discovered that the waste sludge was contaminated with dioxin while the company was preparing to comply with EPA's requirement that dioxin releases be reported under TRI. In addition, DuPont agreed with the Delaware Department of Natural Resources and Environmental Control to spray a 23-acre stretch along the Delaware River with a starch-like coating to keep the dioxin from being stirred up by the wind or

11

October, 2003

eroding into the river.  DuPont used the site to store waste sludge from the Edge Moor plant.
The company will also close four sludge lagoons near the plant and plans to cut dioxin formation
in half by 2003 and by 90 percent by 2007.

**Environmental Targeting**

Budgets to fund environmental programs and measures often do not increase in proportion to the
need for these activities.  Environmental targeting initiatives, such as those listed below, help
governments and communities prioritize their needs and ensure that their resources are used most
efficiently.

The P2 Division in Georgia's Department of Natural Resources used TRI data to identify the
technical assistance needs of manufacturing sectors generating chemicals that pose the greatest
risk to public health and the environment.  The Division prioritized chemicals, examined
manufacturing sectors releasing the highest priority chemicals, and identified particular subsectors
for further assessment.  The Division also conducted in-depth manufacturing sector assessments
to determine which processes produce which wastes, what multi-media waste problems exist,
what P2 activities were being undertaken, and what additional opportunities might exist.

The Florida Waste Reduction Assistance Program provides assistance in source reduction and
waste minimization to facilities handling TRI chemicals.  The Program relies on TRI and other
data to target facilities for the Program.

EPA's Office of Enforcement and Compliance Assurance (OECA) uses TRI data within its Online
Tracking Information System (OTIS)  -- a collection of on-line search engines that enables EPA
staff, state, local, and tribal governments, and federal agencies to access a wide range of data
relating to enforcement and compliance. OTIS is a web application that sends queries to the
Integrated Data for Enforcement Analysis (IDEA) system. Only State and Federal agencies have
access to the OTIS data system. IDEA copies many EPA and non-EPA databases monthly, and
organizes the information to facilitate cross-database analysis. OTIS can be used for many
functions, including planning, targeting, analysis, data quality review, and   pre-inspection review.
OTIS was launched for internal Agency use in November 1999. In addition to performing data
base analysis, OTIS has three other additional benefits:
helps the Regions and States to identify and clean up data errors; provides report information on a
cross media basis, leading to improved integration and targeting; provides the basis for proposed
public access site for enforcement and compliance data.

OTIS is currently restricted to registered users from governmental organizations.  As of March
2002, all states, all EPA Regional Offices, and another 90 local, state and federal governmental
organizations were registered.  Data on the OTIS site are from OECA's Integrated Data for
Enforcement Analysis (IDEA) system, which extracts and integrates information from TRI as well
as the following databases:  AFS (Clean Air Act -- AIRS Facility Subsystem), PCS (Clean Water

October, 2003

Act -- Permit Compliance System), RCRAInfo (Resource Conservation and Recovery Act Information System), the Federal Enforcement Docket, National Compliance Database (NCDB), and the 1990 U.S. Census.

For the purpose of targeting exposure screening for facility employees in certain geographic areas, the U.S. Occupational Safety and Health Administration (OSHA) and local public health departments used TRI data to identify facilities that release specific chemicals. EPA has provided OSHA with all submitted toxics release inventory data for the 28 facilities that are subject to the OSHA special inspection program. These data provide OSHA inspection teams with valuable information, such as a list of chemicals that are used in significant quantities by each facility. EPA is also provides OSHA with information concerning accidental releases.

**Legislation and Regulations**

TRI data often provide the impetus for legislative action from federal, state, and local governments.  For over a decade, TRI data has been used to influence and change environmental standards, regulations, and legislation, as shown below:

The North Carolina Environmental Management Commission set limits for 105 pollutants after a public interest organization published a report, using TRI data, on unregulated toxic chemical releases to air in the state.

In response to legislation passed in 1987 to address toxic chemical releases to the air, the Illinois EPA Bureau of Air used TRI data to determine quantities of stack and fugitive air emissions of reported substances to support continued development of regulatory proposals.

**Risk Assessment**

As the connection between toxic chemicals and human health becomes better known, public health officials are looking for ways to assess the levels of risk in their communities.  TRI data have been a crucial component in creating tools to address these assessments.  Examples follow:

The New York State Department of Health developed a risk screening protocol using TRI air release data and toxicity potency data to produce relative risk scores and rankings for facilities and chemicals within the state.  Results suggested the need for a more careful evaluation of health effects resulting from large releases of noncarcinogenic compounds.

Researchers from EPA's Office of Health Research published a study of national and regional differences in county-level TRI chemical releases to air according to the ethnicity or race and in conjunction with the household income of these populations.  Using the "Population Emissions Index," a population-weighted average release for each county, the study found that all minority groups except Native Americans tend to live in counties where levels of TRI chemical releases to

13

October, 2003

air are higher.  The data also suggest that household incomes tend to be higher in counties with higher TRI chemical releases to air.

The EPA Office of Pollution Prevention and Toxics's Risk-Screening Environmental Indicators Model provides year-to-year indicators of the potential impacts of TRI chemical releases on human health and the environment.  The indicators consider TRI release and transfer volumes, chronic toxicity, exposure potential, and the size of receptor populations.  Both generic and site-specific exposure characteristics can be incorporated in the model.  The model allows the targeting and prioritization of chemicals, industries and geographic areas.  Facility scores can also be tracked from year to year to analyze trends.

**Quality Assurance and Control**

Some states, such as Massachusetts, that require separate reporting of toxic chemical releases for their facilities, find TRI data to be a useful measure of quality assurance and control.  The Air Pollution Control Program in the Missouri Department of Natural Resources also compares fugitive and stack emissions reported to the TRI with toxic chemical release data reported on the state's Emissions Inventory Questionnaire for quality control.

**Other Government Uses**

Additional governmental uses of TRI data can be found in agencies not immediately associated with environmental issues.  The U.S. Internal Revenue Service used TRI data to identify companies releasing chlorofluorocarbons (CFCs) to enforce a tax imposed on releases of CFCs and thus facilitate the phase-out of these chemicals.

# Public Use

Each year, the EPA makes TRI data available to the public on two Internet sites: TRI Explorer (www.epa.gov/triexplorer) and Envirofacts (www.epa.gov/enviro).  The EPA also provides a summary of national and state data in the annual publications Toxics Release Inventory: Public Data Release and Toxics Release Inventory: Public Data Release: State Fact Sheets.  States also release their own reports.  Community organizations, universities, workers and labor unions, local public interest organizations, and national non-governmental organizations (NGOs) also conduct analyses and risk assessments based on TRI data.  Some of these organizations also make data and analyses available to the public.

**Citizen Activists and Community Organizations**

The Oneida Environmental Resources Board in Wisconsin used TRI data to convince leaders of the Oneida Tribe to organize a conference on cleaner ways to manufacture pulp and paper.  The Board used TRI data to show that the pulp and paper industry was the largest industrial source of

October, 2003

toxic chemical releases in Wisconsin, despite industry claims that significant release reductions in the past made further improvements unnecessary. The conference improved industry awareness of more environmentally friendly practices and procedures. The Board also used TRI data to alert a local labor union about possible worker health risks. The union included requests for reductions in toxic chemical releases in its contract renewal negotiations.

California's Silicon Valley Toxics Coalition has used TRI data for over a decade. The Silicon Valley Environmental Index (www.svep.org) shows "sustainability trends" in Santa Clara County, California. The Index provides information about, but not limited to, hazardous materials and air and water quality. At least five cities in Santa Clara County have referenced or relied on the Index as the basis for their "sustainable city" efforts or municipal environmental management system (EMS) initiatives. Private-sector companies, such as IBM and Philips Semiconductor, have also used the Index in evaluating their own EMS practices. Several universities have incorporated the Index into their environmental science course curricula. In addition, several states (Wisconsin, South Carolina, New Jersey) and countries (Germany and the Netherlands) have developed regional environmental indicators studies modeled after the Index.

Wilma Subra, a chemical research analyst in Louisiana, has been a vocal citizen leader and an active proponent of the TRI program for 20 years, working to change regulations and policies to improve public health and the environment at the local level. Ms. Subra has informed residents about the possible effects of toxic chemical releases and has aided their work to improve environmental conditions. The TRI data support Ms. Subra's efforts to reduce toxic chemical releases from Louisiana's industrial facilities. Ms. Subra gathers and analyzes TRI data, distributes information to the public, participates in legal and regulatory processes against industrial facilities, and sits on national and international advisory committees.

**National Organizations**

National organizations employ TRI data in many of the same ways as small community organizations, but on a larger scale. Such organizations analyze TRI data, use it to conduct risk screening and risk assessment, and often help the public interpret the data. National organizations often work with local public interest and community organizations to initiate discussions between citizens and industry. Some national organizations also use TRI data to help lobby for changes in environmental policy. Examples of the use of TRI data by national organizations include the following:

Environmental Defense (ED) launched its Scorecard website in1998 (http://www.scorecard.org). The site's "polluter locator" allows users to perform a search by ZIP code on a database containing information on more than 17,000 chemical-releasing facilities. The Scorecard also provides data on the health effects and regulatory status of different chemicals. The site correlates TRI chemical release data with U.S. Census demographic data. ED is currently linking TRI data with toxicological studies to create a Scorecard tool that compares the risks of different toxic chemical releases. Logging 500,000 data requests on its first day of operation, the Scorecard website has drawn significant public interest.

The Right-to-Know Network (RTKNet) website (http://www.rtknet.org), launched in 1989 by the nonprofit organizations OMB Watch and the Unison Institute, also facilitates public access to TRI data. Users can search the TRI data by ZIP code, city, county, state, year, or chemical. The website also includes links to additional information about chemicals and right-to-know issues. RTKNet estimates that about a quarter of a million searches are performed on the site annually.

The former Environmental Information Center conducted a study of the Great Lakes in 1997. Scientists used TRI data to examine endocrine disrupters released in states bordering the Great Lakes. The study ranked the largest emitters of various classes of toxic chemicals by region, and found the Great Lakes region to be the nation's top emitter of reportable endocrine disrupting chemicals.

In September 2000, Physicians for Social Responsibility, along with the National Environmental Trust and the Learning Disabilities Association of America, released the report, "Polluting Our Future: Chemical Pollution in the U.S. that Affects Child Development and Learning" (www.psr.org/trireport.pdf). This report used TRI and other data to present national information about releases of chemicals that present potential developmental and neurological risks. The report ranked states by the amount of releases of these chemicals and included information about counties, industries, and facilities with the highest toxic chemical releases.

Labor unions also have used TRI data to support demands for safer working conditions for employees. Other than citizens who live near facilities, employees of TRI reporting facilities are most at risk from toxic chemical releases because they are most likely to come in regular contact with these chemicals. Beginning in 1990, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) began training employees and managers of UAW companies to access, interpret, and utilize computer databases and programs in "critically assessing industrial emergency response activities at their facilities." Workers were trained to download and interpret environmental compliance data. TRI data was one of the main sources of information for the program. Concerning TRI, the UAW stated, "knowing about maximum amounts on-site can help people prepare for a 'worst-case scenario'. " It can help an emergency response planning group decide if there is enough response equipment and personnel to deal with an emergency involving the chemical(s) in question."

16

October, 2003

**Direct Negotiation**

Through increasing their understanding of TRI data, members of the public can begin to understand potential risks associated with toxic chemical releases in their communities and can work with facilities to reduce those risks. The nation's first "right-to-act" law was enacted in September 1999 by the Passaic, N.J., Board of Chosen Freeholders, the county's governing body. The law "allows neighbors and/or employees to petition the county health officer for creation of Neighborhood Hazard Prevention Advisory Committees (NHPACs) for specific facilities." Even without the aid of this law, concerned citizens nationwide can take action in their own communities. Community organizations and citizen activists have used TRI data to negotiate with local facilities. Examples of direct negotiation agreements between citizens and facilities follow:

In the city of Richmond, California, community members were concerned about toxic chemical releases from several oil refineries and other large industrial facilities. The West County Toxics Coalition, a local environmental organization, joined with Communities for a Better Environment, a statewide environmental organization, to investigate industrial polluters in Richmond. Using the TRI and other databases, they published the report, *Richmond at Risk*, that identified the area's 20 largest industrial polluters and named the Chevron oil refinery the number one polluter. The report served to initiate discussions among Chevron, the West County Toxics Coalition, and other community and environmental organizations. As a result of the meetings, the company agreed in 1994 to close down older portions of the plant and install P2 equipment to achieve zero net toxic chemical releases on its reformulated fuel project.

The Calhoun County Resource Watch (CCRW), founded by a Texas environmental activist and shrimper named Dianne Wilson, used TRI data to build community awareness about pollution of the rich shrimp and oyster breeding grounds of Lavaca Bay on the Gulf of Mexico. Calhoun County was ranked first in the nation for toxic chemical disposal to the land, based on the 1987 TRI data. Lavaca Bay was designated as a Superfund site in 1993. CCRW brought suit against the Aluminum Company of America (Alcoa) related to this pollution. In 1995, Alcoa signed an agreement designed to protect the breeding grounds. Two Alcoa firms, a chemical plant and a bauxite refinery, committed to "fund independent review of zero discharge options and to adopt the technologies where technically, economically, and environmentally sound." In return, CCRW agreed to drop its legal challenges and suspend permit interventions against the companies. According to an Alcoa operations manager, as of March 2000 the company had made considerable progress toward the goals set in 1995, including compliance with a permit that sets the "allowed total annual maximum mass loading mercury limit" at 30 pounds, development and implementation of a Best Management Practices plan, and installation of an "evaporative spray and dust control system" near the refinery.

In 1998, Butler County, PA, warned pregnant women and infants against drinking water from Connoquenessing Creek due to high levels of nitrates in the water. In its report, the Pennsylvania Public Interest Research Group (PennPIRG) used TRI data to highlight the significant quantities

of nitrate compounds being released into the creek. The report identified the major source of the nitrates as the AK Steel Corporation. TRI data showed that the company had discharged approximately 29 million pounds of nitrates into the creek in 1997 and 32 million pounds in 1998. This report and several newspaper articles about these toxic chemical releases prompted the state to commit to reduce the levels of nitrates that AK Steel is permitted to release into the creek. Pennsylvania began developing a new water permit to reduce allowable nitrate releases to a level 90 percent lower than the previous level. In June 2000, EPA issued an emergency order requiring AK Steel to significantly reduce the nitrate compounds it discharges into Connoquenessing Creek. In addition, AK Steel was required to provide and pay for an alternative water source for the affected public on any day that the local water plant could not meet the federal maximum nitrate contaminant standard.

Working with The Ecology Center, a public interest organization based in Ann Arbor, Michigan, residents of the town of Flat Rock used TRI data to obtain a commitment from Auto Alliance International to enact an aggressive solvent reduction program. TRI data showed that the company's air releases of toluene had increased from 100,000 pounds in 1991 to 800,000 pounds in 1993, along with an increase in noxious odors in the community. A former Ecology Center staff member, Andrew Cormai, said, "[R]esidents who have put up with the smells since 1987 suddenly have a bone to pick with the company. The company is going to be saving some money by recapturing solvents, and they will be improving community air quality."

**Environmental Justice**

The goal of environmental justice is to ensure that all people, regardless of race, national origin, or income, are protected from disproportionate impacts and environmental hazards. "The concept [of environmental justice] addresses evidence [that] in some parts of the nation, poor and minority communities live closer to factories, highways and airports and are exposed to more pollution and noise and generally more environmental risks than the population at large." TRI data have proved to be an important tool in environmental justice. Communities that were once uninformed about the toxic chemical releases in their area now have access to that information. Examples of TRI data use in environmental justice activities include:

Two areas of Louisiana have become focal points for environmental justice efforts: the Mississippi River corridor, popularly known as "Cancer Alley," and the Lake Charles region. Local groups have used TRI data to illustrate the high toxic chemical release rates in these areas compared to those in other regions. Several small communities have confronted industrial facilities about their toxic chemical releases and possibly related health effects. One illustrative dispute arose in Mossville, Calcasieu Parish, Louisiana, where some residents suspected that poor health in their community was due to the activities of 17 industrial facilities located within one half-mile of the community. Their concerns prompted numerous public interest organizations to collaborate on the report, *Breathing Poison: The Toxic Costs of Industries in Calcasieu Parish, Louisiana*. The 2000 report used TRI data and information from the Scorecard website to convey the health risks

to which the community might be exposed.  It stated the need for "pollution reduction, environmental health services, and a fair and just relocation for consenting residents."

The Asian Pacific Environmental Network (APEN) works with Asian and Pacific Islander communities in the San Francisco Bay Area, California.  APEN created a series of maps that combined TRI and demographic data, to show that many poor Asian and Pacific Islanders live in "toxic hot spots."  The maps increased awareness among community members about both their environment and environmental justice issues.  APEN might add more environmental, health, and demographic information, and expand its mapping work to other nearby counties.

The Los Angeles chapter of Communities for a Better Environment used TRI data to help ensure that the communities it serves would not be exposed to higher environmental risks as a result of poverty or ethnicity.  In one project, the organization combined 1996 TRI data with Geographical Information System (GIS) mapping data to show that 80 to 100 percent of facilities that release toxic chemicals in Los Angeles County were located in areas where a large majority of the residents were people of minorities.  These findings led to the report, *Holding Our Breath – the Struggle for Environmental Justice in Southeast Los Angeles.*

## Industry Use

TRI data have also specifically benefitted regulated industrial facilities.

### Cost Reduction

A primary goal of the International Organization for Standardization (ISO 14000) is to bring environmental issues to the attention of the highest levels of corporate management.  Leaving decision-making to environmental managers alone might not produce the corporate commitment necessary to achieve the best success.  TRI data have been used as evidence to convince high-level management of the need for an EMS.  In turn, the proactive environmental protection afforded by an EMS can reduce corporate costs.

For some industries, the creation of the TRI marked the first time that company managers and operators could be made aware of the quantity of chemicals being released from their facilities. Initially, some companies expressed surprise at their own toxic chemical release ratings and set goals to improve their environmental performance.  Some companies have reduced their toxic chemical releases and increased their efficiency at the same time, leading to an increased profit. Examples of ways that industry has used TRI data to reduce costs follow:

After reporting toxic chemical releases to the TRI, Berg Electronics realized that it was releasing almost 300,000 pounds of toxic chemicals into the environment annually.  By installing a new cleaning system, the company reduced its toxic chemical releases to less than 400 pounds per year.  Although the initial costs for the new system were relatively high ($500,000), the company

October, 2003

was able to save approximately $1.2 million a year by avoiding cleanup and hazardous waste disposal costs.

The Haartz Corporation, located in Acton, Massachusetts, makes coated fabrics used in automobiles. The firm once used 800,000 pounds per year of methyl ethyl ketone (MEK), a solvent that can cause dizziness, nausea, or unconsciousness when inhaled. In 1987, when the Haartz Corporation was preparing its first TRI report, the company installed a new emissions control system to capture and recycle MEK. TRI data enabled the company to track the association between reduced toxic chemical releases and reduced costs. According to the Haartz Corporation environmental manager, the company's "emissions have stayed pretty flat" despite its "double-digit sales growth" between 1993 and 1998. In addition, reducing its MEK releases saved the Haartz Corporation an estimated $200,000 annually.

## International Right-to-Know

The TRI has served as the model for many countries' Chemical Right-To-Know programs and laws. Within the next few years, more than 30 nations are expected to have a TRI-like system, known internationally as Pollutant Release and Transfer Registers (PRTRs). PRTRs allow the public to obtain toxic chemical release data covering a large geographic area. Countries can compare their data and share ideas about improving environmental regulations. Examples of how PRTR information is being used include:

The Commission for Environmental Cooperation (CEC), which was created by a side-agreement to the North American Free Trade Agreement (NAFTA), began its PRTR work by preparing a document that compares U.S. and Canadian PRTR systems. The CEC now develops an annual report, entitled *Taking Stock*", that correlates data from the TRI and the Canadian National Pollutant Release Inventory to give an overall view of releases and transfers of toxic chemicals within and between countries. The CEC also has created an Internet search engine that allows the public to obtain continental PRTR data.

In 2000, the Silicon Valley Toxics Coalition attended an international conference in Croatia on public participation and community right-to-know. Participants recognized the fundamental importance of Chemical Right-To-Know and are lobbying the United Nations to promote the program and persuade nations to support the passage of community right-to-know laws modeled after the TRI.

## Investment

The public's increased awareness of environmental issues has made environmental performance an important factor in their investment decisions. Many investment companies have responded to

October, 2003

this demand by providing socially responsible investment options.  Examples of how TRI data have been used in investment decisions include:

Green Century Funds, an investment organization that specializes in socially responsible mutual funds, offers two funds committed to promoting corporate environmental responsibility.  The Green Century Balanced Fund invests in "performance-driven companies that are a part of the solution to environmental problems," as well as in environmentally benign companies and "best of class" companies that are setting standards for environmental protection in their industries.  The Green Century Equity Fund screens out companies with the worst environmental and social records.  The funds are monitored for environmental performance using TRI data.

Vanderbilt University's Owen Graduate School of Management found a correlation between a company's stock value and its P2 efforts, which were assessed using TRI data.  A researcher from the University performed two separate studies comparing the progress of a company's P2 activities as reported on TRI forms to a company's stock market performance.  The study reported that "companies that underperform expected pollution prevention goals are penalized in the stock market, and the stock of the companies that engage in pollution prevention activity tends to outperform the stock of companies that do not engage in pollution prevention."

Using TRI data, the Investor Responsibility Research Center (IRRC) developed an Emissions Efficiency Index® that indicates which companies have a competitive edge in environmental performance.  The Index is predicated on the idea that greater toxic chemical releases are associated with higher risks of negative publicity, more tort actions, and higher costs for pollution control and waste management.  IRRC's constituency uses TRI-based information to identify companies with poor environmental records.  Using the index, investors can either screen such companies out of their portfolios or purchase shares and use their ownership as leverage to improve environmental performance.

## Academic Use

A variety of TRI data applications occur in academia, in areas ranging from doctoral theses and journal publications to teaching in the classroom.

### Research

Universities and research institutions are using TRI data as a means for "examining environmental policies and strategies, and clarifying risks associated with toxic chemicals at the state and local level."  Students and faculty in the academic community also perform studies based on TRI data.  Examples of academic research using TRI data include:

21

October, 2003

In February 2000, the journal *Drug and Chemical Toxicology* published an article entitled, "Using GIS to Study the Health Impact of Air Emissions." This article showed how public health professionals are able to use data (such as the TRI) on toxic chemical releases to air, air dispersion modeling, and GIS to identify and define a potentially exposed population. In addition, such data can be analyzed to estimate the health risk burden of that population and determine correlations between point-based health outcome results and estimated health risk.

In the Journal of Environmental Economics and Management in 1998 and 1999, and in the Journal of Economic Surveys in 2001, researcher Madhu Khanna published results of research that examined the environmental, economic and investment effects of voluntary and mandatory toxic release reporting programs. One of the research studies focused on the EPA's 33/50 Program during its first three years, 1991-1993, and its impact on the U.S. chemical industry. The paper showed that Program participation led to a statistically significant decline in toxic releases over the time period, a statistically significant negative impact on current return on investment, but a positive and statistically significant impact on the expected long-run profitability of firms.

At Louisiana State University, environmental science professor Paul Templet developed a method, using TRI data, to evaluate the comparative effectiveness of pollution control strategies, policies, and programs, by calculating an "emissions to jobs ratio." This ratio, which is the number of pounds of toxic chemical releases per job in a given industry and location, can be compared to a national or other average. The comparison is then used to assess the relative toxic air releases associated with a certain job. This ratio was used to modify tax exemptions granted to facilities to encourage and reward job creation.

Professor Mark Stephan used TRI as the background for an academic paper focusing on the role of information disclosure programs in environmental policy. Professor Stephan used TRI as a prime example for the fundamental theories and concepts that underlie the empirical work on the comparison of basic theories arising from the knowledge of economics, psychology, and politics.

Researchers R.D. Klassen and D.C. Whybark studied management of the natural environment in manufacturing firms, given increased public awareness and scrutiny as a result of programs like the TRI. In one of their published studies, it was found that an emphasis on pollution prevention instead of pollution control, improved delivery performance and firms'competitiveness.

**Classroom Use**

High school and university instructors have incorporated the TRI into curricula involving subjects ranging from introductory chemistry to business.

The JSI Center for Environmental Health Studies developed a field-based environmental education curriculum for high school students in Chelsea, Massachusetts, a low-income minority

community near Boston.  The goal was to encourage student participation in environmental assessment and protection.  Students learned to inventory sources of contamination in a local creek and to work with community agencies on protecting a valuable environmental resource. TRI data were an integral part of the students' research.

Professor Robert Hognor of Florida International University incorporated TRI data into his classes in the Department of Business and Society.  In one example, students used TRI data as the basis for assessing the potential impact of toxic chemicals in the Caribbean and then issued a report on the subject.

## 3      THE RESPONDENTS AND THE INFORMATION REQUESTED

### 3(a)  Respondents/SIC Codes

The statute applied the reporting requirement to owners and operators of facilities that have 10 or more full-time employees, manufacture or process more than 25,000 pounds or otherwise use more than 10,000 pounds of a listed chemical, and are in Standard Industrial Classification (SIC) codes 20 through 39.  The SIC code determination applies to all operations within each two-digit category, including all sub-categorizations to the four-digit level.  In addition, in May, 1997, EPA issued a final rule that expanded the TRI reporting requirements to facilities in seven industries outside of the manufacturing sector.  A detailed listing of the four-digit SIC codes and categories can be found in Table I of Attachment A (Toxic Chemical Release Inventory Reporting Forms and Instructions).  The following identifies the SIC codes and corresponding categories at the two and four-digit level:

| SIC Code | Industry Group |
|---|---|
| 10 | Metal Mining (except 1011,1081 and 1094) |
| 12 | Coal Mining (except 1241) |
| 20 | Food |
| 21 | Tobacco |
| 22 | Textiles |
| 23 | Apparel |
| 24 | Lumber and Wood |
| 25 | Furniture |
| 26 | Paper |
| 27 | Printing/Publishing |
| 28 | Chemicals |
| 29 | Petroleum |
| 30 | Rubber and Plastics |
| 31 | Leather |
| 32 | Stone, Clay, and Glass |
| 33 | Primary Metals |

October, 2003

| | |
|---|---|
| 34 | Fabricated Metals |
| 35 | Machinery (ex. electrical) |
| 36 | Electrical/Electronic Equipment |
| 37 | Transportation Equipment |
| 38 | Instruments |
| 39 | Miscellaneous Manufacturing |
| 4911, 4931 or 4939 | Electric Utilities (limited to facilities that combust coal and/or oil for the purpose of generating electricity for distribution in commerce.) |
| 4953 | Commercial Hazardous Waste Treatment (limited to facilities regulated under RCRA Subtitle C, 42 U.S.C. section 6921 et seq. |
| 5169 | Chemical Allied Products-Wholesale |
| 5171 | Petroleum Bulk Terminals and Plants-Wholesale |
| 7389 | Solvent Recovery Services (limited to facilities primarily engaged in solvents recovery services on a contract or fee basis). |

Establishments that are part of a multi-establishment facility have the option to report separately, provided that all of the releases and waste management data from all of the establishments in that facility are reported.

### 3(b)  Information Requested

### (i)  Data Items

**Reporting Requirements for Form R.**   Form R consists of two major parts.  Part I is for facility identification information such as the name, address, and other identifying information including permit numbers.  Part II is for chemical-specific information, such as the identity, uses at the facility, quantification of the releases and other waste management activities.

**Changes to the Form R:**  EPA is proposing changes to Part II the Form R based on feedback received from stakeholders through various venues (e.g., Stakeholder Phase I process, ICR renewal process in 2002, letters, meetings, etc.).  Specifically, stakeholders have requested that EPA provide more clarity in the organization of data that are collected.  The following is an outline of the changes that are being proposed.  A copy of the revised Form R (EPA Form 9350-1, Rev. 01/2001) is being submitted to OMB for review and is included with the Form R ICR Supporting Statement as Attachment G.

24

October, 2003

Part I & II:

The TRIFID and chemical ID will appear on every page of the reporting form.

Section 5: Quantity of the Toxic Chemical Entering Each Environmental Media Onsite:

The existing data element, 5.5.3 Surface Impoundment, will be broken out into 5.5.3.A. RCRA Subtitle C Surface Impoundments and 5.5.3.B. Other Surface Impoundments.

Section 6: Transfers of the Toxic Chemical in Wastes to Off-site Locations:

Information for surface impoundments for RCRA Subtitle C and other surface impoundments (as requested for Section 5) will be broken down by deleting the existing code M63-Surface Impoundment, and replacing it with codes M66-RCRA Subtitle C Surface Impoundment and M67-Other Surface Impoundments.

Because of changes to Section 8.1 described below, the existing code M71-Underground Injection will be deleted and replaced with codes M81-Underground Injection to Class I Wells and M82-Underground Injection to Class II-V Wells.

Section 7B: On-site Energy Recovery Processes:

The code U09 - Other Energy Recovery Methods will not be used. This element is no longer applicable since the only energy recovery methods are combustion in a boiler or industrial furnace. Combustion units other than boilers and industrial furnaces are used for treatment of the toxic chemical (except for metal and metal compounds).

Section 8: Source Reduction and Recycling Activities:

The information collected on releases in section 8.1 of Part II is broken out into four subcategories: section 8.1.a.. Total on-site disposal to Underground Injection to Class I Wells, RCRA Subtitle C landfills, and other landfills; section 8.1.b. Total other on-site disposal or other releases; section 8.1.c. Total off-site disposal to Underground Injection to Class I Wells, RCRA Subtitle C landfills, and other landfills; and section 8.1.d. Total other off-site disposal or other releases. This provides a more complete characterization of TRI chemicals in waste streams by distinguishing between releases to ambient media and releases to managed facilities consistent with environmental reporting requirements under other laws. Therefore, all release quantities other than quantities sent to on-site or off-site landfills and Class I Underground Injection Control wells would be included in the subcategories 8.1.b and 8.1.d. EPA believes that this description more accurately reflects the intent of EPA's original proposed breakdown without introducing the confusion of created by using the terms "contained" and "uncontained."

25

October, 2003

**Reporting Requirements for the Form A Certification Statement.** On November 30, 1994 (59 FR 61488), EPA promulgated the alternative threshold rule which allows a facility which manufactures, processes, or otherwise uses 1 million pounds or less of a chemical annually, and if 500 pounds or less of that chemical is present in their total annual reportable amount, then the alternate threshold reporting option, TRI reporting Form A Certification Statement, is available to that facility for a specific chemical. An annual reportable amount is defined as the combined total quantities released at the facility, treated at the facility (as represented by amounts destroyed or converted by treatment processes), recovered at the facility as a result of recycle operations, combusted for the purpose of energy recovery at the facility, and amounts transferred from the facility to off-site locations for the purpose of recycling, energy recovery, treatment, and/or disposal.

The reporting and recordkeeping requirements associated with the alternate reporting requirement using the Form A Certification Statement are contained in a separate ICR approved under OMB Control #2070-0143 (EPA ICR #1704).

**Recordkeeping.** Facilities must keep a copy of each Form R and Form A Certification Statement submitted for at least 3 years from the date of submission. Facilities also must maintain the documents, calculations, and other information used to prepare the reports. Documents and records that facilities keep to prepare a report submitted may include, but are not limited to:

- Prior years' Form Rs;
- Inventory data and purchase records;
- Process diagrams that indicate releases and waste management activities;
- Monitoring records;
- Flowmeter data;
- Manufacturer's estimates of efficiencies;
- Worksheets, engineering calculations, and other notes;
- NPDES permits and associated data;
- EPCRA Section 312 Tier II reports;
- Pretreatment reports when applicable;
- RCRA manifests;
- RCRA Hazardous Waste Generator's Report; and
- Invoices from waste management companies.

### (ii) Respondent Activities

EPA makes Form R, the Form A Certification Statement, and detailed instructions and guidance documents available to owners or operators of facilities subject to the section 313 reporting requirements. In addition, a toll-free hotline is available to handle general and technical inquiries from the regulated community. Technical assistance also is available through the EPA Regional offices and States. The regulated community is expected to comply with the reporting requirements by completing either the Form R or the Form A Certification Statement and mailing it to EPA and the appropriate state agency. Section 313(g)(2) provides that a "facility may use

26

October, 2003

readily available data (including monitoring data) collected pursuant to other provisions of law, or where data are not readily available, reasonable estimates of the amounts involved." Respondents are not required to develop new information. The following are the respondent activities and are briefly summarized below:

- Compliance Determination
- Report Completion (Compliance)
- Substantiation of a Trade Secret Claim
- Recordkeeping/Disclosure
- Supplier Notification
- Petition Submission (not a requirement)

**Compliance Determination.** Facilities must first determine if they are required to submit a Form R or are eligible to submit a Form A Certification Statement. The determination is based on the SIC code(s) for the facility, the number of full-time employees or equivalents, and the quantities of listed toxic chemicals manufactured, processed, or otherwise used at the facility. For facilities contemplating using the Form A Certification Statement, for each non-PBT (persistent bioaccumulative toxic) chemical, facilities also must determine the sum of amounts in total waste and determine that they did not manufacture, process, or otherwise use more than 1 million pounds of the listed toxic chemical. Assistance with compliance determination and Form R completion is available through the States and the EPA Headquarters and Regions.

**Report or Form Completion (Compliance).** Once a facility has determined that it must comply with the statute, it must submit either a Form R or, if eligible, a Form A Certification Statement for each reportable chemical. The basic procedures for reporting are detailed in the regulations at 40 CFR 372 and described in the Reporting Forms and Instructions (Attachment A).

**Substantiation of a Trade Secrecy Claim.** If a submitter claims that the identity of a chemical is a trade secret, the submitter must support that claim. As the intent of the statute is public disclosure, the burden is upon industry to prove that certain data must be withheld from the public. Information must be provided to EPA that indicates that the identity has not been already revealed, that a competitive advantage would be lost if the identity were revealed, and that reverse engineering could not be performed to reveal the true identity of the substance if trade secrecy was granted. Trade Secrecy Substantiation, including the burden and costs to industry, is discussed in greater detail in the ICR for the Trade Secrecy Rule for EPCRA (EPA ICR #1428, OMB #2050-0078).

**Recordkeeping/Disclosure.** Respondents are required to maintain records up to three years. Respondents are not required to disclose any information directly to the public.

**Supplier Notification.** Suppliers of facilities in SIC codes 20-39 are required to develop and distribute a notice if the mixtures or trade name products they manufacture or process, and subsequently distribute, contain listed toxic chemicals. These notices are distributed to companies

October, 2003

in SIC codes 20-39 or to companies that sell or otherwise distribute the product to facilities in SIC codes 20-39.

**Petition Submission**.  EPA issued statements of petition policy and guidance in the Federal Register on February 4, 1987 (52 FR 3479) and on May 23, 1991 (56 FR 23703).  Petitioners may submit, in writing, a request to either add or delete a chemical to or from the section 313 list.  The petitioner may include in this request evidence that the chemical either meets or does not meet the criteria established for inclusion on the section 313 list.  Submission of a petition thus may involve a literature search and compilation and presentation of the findings to the Agency.  Petition submission is not an activity that is required of regulated entities, but the burden estimates for filing a petition are included in this ICR.

4      **THE INFORMATION COLLECTED--AGENCY ACTIVITIES, COLLECTION METHODOLOGY, AND INFORMATION MANAGEMENT**

4(a)  **Agency Activities**

EPA engages in many activities to fulfill the requirements of EPCRA.  These activities can be grouped in the following categories which cover what the Agency does to assist the regulated community with compliance, process the data, maintain the database, and make the data available.

- Assistance to Respondents
- Data Processing and Quality Control
- Making Data Available
- List Revisions and Petition Reviews
- Trade Secrecy Reviews

**Assistance to Respondents.**  The Agency has operated a successful outreach program to assist businesses in obtaining and completing both the Form R and Form A Certification Statement.  A reporting package that is updated annually is distributed directly to all TRI respondents.  This package also is made available to potential respondents through EPA's TRI website, Regional office coordinators and the EPA publications distribution center.  The package contains reporting forms with detailed instructions along with a magnetic media software package that allows reporters to submit their data on computer diskettes.  General guidance has been prepared for estimating releases, including fourteen industry-specific guidance documents.

EPA also has established a training program designed to familiarize Regional personnel with the reporting requirements and to train them in providing technical assistance to respondents.  Using that training, the Regions have conducted and continue to conduct numerous workshops each year to explain the reporting requirements to the regulated community.  EPA also has established a training program to teach EPCRA section 313 reporting requirements to private businesses and consultants that wish to provide counsel on section 313 compliance.  As previously mentioned,

28

October, 2003

EPA operates a toll-free hotline to answer general questions and direct potential respondents to proper EPA personnel. In addition, the Agency maintains a website with current program-specific information and guidance (www.epa.gov/tri).

EPA has also provided guidance for persons or organizations interested in petitioning the agency to add or delete chemicals from the TRI list. In addition to this guidance, EPA also convenes pre-petition meetings to assist petitioners if they request such assistance.

**Data Processing and Quality Control.** When TRI reports are submitted on paper, the information is keyed into a database on a PC-based local area network (LAN). Automated data quality checks begin at data entry, including various edit checks and the start of normalization of some of the data fields. At this point, emphasis is placed on identifying forms that are not completed correctly. If the problem(s) identified prevent further processing of the form, EPA sends a Notice of Significant Error to the respondent. Notices of Technical Error are sent to the respondents identifying any errors and requesting corrections.

At this stage, EPA also loads data from those facilities that have provided their Form R submissions on magnetic media. Many data quality checks are incorporated into the magnetic media reporting package.

EPA continues to place a high emphasis on data entry accuracy within the TRI. EPA's internal review of approximately 4% of the records showed a data entry accuracy rate of over 99.9%. This is up from 97.5% for the 1987 reporting year. EPA continues to conduct the computerized edit checks at the point of data entry, including a high percentage of verification and data reconciliation activities. EPA now has available an electronic Facility Data Profile (FDP) that enables all reporting facilities to verify online all TRI data submitted. EPA continues to mail hard copy notices of significant reporting errors to reporting facilities.

Once on the LAN, the data are uploaded to the mainframe, where further data quality checks are made. These operations involve continued normalization of name fields, such as county names, insertion of missing latitude and longitude coordinates along with checks with other data.

Congress requires EPA to make TRI data available to the public through computer telecommunications. As a result, EPA has found it necessary to undertake a variety of activities to make the data more usable. This is due to the fact that computer searches only retrieve data in exactly the format requested. Because facilities report their data in a wide variety of ways, EPA has taken steps to use a consistent name for all counties, uses a variety of nomenclature standards for names within the database, has added latitude and longitude representing the center of the zip code area in which the facility is found, and has taken other steps to assist in the normalization of the data.

October, 2003

EPA generates a facility identification number for newly reporting facilities at the time of data entry. This allows linkage to all years of reports for a particular facility or location. The identification number also allows easy retrieval of cross-year data, even when a facility is sold or changes its name. This number has been sent to all facilities and they are required to use it on all future submissions submitted to the Agency. Use of the facility identification number also facilitates data quality and cross-year analysis.

Under EPCRA section 313, facilities are required to submit forms both to EPA and the state in which they operate. For additional quality assurance and tracking purposes, EPA provides all states with a listing of facilities that reported to the Federal Reporting Center for each reporting year. This activity typically results in the identification of several cases where facilities had not reported to one or the other government. Many states then provide copies of forms to the EPA where EPA had not received copies, and vice-versa. This activity has provided a critical step to assist EPA in coordinating the data collection with the states and completing both data repositories.

**Making TRI Data Available**. Many options are available for accessing TRI data. EPA offers the data in a variety of common computer and hard copy formats to ensure that everyone can easily use the information. TRI is available on diskette, CD-ROM, and on the Internet. While TRI data have been available from several computer-based sources, recent system conversions, processing efficiencies, improvements in web-based access have created a need for a primary source for accessing TRI (and other Agency) data. Therefore, EPA has shifted its focus to the Envirofacts and TRI Explorer systems to address this need. TRI data will be updated in the Envirofacts and TRI Explorer systems at a more frequent rate than previously possible allowing the user community access to virtually "live" TRI data.

TRI reports are also available from state government offices as well as from EPA. For each reporting year, many states make their data available before EPA releases data from the national database. Persons interested in receiving state specific information may call their state EPCRA Coordinator or EPA Regional TRI Coordinator for assistance.

**List Revisions and Petition Reviews**. The list of toxic chemicals subject to reporting under section 313 of EPCRA is not static. The list can be modified by Agency-initiated reviews of chemicals or by public petition. If a listing petition is submitted by a State governor, then EPA must respond within 180 days by either publishing an explanation of denial or granting the petition. If EPA does not respond within 180 days the chemicals are automatically added to the toxic chemical list. Once a petition is received, EPA begins an intensive review that includes chemistry and toxicity analyses of the chemical or chemicals. Depending on the toxicity of the chemical or chemicals, EPA's review also may include exposure, economic, and engineering analyses. If the chemical meets the criteria for addition to the list, it is added or maintained on the list. If the criteria are not met, then the chemical is removed from the list. The criteria for inclusion on the list are stated in section 313(d)(2): the chemical is known to or can reasonably be

30

October, 2003

anticipated to cause significant adverse acute human health effects at concentration levels that are reasonably likely to exist beyond facility site boundaries as a result of continuous, or frequently recurring, releases; the chemical is known to cause or can reasonably anticipated to cause in humans cancer or teratogenic effects, or serious or irreversible reproductive dysfunctions, neurological disorders, heritable genetic mutations or other chronic health effects; or the chemical is known to cause or can reasonably be anticipated to cause a significant adverse effect on the environment because of its toxicity, its toxicity and persistence in the environment, or its toxicity and tendency to bioaccumulate in the environment.

Since the list was first published, there have been 332 additions (including 6 chemical categories) to and 19 deletions or modifications (including modifications to two chemical categories) from it, and several delisting petitions are pending.  Two hundred ninety-one of these additions (including 4 chemical categories) are the result of Agency-initiated rulemakings.  Four of the deletions or modification, including acetone, sodium hydroxide (solution), sodium sulfate (solution), hydrochloric acid (non-aerosol), and sulfuric acid (non-aerosol), were high production volume chemicals, which greatly reduced the reporting burden on industry.  In general, previous petitions have been submitted for single chemicals, however, a recent increase in petitions for groups of chemicals has occurred.  EPA may list the chemicals as a category or add only those individual chemicals which meet the section 313(d)(2) criteria.  Since inception of the TRI Program, EPA has identified several existing listed chemicals as PBT chemicals as well as added new chemicals as PBT chemicals.

**Trade Secrecy Reviews.**  When a respondent claims a chemical identity as a trade secret, a substantiation must be included.  Occasionally respondents claim trade secret status on Form R, but do not provide substantiation.  In those cases, EPA must review the claim and contact the respondent to determine the true intent.  In many cases, the trade secret claim was not intended and no substantiation is made.  Trade Secrecy reviews, including the costs to EPA, are discussed in greater detail in the ICR for the Trade Secrecy Rule for EPCRA (EPA #1428, OMB #2050-0078).

### 4(b)  Collection Methodology and Management

EPA continues to encourage the use of submissions on magnetic media.  The use of magnetic media is intended to reduce both the cost and the time required to enter, process, and make available the data, although is may also reduce the reporting burden on industry. Submission by magnetic media also improves data quality because of automatic checks that highlight errors or omitted data.  As an additional step in improving user's ability to report using magnetic media, EPA has made the Form A Certification Statement available on magnetic disk and CD-ROM.  For TRI reporting, EPA has made available an automated reporting software package called TRI-ME, that simplifies the reporting process by automating calculations and compiling instructions and guidance in an electronic format.

October, 2003

### 4(c)  Small Entity Flexibility

The statute provides that facilities with less than 10 full-time employees (or equivalent) are not required to report.  In addition, EPA has taken several steps to minimize the burden for small businesses.  A range reporting option was added to the February 16, 1988 final rule (53 FR 4500) that codified the EPCRA section 313 reporting requirements.  Range reporting was the preferred option from the Regulatory Flexibility Act analysis to provide burden reduction for small businesses. Range reporting provides an option for releases of less than 1,000 pounds to be recorded as a code representing one of three ranges, 1 to 10 pounds, 11 to 499 pounds, or 500 to 999 pounds, rather than as a specific estimate of the release amount.  The benefit is not, however, limited to small businesses. Range reporting is not applicable for PBT chemicals.

In addition, in response to a petition from the Small Business Administration, EPA has promulgated the alternate threshold (November 30, 1994, 59 FR 61488) discussed above. Although any reporting facility meeting the criteria may use the alternate threshold, EPA believes that this alternate threshold is most advantageous to small entities.

EPA has also developed interactive, intelligent, user-friendly software called "Toxics Release Inventory Made Easy Software (*TRI-ME*)," that asks the user simple, straightforward questions to help the user determine if the facility is subject to TRI reporting.  *TRI-ME* has greatly reduced data quality errors and therefore, reduced the likelihood of a facility being in violation of the reporting requirements, or having to subsequently submit corrections. For reporting year 2001, 85 percent of the Form R responses were received electronically and 37 percent of Form R responses were filed using TRI-ME.  In the supporting statement for the previous ICR renewal, EPA had predicted a 40 percent TRI-ME adoption rate for reporting year 2001. Preliminary results from reporting year 2002 show 85 percent of the Form R responses were received electronically, and 92 percent of Form R responses were filed using TRI-ME (TRI-ME output for submission can be in paper or electronic formats).

### 4(d)  Collection Schedule

Facilities must report their information on a calendar year bases, and submit the Form R to EPA by July 1 each year.  On average, EPA has released the national TRI data set to the public approximately ten months after the annual reporting deadline, i.e., July 1. In response to public concerns about shortening the time frame for release of TRI information, EPA is instituting tighter deadlines for facilities to submit revised reports, and combining a series of automated data quality operations. The Agency expects these measures will help it to meet the ultimate goal of releasing data in the year of submission.  Also, it is important to note that EPA's national database is just one avenue of access to the TRI information.  Each state also makes its data available to the public, and most states are able to make their data available prior to EPA's release of the national database.  For example, nearly half of the states release their state's TRI database within four months of the reporting deadline.

32

October, 2003

## 5     NONDUPLICATION, CONSULTATIONS, OTHER COLLECTION CRITERIA

### 5(a) Nonduplication

The basic information requested on the Form R is required to be reported by law.  Other statutes, however, also require the reporting of information about releases of chemicals to the environment, creating the possibility of overlap or duplication of reporting requirements.  EPA anticipates some overlap and provides that respondents may use readily available data collected pursuant to other provisions of law to complete the section 313 reports. However, currently available non-TRI sources of information cannot provide readily accessible release and transfer, inventory, or pollution prevention data with the scope, level of detail, and chemical coverage as data currently included in TRI.

October, 2003

## FIGURE 1 - MAJOR RELEASE AND TRANSFER DATABASES

| Data source | Media and chemical coverage[1] | Relevant releases statistics available | Ease of database substitution for TRI data[2] |
|---|---|---|---|
| Aerometric Information Retrieval System (AIRS), Facility Subsystem (AFS) | Contains annual emissions of six criteria air pollutants for facilities above reporting thresholds. Also contains limited information on toxics. | Total annual releases; average daily releases in non-attainment areas. | Limited toxics data due to submission being voluntary. |
| Permit Compliance System (PCS) | Contains monthly discharge monitoring data and flow rates for major sources of water pollutants. | Contains concentration data; total annual releases can be calculated; average daily releases, maximum "moment" if continuous monitoring. | Only includes chemicals for which a discharge limit has been set. Difficult to link between PCS parameters and CAS #; very limited monitoring data for minor dischargers. |
| Biennial Reporting System (BRS) | Contains waste volumes by RCRA waste code reported biennially. | Total annual off-site transfers of hazardous waste for land disposal; total annual releases to POTW. | Many RCRA waste codes are not specific to an individual CAS #. Quantities of chemicals in waste can not be determined. Portion of waste stream matching each waste code can not be determined. |

Under RCRA, generators, treaters, storers, and disposers of hazardous waste are required to submit reports to the Biennial Reporting System (BRS) every two years. The Biennial Reporting System is a national system that collects data on the generation, management, and minimization of hazardous waste.(http://www.epa.gov/enviro/html/brs/index.html). This system captures detailed data on the generation of hazardous waste from large quantity generators and data on waste management practices from treatment, storage, and disposal facilities. The biennial data

---

[1]. For additional detailed information on chemical coverage of TRI, AFS, BRS, and PCS, please refer to Attachments B-1 and B-2 at the end of this document.

[2]. "Ease of substitution" refers only to the potential of the information in the database to substitute for TRI reporting. It does not imply that the database is not adequate for the purposes for which it was designed.

October, 2003

provide a basis for trend analyses. Data about the previous year's hazardous waste activities is reported on even years by the facilities to EPA. EPA then provides reports on hazardous waste generation and management activity that accompany the data files. BRS cannot duplicate the information contained within TRI, as BRS waste codes do not necessarily map to unique chemicals, quantities of specific wastes in the wastestream cannot be determined, and reporting is less frequent than that of TRI.

The Permit Compliance System (PCS) tracks permit compliance and enforcement status of facilities that discharge to surface waters. The Permit Compliance System (PCS) (http://www.epa.gov/enviro/html/pcs/) provides information on companies which have been issued permits to discharge waste water into rivers. PCS allows the user to review information on when a permit was issued and expires, how much the company is permitted to discharge, and the actual monitoring data showing what the company has discharged. The Water Discharge Permits Query allows the user to retrieve preselected data from the PCS database in Envirofacts. The search can be narrowed by selecting various options including facility name, geographic location, standard industrial classification, and chemicals.

PCS data are not a suitable substitute for TRI data due to the fact that PCS is a permit tracking system and not a loadings system. In other words, PCS typically tracks pollutant concentrations, and not total releases. This difference in purpose results in differences which are difficult to resolve in the amount and types of data collected. Furthermore, PCS does not contain all TRI chemicals.

TRI also contains inventory data, which makes up a small portion of the total data. The most likely alternatives for TRI inventory data are the Tier I/II data reported under EPCRA §312. Under EPCRA §312, regulated facilities must submit annual inventory reports of hazardous chemicals stored on site to the state. Tier I requires reporting on broad categories of physical hazards, while Tier II requires chemical specific information by CAS number. The information contained on the Tier I and Tier II reports surpasses the chemical inventory data requested on TRI Form R in terms of the chemicals covered and level of detail. However, there are significant difficulties with respect to public access of Tier I and Tier II data, including the lack of a national integrated database.

In addition to release/transfer and inventory data, TRI also collects pollution prevention data from reporting facilities. Pollution prevention data somewhat analogous to data in TRI can be found in BRS (described above) and databases administered by two state environmental agencies. While BRS provides both qualitative and quantitative pollution prevention information, it does not have the facility or chemical coverage necessary to replace TRI pollution prevention reporting requirements. BRS contains data on generation, transfer, and management of hazardous wastes, while pollution prevention data contained in TRI includes information on wastes or process by-products in all production phases and media. In addition, states have come to rely on the

35

pollution prevention data provided to them by TRI.  As a result, no state program collects all of the pollution prevention data currently available in TRI.

What follows is a more detailed discussion of the several information sources that currently provide pollutant release and transfer data.  The analysis is broken down by specific type of data collected under TRI.

## Fugitive/Non-Point Air Emissions and Stack/Point Air Emissions

Fugitive (non-point) air emissions and stack (point) air emissions are reported under Sections 5.1 and 5.2, respectively, of TRI Reporting Form R.  (Fugitive air emissions are defined as all releases of air pollutants to the air that are not released through stacks, vents, ducts, pipes, or any other confined air stream.  Stack air emissions are defined as all releases of air pollutants that are released through stacks, vents, ducts, pipes, or any other confined air stream.)  In the paragraphs below, several alternative data sources are compared and contrasted to TRI.  Key criteria considered in comparing the alternative data sources with TRI include: chemical coverage, industry/facility coverage, release statistics, and public accessibility to the data.

## AIRS Facility Subsystem (AFS)

The Aerometric Information Retrieval System (AIRS) is a computer-based repository of information on airborne pollution in the United States and various World Health Organization (WHO) member countries.  AIRS is comprised of four major databases - Air Quality (AQ), AIRS Facility Subsystem (AFS), Area/Mobile Source (AMS), Geo-Common (GCS) subsystems, and a mapping utility for all AIRS data called AIRS Graphics (AG). Each subsystem addresses different, but connected, aspects of the Clean Air Act regulatory requirements. AIRS is administered by EPA's Office of Air and Radiation (OAR), though AFS is managed by OECA.

The AIRS Facility Subsystem (AFS) is the database component of  AIRS which tracks air emissions from industrial plants. AFS  is a sub-system of the Aerometric Information Retrieval System (AIRS). AFS contains compliance and permit data for stationary sources regulated by the U.S. EPA and state and local air pollution agencies.  AFS contains emissions, compliance, and enforcement data on air pollution point sources regulated by EPA, state and local environmental regulatory agencies.

OAR manages EPA programs to improve air quality in areas where the current quality is unacceptable and to prevent deterioration in areas where the air is relatively free of contamination. To help accomplish this task, OAR uses AFS to track emissions of pollutants that have been proven to be detrimental to public health, known as *criteria pollutants*, as defined in the national ambient air quality standards.  The six criteria pollutants which states must report to AFS include: particulate matter less than 10 microns in size (PM10), carbon monoxide (CO), sulfur dioxide

October, 2003

($SO_2$), nitrogen dioxide ($NO_2$), lead (Pb), and ozone (reported as reactive volatile organic compounds, an ozone precursor). States are required to report ambient air quality data on a quarterly basis, and point source data on a yearly basis, for the criteria pollutants listed. In addition, states may choose to use the AIRS system to store data on a wide variety of other pollutants and related variables.

Data in AFS is organized into four logical levels: plant, stack, point, and segment. The plant is a facility represented by its physical location, and defined by property boundaries. A stack or vent is where emissions are introduced into the atmosphere. An emission point is a physical piece of equipment or a process that produced emissions. Finally, a segment is a component of a point process (such as fuel combustion) that is used in the computation of emissions. (U.S. EPA, 1995a)

At the facility level, sources with air emissions greater than 1,000 tons per year (tpy) for CO, 100 tpy for VOC, PM-10, $SO_x$, or $NO_x$, or 5 tpy for lead must report actual or estimated annual emissions data. At the point level, such as a stack or any single piece of equipment or process where emissions occur, sources with air emissions greater than 25 tpy for VOC, PM-10, $SO_x$, or $NO_x$, 250 tpy for CO, and 5 tpy for lead must report actual or estimated annual emissions data. AFS data are utilized by states to prepare State Implementation Plans to comply with regulatory programs and by EPA as an input for the estimation of total national emissions. Data for over 100,000 point source facilities are stored in AFS.

Compliance and enforcement data are updated by states and EPA based on the data submitted by facilities. Compliance data for these plants may be recorded for the plant as a whole or for a specific point within the plant. Emissions estimates are available for facilities satisfying the emissions thresholds described above. States also are required to report emissions data for point sources which emit below the 100 ton threshold in areas where air quality does not meet federal standards (non-attainment areas).

Fugitive air emissions data are not specifically flagged within AFS. It may be possible, however, to generate fugitive emissions estimates for pollutants included within AFS by determining all Source Classification Codes (SCCs) generating fugitive air emissions, and then totaling emissions (Kleeman, 1995). SCCs are eight-character codes which represent specific processes or functions within a source category. For example, SCC 1-02-005-01 corresponds to the burning of distillate oil in an industrial boiler. SCCs allow proper identification of processes as well as proper calculation of emissions when applying AP-42 emission factors.[3] Because SCC codes are not

_____

[3]. AP-42 Emission Factors, available from the Factor Information Retrieval (FIRE) System, and emission factors in general, are representative values that attempt to relate the quantity of a pollutant released with a given activity associated with the release of that pollutant. Emission factors are typically expressed as the weight of pollutant divided by a unit weight, volume, distance, or duration of the activity emitting the pollutant (EPA, 1995b). Generally, AP-42

37

designed to distinguish stack level emissions from fugitive air emissions, such an effort would require a review of all coded industrial processes in order to identify those generating fugitive emissions.

As described in more detail in following sections, AFS data are not good substitutes for TRI stack or fugitive emissions data. Problems include the lack of reporting requirements for most air toxics, and the lack of rigid reporting schedules.

Chemical coverage: States are required to report to EPA annual emissions estimates for point sources emitting greater than or equal to threshold quantities of the *criteria pollutants* (40 CFR §51: 321-326): particulate matter ($PM_{10}$ & $PM_{2.5}$), carbon monoxide, sulfur oxides, nitrogen oxides, lead, and ozone. Currently, there is no requirement for states to report hazardous air pollutants (HAPs) to AFS, although some states with toxics reporting requirements that exceed federal requirements may upload their air toxics information to AFS.[4] At this time, however, no research has been undertaken to determine which states report which HAPs. There also are no statistics on the frequency of state HAP reporting, which facilities report, or the reporting thresholds.

Because data on toxic releases in AFS are sparse, emissions can be estimated (that is, modeled) using a technique called "speciation." Speciation involves multiplying reported emissions of particulate matter (PM) and VOCs by fractions representing various compounds, according to a profile specific to the emission source. SPECIATE is EPA's repository of total organic compounds (TOC) and particulate matter (PM) speciated profiles for a variety of sources for use in source apportionment studies. OAQPS's Clearinghouse for Inventories on Emission Factors (CHIEF) website makes available SPECIATE, a windows-based speciation application with apportionment factors for 691 organic chemicals and 110 particulates in about 700 total profiles. However, there are significant limitations to the accuracy and reliability of speciation data. The speciation profiles contained in SPECIATE were developed from field sampling, engineering judgements, and other indirect techniques. The weight percentages and number of chemicals in a given profile may be heavily influenced by the particular analytical and sampling methods used to develop the profile. (U.S. EPA, 1996)

Another shortcoming of SPECIATE involves the assignment of profiles for all SCCs in AIRS. Ideally, each SCC in AIRS would have a unique profile to represent its speciation characteristics;

---

emission factors are simply averages of available emissions rates that can be used to facilitate the estimation of air emissions and are sometimes used by facilities to estimate TRI releases and transfers. A difficulty with using emissions factors is that there is a lack of facility-specific throughput data (production or activity), without which estimates cannot be made. Another difficulty is that the factors are averages and do not account for the variations between facilities.
[4] 4. Hazardous Air Pollutants (HAPs) are defined in Section 112 of the Clean Air Act (CAA). Section 112 lists 189 HAPs, of which 181 also are listed in TRI.

October, 2003

however, there are far more SCCs than available profiles. Therefore, those categories which are not associated with original profiles are assigned profiles based on engineering judgement (Radian, 1993).

Industry/facility coverage: Because facilities are included in AFS on the basis of their emissions levels, there are no SIC or industry limitations imposed on the list of AFS-covered facilities. In contrast, TRI currently only requests data from some, but not all SIC codes, thereby excluding many other industries. It is important to note, however, that emissions thresholds play an important role in determining which facilities are covered. Facilities are covered under AFS only if they release multiple tons of criteria pollutants annually. Smaller HAP emitters that release small amounts of criteria pollutants may therefore be completely exempted from reporting to AFS. TRI, on the other hand, employs thresholds of 10,000 and 25,000 pounds per year, depending on how a particular chemical is used, processed, or manufactured. In addition to this use threshold, TRI also exempts facilities with less than the equivalent of ten full time employees.

**Release statistics/reporting frequency**: EPA requests that states upload information to AFS on an annual basis. However, because there are no defined reporting schedules and no real penalties for not reporting, in practice there is "rolling receipt" of information, with some states failing to report for various reasons in some years. Although AFS notes that most states report regularly, and some facility-specific emissions data are available from AFS across all reporting years (Wakefield, 1995), the looseness of the reporting structure makes comparisons across states, industry, facilities, or years difficult.

**Accessibility**: AFS data are accessible through the EPA Mainframe and to a limited degree, through AIRS Executive, a self-contained updatable and downloadable program which digests and summarizes AIRS data. There are no access restrictions for AIRS Executive which is available through the EPA World Wide Web site (http://www.epa.gov/airs/aexec.html). The EPA Mainframe, however, is password protected and is not accessible by the general public.

State Air Emissions Inventories

Several states and regional agencies maintain their own air emissions inventories, including the inventory set up under California's "Hot Spots" Information and Assessment Act (Assembly Bill 2588), and the Great Lakes Regional Air Toxics Emissions Inventory. Approximately half the states have implemented some kind of air toxics reporting system (Pope, 1995). However, the amount of data as well as the types of data elements collected varies widely from state to state. The Great Lakes inventory merits special attention because other states and countries (including Louisiana; Texas; Ontario, Canada; and Mexico) use it as a model for their own inventories. A number of other states have active programs or are in the process of developing them. A number of other states have active programs or are in the process of developing them. Two are discussed below in terms of their coverage and accessibility characteristics.

39

October, 2003

**Chemical coverage**:  Chemicals covered under state and regional inventories vary widely in the number of chemicals covered, data elements required, and reporting thresholds used.  While some inventories collect detailed, facility level information on many chemicals, others are designed only to track very specific pollutants for specific applications.

**Industry/facility coverage**:  States often develop their own toxics inventories due to perceived gaps in TRI's industry coverage.  For example:

The Great Lakes Regional Air Toxics Emissions Inventory does not require emissions reporting by industry.  Rather, state agencies will use best available emission factors (FIRE) or source-specific emission factors and throughput information to estimate emissions from a much larger catalog of sources than TRI, including area sources such as dry cleaners, asphalt plants, and wood stoves (Ratza, 1995).

**Release statistics/reporting frequency**:  The type of data collected and data collection frequency among states and regions also varies widely.  For example:

**Accessibility**:  Because each state or region which maintains a HAPs database does so more or less independently of the federal government, there currently is no central repository of this information.  Because the states and regions also use different database formats and applications to maintain their data, building a multi-state/region air emissions inventory from the existing databases would be a challenging task.  However, OAQPS is in the process of developing a national toxics inventory database, which will utilize a combination of TRI data and state, regional, & local databases (Pope, 1995).

Another potential partial solution to the data compatibility problem, once it is fully implemented, is the Great Lakes Regional Air Toxics Emissions Inventory, which is maintained using the Regional Air Pollutant Inventory Development System (RAPIDS).

As the principal component of the Great Lakes Regional Air Toxic Emissions Inventory project, the Regional Air Pollutant Inventory Development System (RAPIDS) is the first ever multi-jurisdictional pollutant emissions inventory software that has been developed. This software is an important product of the binational steering committee effort to design and implement a regional inventory containing sources of toxic air contaminants. RAPIDS was originally tested by Illinois, Indiana, and Wisconsin in their joint development of the Southwest Lake Michigan Pilot Study. The focus of the study was on the Commission defined list of 49 toxic pollutants, in addition to several other important nontoxic compounds. Now, RAPIDS is used by each Great Lakes state and Province of Ontario. The eight Great Lakes states and Ontario province working together through the Great Lakes Commission are currently in the process of developing a regional emission inventory for airborne toxic pollutants. This regional emission inventory is focused on 49 toxic air pollutants which have been identified as significant

October, 2003

contributors to the contamination of the Great Lakes. The development of the regional emission inventory has included the development of technical specifications for a regional air toxic database (Phase I); the development of an automated Regional Air Pollutant Inventory Development System (RAPIDS), an emission factor database, and an emission inventory protocol for inventorying hazardous air pollutants (Phase II); and the full implementation of the protocol and emission inventory software to complete an eight state point and area source toxic air emission inventory (Phase III). To date, this inventory system has been developed to estimate emissions from point and area sources only. RAPIDS, a state-of-the-art client/server software for the estimation of emissions from point and area sources is designed to run on a personal computer. Each State will create its own Statewide inventory that will be uploaded to the regional RAPIDS repository, an Oracle database, at the USEPA's Great Lakes National Program Office (GLNPO). RAPIDS uses the Great Lakes State-approved USEPA emission factor database, the Factor Information Retrieval System (FIRE) to estimate emissions, and also accepts source-specific emissions data. The RAPIDS design has focused on flexibility and versatility, and is built upon an innovative data model.

The latest release of RAPIDS (Version 2.1) has been updated to include, among other things, the ability to export emissions data in a format compatible with the U.S. EPA's National Emissions Inventory (NEI). For the 1999 national inventory, all states were required to submit emissions data in this format, which makes RAPIDS one of the most progressive emissions inventory systems available. According to the Great Lakes Commission, RAPIDS is the "first-ever multi-state pollutant emissions estimation software," and handles sophisticated relational data management as well as emissions estimations.

#### Title V Part 70 Operating Permits

Under the 1990 Clean Air Act Amendments (CAAA), facilities designated as "major sources" and facilities otherwise subject to Section 112 and Title IV must apply for a Title V Part 70 Operating Permit. Although a facility can meet the criteria for a major source in any of several ways, particularly relevant are those facilities which attain major source status by emitting 10 tons per year (tpy) or more of any HAP or 25 tpy total combined HAPs. As part of the application for a Title V permit, some facilities may have to report emissions of air toxics (see discussion on chemical coverage below). There is significant overlap between the 189 HAPs regulated under the CAA and the 650+ chemicals in TRI. Compared to TRI, however, the information provided in the permit applications has very different characteristics in terms of chemical coverage, completeness, and accessibility.

**Chemical coverage**: Title V requires that all permit applicants provide qualitative descriptions of their emissions, including all criteria pollutants and all 189 toxic pollutants. Quantitative emissions estimates are usually required by the permitting authorities only when more information is needed to resolve a dispute over applicable requirements, such as whether or not the facility should be

41

classified as a major source. In the event that there is no dispute, no emissions estimates are required. In situations where estimates are required, facilities are allowed to use "available information," which includes EPA emission factors documents, "reasonable engineering projections," as well as test data. EPA's policy, as outlined in the "White Paper for Streamlined Development of Part 70 Permit Applications," is to request just enough information to convince the permitting authorities that the facility meets all emissions requirements. According to the White Paper, "emissions information for these purposes does not always need to be detailed or precise." (U.S. EPA, 1995c) For most pollutants, it is not likely that Title V Part 70 emissions data could substitute for TRI release reporting.

**Industry/facility coverage**: There are no SIC or industry limitations for major facilities. For non-major sources, decisions on permit applicability are made on a source category by source category basis. Decisions are currently being made on Title V Part 70 permit requirements for non-major sources as to which source categories will be exempted, deferred, or required to obtain permits (Seitz, 1995). However, as stated above in the chemical coverage discussion, actual emissions estimates are required only when attempting to settle a dispute over facility status or other applicable requirements. Therefore, the majority of Title V permit applicants are not required to furnish any quantitative data. Title V's facility coverage is likely to be different from TRI's facility coverage, due to the differences in applicability criteria between the two systems. While TRI has a manufacture, process, or use threshold for toxic chemicals, Title V has applicability criteria based on HAPs emissions (see above).

**Release statistics/reporting frequency**: Emissions information is required at the time of permit application, renewal, and modification. Since permits are typically renewed every five years, most facilities will report their information every five years (Swanson, 1995). Other possible situations for emissions information updates include new applicable requirements not requiring permit modifications, and changed compliance status of facilities. Even if the information was as complete as TRI, the duration between reports is much longer than the one year timespan between TRI reports.

**Accessibility**: The U.S. EPA does not maintain a central inventory of the emissions data contained in the permit applications (Southerland, 1995). This information is kept at the state and regional levels, making it difficult to access, especially in comparison to TRI.

Summary of Availability of Fugitive/Non-Point and Stack/Point Air Emissions Data

None of the data sources described above can be used in place of TRI fugitive or stack emissions data. Although AFS provides good data on criteria pollutants, only one criteria pollutant (lead) is reportable as a discrete chemical substance on both AFS and TRI. Further, AFS HAP release information is not a good substitute for TRI because data for EPCRA Section 313 toxic chemicals are generally unavailable, and speciation cannot reliably generate accurate facility-specific HAP

October, 2003

emissions estimates. In addition, fugitive emissions are not specifically flagged within AFS. Some state air emissions inventories such as California's may collect air emissions information that is as complete or even more detailed than TRI. However, not all states maintain inventories, and there are still many unresolved data compatibility and accessibility issues. The Great Lakes inventory is limited in its geographic coverage as well as the number of chemicals it contains, uses different data collection techniques than TRI, and relies on state-generated estimates in lieu of facility reported release data. Emissions information on air toxics contained within Title V Permit documents also are not a substitute for TRI emissions in terms of chemical coverage, frequency of reporting, or accessibility.

**Direct Discharges to Receiving Streams or Water Bodies**

Form R requires that facilities report total direct discharges to receiving streams or water bodies. Releases are reported in pounds per year and include the name of the receiving stream or water body. The following section compares and contrasts the Permit Compliance System (PCS) with TRI to determine whether it could be used as a substitute for TRI chemical release data. In comparing and contrasting PCS with TRI, several variables are considered. Key criteria include: chemical coverage, industry and facility coverage, release statistics, reporting frequency, and accessibility.

The Permit Compliance System (PCS) tracks permit compliance and enforcement status of facilities regulated by the National Pollutant Discharge Elimination System (NPDES) under the Clean Water Act (CWA) and is managed by EPA's Office of Enforcement and Compliance Assurance (OECA). PCS tracks all point source discharges to surface waters, but does not include indirect releases such as discharges to Publicly Owned Treatment Works (POTWs). Permits are classified as major or minor based on facility discharge characteristics such as toxic pollutant potential and flow volume. Facilities are classified as "major" based upon a scoring system which considers toxic pollutant potential, flow/streamflow volume, conventional pollutant loading, public health impacts, water quality factors, and proximity to near coastal waters.

Major dischargers report compliance with their NPDES permit limits through Discharge Monitoring Reports (DMRs). DMRs are generally submitted on a monthly basis to state and regional EPA, providing detailed information on reported measurement values for those chemicals regulated within their NPDES permit. Data collected via DMRs are entered into PCS, including: concentration and quantity values for regulated pollutants, and the type of permit violation (if any). EPA uses PCS to produce the Quarterly Non-Compliance Report (QNCR), a public document listing NPDES permit violations. EPA requires monitoring data only for those permits classified as major. For minor facilities the database contains only general facility-level information. It is important to note, however, that all NPDES permittees (both major and minor) are required to file DMRs with their State or Regional NPDES authorities. Therefore, monitoring

43

data for minor facilities are available from the files of these permitting authorities, which are open to the public. Data for minor facilities are not maintained through the national database.

There are several differences between TRI and PCS stemming primarily from the divergent purposes of the two systems. Unlike TRI, PCS is a permit tracking system rather than a toxic pollutant loadings system. The differing data needs of these two types of systems make it problematic to transfer information from one to the other. For example, although EPA requires the reporting of PCS data in mass units unless it is impracticable to do so, the fact that PCS monitoring data can be reported in either mass units or as concentrations can make comparing the releases of two facilities a complicated issue. Data in units of concentration data can be converted to mass units only if flow data also exist.

**Chemical coverage**: A facility's permit record may not include all pollutants actually being discharged by the facility. The monitoring data available through PCS for major dischargers include only those chemicals for which a monitoring requirement has been set in the permit. Federal effluent guidelines exist for many major industries and determine chemicals for which monitoring is required. However, the guidelines may not consider the same chemicals across industries. Therefore, two facilities in different industries with similar chemical releases may not necessarily both report the same set of chemicals to PCS. Also, for facilities not covered by a Federal effluent guideline, and/or if additional controls are needed to ensure compliance with water quality standards, it is left to the discretion of the permit writers to decide which pollutants will be included in the permit, how often monitoring must occur, and which parameters and units of measure are to be used.

Because NPDES permit discharge limits are written in terms of PCS pollutant parameters, and not CAS numbers, much of the data contained within PCS is not chemical-specific. An example of a non chemical-specific PCS parameter is parameter 00535, Suspended Volatile Solids. It may be difficult to determine the mix of specific chemicals when data are reported using non chemical-specific parameters. In addition, in many cases, multiple parameters are reported for the same chemical, representing different measures of the same chemical. For example, PCS parameter numbers 01049, 01050, and 01051 represent dissolved, suspended, and total lead, respectively. Because there may be several parameters for a single chemical, it becomes difficult to aggregate their masses. Chemical Abstract Service (CAS) registry numbers are not reported for chemical parameters; however, parameters can sometimes be linked to a specific CAS number using an EPA database called SUPERCAS. SUPERCAS is an edited and augmented version of the CAS matching file contained in STORET, an EPA water monitoring data system. All PCS parameters are contained within SUPERCAS, and although SUPERCAS is not updated regularly, the addition of new parameters to PCS is a relatively infrequent event.

**Industry/facility coverage**: EPA requires monitoring data only from those facilities classified as major dischargers. For minor facilities, the database contains only general facility-level

October, 2003

information.  While the database tracks about 65,000 active permits, only about ten percent of these are classified as major.  A state may choose to submit monitoring data for minor facilities but generally such data are unavailable.  Unlike TRI, PCS does not restrict reporting requirements to specific industry groups or exempt facilities with less than the equivalent of ten employees.

**Release statistics**:  The release statistics reported for PCS parameters depend on the permit specifications.  Often, releases are reported as concentrations in parts per million (ppm) or milligrams per liter (mg/L), as opposed to units of mass such as pounds per year (lb/yr) or kilograms per year (kg/yr) (Rubin, 1995).  If discharges are reported in mass units, a maximum daily discharge also is reported. The basis for these reported data varies among facilities.  For example, a facility may sample its effluent only once per month and still report a monthly maximum discharge.  If discharges are reported as concentrations, a minimum, maximum, and average value may be reported, although a significant percentage of dischargers report only a maximum concentration (Rubin, 1995).  In general, flow rates are available for converting concentration units to units of mass (i.e., kg/year can be calculated by multiplying mg/L by the annual flow rate), although in some cases the flow rates are not provided.

A complex algorithm is required to estimate annual loadings from PCS data.  The algorithm must first identify facilities reporting quantities in pounds or kilograms, favoring mean values over maximum or minimum values.  For facilities with no loadings data, monthly concentration data must be linked and multiplied by each month's corresponding flow data, again favoring mean values over maximum and minimum values.  Additionally, the algorithm must convert the results to a single unit of measure.  PCS facilities report at least 26 different units of measure and 15 units of flow (e.g., gallons, thousands of gallons, and millions of gallons in terms of minutes, hours, days, and years).  This step is repeated for each month and summed to produce an annual loadings estimate.  If twelve months of data are not available, an average value can be used to produce an annual estimate.

Facility releases may be overestimated for several reasons: 1) facilities that release chemicals below their detection limit (e.g., between 0-6 ppm) will sometimes report releases at the detection limit (e.g., 6 ppm) in order to indicate the likely presence of a chemical; 2) facilities with episodic releases may be required to report releases at their peak level and not an average annual quantity; and 3) Facilities might have multiple monitoring points along the same outfall route, resulting in double counting.  Such reporting specifications may be appropriate given the purpose of the NPDES permit; however, PCS data will not always be appropriate for estimating annual pollutant loadings.

**Reporting frequency**: Discharge Monitoring Reports are generally submitted monthly to State or Regional EPA; therefore, reporting frequency is not a limitation when compared to TRI.

45

October, 2003

**Accessibility**: PCS data are accessible through the EPA Mainframe, the ENVIROFACTS database, as well as RTK NET. The EPA Mainframe is not accessible to the general public.

<u>Conclusion of Availability of Data on Direct Discharges to Water</u>

Because PCS is a permit tracking system, and not a pollutant loadings system, it cannot provide a suitable substitute for TRI release data. Within PCS, release data are only available for major facilities, and are reported in terms of PCS parameters, not specific chemicals. These chemical parameters cannot always be easily converted into CAS numbers. In addition, only those chemical parameters actually specified in the facility permit have monitoring requirements. In some cases, data may be reported in units of concentration rather than units of mass. If flow rates also are reported, concentration data can be used to estimate total releases, although there are several complicating factors in producing such an estimate.

**Underground Injection and Land Disposal On-Site** Section 313 gives EPA the authority to require reporting of on-site surface and subsurface (i.e., underground injection) releases to land. On-site surface releases to land include the following subcategories: RCRA subtitle C landfills, other landfills, land treatment/application farming, RCRA subtitle C surface impoundment, other surface impoundment, and other disposal. The Biennial Reports (part of the RCRAInfo database) require reporting of both underground injection and other on-site releases to land. The following analysis compares and contrasts Biennial Reports with TRI to determine whether it can be used as a substitute for TRI underground injection and on-site releases to land data.

Under Section 3002(a)(6) of the Resource Conservation and Recovery Act, facilities that generate an amount of hazardous waste that exceeds a defined threshold are required to submit biennial reports on that waste to EPA (or to state agencies that run RCRA programs). These reports include information on the quantity and nature of hazardous waste, the disposition of all hazardous waste, efforts undertaken to reduce volume and toxicity of waste generated, and the changes in volume and toxicity of waste actually achieved during the year. Facilities which treat, store, or dispose of hazardous wastes must provide information on the methods of treatment, storage or disposal. Data are reported to the states and regions, which then provide it to EPA headquarters. Information is entered into RCRAInfo, which is maintained by the Office of Solid Waste and Emergency Response (OSWER).

RCRAInfo is EPA's comprehensive information system, providing access to data supporting the Resource Conservation and Recovery Act (RCRA) of 1976 and the Hazardous and Solid Waste Amendments (HSWA) of 1984. RCRAInfo replaces the data recording and reporting abilities of the Resource Conservation and Recovery Information System (RCRIS) and the Biennial Reporting System (BRS).

The RCRAInfo system allows tracking of many types of information about the regulated

46

October, 2003

universe of RCRA hazardous waste handlers. RCRAInfo characterizes facility status, regulated activities, and compliance histories and captures detailed data on the generation of hazardous waste from large quantity generators and on waste management practices from treatment, storage, and disposal facilities.

Using cutting-edge technology and a simple architecture, RCRAInfo provides a convenient user interface for the program staff and managers of the EPA and its State and Tribal partners. RCRAInfo data is made available to the public through EPA's Envirofacts Data Warehouse through monthly extracts or through the  Right to Know Network.

Biennial Reports provide an overview of the progress of the RCRA program through tracking trends in hazardous waste generation and management.  Large quantity generators (LQGs) and treatment, storage, and disposal facilities (TSDFs) are required to report every two years.  Large quantity generators are defined as facilities that generate 2,200 pounds of total RCRA hazardous waste per month; generate 2.2 pounds of RCRA acute hazardous waste a month, or accumulate this amount during the year; or generate or accumulate more than 220 pounds annually of spill cleanup material contaminated with RCRA acute hazardous waste.  Biennial Reports contain data for about 23,000 LQGs and 4,000 TSDFs.

There are several important differences between Biennial Reports and TRI.  Although Biennial Reports maintain a large amount of useful data, it nevertheless cannot duplicate the information contained within TRI.  Waste codes used in Biennial Reports do not necessarily map to unique chemicals, quantities of  specific chemicals in a wastestream cannot be determined, and reporting is less frequent than for TRI.  As detailed below, for these reasons Biennial Reports are not a reasonable substitute for TRI.

**Chemical coverage**: Biennial Reports contain data on hazardous wastes as defined by RCRA. RCRA hazardous waste is designated as either "listed waste" or "characteristic waste".  Listed wastes have been identified as hazardous as a result of EPA investigations of particular industries or because EPA has specifically recognized a commercial chemical waste's toxicity.  Listed wastes appear in 40 CFR Part 261.  Characteristic wastes are determined hazardous because they exhibit one or more of the following "characteristics": ignitability, corrosivity, reactivity, or toxicity.

The primary difficulty with waste codes is that not all waste codes used in Biennial Reports reporting map directly to a single, unique chemical.  For example, waste code F004 is defined as:

*The following spent non-halogenated solvents: cresols, cresylic acid, and nitrobenzene; all spent solvent mixtures/blends containing, before use, a total of ten percent or more (by volume) of one or more of the above non-halogenated solvents or those solvents listed in F001, F002, and F005; and still bottoms from the recovery of these spent solvents and spent solvent mixtures.*

47

October, 2003

Listed wastes that are categorized as non-specific source waste (the F wastes, such as F004 defined above), specific source wastes (the K wastes), and three of the characteristic waste categories (D001, D002, and D003) cannot be matched to a specific chemical. Listed wastes categorized as commercial chemical products (the P and U wastes), and characteristic wastes meeting the toxicity characteristic (D004-D043) each may represent a single, unique chemical, but they also may represent a mixture of various materials of which the identified chemical is but a small proportion.

**Industry/facility coverage**: Biennial Reports reporting requirements do not require that specific industries or SIC codes report; however, certain waste categories are excluded (40 CFR §§261.4 and 261.3(c)(2)(ii)). For example, the so-called the Bevill exemption (40 CFR §261.4(b)(7)) classifies solid wastes resulting from the extraction, beneficiation, and processing of ores and minerals (including coal, phosphate rock and overburden from the mining of uranium ore) as non-hazardous solid wastes and therefore not subject to Biennial Reports reporting. Extraction and beneficiation wastes, plus 20 special mineral processing wastes (listed under 40 CFR §261.4(b)(7)), fall under RCRA Subtitle D classification. TRI now requires reporting from the mining industry. In addition, emission control wastes, which are prominent wastes within the electric utilities industry, are excluded from Biennial Reports reporting. Electric utilities represent an industrial group being considered for addition to TRI. The full list of wastes that are excluded from Biennial Reports reporting include the following:

| | |
|---|---|
| Acid | Mining, Overburden |
| Agriculture, Irrigation | Nuclear |
| Cement Kiln Dust | Petroleum-contaminated Media and Debris |
| Chromium, Leather Tanning | Precipitation Runoff |
| Drilling Fluid | Pulping Liquor |
| Emission Control Waste | Sewage, Domestic |
| Fertilizer | Sewage, Mixture |
| Household | Wastewater, Point Source Discharge |
| Mining | Wood, Wood Products |
| Mining, In situ | |

October, 2003

**Release statistics**: While some of the waste codes used in Biennial Reports to identify waste streams may refer to a single, unique chemical (i.e., a specific CAS number), others do not. In addition, a waste stream can be identified by multiple waste codes (e.g., a waste stream can simultaneously be ignitable, contain spent halogenated solvents, contain benzene, etc.). At present, there is no mechanism to apportion the waste stream volume to particular waste codes where multiple codes are reported.

The "mixture rule" and "derived-from" rule were adopted by EPA in 1980 and affect the data reported to Biennial Reports.[5] The derived-from rule provides that wastes derived from a listed hazardous waste (such as the ash from incineration of a listed waste) also are deemed hazardous waste. The mixture rule provides generally that any mixture of listed hazardous and non-hazardous waste are considered hazardous waste (although there are important exceptions). RCRA waste streams are often a mixture of one or more toxic chemicals contained at various concentrations in a non-hazardous matrix (e.g., railroad gravel or water). From the reported data, it is not possible to determine the fraction of the entire waste stream that is composed of a particular hazardous chemical. While it is evident that the chemical concentration is adequate to result in the waste stream being defined as hazardous (e.g., the chemical concentration exceeds a certain threshold), no more detailed determination regarding the quantity of the hazardous component released can be drawn.

Reporting frequency: LQGs and TSDFs submit Biennial Reports data on a biennial basis. In contrast, TRI reporting occurs on an annual basis.

**Accessibility**: Biennial Reports are accessible through the EPA Mainframe, the ENVIROFACTS database, as well as RTK NET (See Attachment B-3). The EPA Mainframe is not accessible to the general public.

Conclusion on Availability of Data on On-Site Releases to Land

Biennial Reports require individual reporting of underground injections on-site as well as on-site releases to land, as does TRI. However, only half of the waste codes used in Biennial Reports can be assumed to identify individual chemicals. In addition, the waste classification system, including the "mixture rule" and "derived-from" rules, results in waste quantities being reported to Biennial Reports that do not identify quantities of the individual chemicals. The quantity reported to Biennial Reports represents the quantity of the entire waste stream, and not individual chemicals. Therefore, Biennial Reports is not a good substitute for TRI because it is not possible to reliably estimate the releases of a particular toxic chemical to underground injection on-site or releases to land on-site from Biennial Reports.

---

[5] The "mixture rule" and the "derived-from" rule were struck down by a 1991 D.C. Circuit Court ruling, but at the court's suggestion, EPA has temporarily reenacted the rules on an interim basis while it develops a new rule to consider them.

October, 2003

### Discharges to a POTW

Section 313 gives EPA the authority to require that facilities report information on annual discharges to POTWs (Public Owned Treatment Works), including the name and location of the POTW. Although Biennial Reports requires some reporting of discharges to POTWs, and PCS allows for reporting of indirect discharges to water, neither system provides information about POTW discharges at TRI's level of detail and completeness.

The RCRAInfo system, which contains data from the biennial reports of large quantity generators (LQGs) and treatment, storage and disposal facilities (TSDFs), also requires reporting of some discharges to POTWs. Several limitations associated with Biennial Reports data, however, are described above. In addition, hazardous waste, once mixed with domestic sewage and sent to a POTW for treatment, is no longer considered a hazardous waste and is therefore not reported to RCRAInfo.

Section 1004(27) of the Resource Conservation and Recovery Act (RCRA) provides that once hazardous waste is discharged directly to waters of the United States, the waste is not subject to Biennial Reports reporting. Hazardous waste must be reported only if it receives on-site treatment or is stored in a RCRA permitted unit prior to discharge. If it receives treatment or is stored in an exempt unit (e.g., tanks or totally enclosed treatment units), the waste is reported only if the generator qualifies as a large quantity generator, although the exempt waste is not counted when determining whether a facility is a Large Quantity Generator. TRI provides no exemption for discharges to POTWs which receive no prior treatment.

Although the Permit Compliance System (PCS) includes indirect discharge data elements, PCS does not require reporting of indirect discharges (i.e., discharges that pass through a POTW before entering a waterbody, in contrast to waste discharged directly to a waterbody). States have the option of including indirect discharge data, although very few require that this data be reported (Rubin, 1995).

### Transfers to Other Off-Site Locations

EPCRA Section 313 gives EPA the authority to require that facilities reporting to TRI report transfers to off-site locations, including the name, location, and RCRA ID number of the off-site location. The Biennial Reports, which contains hazardous waste data from large quantity generators (LQGs) and treatment, storage and disposal facilities (TSDFs), also requires reporting of off-site transfers on its Form GM. Information requested by RCRAInfo includes the EPA ID of the facility to which the waste was shipped, the processes used to treat, recycle, or dispose of the waste at the off-site facility, the off-site availability code, and the total quantity of waste shipped during the report year (see discussion above of underground injection and land disposal for a more complete description of Biennial Reports). Biennial Reports also provides data on the volume of hazardous waste shipped off-site for land disposal, a release end-point of relevance to TRI.

50

October, 2003

There are several difficulties associated with comparing Biennial Reports data to TRI data, which are described above in the section covering on-site releases to land.

### Review of State Right-to-Know Programs

Under the TRI program, data is submitted to both the U.S. Environmental Protection Agency and to the state or tribal entity in whose jurisdiction the reporting facility is located. With the advent of the federally mandated TRI reporting requirements and the influx of this new information, states with release and transfer reporting requirements of their own changed their programs to minimize program costs to industry and government. In New Jersey, for example, where TRI overlapped with state toxics reporting requirements under the New Jersey Right-To-Know (RTK) program, the RTK reporting requirements were removed to minimize reporting overlap. For more information on state-expanded TRI reporting, a detailed discussion is presented in the "Status of State TRI Programs" section of the TRI Public Data Release, State Fact Sheets. (U.S. EPA, 1999g) This section of the Public Data Release contains a survey administered by the National Conference of State Legislatures to all states on their TRI data use and expansion activities.

As of 1994, only Arizona, Massachusetts, Minnesota, and Wisconsin required or were planning to require expanded state TRI reporting to include non-manufacturing facilities (NCSL, 1995). Under the expanded state requirements, non-manufacturing facilities are required to file Form Rs with the state, but are not required to file with the federal EPA. In addition, some states require facilities to report release information beyond that required by the federal TRI program. Overall, however, the additional data collected by states are far less complete and uniform than would be available under an expanded federal TRI program. Descriptions of how state programs differ from federal TRI requirements are given below.

<u>Massachusetts</u>

The Massachusetts Toxics Use Reduction Act of 1989 (TURA) requires companies to report on their toxic chemical use, while TRI requires companies to report their toxic chemical releases. TURA covers facilities in the following SIC codes:

mining (SIC codes 10-14)
manufacturing (SIC codes 20-39),
transportation, communications, utilities (SIC 40, 44-49),
wholesale trade (SIC 50 and 51),
personal services (SIC 72),
business services (SIC 73),
automotive repair, services, and parking (SIC 75),
and miscellaneous repair services (SIC 76).

51

Initially, TURA covered the same facilities and chemicals as the federal TRI program. As of 1995, TURA requirements expanded to include facilities under the above SIC codes which use chemicals that are listed as hazardous substances under §101(14) and §102 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). (These chemicals are listed at 40 CFR §302.4). Also, substances found on the federal Comprehensive Environmental Response and Compensation Liability Act (CERCLA) list are subject to TURA reporting and planning, except for chemicals that are delisted. There are over 1400 chemicals that are subject to reporting, although only about 250 have been used and reported in Massachusetts. Massachusetts otherwise uses the same employee and manufacture/process/use thresholds and chemical list as the federal TRI program (TURI, 1994). Federal facilities are exempt from TURA reporting

Facilities covered under TURA must file an annual report called a Form S (similar to Form R) which identifies the listed chemicals used during the year in each production process, the percentage reduction of toxic by-products and toxic emissions compared to a defined base year, and the toxic use reduction techniques used to reduce the wastes. Data from the Form Ss are entered into the state Toxics Use Reduction Inventory. In addition, as of 1995, facilities are required to prepare a detailed toxic use reduction plan every two years (MA DEP, 1993).

### Wisconsin

In 1996, Wisconsin required mining operations (SIC codes 10 through 13) to file Form Rs to the state. In addition, public agencies, public and private educational facilities, and public and private research facilities in Wisconsin are subject to federal TRI reporting requirements. Aside from the additional SIC codes, Wisconsin's Right-To-Know reporting requirements are identical to those of the federal TRI program (NCSL, 1995; BNA, 1995; Dunst, 1995)

### Conclusion of Availability of TRI-like Data at the State Level

Although some states have built on the foundation of TRI data with additional state reporting requirements, their data do not have major redundancies with, and therefore are not substitutes for, the current TRI or the proposal to expand TRI. The advent of federally mandated TRI reporting has resulted in many states adopting Form R for their state reporting, and provided a strong impetus for states to remove redundancies in their own reporting in order to minimize costs to facilities in their jurisdictions. Information collected by states above and beyond federal reporting requirements may be available in piecemeal fashion.

### Inventory Data

For each listed toxic chemical, a regulated facility must complete data element 4.1 of Part II of Form R, which asks for the "Maximum Amount of the Toxic Chemical On-Site at Any Time During the Calendar Year." Maximum amounts (in pounds) are reported in ranges that increase by powers of ten. Alternative sources of "maximum amount on site" chemical inventory data include EPCRA Section 312 Tier I and II reports.

October, 2003

EPCRA (§311-312) requires that states establish plans for local chemical emergency preparedness and that inventory information on hazardous chemicals be reported by facilities to state and local authorities. "Hazardous chemicals" are defined under the Occupational Safety and Hazard Administration's (OSHA) requirements -- essentially any chemical that poses physical or health hazards. The relevant regulations are detailed in 40 CFR §370. Data elements similar to both TRI and Tier I/II reports make EPCRA Tier I/II the best candidate for an alternative source of TRI "maximum amount on site" inventory information.

EPCRA Section 312 outlines a "two-tier" approach for annual inventory reporting. All facilities that store hazardous or extremely hazardous substances must submit at least a Tier I and often a Tier II form as well. Tier I requires reporting on broad categories of physical hazards such as fire, sudden release of pressure, and reactivity, as well as acute and chronic health hazards. Upon request by a Local Emergency Planning Committee (LEPC), State Emergency Response Commission (SERC), or fire department, a facility may be required to submit the more detailed Tier II form (which may be submitted instead of the Tier I form). Tier II requires chemical specific information by CAS number. For example, a Tier I report might state that a facility stores 3,000 pounds of chemicals that pose chronic health hazards, while a Tier II form for the same facility would report 1,000 pounds of toluene and 2,000 pounds of benzene on-site. Approximately 33 states require regulated facilities to submit Tier II forms, and most of the remaining states recommend that facilities submit Tier II forms.

A regulated facility is required to submit this information to each of the following groups: LEPCs, SERCs, and the local fire department with jurisdiction over the facility. A facility must submit an annual report for every chemical which requires an MSDS and which exceeds certain reporting thresholds for the amount of chemical stored on site at any one time. The reporting threshold for chemicals listed under EPCRA §302 as Extremely Hazardous Substances (EHSs) is the threshold planning quantity (TPQ), or 500 pounds, whichever is lower.[6] For all other chemicals with MSDSs, the threshold is 10,000 pounds. In general terms, the inventories contain information about the maximum quantity stored, the average quantity on-site at any given time, the location of the chemicals at the facility, and the number of days on-site.

Chemical coverage: The chemicals covered under Section 312 are all those defined as hazardous or extremely hazardous substances in Section 311 (essentially any substance that poses a health or physical hazard). All of these substances, for which facilities must submit MSDSs, are covered under OSHA's Hazard Communication Standard regulations. OSHA's definition of "hazardous chemical" not only includes toxic chemicals but also chemicals which are considered health hazards, irritants, sensitizers, corrosive, fire hazards, explosive, as well as reactive. Consequently, many more chemicals are included under OSHA's rule than under TRI.

**Industry/facility coverage:** Facilities that are required to submit MSDSs to the state authorities for hazardous chemicals on site also must submit Tier I and/or Tier II forms. While

---

[6] The Extremely Hazardous Substances and their TPQs are listed in 40 CFR Part 355, Appendices A and B.

October, 2003

there are no SIC exemptions for facilities that are covered under the reporting threshold requirements, facilities not included under OSHA's Hazard Communication Standard (e.g., mines) do not have to file reports. Because the Section 312 thresholds cannot be used to determine whether a facility covered under Section 312 also would be covered under Section 313 (e.g., whether a facility which stores 10,000 lbs. of a toxic chemical listed under TRI also meets Section 313 thresholds), the extent to which facilities potentially subject to TRI reporting would be captured by Section 312 is unknown.

**Release statistics/reporting frequency**:  Facilities covered under EPCRA Section 312 must submit their Tier I and/or Tier II reports containing data with respect to the preceding calendar year to their respective states annually on or before March 1.

When completing a Tier II form, a covered facility must report the following information:

The chemical name or the common name of the chemical and the CAS registry number (as it appears on the MSDS);

- Indication of whether the hazardous chemical is an extremely hazardous substance;

- Indication of whether the hazardous chemical is present at the facility in its pure state or in a mixture, and whether it is a solid, liquid, or gas;

- The applicable health and physical hazard categories;

- An estimate (in ranges) of the maximum amount of the hazardous chemical present at the facility at any time during the preceding calendar year (e.g., 10,000 to 99,999 pounds);

- An estimate (in ranges) of the average daily amount of the hazardous chemical present at the facility at any time during the preceding calendar year;

- The number of days the hazardous chemical was found on-site at the facility;

- A brief description of the manner of storage of the hazardous chemical at the facility;

- A brief description of the precise location of the hazardous chemical at the facility, and

- An indication of whether the owner or operator of the facility elects to withhold location information on a specific hazardous chemical from disclosure to the public.

Facilities that choose to withhold from the public certain data on hazardous chemicals must nevertheless provide the information to the relevant authorities via the Tier II Confidential Location Information Sheet.  The information contained on these sheets is not made available to the public.

October, 2003

**Accessibility**:  The general public may access Tier I and Tier II information on a facility by facility basis by forwarding a written request to either the SERC or the LEPC.  Tier II information on facilities which do not meet the reporting threshold requirements also may be obtained from the SERC or the LEPC if a "general need" can be demonstrated on the part of the requester.  In these cases, the relevant authorities will request that the relevant facility or facilities fill out Tier II forms.

The ability to access state EPCRA data at a higher level of aggregation depends partly on the information technology resources of the state authority responsible for maintaining the data.  Approximately one half of all the states have some type of computerized database, and of those, five states (Arkansas, Maryland, New Jersey, Oregon, and Rhode Island) store full Tier II data in a modem-accessible format.  However, because these databases were created using different software and possess different database structures, it is a considerable challenge to aggregate the data contained within them.

In some states that do not yet maintain computerized databases of Tier I and Tier II information, the parties requesting information are required to cover the copying and administrative costs of the data retrieval.  Because some EPCRA reporting programs are unfunded, fees charged for this service range from low to substantial.  In other states, the requesting parties must go to the office and perform the copying themselves (ICF, 1996).

### Conclusion on the Availability of Inventory Data

Tier I forms only request information based on possible health and physical hazards, and do not ask for chemical-specific data. The level of detail and the number of chemicals covered in Tier II "maximum amount on site" inventory data surpasses the chemical inventory data requested on TRI Form R.  Not all states, however, require submission of Tier II forms. Therefore, some of the facilities that are covered under TRI do not have to report as detailed inventory information under EPCRA Section 312.

There also are significant difficulties with respect to public access of Tier I and Tier II data.  All information is reported to state authorities; there is no national integrated database.  In addition, because not all states have set up computerized databases to manage this information, extensive data retrieval and analysis is often both cumbersome and expensive.

**Pollution Prevention Data (P2).**  Form R requires that facilities report a variety of information that can be used for pollution prevention analyses, including non-quantitative reporting of pollution prevention activities, production ratios, and chemical-specific amounts of materials treated, recycled, released (one-time, and for the entire year), and shipped off-site in wastes.

### EPA Databases with Pollution Prevention Data

55

October, 2003

Besides TRI, waste prevention and management data are collected at the federal-level through RCRA Biennial reports. RCRA biennial report data are compiled in the RCRAInfo database, as discussed above. The level of chemical specificity and flowthrough estimates for waste prevention and management information in RCRAInfo and TRI are not available in other federal data sources.

Biennial Reports contains pollution prevention information on hazardous waste large quantity generators and treatment, storage, or disposal facilities. Data are collected primarily by states, and are collated by EPA into the RCRAInfo database system. States are not required to use official Biennial Reports forms for the submission of data; EPA transfers data on state forms into the RCRAInfo system as necessary (ICF, 1993).

All large quantity generators must submit the following facility-specific information to RCRAInfo:

•       whether any source reduction or recycling activities took place during the reporting year, and

•       limiting factors that have affected source reduction and/or recycling activities.

In addition, for each hazardous waste generated, a generator must specify the following pollution-prevention related data:

•       RCRA waste code and hazardous waste quantity generated;

•       efforts to reduce the volume and toxicity of wastes, and

•       reductions in volume and toxicity actually achieved compared with those achieved in previous years.

If a hazardous waste has been minimized as the result of new activities implemented in the reporting year, the generator also must report the following pollution-prevention related information:

•       quantity of waste recycled;
•       source reduction quantity; and
•       waste minimization activity implemented (e.g., waste segregation, inventory control).

RCRA Biennial reports provide some qualitative and quantitative pollution prevention information, but, at a systems level, do not have the same facility or chemical coverage as TRI. The Biennial Reports system is not a substitute for TRI pollution prevention data. RCRA Biennial reports only include hazardous wastes; pollution prevention data contained in TRI includes information on wastes or process by-products in all production phases and media. In addition, the chemical reporting universe is different between the two systems. The universe of toxic chemicals regulated under TRI differs from the universe of listed hazardous wastes or chemicals with hazardous waste characteristics regulated by RCRA.

56

October, 2003

Also, the facility universes captured by the two systems are not the same. RCRA Biennial reports are only completed by RCRA large quantity generators, while TRI reports are required by facilities in manufacturing industries that exceed employee as well as chemical manufacturing, process, and use thresholds. The Biennial Reports facility universe is also different due to RCRA waste exclusions and exemptions. For example, wastes mixed with domestic sewage that are excluded from Biennial Reports reporting can be an indirect water discharge that may be covered under TRI reporting.

The pollution prevention reporting in Biennial Reports contains information on hazardous waste minimization and recycling efforts. Where this information does overlap with TRI pollution prevention reporting, it does not contain the same level of detail. For example, in some cases Biennial Reports pollution prevention information applies to wastestreams consisting of chemical mixtures, while TRI pollution prevention data are chemical specific. Since Biennial Reports waste codes are more general in nature than CAS numbers, a facility's waste mixture could change from year to year, and yet it might report the same waste code. Lack of precision in reporting of waste contents also could result in a situation where a facility reduces the aqueous quantity of its wastes, and thus appear to be preventing pollution. However, by changing its waste mixture, the facility might even increase the amount of toxic material entering the wastestream without modifying its Biennial Reports reporting. That the exact contents of a facility's waste mixture cannot always be determined may make it difficult to extract chemical-specific data from Biennial Reports.

### State Environmental Agency Databases

Under current TRI reporting procedures, facilities send copies of all TRI reports to both state and federal agencies. Many states currently rely on the pollution prevention data received from TRI for planning and targeting purposes (U.S. EPA, 1993), and do not require additional reporting. However, two states, New Jersey and Massachusetts, have passed laws to collect materials accounting pollution prevention data that exceeds that found in Section 8 of Form R. Twelve other states have pollution prevention planning requirements in place, but only Massachusetts and New Jersey currently have mandatory materials accounting.[7]

**Massachusetts Pollution Prevention Reporting**: The Massachusetts Toxics Use Reduction Act (TURA) has required firms to report on toxic use for individual "production units" at their facilities since July of 1991. Facilities submit annual Toxics Use Reports (Form S) to the Massachusetts Department of Environmental Protection (MDEP) as a supplement to the TRI Form R. With the exception of qualitative source reduction pollution prevention reporting requirements and production ratios, TURA pollution prevention reporting requirements are additional to those collected by TRI.

Form S records information on the quantity of the toxic substance used on a facility-wide and production unit basis. Form S is divided into two parts: 1) cover sheet and 2) chemical reports.

---

[7]8. For a detailed comparison of materials accounting data elements reported to TRI, New Jersey, and Massachusetts, see (U.S. EPA, 1995d).

October, 2003

The cover sheet contains general facility information, a certification statement, and an identification of production units at the facility. Form S chemical reports must be filed on each listed toxic chemical manufactured, processed, or otherwise used at greater than 10,000 pounds per year (ICF, 1993). The form contains the following information on chemical use and pollution prevention: facility-wide and production unit data for each chemical, year-to-year reporting changes, and production unit reports.

**New Jersey Pollution Prevention Reporting**: New Jersey has collected toxic chemical release and pollution prevention data longer than the TRI program has been in existence. Since 1979, New Jersey has collected toxic chemical release and pollution prevention data through a variety of separate programs and activities, gradually narrowing down the scope of these reporting requirements as TRI was introduced and expanded to include pollution prevention. In fact, the results of an Industrial Survey, which collected release and throughput data from 15,000 New Jersey facilities, were used to develop the list of SARA Title III chemicals (U.S. EPA, 1995d). For these reasons, New Jersey data, unlike data collected in Massachusetts, still overlaps somewhat with data collected on TRI Form R. New Jersey pollution prevention data also contain detailed throughput information which exceeds that currently contained in TRI. These throughput data require facilities to account for all amounts of the chemical brought or produced on-site, shipped off-site in products, destroyed on-site through treatment, recycled on-site, and released to the environment or shipped off-site in wastes.

New Jersey's additional reporting requirements apply to all TRI chemicals and all facilities covered by TRI (SIC codes 20-39). Originally, New Jersey required facilities manufacturing, processing, or using an Environmentally Hazardous Substance (EHS) to report toxic chemical release information (U.S. EPA, 1995d). The original EHS list was comparable to the list of chemicals generated by the Industrial Survey mentioned above, and therefore similar to the original SARA Title III list. The list of chemicals for which New Jersey now collects toxic chemical release and pollution prevention information has been expanded to contain those in the national TRI listing.

**Alternative Sources of Emergency Release Data**

TRI Form R requires that facilities report the quantity of TRI listed chemicals released to the environment as a result of remedial actions, catastrophic events, or one-time events not associated with production processes. Accidental release data reported to TRI also are potentially reported to the National Response Center (NRC). However, as discussed below, the NRC is a database of initial notifications, made during or immediately after a release occurs. For this reason, data within NRC may be incomplete or inaccurate and will not substitute for TRI emergency release data.

Emergency Response Notification System (ERNS)

58

October, 2003

The Emergency Response Notification System (ERNS) is a computer database containing information on release notifications of oil and hazardous substances that have occurred throughout the United States and have been reported to the National Response Center (NRC) and or one of the 10 EPA Regions. Initial notifications, which comprise most of the information in ERNS, supply preliminary information on a release and are cited as unverified data. Depending on the severity of the release and any response actions taken, the EPA or Coast Guard On-scene Coordinator (OSC) may obtain further information at the site of the release or through discussions with state and local officials. Data has been collected into ERNS since 1987.

ERNS contains many types of information on specific notifications of releases of oil and hazardous substances, including the following: discharger information, date of release, material released, cause of release, damage/injuries/deaths, amount released, source of release, incident location, response actions taken, authorities notified, and environmental medium into which the release occurred.

ERNS serves as a mechanism to document and verify incident-location information as initially reported and is utilized as a direct source of easily accessible data needed for analyzing releases of oil and hazardous substances. ERNS information is used for guidance and regulatory development, Congressional inquiries, response preparedness, compliance and enforcement support, statistical and trend analyses, program planning and management, and responses to requests for information from the public.

ERNS supports the release notification requirements of section 103(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended; section 311(j) of the Clean Water Act; and sections 300.300 and 300.405 of the National Oil and Hazardous Substances Contingency Plan, which begins at 40 CFR Part 300.

ERNS is a database of initial notifications, made during or immediately after a release occurs. Because the data are reported at such an early stage, the exact details of the release are often unknown and are therefore not reported. It is estimated that two-thirds of the 193 data fields in ERNS are not completed for most release notifications. In addition, duplicate reports may appear in the database because of follow up calls that are not identified as such or observers reporting a release that has already been reported. Approximately five percent of ERNS records are estimated to be duplicates. (U.S. EPA, 1995e)

**Integrated Management Information System (IMIS)**

October, 2003

IMIS is an OSHA database that contains records of workplace inspections conducted by OSHA industrial hygienists. Two general types of inspections are conducted by OSHA: 1) Scheduled or planned inspections which are on-site enforcement inspections to verify compliance with OSHA standards, and 2) Unplanned inspections which are investigations of workplace incidents where there is one fatality or three or more worker hospitalizations (five or more worker hospitalizations were required to trigger an inspection before 1993). Inspection data are input and stored within IMIS, providing a record of OSHA activities at each workplace that has been inspected.

OSHA is estimated to add more than 120,000 inspection records per year, of which 4,000-5,000 are related to accidents. Accident inspections include a short description of the incident, information regarding each worker that is injured, and any hazardous substances that may be involved. It is estimated that 100 incidents reported each year involve hazardous substances. A four digit hazardous substance code is entered into IMIS rather than a CAS number. The quantity of hazardous material released is not entered. In addition, it can not be assumed that the reported death or injury was a result of an accidental release even in cases where a hazardous substance was involved. For example, if a maintenance person cleans the inside of a storage tank and is asphyxiated by the nitrogen rich environment, the death is not the result of an "accidental release". (U.S. EPA, 1995e)

## Summary on Availability of Pollution Prevention and Accidental Release Data

The data systems discussed above cannot replace TRI's pollution prevention and accidental release data. Difficulties exist in chemical and facility coverage, reporting frequency, and the level of data detail. Specifically, RCRA Biennial reports cannot easily be used as a substitute for TRI pollution prevention data. While Biennial Reports provides some qualitative and quantitative pollution prevention information, it does not have the same facility or chemical coverage as TRI. Biennial Reports only includes hazardous wastes, while TRI pollution prevention data includes information on wastes or process by-products in all production phases and media. Because Biennial Reports collects data organized by Biennial Reports waste codes, it also lacks the chemical-specific detail that TRI contains. In addition, the facility and chemical reporting universes are different between the two systems.

Overlap of State pollution prevention data with that found in TRI is minimal; state data could not be used to replace current TRI pollution prevention reporting requirements. Under current TRI reporting procedures, facilities send copies of all TRI reports to both state and federal agencies. Many states have come to rely on this easily available source of pollution prevention data. As Massachusetts and New Jersey demonstrate, even those states that had taken a proactive role in collecting toxics release and pollution prevention data scaled back their programs with the introduction of mandatory TRI reporting. No state program collects all of the pollution prevention data currently contained in Form R, though some states (e.g., New Jersey and Massachusetts) augment TRI pollution prevention data with requirements additional to those contained in Section 8 of Form R. These data, such as materials accounting data, are used at the

October, 2003

state level for a variety of purposes, including benchmarking of facility pollution prevention efforts and the determination of toxic material flows in production processes.

In addition, accidental release data reported to ERNS does not substitute for TRI accidental release data. ERNS is a database of initial notifications, made during or immediately after a release occurs. For this reason, data within ERNS may be incomplete or inaccurate.

**Value Added from the TRI Reporting System**

In addition to containing data not available through other sources, TRI enhances the usefulness and functionality of the data by allowing public access to the data, linking release data across media (e.g., water, air, land), and providing definitional consistency for the units of measurement. These features give TRI additional advantages over any emissions data system that might be assembled from non-TRI sources.

Perhaps the most important advantage TRI possesses over non-TRI sources is the information that can only be found in TRI. As described, data unique to TRI include chemical-specific multimedia release information as well as important pollution prevention information. For example, AFS currently only tracks a limited amount of HAP emissions, and Biennial Reports does not track hazardous waste treatment, transfer, or disposal at a chemical-specific level. TRI can provide this as well as other types of information not available elsewhere.

Because an important part of TRI's mission is to provide emissions data to the public, many different methods of access to TRI have been implemented. Data analysis difficulties aside, access issues make it very difficult for the general public to assemble non-TRI data into a TRI-like form. Current methods of accessing TRI include on-line resources such as EPA's Envirofacts, TRI Explorer, the National Library of Medicine's TOXNET, RTK NET, electronic media such as CD-ROM, and printed media. TRI places all of the information in one location, and providing many avenues of access to that data.

Another major problem associated with using non-TRI sources for TRI-like data is linking facility release information across various release media. In the past, the tool used to identify facilities reporting to multiple systems was the Facility Indexing System (FINDS). FINDS was a centralized inventory of facilities monitored or regulated by EPA, and served as an index database to other EPA Program Office databases. This system has been replaced with the Facility Registry System (FRS), a system developed through the assistance of the Facility Registry System.

The above advantages notwithstanding, it is important to recognize that these systems have certain shortcomings with respect to any effort to assemble TRI-like information from non-TRI sources. For example, one significant difficulty with IDEA involves problems with the FINDS linkages themselves. Because of various data inconsistencies, many facilities are not linked to all of their permits through IDEA, or have incorrectly linked permits. TRI's reporting mechanism helps to reduce this problem within TRI, where data from a facility is reported at one time in one

October, 2003

place. In addition, because IDEA is designed to primarily provide compliance and enforcement data, the system does not always include emissions data even when such data exists.

The lack of definitional consistency also can result in difficulties in understanding information aggregated across non-TRI databases. A substantial amount of effort would be required to overcome discrepancies in units of measure, chemical coverage, reporting thresholds, reporting exemptions, and reporting frequencies in the various databases. TRI overcomes many of these problems by allowing the user to view cross-media data using a single set of reporting definitions and requirements.

The different units and data aggregation methodologies used by various non-TRI sources can lead to data incompatibilities. For example, because PCS data are reported in terms of PCS *parameters* (usually chemical concentrations as opposed to units of mass), some fairly involved calculations must take place before that data can be converted into TRI-like units. For Biennial Reports, facilities report their hazardous waste throughput in terms of aggregated waste *codes*, which cannot always be easily broken down to specific chemicals. Discrepancies between the way chemical information is reported to the various non-TRI databases can make it difficult or even impossible to accurately sum totals of pollutants across databases. Because all TRI release and transfer data are reported in a uniform fashion, no such difficulty exists in TRI.

Databases often also have different reporting frequencies, which can make it difficult to assemble high quality historical data at the facility level. Biennial Reports requires facilities to report data every two years, whereas AFS requires but does not enforce annual reporting. Because TRI requires annual reporting from all covered facilities, TRI effectively overcomes this problem.

In summary, the value which TRI alone adds to the community at large is significant. The many technical, access-related, and data coverage problems associated with attempting to use non-TRI sources for TRI data makes impractical the substitution of these sources for TRI.

### 5(b)  Consultations

EPA has consulted with a large number of individuals and organizations throughout all segments of the public in the development and continued implementation of the TRI program. Since the initial development of the program, feedback through EPA's outreach efforts have been received from various organizations, including environmental and public interest groups, trade associations, and individual representatives. This feedback is continually sought and incorporated in the ongoing evolution of the 313 program.

During the initial development of the TRI program, EPA consulted with a large number of individuals and organizations throughout all segments of the public in developing the rule, form, and instructions. This consultation has continued throughout the operation of the program, and has been expanded due to the proposed expansion of TRI to include additional industry groups.

62

October, 2003

Among the industry-oriented organizations that are or have been involved with the TRI program are:

American Association of Exporters and Importers
American Chemistry Council
American Chemical Society
American Coke and Coal Chemical Institute
American Gas Association
American Iron and Steel Institute
American Petroleum Institute
American Pharmaceutical
American Public Power Association
American Textile Manufacturers Institute
American Trucking Association
American Warehouse Association
Air Transport Association
American Wood Preservers Institute
Associated Gas Distributors
Association of Metropolitan Sewerage Agencies
Cement Kiln Recycling Coalition
Chemical Manufacturers Association
Chemical Producers and Distributors Association
Chemical Specialties Manufacturers Association
Chem-Tex Solvents Corporation
Chlorine Institute
Domestic Petroleum Council
Dry Color Manufacturers Association
Edison Electric Institute
Electric Power Institute
Environmental Industries Association
Environmental Technology Council
Fertilizer Institute
Hazardous Material Advisory Council
Independent Lubricant Manufacturers Association
Independent Liquid Terminals Association
Independent Petroleum Association of America
International Precious Metals Institute
Interstate Mining Compact Commission
Interstate Oil and Gas Compact Commission
Lead Industries Association
Metal Powder Industries Federation
National Agricultural Chemicals Association
National Air Transport Association
National Association of Chemical Distributors
National Association of Chemical Recyclers

October, 2003

National Association of Manufacturers
National Association of Printing Ink Manufacturers, Inc.
National Electrical Manufacturers Association
National Food Processors Association
National Mining Association
National Rural Electric Cooperative Association
National Screw Machine Products Association
National Solid Waste Management Association
Petroleum Marketers Association of America
Silver and Gold Institute
Small Business Administration
Society for Mining, Metallurgy and Exploration
Solid Waste Association of North America
Steel Service Centers Institute
Synthetic Organic Chemical Manufacturers Association
The Society of the Plastics Industry, Inc.
U.S. Chamber of Commerce

With the addition of Federal facilities to TRI in 1993 (Executive Order 12856), other Federal agencies such as the Department of Defense and Department of Energy now play an active role in TRI, including as participants in Interagency Workgroups. In addition to the industry-oriented groups, EPA has also worked with public interest groups in the development of the TRI program. Environmental and public interest groups assisted in the development of the Form R, testing of the NLM database, and have provided feedback on a wide range of public access issues. Among the environmental and public interest organizations who have been, or are, involved with TRI are:

AFL-CIO
American Library Association
Environmental Defense Fund
Environmental Law Institute
INFORM
Information Industry Association
Mineral Policy Center
National Wildlife Association
Natural Resources Defense Council
OMB Watch
Sierra Club
U.S. Public Interest Research Group
Working Group on Community Right-to-Know

Discussions with all of the above groups have resulted in changes to the program that have had beneficial effects, including burden reduction.

64

October, 2003

Over the course of the past decade, EPA has used the regularly-held public meetings of the Forum on State and Tribal Toxics Action (FOSTTA), which represents state environmental agencies, and the National Advisory Council on Environmental Policy and Technology (NACEPT), which includes representatives from industry, environmental organizations, states, and academia, as public venues to consult on TRI and related issues. Major issues discussed through these groups include the expansion of TRI to include both additional chemicals and facilities; implementation of PPA requirements; redesign of the Form R; and development of the Alternate Reporting Threshold Modification. EPA officials routinely meet with representatives from industries, states, local governments, environmental organizations, and community groups on specific issues related to TRI, as the need for consultation arises.

EPA also makes a concerted effort to receive input from small businesses. Many trade associations and other industry organizations with which EPA has held discussions include small businesses as members or participants. These groups have represented the interests of some small businesses to EPA, and have helped to inform businesses about TRI. In addition, EPA has addressed forums such as the Small Business Roundtable regarding its initiatives, and has briefed officials of the Small Business Administration as well as EPA's Small Business Omsbudsman and Regional Small Business Liaisons.

EPA is currently undertaking a stakeholder dialogue process for the TRI program. The stakeholder dialogue has two phases. Phase 1 was completed in December, 2002 and focused on the program objective of timely public release of quality data. Specifically, EPA sought comment in the following areas:

I       How to improve the compliance assistance provided by the TRI program, both at Headquarters and in the Regions, to aid the reporting community;

II      How to streamline the collection and processing of the 90,000+ TRI forms that EPA receives annually; and

III     How well the materials, including the context, documents and tools, that EPA develops for its annual public release of the TRI data supports their use and analysis of the data.

Phase 2 of the stakeholder dialogue, will commence in late fall/early winter of 2003 and will focus on the future direction of the program, including what TRI data are collected and how they are characterized. One key element will be clarifying the data elements on recycling and other waste management activities required by the Pollution Prevention Act. As part of the stakeholder dialogue, EPA will also be requesting comment on a variety of options aimed at reducing the burden associated with TRI reporting. A final report summarizing the stakeholder input will be made available on the TRI website after the on-line dialogue period closes and the ideas and suggestions have been analyzed.

**5(c)  Effects of Less Frequent Collection**

65

October, 2003

Section 313 requires annual reporting.  Section 313(i) permits EPA to modify the reporting frequency by rulemaking, however, EPA must first notify Congress and then wait to initiate the rulemaking to propose the modification for at least 12 months.  In addition, EPA must find:

(A) ...that the modification is consistent with the provisions of subsection (h) of [section 313] based on -
    (i) experience from previously submitted toxic chemical release forms,
    (ii) determinations made under paragraph (3).]

Paragraph (3), in turn,  provides that EPA must determine

  (A) The extent to which information relating to the proposed modification provided on the toxic chemical release forms has been used by the Administrator or other agencies of the Federal government, States, local governments, health professionals and the public.

  (B) The extent to which information is (i) readily available to potential users from other sources, such as State reporting programs, and (ii) provided to the Administrator under another Federal law or through as State program.

  (C) The extent to which the modification would impose additional and unreasonable burdens on facilities subject to the reporting requirements under this section.
However, EPA may not permit less frequent reporting unless it can find that such modification is consistent with the purposes of the Act, as determined by previously submitted Form Rs.  Since TRI represents the best available database tracking toxic chemical releases in the U.S., changes in reporting frequencies would have profound impacts on the quality and value of these data for purposes of planning and establishing baselines in both government and industry.

Less frequent reporting would also significantly delay the availability of the data to the public. Form Rs are required to be submitted on or before July 1 following the year in which the reported releases and transfers occur, and then national data are available from EPA within a year after that.  Public access to the most current toxic chemical release data and other waste management information possible could then be severely limited if reporting were to occur less frequently.

### 5(d)  General Guidelines

This ICR adheres to the guidelines stated in the 1980 Paperwork Reduction Act, as amended, OMB's implementing regulations, and all applicable OMB guidance.

Although reporting facilities are required to identify the chemical for which reports are submitted, they can claim the chemical identity as a trade secret.  A generic name must be provided as part of the information made available to the public.  EPA securely stores and maintains the true identity of the chemical.  This is further discussed in 5(e)(i).

October, 2003

EPA is actively encouraging the use of automated techniques, most notably PC-based report generating programs produced both by the Agency and by the private sector and other submissions on magnetic media. EPA recognizes that not all reporting facilities are able to or are interested in investing the time and funds necessary to employ such automated techniques. The final decision on how to report is ultimately the reporting facility's.

Small facilities (less than 10 full-time employees or equivalent) are exempt from reporting under section 313. An optional range reporting provision and an alternate threshold have been promulgated that afford burden reduction to all facilities but are particularly beneficial to smaller facilities with small releases and wastes.

### 5(e) Confidentiality and Sensitive Questions

### (i) Confidentiality

Respondents may designate the specific chemical identity of a substance as a trade secret. Procedures for submission and review of trade secret claims under section 313 are set forth in 40 CFR 350. This rule implements the general trade secret provisions of EPCRA. When a respondent claims the chemical identity to be a trade secret, EPA, upon substantiation of the claim, will not disclose the identity of the chemical to the public. EPA securely stores forms with trade secret information and allows access to those documents only to persons with Trade Secret clearance. Data made available to the public through any means does not include trade secret information.

### (ii) Sensitive Questions
This collection does not request any sensitive information.

## 6    ESTIMATING THE BURDEN AND COST OF THE COLLECTION

### 6(a) Estimating Respondent Burden

This section presents the burden of this information collection activity to respondents in terms of the time required for facility personnel to perform the activities outlined in Section 3 of this document. These burden estimates are based on previous ICRs and economic analyses, respondent experience as reflected in comments to EPA and other parties, and information acquired through site visits and telephone interviews.

The burden to respondents is estimated for Form R requirements (including compliance determination and supplier notification) and petitions. Burden estimates are developed for the compliance activities and then multiplied by the number of facilities or reports (as appropriate) to estimate the total burden to respondents. The burden estimates used by EPA are national average values. As with any average, some facilities will be above the average, and others will be below it.

67

October, 2003

Large, complex facilities may require more than the average time to comply. However, there are many other facilities subject to the rule that are not large or complex. Therefore, EPA believes that its burden estimates represent reasonable national averages.

As discussed elsewhere in this supporting statement, minor modifications to the design of Section 8.1 of Form R have been proposed. These modifications involve less aggregation and more specificity in relation to categories of releases of TRI chemicals reported in Section 8.1 of the reporting form. New information is generated by having facilities record these data in more specific sub-sections instead of adding the data together and recording the result in a more general reporting classification on the Form R. These modifications may prompt some slight increase in unit reporting burden as facilities become familiar with the new reporting format, but the increase should be mitigated by the fact that the modifications are related to presentation of data that have already been assembled by the reporting facility. Note that the filling in of various sub-sections will be automated in the TRI-Made Easy reporting software, which is already used by approximately 90 percent of reporting facilities.

<u>Form R Requirements</u>

The tasks associated with TRI reporting during the period of this ICR include the following:

▌ **Compliance Determination:** Facilities must determine whether they meet the criteria for Section 313 reporting. This task includes the time required to become familiar with the definitions, exemptions, and threshold requirements under the TRI program, to review the list of TRI chemicals, and to conduct preliminary threshold determinations to determine if the facility is required to report.

▌ **Rule Familiarization:** Facilities that are reporting under section 313 for the first time must read the reporting package and become familiar with the reporting requirements. This includes the time needed to review instructions, and the time needed to train personnel to be able to respond to a collection of information.

▌ **Calculations and Report Completion:** Facilities must gather data and perform calculations to provide the information required on the form. This task includes the time required to search data sources and the time to complete and review the information.

▌ **Recordkeeping and Submission:** Facilities must maintain recordkeeping systems and mail the report to EPA and the State in which the facility the facility is located. This task includes the time required to transmit or otherwise disclose the information.

▌ **Supplier Notification:** Certain suppliers of mixtures or trade name products containing reportable substances must annually notify their customers of the product's composition, if the customer is subject to Section 313 reporting. This task includes the time

68

October, 2003

required to inform customers, either by letter or through the materials safety data sheet (MSDS) for the product.

The remainder of this section discusses the unit burden hour estimates for each specific industry activity. Activities are organized into two categories: those performed at the facility level and those that must be performed for each Form R submitted. The estimated hours required to complete each activity are summarized in Table 1 by labor category. Table 2 presents the annual estimated burden hours according to type of facility for facilities that submit 3 Form Rs each.[8] This represents the burden on a "typical" facility, although many facilities file fewer Form Rs and some file more. The total annual burden to all facilities is discussed in Section 6(d). Note that total annual burden estimate is based on unit reporting burdens multiplied by the total number of facilities or forms (as appropriate); it is not based on the "typical" facility burdens shown in Table 2.

---

[8] Approximately 70 percent of affected facilities file 3 or fewer Form Rs. The most common number of reports filed is 1.

October, 2003

**Table 1**
**Average Annual Burden Hour Estimate by Activity**

| Category | Activity | Management | Technical | Clerical | Total Hours |
|---|---|---|---|---|---|
| Facility Level | Compliance Determination - all facilities | 1 | 3 | 0 | 4 |
| | Rule Familiarization - first-time filers only | 12 | 22.5 | 0 | 34.5 |
| | Supplier Notification | 0 | 7 | 17 | 24 |
| Per Form R | Calculations and Report Completion - first-time filers only | 20.9 | 45.2 | 2.9 | 69.0 |
| | Calculations and Report Completion - subsequent year filers only | 4.4 | 9.5 | 0.6 | 14.5 |
| | Recordkeeping/Submission - all filers | 0 | 4 | 1 | 5 |

**Table 2**
**Average Annual Burden Hour Estimate per Facility in Each Subsequent Year**

| Type of Facility | Average Annual Hours Burden | | | |
|---|---|---|---|---|
| | Management | Technical | Clerical | Total Hours |
| Compliance Determination Only | 1 | 3 | 0 | 4 |
| Compliance Determination and 3 Form Rs | 14.2 | 43.5 | 4.8 | 62.5 |
| Compliance Determination, 3 Form Rs, and Supplier Notification | 14.2 | 50.5 | 21.8 | 86.5 |

Activities Performed at the Facility Level

*Compliance Determination* - A facility must report under Section 313 if it: (1) is within an SIC code or industry group covered by the TRI program; (2) has ten or more full-time equivalent (FTE) employees; and (3) manufactures, processes or otherwise uses any of the listed chemicals above the threshold quantities. All facilities must determine if they meet these criteria. Most facilities incur little burden to make determinations regarding the first two criteria. Many facilities require time for the management and technical staff to determine the types of chemicals used at the facility and whether these chemicals are manufactured, processed, or otherwise used above threshold levels, in order to make the determination under the third criterion.

70

October, 2003

To make the determination, a facility will typically review whether it manufactures, processes, or otherwise uses any of the chemicals in any quantity, and then determine whether it exceeds a threshold quantity. In many cases, particularly at facilities that do not manufacture, process or otherwise use any listed chemicals, this first activity should be completed within a relatively short period of time. The second activity may involve a more detailed set of calculations.

The average burden for compliance determination is estimated to be 4 hours per facility per year. This average reflects the time requirements of facilities that do not have listed chemicals on-site, have very large or small quantities of listed chemicals (*i.e.*, are significantly above or below the thresholds and thus do not require a significant amount of time to make the determination), or have not had significant changes from the prior year, as well as facilities that have more complex and time-consuming compliance determination requirements.

*Rule Familiarization* - If a facility will be reporting under the section 313 requirements for the first time, facility staff must review and comprehend the reporting requirements. At a minimum, this effort will involve reading the instructions to the Toxic Release Inventory Reporting Form R, however, it may also involve consulting EPA guidance documents, attending a training course, and/or calling the EPCRA technical hotline. The cost associated with rule familiarization occurs only in the first year that a facility becomes subject to reporting. In subsequent years, staff are assumed to be familiar with the requirements that apply to their facility. Thus, the facility would no longer bear this cost. Similarly, facilities that already report on one or more existing TRI chemicals will not incur a rule familiarization cost.

It is estimated that facilities reporting under section 313 for the first time will need to make a one-time expenditure of 34.5 hours for rule familiarization. This burden estimate is comprised of 12 hours of management time and 22.5 hours of technical time.

*Supplier Notification* - Certain suppliers of mixtures or trade name products containing reportable substances must annually notify their customers of the product's composition if the customer is subject to Section 313 reporting or sells the product to another company that is subject to reporting. Facilities may be subject to the supplier notification requirements even if they are not covered by the Section 313 reporting requirements. For example, a facility with less than ten full-time employees or that does not meet reporting thresholds may still be required to notify certain customers. Supplier notification is required so that customers can make threshold determinations and complete reports for their own facilities. The notification can be provided by a letter identifying the chemical by name and CAS number, and indicating its percentage by weight in the formulation. It can also be provided on the materials safety data sheet (MSDS) for the product. On average, approximately 24 hours per facility are estimated for compliance with this requirement.

Activities Specific to Completing the Form R

71

October, 2003

*Calculations and Report Completion* - Facilities that determine they must report under Section 313 will incur additional burden to retrieve, process, review, and transcribe information to complete each report. Most of the time required for form completion is to calculate releases, transfers, and other waste management practices; relatively little time is required to copy information to the form. The facility must complete one Form R for each listed chemical it is reporting to TRI.

The burden is estimated to average 14.5 hours per Form R for on-going, annual reporting. This estimate is based on burden hour data collected from TRI respondents.[9] To complete the Form R, facilities will need to verify and update data, review previous calculations, and modify the information reported on the previous year's Form R. For a facility completing 3 forms in subsequent years, this results in an average estimated burden of 43.5 hours. The estimate for first year calculations and report completion is unchanged at 69 hours per Form R.

*Recordkeeping and Submission* - After a facility has completed the form, it incurs additional burden for recordkeeping and submission associated with filing a Form R report. Recordkeeping allows a facility to use the information in making calculations in subsequent years and as documentation in the event it receives a compliance audit. Facilities must maintain records used to provide the information required on the Form R; those records may include estimation methodology and calculations, engineering reports, inventory, incident and operating logs, and other supporting materials. Recordkeeping and submission are estimated to take an average of 5 hours per Form R, which works out to 15 hours for a facility filing 3 Form Rs.

### Average Burden per Respondent

The estimated burden per respondent depends on the type of respondent and the number of reports submitted. For example, the burden for facilities that only perform compliance determination is estimated to average 4 hours per facility. For facilities required to file 3 Form Rs, but not required to comply with supplier notification, the burden is estimated to average 62.5 hours. For facilities submitting 3 Form Rs that are also required to comply with supplier notification, the average burden in the third year is estimated at 86.5 hours per facility.

### Petitions

The activities required to prepare and file a petition are listed below. Included is a discussion of the burden associated with each activity. The time needed to complete these activities is presented in Table 3. The total annual burden for all petitions is estimated in Section 6(d).

---

[9] USEPA/OEI, *Estimates of Burden Hours for Economic Analyses of the Toxics Release Inventory*, June 10, 2002. The estimate is based on respondent experience, and reflects computerization/automation, increased familiarity with reporting requirements, improved guidance, and other factors.

October, 2003

**Table 3**
**Average Burden Hour Estimate per Petition**

| Activity | Average Annual Hours Burden | | | Total Hours Burden |
|---|---|---|---|---|
| | Management | Technical | Clerical | |
| 1. Read EPA Policy and Guidance | 4 | 0 | 0 | 4 |
| 2. Plan Activities | 2 | 1 | 0 | 3 |
| 3. Prepare Literature Search | 2 | 7 | 0 | 9 |
| 4. Conduct Literature Search | 0 | 48 | 0 | 48 |
| 5. Process, Review, and Focus Information | 12 | 74 | 0 | 86 |
| 6. Write Petition | 4 | 8 | 6 | 18 |
| 7. Review and Edit petition | 4 | 8 | 2 | 14 |
| 8. Submit to EPA and File | 0 | 0 | 3 | 3 |
| **Total Hours per Petition** | 28 | 146 | 11 | **185** |

These estimates assume prior knowledge by the respondent of the issues prompting the listing of specific chemicals. An additional assumption was made that the petitioners had no in-house library facilities and, consequently, that they would have to use a university library or similar facility. Based upon the experience of the previous reporting years, fewer than 5 petitions per year are expected. Following are specific descriptions of the activities associated with preparing and filing a petition for chemical listing or de-listing.

Read EPA guidance document and consult with EPA. The reading and interpretation of EPA policy and guidance notice is conducted by management and involves four hours per petition.

Plan activities. The planning activities are conducted jointly by management and technical personnel. Three hours per petition are required to complete these activities.

Prepare literature search. This activity would be conducted by both management and technical personnel, involving about nine hours.

Conduct literature search. The technical staff member conducts this activity, which requires about 48 hours per petition.

Process, review, and focus information. This activity would be completed by both technical and management personnel, involving a total of 86 hours per petition.

Write petition. This activity would be completed by a combination of technical, management, and clerical personnel. About 18 hours are required per petition to complete the writing.

73

October, 2003

<u>Review and edit petition</u>. A combination of management, technical, and clerical personnel would be involved in this activity, requiring a total of 14 hours per petition.

<u>Submit petition to EPA and file</u>. These activities would be done by the clerical personnel, requiring approximately three hours per petition.

<u>Total respondent burden</u>. The total burden of submitting a petition is estimated to average 185 hours.

### 6(b) Estimating Respondent Costs

The cost to respondents is based on the time needed to complete the tasks listed in Section 6(a) and the hourly cost of labor at appropriate levels (loaded labor rates). There are no specific capital costs associated directly with this information collection activity. There may be some small additional costs for mailing and supplies. Total annual costs for all facilities are discussed in Section 6(d).

   <u>Form R Requirements</u>

To determine the per-facility costs for typical respondents, the unit burden hour estimates for compliance activities are multiplied by fully loaded hourly rates for the appropriate categories of labor conducting these activities.[10] Loaded hourly rates are the product of wages, benefits, and overhead. Hourly wage rates are divided into three categories: managerial, technical, and clerical. Average wage and salary data for these categories are obtained from the Employer Costs for Employee Compensation (ECEC) report from the Bureau of Labor Statistics (BLS) for all goods-producing, private industries. The additional cost of benefits, such as paid leave and insurance, is also derived from information provided in the ECEC report. Loading factors for benefits are calculated separately for managerial, technical, and clerical labor by dividing the benefits percentage of total compensation by the wage percentage of total compensation. Based on information provided by the chemical industry and chemical industry trade associations, an additional loading factor of 17 percent is applied for general overhead. This loading factor is added to the benefits loading factor, then applied to the base wage. The new wage rates are calculated using current data on salaries and benefits for these three labor categories. The fully loaded hourly wage rates as of June 2003 are shown in Table 4.

---

[10] USEPA/OEI, *Wage Rates for Economic Analyses of the Toxics Release Inventory Program*, June 10, 2002. The wage rates used in this supporting statement have been updated to June 2003 using the methods described in this reference.

October, 2003

**Table 4**
**Loaded Hourly Wage Rates by Labor Category**

| Labor Category | Average Hourly Wage | Benefit (% wages) | Overhead (% wages) | Loaded Hourly Rate |
|---|---|---|---|---|
| Managerial | $32.46 | 46.0% | 17% | $52.91 |
| Technical | $28.18 | 45.6% | 17% | $45.81 |
| Clerical | $14.99 | 44.9% | 17% | $24.27 |

Average costs are summarized by activity in Table 5 and per facility in Table 6. The average cost per facility for those completing only compliance determination is $190. Based on the burden hour estimates in Table 1 and the loaded hourly rates in Table 4, the average subsequent year cost for a facility performing compliance determination and submitting 3 Form Rs is $2,860, while the cost for a facility performing compliance determination, submitting 3 reports, and complying with supplier notification is estimated to be $3,594.

**Table 5**
**Average Annual Cost Estimate by Activity**

| Category | Activity | Management | Technical | Clerical | Total Cost |
|---|---|---|---|---|---|
| Facility Level | Compliance Determination - all facilities | $53 | $137 | $0 | $190 |
| | Rule Familiarization - first-time filers only | $635 | $1,031 | $0 | $1,666 |
| | Supplier Notification | $0 | $321 | $413 | $734 |
| Per Form R | Calculations and Report Completion - first-time filers only | $1,106 | $2,071 | $70 | $3,247 |
| | Calculations and Report Completion - subsequent year filers | $233 | $435 | $15 | $683 |
| | Recordkeeping/Submission - all filers | $0 | $183 | $24 | $207 |

**Table 6**
**Average Annual Cost Estimate per Facility in Each Subsequent Year**

| Type of Facility | Management | Technical | Clerical | Total Cost |
|---|---|---|---|---|
| Compliance Determination Only | $53 | $137 | $0 | $190 |
| Compliance Determination and 3 Form Rs | $752 | $1,991 | $117 | $2,860 |
| Compliance Determination, 3 Form Rs and Supplier Notification | $752 | $2,312 | $530 | $3,594 |

October, 2003

<u>Petitions</u>

The primary cost to respondents for developing and submitting petitions under Section 313(e) will be the labor costs associated with the activities outlined in Section 6(a) of this document. These costs are the product of the labor hours expended to prepare the average petition, the wage rates for the employees involved in preparing the petitions, and the average number of petitions submitted annually. Based on the burden hour estimates in Table 3 and the loaded hourly rates in Table 4, the cost estimate for the preparation of a petition is presented in Table 7.

**Table 7**
**Average Cost per Petition**

| Activity | Management | Technical | Clerical | Total |
|---|---|---|---|---|
| 1. Read EPA Policy and Guidance | $212 | $0 | $0 | $212 |
| 2. Plan Activities | $106 | $46 | $0 | $152 |
| 3. Prepare Literature Search | $106 | $321 | $0 | $427 |
| 4. Conduct Literature Search | $0 | $2,199 | $0 | $2,199 |
| 5. Process, Review, and Focus Information | $635 | $3,390 | $0 | $4,025 |
| 6. Write Petition | $212 | $366 | $146 | $724 |
| 7. Review and Edit petition | $212 | $366 | $49 | $627 |
| 8. Submit to EPA and File | $0 | $0 | $73 | $73 |
| **Total Cost per Petition** | $1,483 | $6,688 | $268 | **$8,439** |

Based upon prior years of implementation of EPCRA Section 313, it is assumed that fewer than 5 petitions will continue to be submitted annually (in recent years, only 1 or 2 petitions have been submitted each year). The total average unit cost to prepare a petition is estimated to be $8,439.

### 6(c) Estimating Agency Burden and Cost

This section estimates the burden and costs to EPA to process Form R reports based on information characterizing the resources used in previous years. Burden and costs are incurred by EPA for five categories of activities: data processing, outreach and training, information dissemination, policy and petitions, and compliance and enforcement. These activities are described in detail in Table 8.

October, 2003

**Table 8**
**EPA Activities for Form R**

| Category | Description |
|---|---|
| Data Processing | Data entry – entering the information into the database, microfilming or microfiching the reports, and filing all reports; |
| | Data quality – reviewing reports for completeness, errors, and inconsistencies; making inquiries to resolve discrepancies; and reentering corrected data; |
| | Magnetic media support – distributing computer program for electronic submissions; creation and updating of intelligent reporting software; |
| | Programming and operating the EPA mainframe and local area network; |
| | Data analysis – developing tools to use TRI data, analyzing data to support EPA needs, and preparing data for use by others; and |
| | EPCRA Reporting Center fixed costs – rent and form storage. |
| Outreach and Training | Providing EPCRA technical hotline, technical guidance, industry outreach, and regional, state, and public training; and |
| | Responding to requests for information through TRI User Support. |
| Information Dissemination | Public data release, Internet, data access tools. |
| Policy and Petitions | Analysis to support petitions, list revisions, trade secret claims, and rulemakings. |
| Compliance and Enforcement | Technical assistance, compliance outreach, facility inspections, issuance of cases and creation of Supplemental Environmental Projects (SEPs). |

To estimate EPA burden and cost, EPA employees (as measured by full time equivalents, or FTEs) and extramural costs are separated into a fixed component and a variable component. Activities and expenses that are not greatly affected by marginal changes in numbers of reports are treated as fixed. These include rent for the EPCRA reporting center, development costs for data access tools, compliance assistance measures, and other activities and expenses. The variable component is the amount that varies depending on the number of forms. The variable component reflects total extramural data processing costs divided by the total number of reports processed in the 2000 reporting year. $7.35 million in fixed costs and 31.3 FTEs are required to conduct the EPA activities described above plus an additional $26 in variable costs for each form processed.

October, 2003

As discussed in the following section, approximately 84,000 Form R reports are expected to be filed per year. Thus, the total annual burden to EPA is estimated to be $2.16 million in variable costs, along with the $7.35 million in fixed costs and 31.3 FTEs (or 65,104 hours at $3.2 million in loaded labor costs). The analysis assumes that half of the fixed FTE requirement is met by EPA employees at the general pay scale grade GS-12, step 5 (at a loaded salary of $93,402) and half by employees at grade GS-13, step 5 (at a loaded salary of $111,070), using a standard loading factor of 1.6.

### 6(d) Bottom Line Burden Hours and Costs

<u>Estimated Total Annual Burden for All Respondents</u>

This section presents the total annual burden hours for all respondents including both those complying with Section 313 and submitting petitions. The total burden hours for all respondents to comply with Section 313 is estimated by multiplying the unit burden estimate for each compliance activity by the relevant units: facilities or reports. It is estimated that 201,785 facilities must determine compliance each year, of which approximately 23,000 facilities are expected to also perform the report completion and recordkeeping activities for 84,000 Form Rs.[11]

As a result, 178,785 facilities are estimated to complete only the compliance determination procedure. An additional 23,000 facilities are expected to complete compliance determination, form completion and recordkeeping, and of these, 3,734 facilities are expected to also conduct supplier notification. Of the 23,000 facilities that file Form Rs, it is expected that 1,081 facilities will be reporting to TRI for the first-time as they exceed applicable thresholds, and that these facilities will file 1,680 of the Form Rs.[12] Table 9 presents the total annual burden hours based on these estimates.

---

[11] The Bureau of Census's *County Business Patterns - 1997* indicates that there are 191,745 facilities with 10 or more employees in SIC codes 20 to 39. There are an additional 10,040 facilities in the seven non-manufacturing industries that are estimated to perform compliance determination, for a total of 201,785 facilities performing compliance determination. For the 2001 reporting year, 22,359 facilities submitted 83,218 Form Rs. The number of facilities and forms has been rounded up to the nearest thousand for this ICR.

[12] Between RY1994 and RY2001, there have been three reporting years with no major programmatic changes. Based on reporting for 1996, 1997, and 1999, the average rate of facilities that file using new TRI Facility IDs is 4.7%. These facilities filed an average of 2% of the Form Rs. For the purposes of this ICR, these facilities represent "first-time filers."

October, 2003

**Table 9**
**Total Annual Burden Hour Estimate For Form R**

| ACTIVITY | Hours | Number of Facilities | Number of Reports | Total Burden |
|---|---|---|---|---|
| Compliance Determination - all facilities | 4 | 201,785 | N/A | 807,140 |
| Rule Familiarization - first-time filers only | 34.5 | 1,081 | N/A | 37,295 |
| Form R Completion - reports from first-time filers | 69 | N/A | 1,680 | 115,920 |
| Form R Completion - reports from subsequent year filers | 14.5 | N/A | 82,320 | 1,193,640 |
| Recordkeeping/Submission - all reports | 5 | N/A | 84,000 | 420,000 |
| Supplier Notification | 24 | 3,734 | N/A | 89,616 |
| **Total** | | | | **2,663,611** |

In an effort to reduce reporting burden, EPA has developed intelligent software for the desktop computer called TRI–Made Easy (TRI-ME) to assist facilities in determining and completing their reporting obligations. For reporting year 2001, 85 percent of the Form R responses were received electronically and 37 percent of Form R responses were filed using TRI-ME. In the supporting statement for the previous ICR renewal, EPA had predicted a 40 percent TRI-ME adoption rate for reporting year 2001. Preliminary results from reporting year 2002 show 85 percent of the Form R responses were received electronically, and 92 percent of Form R responses were filed using TRI-ME (TRI-ME output for submission can be in paper or electronic formats). For the purposes of this ICR, EPA uses an estimate of 90 percent of Form Rs being filed using TRI-ME.

Based on responses from facilities that tested TRI-ME in reporting year 2000 and facilities that used TRI-ME in 2001, EPA expects that TRI-ME will result in a burden reduction of 15 percent in the activities of Form R Completion and Recordkeeping/Submission.[13] The total estimated annual burden reduction attributable to TRI-ME is shown in Table 10.

---

EPA contacted 9 TRI-ME users in 2002 and 9 TRI-ME users in 2003 to obtain estimates of the burden reduction attributable to TRI-ME. The burden reduction estimate is based on the average burden reduction reported by first-time users of TRI-ME.

October, 2003

**Table 10**
**Annual TRI-ME Burden Reduction for Form R**

|  | Hours Saved per Form | Number of Affected Forms | Burden Reduction |
|---|---|---|---|
| Form R Completion - reports from first-time filers | (11.1) | 1,512 | (16,783) |
| Form R Completion - reports from subsequent year filers | (2.9) | 74,088 | (214,855) |
| **Total** |  |  | **(231,638)** |

The annual hours burden for all petitions is calculated by multiplying the per-petition burden estimate for each activity by the expected number of petitions per year. A total of 5 petitions are estimated to be filed annually. Table 11 presents the total annual hours burden for all petitions. The total annual hours burden for all petitions submitted is expected to be 925 hours.

**Table 11**
**Total Annual Burden Hour Estimate For All Petitions (5 petitions per year)**

| Activity | Annual Hours Burden | | | |
|---|---|---|---|---|
|  | Management | Technical | Clerical | Total Hours |
| 1. Read EPA Policy and Guidance | 20 | 0 | 0 | 20 |
| 2. Plan Activities | 10 | 5 | 0 | 15 |
| 3. Prepare Literature Search | 10 | 35 | 0 | 45 |
| 4. Conduct Literature Search | 0 | 240 | 0 | 240 |
| 5. Process, Review, and Focus Information | 60 | 370 | 0 | 430 |
| 6. Write Petition | 20 | 40 | 30 | 90 |
| 7. Review and Edit petition | 20 | 40 | 10 | 70 |
| 8. Submit to EPA and File | 0 | 0 | 15 | 15 |
| **Total Annual Hours Burden** | **140** | **730** | **55** | **925** |

<u>Estimated Total Annual Cost for All Respondents</u>

The total annual reporting cost for all respondent facilities is determined by multiplying the unit cost estimates by the relevant units (facilities or reports) for each compliance activity. Table 12 presents the annual reporting cost for Form R before accounting for TRI-ME burden reduction.

October, 2003

**Table 12**
**Total Annual Cost Estimate For Form R**

| ACTIVITY | Cost | Number of Facilities | Number of Reports | Total Cost |
|---|---|---|---|---|
| Compliance Determination - all facilities subject to EPCRA 313 | $190 | 201,785 | N/A | $38,339,150 |
| Rule Familiarization - first-time filers | $1,666 | 1,081 | N/A | $1,800,946 |
| Form R Completion - reports from first-time filers | $3,247 | N/A | 1,680 | $5,454,960 |
| Form R Completion - reports from subsequent year filers | $683 | N/A | 82,320 | $56,224,560 |
| Recordkeeping/Submission - all reports | $207 | N/A | 84,000 | $17,388,000 |
| Supplier Notification | $734 | 3,734 | N/A | $2,740,756 |
| **Annual Total** | | | | **$121,948,372** |

As a result of the adoption of TRI-ME, EPA expects a reduction in total annual costs attributable to Form R reporting. Using the adoption rate and burden reduction percentages discussed above, EPA predicts reductions in total annual costs as shown in Table 13.

**Table 13**
**Annual TRI-ME Cost Reduction for Form R**

| | Cost Reduction per Form | Number of Affected Forms | Cost Reduction |
|---|---|---|---|
| Form R Completion - reports from first-time filers | ($518.10) | 1,512 | ($783,367) |
| Form R Completion - reports from subsequent year filers | ($133.50) | 74,088 | ($9,890,748) |
| **Total** | | | **($10,674,115)** |

The annual cost for all petitions is calculated by multiplying the per-petition cost for each activity by the expected number of petitions per year. A total of 5 petitions are assumed to be filed annually. The total annual cost for all petitions submitted is shown in Table 14.

81

October, 2003

**Table 14**
**Total Annual Cost Estimate for All Petitions**

| Activity | Management | Technical | Clerical | Total Cost |
|---|---|---|---|---|
| 1. Read EPA Policy and Guidance | $1,060 | $0 | $0 | $1,060 |
| 2. Plan Activities | $530 | $230 | $0 | $760 |
| 3. Prepare Literature Search | $530 | $1,605 | $0 | $2,135 |
| 4. Conduct Literature Search | $0 | $10,995 | $0 | $10,995 |
| 5. Process, Review, and Focus Information | $3,175 | $16,950 | $0 | $20,125 |
| 6. Write Petition | $1,060 | $1,830 | $730 | $3,620 |
| 7. Review and Edit petition | $1,060 | $1,830 | $245 | $3,135 |
| 8. Submit to EPA and File | $0 | $0 | $365 | $365 |
| **Total Cost per Petition** | **$7,415** | **$33,440** | **$1,340** | **$42,195** |

The previous tables have detailed the total burden and cost for complying with Section 313 and for submitting a petition independently. Table 15 presents the total burden and cost for both activities, as well as for the reduction in cost and burden attributable to TRI-ME.

**Table 15**
**Total Annual Respondent Burden and Cost**

| Activity | Annual Burden Hours | Annual Costs (millions of 2003 dollars) |
|---|---|---|
| Form Rs | 2,663,611 | $121.95 |
| TRI-ME | (231,638) | ($10.67) |
| Petitions | 925 | $0.04 |
| **Total** | **2,432,898** | **$111.3** |

### 6(e) Reasons for Change in Burden

As a result of OMB's March 10, 2003 approval of the last ICR renewal, OMB's inventory reflects 88,117 responses and 5,566,564 hours for this information collection. This ICR supporting statement is for 84,000 responses and 2,432,898 hours. The reduction in the estimate of total burden of approximately 3.13 million hours is the result of three adjustments.

The first adjustment is to the number of responses. The estimate of 88,117 responses in the existing OMB approval incorporated a predicted reporting increase from the economic analysis

of the final rule to lower reporting thresholds for lead and lead compounds. This prediction overestimated actual reporting levels; EPA received about 70 percent of the additional lead and lead compound reports that were forecast. The number of responses in this ICR supporting statement have been adjusted to accurately reflect actual reporting levels (rounded to the next highest thousand responses). This adjustment accounts for a decrease of about 218,000 hours.

The second adjustment is to the unit burden hour estimates for subsequent year reporting. EPA has adjusted the estimate of unit burden hours for Form R completion in subsequent years from 47.1 hours to 14.5 hours based on responses from TRI reporting facilities. This adjustment accounts for a decrease of about 2.68 million hours.

The third adjustment relates to the adoption of TRI-ME, an automated reporting software package. EPA has reduced the burden estimates related to Form R Completion and Recordkeeping/Submission by 15 percent for the reports filed using TRI-ME. An estimated 90 percent of reports are expected to be filed using TRI-ME over the three years of the ICR. This adjustment accounts for a decrease of about 232,000 hours.

The sum of these adjustments is a decrease of 4,117 responses and 3,133,666 burden hours from the current approved total. Table 16 summarizes the major program changes and adjustments that have been made over the last several years, as well as the changes due to the adjustments in this ICR supporting statement.

October, 2003

**TABLE 16**
**Recent Changes in TRI Form R Burden**

| Activity - Explanation | TRI Form R ICR ( EPA # 1363, OMB #2070-0093) | | | |
| --- | --- | --- | --- | --- |
| | Change | | Total | |
| | # Responses | Burden Hours | Total Responses | Total Burden Hours |
| **1997 Baseline** | — | — | 90,362 | 5,538,727 |
| **1997 Program Change - Industry Expansion:** This rule added 7 new industries to the list of industries subject to TRI reporting beginning in RY98. | 39,033 | 2,467,463 | 129,395 | 8,006,190 |
| **1999 Adjustment - Form R Correction Worksheet:** This adjustment revised the number of responses to be more consistent with actual reporting levels. However, it did not correct for overestimation of expected reporting from the Industry Expansion rule. | (13,226) | (665,666) | 116,169 | 7,340,524 |
| **1999 Program Change - PBT Rule:** This rule lowered reporting thresholds for certain PBT chemicals, and added other PBT chemicals at lower thresholds beginning in RY00. | 19,990 | 1,485,411 | 136,159 | 8,825,935 |
| **2000 Program Change - Lead Rule:** This rule lowered reporting thresholds for lead and lead compounds beginning in RY01. | 9,813 | 786,169 | 145,972 | 9,612,104 |
| **January 2003 Form R ICR Renewal:** This request incorporated accounting adjustments to reflect actual number of responses. | (57,855) | (5,045,540) | 88,117 | 5,566,564 |
| **October 2003 Form R ICR Renewal:** This request reflects actual number of responses and incorporates adjustments to estimates of unit reporting burden based on facility experience and TRI-ME reporting software. | (4,117) | (3,133,666) | 84,000 | 2,432,898 |
| **CURRENT TOTALS** | **84,000** | **2,432,898** | — | — |

October, 2003

**6(f) Burden Statement** (To appear on Collection Instrument)

The annual public burden related to the Form R, which is approved under OMB Control No. 2070-0093, is estimated to average 19.5 hours per response.

Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations are listed in 40 CFR Part 9 and 48 CFR Chapter 15.

To comment on the Agency's need for this information, the accuracy of the provided burden estimates, and any suggested methods for minimizing respondent burden, including the use of automated collection techniques, EPA has established a public docket for this ICR under Docket ID No. OEI-2003-0025, which is available for public viewing at the Office of Environmental Information Docket in the EPA Docket Center (EPA/DC), EPA West, Room B102, 1301 Constitution Ave., NW, Washington, DC. The EPA Docket Center Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Reading Room is (202) 566-1744, and the telephone number for the Office of Environmental Information Docket is (202) 566-1752. An electronic version of the public docket is available through EPA Dockets (EDOCKET) at http://www.epa.gov/edocket. Use EDOCKET to submit or view public comments, access the index listing of the contents of the public docket, and to access those documents in the public docket that are available electronically. Once in the system, select "search," then key in the docket ID number identified above. Also, you can send comments to the Office of Information and Regulatory Affairs, Office of Management and Budget, 725 17th Street, NW, Washington, DC 20503, Attention: Desk Office for EPA. Please include the EPA Docket ID No. OEI-2003-0025 and OMB control number 2070-0093 in any correspondence.

The completed forms should be submitted in accordance with the instructions accompanying the form, or as specified in the corresponding regulation.

October, 2003

# REFERENCES

Certain references cited are available in EPA docket # OPPTS-400104; other references are readily available.

Arbuckle, J. Gordon, et al., 1993.  Environmental Law Handbook, Twelfth Edition. Government Institutes, Inc., Rockland MD.

Bureau of National Affairs, 1995. "State Pollution Prevention Laws & Programs and Document Submissions Chart."

Burke, Lauretta M., 1993.  Environmental Equity in Los Angeles (Santa Barbara:  University of California Center for Geographic Information and Analysis, July).

California Air Resources Board, Technical Support Division, 1993. Emissions Inventory Criteria and Guidelines Regulation Pursuant to the Air Toxics "Hot Spots" Information and Assessment Act of 1987 (as amended June 1990, September 1990, June 1991, and June 1993).

California Air Resources Board, undated. "Overview of the Air Toxics 'Hot Spots' Information and Assessment Act."

Chikkala, John,  1995.  Minnesota Department of Public Safety Emergency Response Commission.  Conversation with Abt Associates.  November 13.

Chines, Peter (1994).  Investor Responsibility Research Center, Inc. Letter to Samuel Sasnett, U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, April 21, 1994; and attachment, "How to Read IRRC's Corporate Environmental Profiles," pp. 18-19.

Citizens Fund, 1993.  Poisons in Our Neighborhoods:  Toxic Pollution in the United States (Washington, DC:  Citizens Fund, November).

Citizens Fund, 1992.  Manufacturing Pollution (Washington, DC:  Citizens Fund, August).

Cummens, Pat, 1993.  Untitled presentation, in Proceedings:  Toxics Release Inventory (TRI) Data Use Conference (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, July).

Doer, Lisa, 1995.  "How TRI Can Drive Pollution Prevention," in  Proceedings:  Toxics Release Inventory (TRI) Data Use Conference:  Building TRI and Pollution Prevention Partnerships (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, March).

Donaghue, Bob, 1995.  "Prioritizing Pollution Prevention Assistance Needs Using the 1992

October, 2003

Toxic Release Inventory," in  Proceedings:  Toxics Release Inventory (TRI) Data Use Conference:  Building TRI and Pollution Prevention Partnerships (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, March).

Dunst, Russ,  1995.  Wisconsin Department of Natural Resources. Conversation with Abt Associates.  November 14.

Goodenow, Dennis California Air Resources Board (CARB), 1995. Personal communication with Abt Associates, August 29, 1995.

Great Lakes Information Network, 1996. "Regional Air Pollutant Inventory Development System," Information from Great Lakes Information Network World Wide Web site: (http://www.glc.org/projects/air/rapids/rapids.html)

Greene, Terry, 1995.  "JSI Community Outreach Project," in  Proceedings:  Toxics Release Inventory (TRI) Data Use Conference:  Building TRI and Pollution Prevention Partnerships (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, March).

Hartmann, Carolyn, 1993.  Troubled Waters:  Major Sources of Toxic Water Pollution (Washington, DC:  U.S. Public Interest Research Group, June).

Hausman, Rick, 1993.  "Environmental Investing:  Dollars and Change," Online:  The RTK NET Newsletter, Vol. 3, No. 2 (Fall).

Herring, Jeff, OAQPS, 1995. Personal communication with Abt Associates, August 21, 1995.

ICF Incorporated, 1996. Fax transmission from Maravene Edelstein to John Ferris dated 5/8/96, with table containing information of Tier II (EPCRA Section 312) data availability by state.

ICF Incorporated, 1993. Data Gaps and Redundancies in Pollution Prevention Reporting; A Compendium of Memoranda. Prepared for U.S. EPA, Office of Prevention, Pesticides, and Toxics, Pollution Prevention Division.

Kleeman, Jane, AFS Emissions Coordinator, 1995 Personal communication with Abt Associates, September 5, 1995.

Kolwey, Neil and Margery Lynch, 1994.  Pollution Prevention Priorities:  A Study of Priorities for Pollution Prevention Activities in Colorado (Colorado Pollution Prevention Advisory Board, May).

MacLean, Alair and Paul Orum, 1992.  Progress Report:  Community Right-to-Know (Washington, DC:  OMB Watch and Working Group on Community Right-to-Know, July).

October, 2003

MacLean, Alair and Rich Puchalsky, 1994.   Where the Wastes Are:  Highlights from the Records of the More Than 5,000 Facilities that Receive Transfers of TRI Chemicals (Washington, DC:  OMB Watch and Unison Institute, April).

Massachusetts Toxics Use Reduction Institute, 1994.  Toxics Use Reduction:  Fact Sheet 1. Lowell, MA:  University of Massachusetts Lowell.  February.

Massachusetts Department of Environmental Protection, 1993.  An Overview of the Toxics Use Reduction Act.  Prepared by Manik Roy.  February.

McLure, Pam, 1994.  "Georgia on My Mind",  Online:  The RTK NET Newsletter, Vol. 4, No. 1 (Summer).

Memorandum from J. Karnes to Brian Muehling (EPA/OTS) on Updating of Unit Labor Costs to Reflect Inflation and Industry Comments for CAIR, Centaur Associates Inc.  May 28, 1987.

National Conference of State Legislatures (NCSL), 1995. "1995 State TRI Program Assessment."

"Notes from the Field:  Students Use SARA Title III Data to Conduct Local Toxic Waste Audits,"  Hazardous Materials Dialogue, Vol. 4, No. 1, 1992.

Orum, Paul and Beth Wohlberg, 1994.  "Reports Using Toxics Release Inventory (TRI) Data," Working Notes on Community Right to Know, July-August.

Pope, Anne, OAQPS, 1995. Personal communication with Abt Associates, September 6, 1995.

Quinn, Bill.  1995.  Arizona Department of Environmental Quality.  Conversation with Abt Associates.  November 14.

Radian Corporation, 1993. Volatile Organic Compound (VOC)/Particulate Matter (PM) Speciation Data System (SPECIATE) User's Manual Version 1.5 Final Report, February 1993.

Ratza, Carol, Great Lakes Information Network (GLIN) Director, 1995.  Email communication with Abt Associates, August 30, 1995.

Recer, Gregg, and Thomas Johnson, 1995.  "Risk Screening in New York State Using Toxic Release Inventory Data," in Proceedings:  Toxics Release Inventory (TRI) Data Use Conference:  Building TRI and Pollution Prevention Partnerships (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, March).

Rice, Faye, 1993.  "Who Scores Best on the Environment," Fortune, Vol. 128, No. 2 (July 26, 1993).

October, 2003

Rubin, Steve, Data Management Branch OECA, 1995.  Personal communication with Abt Associates, November 3, 1995.

Seitz, John S., Director OAQPS, 1995. Memorandum: "Title V Permitting for Non-major Sources in Recent Section 112 Maximum Achievable Control Technology (MACT) Standards," May 16, 1995.

Settina, Nita and Paul Orum, 1991.  Making the Difference, Part II:  More Uses of Right-to-Know in the Fight Against Toxics (Washington, DC:  Center for Policy Alternatives and Working Group on Community Right-to-Know, October).

Smith, Ted, 1992.  Untitled presentation, in Proceedings:  Toxic Release Inventory (TRI) Data Use and Pollution Prevention Conference (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, June).

Southerland, Jim, OAQPS, 1995. Personal communication with Abt Associates, August 29, 1995.

Swanson, Joanna, OAQPS, 1995. Personal communication with Abt Associates, August 21, 1995.

Templet, Paul H., 1993.  "The Emissions to Jobs Ratio,"  Environmental Science and Technology, Vol. 27, No. 5 (May).

Texas Network for Environmental and Economic Justice, 1993.  Toxics in Texas and their Impact on Communities of Color  (Austin, TX:  Texas Network for Environmental and Economic Justice, March).

Tryens, Jeffrey, Richard Schrader, and Paul Orum, undated.  Making the Difference:  Using the Right-to-Know in the Fight Against Toxics  (Washington, DC:  Center for Policy Alternatives and Working Group on Community Right-to-Know).

U.S. Department of Commerce, Bureau of the Census.  County Business Patterns - 1997. Washington, D.C.: Government Printing Office, 1999.

U.S. Department of Labor, Bureau of Labor Statistics.  Employer Costs for Employee Compensation ─ March 1997.  U.S. Department of Labor, Washington, D.C.  1997.

U.S. Department of Labor, Bureau of Labor Statistics. USDL News Release: 97-371, Table 11, U.S. Department of Labor, Washington D.C., October 21, 1997.

U.S. Department of Labor, Bureau of Labor Statistics.  Employment Cost Index─March 1998. U.S. Department of Labor, Washington D.C. 1998.

October, 2003

U.S. Department of Labor, Bureau of Labor Statistics. *USDL News Release 98-170,* Table 6. U.S. Department of Labor, Washington D.C., April 30, 1998.

U.S. Department of Labor, Bureau of Labor Statistics. *Occupational Compensation Survey, National Summary 1996.* U.S. Department of Labor, Washington, D.C., 1996.

U.S. Department of Labor, Bureau of Labor Statistics. Occupational Compensation Survey, National Summary 1996 (1998). U.S. Department of Labor, Washington, D.C., March. Bulletin 2497, Tables A-1, D-1 and D-3, 1998.

U.S. EPA, 1991. 1991 Hazardous Waste Report: Instructions and Forms. EPA Form 8700-13A/B (5-80) revised 8-91.

U.S. EPA, 1993. "Proceedings: Toxics Release Inventory (TRI) Data Use Conference." July 1993.

U.S. EPA, 1993b. State Directory: 33/50 and Voluntary Pollution Prevention Programs, 1993. (Washington, DC: U.S. Environmental Protection Agency, Office of Prevention, Pesticides and Toxic Substances, October).

U.S. EPA, 1994. "National Analysis: The Biennial RCRA Hazardous Waste Report (Based on 1991 Data)." September 1994.

U.S. EPA, 1995a. Information from the AIRS AFS Home Page on the U.S. EPA World Wide Web site: (http://www.epa.gov/docs/airs/afs.html).

U.S. EPA, 1995b. "Compilation of Air Pollutant Emission Factors: Volume I: Stationary Point and Area Sources," Office of Air Quality Planning and Standards (OAQPS), January 1995.

U.S. EPA, 1995c. "White Paper for Streamlined Development of Part 70 Permit Applications," Office of Air Quality Planning and Standards (OAQPS), July 10, 1995.

U.S. EPA, 1995d. "Report to President Clinton: Expansion of Community Right-to-Know Reporting to Include Chemical Use Data: Phase III of the Toxics Release Inventory."

U.S. EPA, 1995e. "User's Guide to Federal Accidental Release Databases," Office of Solid Waste and Emergency Response, September 1995.

U.S. EPA, 1995f. Information from the ENVIROFACTS database on the U.S. EPA World Wide Web site: (http://www.epa.gov/enviro/html/ef_home.html).

U.S. EPA, 1999g. "1997 Toxics Release Inventory Public Data Release: State Fact Sheets, Office of Pollution Prevention and Toxics, EPA 745-F-99-001, March 1995.

90

October, 2003

U.S. EPA 1995h. "An Overview of the Toxics Release Inventory Data in the U.S.," Environmental Assistance Division, Office of Pollution Prevention and Toxics, June, 1995.

U.S. EPA, 1996. SPEC.TXT, document on CHIEF (Clearing House for Inventories and Emissions Factors) BBS on the Technology Transfer Network (TTN) BBS. Dialup (919-541-5742) or ftp  (ttnftp.rtpnc.epa.gov).

U.S. EPA, 1999. "Economic Analysis of the Final Rule to Modify Reporting of Persistent Bioaccumulative Toxic Chemicals Under EPCRA Section 313".  Economics, Exposure and Technology Division, Office of Pollution Prevention and Toxics. October 1999.
Wakefield, Mary Jean,  AFS Helpline 1-800-367-1044, 1995.  Conversation with Abt Associates. November 28, 1995.

October, 2003

# ATTACHMENT A

**Toxic Chemical Release Inventory Reporting Form R (EPA Form # 9350-1)**
**(Note:  This form is the last approved by OMB and can be downloaded in .pdf format from**
**www.epa.gov/tri/report/form_r.pdf)**

October, 2003

## ATTACHMENT B
### TRI Chemicals Reported to Non-TRI Databases

The first two tables in this attachment compare chemical coverage between TRI and three media-specific databases: AFS (AIRS Facility Subsystem), BRS (Biennial Reporting System), and PCS (Permit Compliance System). These three databases were chosen for analysis because they contain media-specific chemical release information. The third attachment discusses the accessibility of the data in each of these sources.

The chemicals currently in TRI are listed in Attachment B-1, while the TRI chemical categories are listed in Attachment B-2. For each TRI chemical or category, there is a table entry which contains its name as listed in TRI, its CAS number or TRI-assigned category number, and indicators as to whether or not that particular TRI chemical is tracked by AFS, BRS, and/or PCS. A dot in the AFS, BRS, or PCS columns indicates that the chemical listed at that row is either tracked by that database or is speciable using data from that database. While a dot means that the particular chemical is tracked by both TRI and the database in question, it does not necessarily mean that a facility releasing the chemical reports that specific chemical to both systems. In other words, the same facility may not be reporting the same information to different programs. Therefore, the indication that a chemical is tracked in both systems does not mean the information contained in the systems is equivalent.

AFS matches are based on emissions data "speciated" from limited industry profiles, and are not derived from directly reported data. Speciated chemical emissions are estimated using SPECIATE and are based on actual reported PM-10 and VOC emissions. Please see section 5(a) of this supporting statement for a description of SPECIATE.

Because data categorized by BRS waste codes can be only partially translated into chemical-specific information, chemicals have been tagged in the table as reporting to BRS only where there is CAS-specific data that can be matched. Other wastestreams may contain additional TRI chemicals, but because their waste codes are not CAS-specific, it is difficult to determine which chemicals (as well as how much of them) are actually in the wastestream.

PCS chemicals are tagged in the table if at least one PCS facility reports the chemical as part of its Discharge Monitoring Report (DMR). Therefore, because a chemical is tagged does not necessarily mean that it is significantly represented in PCS. In addition, because the list of chemicals a facility reports depends heavily on the language of the permit, facilities releasing identical chemicals may not be required to report the same set of chemicals to PCS.

October, 2003

**Attachment B-1**

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| **Chemical Name** | **CAS Number** | **AFS** | **BRS** | **PCS** |
| 1,1,1,2-Tetrachloro-2-fluoroethane  (HCFC-121a) | 354110 | | | |
| 1,1,1,2-Tetrachloroethane | 630206 | | ● | |
| 1,1,1-Trichloroethane | 71556 | ● | ● | ● |
| 1,1,2,2-Tetrachloro-1-fluoroethane  (HCFC-121) | 354143 | | | |
| 1,1,2,2-Tetrachloroethane | 79345 | | ● | ● |
| 1,1,2-Trichloroethane | 79005 | ● | ● | ● |
| 1,1-Dichloro-1,2,2,3,3-pentafluoropropane (HCFC-225cc) | 13474889 | | | |
| 1,1-Dichloro-1,2,2-trifluoroethane (HCFC-123b) | 812044 | | | |
| 1,1-Dichloro-1,2,3,3,3-pentafluoropropane (HCFC-225eb) | 111512562 | | | |
| 1,1-Dichloro-1-fluoroethane (HCFC-141b) | 1717006 | | | |
| 1,1-Dimethyl hydrazine | 57147 | | ● | |
| 1,2,3-Trichloropropane | 96184 | | | |
| 1,2,4-Trichlorobenzene | 120821 | | | ● |
| 1,2,4-Trimethylbenzene | 95636 | ● | | ● |
| 1,2-Butylene oxide | 106887 | | | |
| 1,2-Dibromo-3-chloropropane | 96128 | | ● | |
| 1,2-Dibromoethane | 106934 | ● | ● | ● |
| 1,2-Dichloro-1,1,2,3,3-pentafluoropropane (HCFC-225bb) | 422446 | | | |
| 1,2-Dichloro-1,1,2-trifluoroethane (HCFC-123a) | 354234 | | | |
| 1,2-Dichloro-1,1,3,3,3-pentafluoropropane (HCFC-225da) | 431867 | | | |
| 1,2-Dichloro-1,1-difluoroethane (HCFC-132b) | 1649087 | | | |
| 1,2-Dichlorobenzene | 95501 | ● | ● | ● |
| 1,2-Dichloroethane | 107062 | ● | ● | ● |
| 1,2-Dichloroethylene | 540590 | | | |
| 1,2-Dichloropropane | 78875 | | ● | ● |
| 1,2-Diphenylhydrazine | 122667 | | ● | ● |
| 1,2-Phenylenediamine | 95545 | | | |
| 1,2-Phenylenediamine dihydrochloride | 615281 | | | |
| 1,3-Butadiene | 106990 | ● | | |
| 1,3-Dichloro-1,1,2,2,3-pentafluoropropane (HCFC-225cb) | 507551 | | | |
| 1,3-Dichloro-1,1,2,3,3-pentafluoropropane (HCFC-225ea) | 136013791 | | | |
| 1,3-Dichlorobenzene | 541731 | ● | ● | ● |
| 1,3-Dichloropropylene | 542756 | | ● | ● |

B-2

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| 1,3-Phenylenediamine | 108452 | | | |
| 1,4-Dichloro-2-butene | 764410 | | ● | ● |
| 1,4-Dichlorobenzene | 106467 | ● | ● | ● |
| 1,4-Dioxane | 123911 | | ● | ● |
| 1,4-Phenylenediamine dihydrochloride | 624180 | | | |
| 1-(3-Chloroallyl)-3,5,7-triaza-1-azoniaadamantane chloride | 4080313 | | | |
| 1-Amino-2-methylanthraquinone | 82280 | | | |
| 1-Bromo-1-(bromomethyl)-1,3-propanedicarbonitrile | 35691657 | | | |
| 1-Chloro-1,1,2,2-tetrafluoroethane (HCFC-124a) | 354256 | | | |
| 1-Chloro-1,1-difluoroethane (HCFC-142b) | 75683 | | | |
| 2,2-Dibromo-3-nitrilopropionamide | 10222012 | | | |
| 2,2-Dichloro-1,1,1,3,3-pentafluoropropane (HCFC-225aa) | 128903219 | | | |
| 2,2-Dichloro-1,1,1-trifluoroethane (HCFC-123) | 306832 | | | |
| 2,3,5-Trimethylphenyl methylcarbamate | 2655154 | | | |
| 2,3-Dichloro-1,1,1,2,3-pentafluoropropane (HCFC-225ba) | 422480 | | | |
| 2,3-Dichloropropene | 78886 | | | |
| 2,4,5-Trichlorophenol | 95954 | | | ● |
| 2,4,6-Trichlorophenol | 88062 | | | ● |
| 2,4-D | 94757 | | ● | ● |
| 2,4-D 2-ethyl-4-methylpentyl ester | 53404378 | | | |
| 2,4-D 2-ethylhexyl ester | 1928434 | | | |
| 2,4-D butoxyethyl ester | 1929733 | | | |
| 2,4-D butyl ester | 94804 | | | |
| 2,4-D chlorocrotyl ester | 2971382 | | | |
| 2,4-D isopropyl ester | 94111 | | | |
| 2,4-D propylene glycol butyl ether ester | 1320189 | | | |
| 2,4-D sodium salt | 2702729 | | | |
| 2,4-DB | 94826 | | | |
| 2,4-Diaminoanisole | 615054 | | | |
| 2,4-Diaminoanisole sulfate | 39156417 | | | |
| 2,4-Diaminotoluene | 95807 | | | ● |
| 2,4-Dichlorophenol | 120832 | | ● | ● |
| 2,4-Dimethylphenol | 105679 | | ● | ● |
| 2,4-Dinitrophenol | 51285 | | ● | ● |
| 2,4-Dinitrotoluene | 121142 | | ● | ● |
| 2,4-Dithiobiuret | 541537 | | ● | |
| 2,4-DP (Dichlorprop) | 120365 | | | ● |

B-3

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| 2,6-Dimethylphenol | 576261 | | | |
| 2,6-Dinitrotoluene | 606202 | | ● | ● |
| 2,6-Xylidine | 87627 | | | |
| 2-Acetylaminofluorene | 53963 | | ● | |
| 2-Aminoanthraquinone | 117793 | | | |
| 2-Bromo-2-nitropropane-1,3-diol (Bronopol) | 52517 | | | |
| 2-Chloro-1,1,1,2-tetrafluoroethane (HCFC-124) | 2837890 | | | |
| 2-Chloro-1,1,1-trifluoroethane (HCFC-133a) | 75887 | | | |
| 2-Chloroacetophenone | 532274 | | | |
| 2-Ethoxyethanol | 110805 | ● | ● | |
| 2-Mercaptobenzothiazole (MBT) | 149304 | | | |
| 2-Methoxyethanol | 109864 | ● | | |
| 2-Methyllactonitrile | 75865 | | ● | |
| 2-Methylpyridine | 109068 | | ● | |
| 2-Nitrophenol | 88755 | | | ● |
| 2-Nitropropane | 79469 | | ● | |
| 2-Phenylphenol | 90437 | ● | | |
| 3,3'-Dichlorobenzidine | 91941 | | ● | ● |
| 3,3'-Dichlorobenzidine dihydrochloride | 612839 | | | |
| 3,3'-Dichlorobenzidine sulfate | 64969342 | | | |
| 3,3'-Dimethoxybenzidene dihydrochloride (o-Dianisidine dihyd | 20325400 | | | |
| 3,3'-Dimethoxybenzidine | 119904 | | ● | |
| 3,3'-Dimethoxybenzidine hydrochloride (o-Dianisidine hydroch | 111984099 | | | |
| 3,3'-Dimethylbenzidine | 119937 | | ● | |
| 3,3'-Dimethylbenzidine dihydrochloride (o-Tolidine dihydroch | 612828 | | | |
| 3,3'-Dimethylbenzidine dihydrofluoride (o-Tolidine dihydrofl | 41766750 | | | |
| 3,3-Dichloro-1,1,1,2,2-pentafluoropropane (HCFC-225ca) | 422560 | | | |
| 3,4-Dichloropentafluoropropane | 127564925 | | | |
| 3-Chloro-1,1,1-trifluoropropane (HCFC-253fb) | 460355 | | | |
| 3-Chloro-2-methyl-1-propene | 563473 | | | |
| 3-Chloropropionitrile | 542767 | | ● | |
| 3-Iodo-2-propynyl butylcarbamate | 55406536 | | | |
| 4,4'-Diaminodiphenyl ether | 101804 | | | |
| 4,4'-Isopropylidenediphenol | 80057 | | | ● |
| 4,4'-Methylenebis(2-chloroaniline) | 101144 | | ● | |
| 4,4'-Methylenebis(N,N-dimethyl)benzenamine | 101611 | | | |
| 4,4'-Methylenedianiline | 101779 | ● | | |

B-4

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| 4,4'-Thiodianiline | 139651 | | | |
| 4,6-Dinitro-o-cresol | 534521 | | ● | ● |
| 4-Aminoazobenzene | 60093 | | | |
| 4-Aminobiphenyl | 92671 | | | |
| 4-Dimethylaminoazobenzene | 60117 | | ● | |
| 4-Nitrobiphenyl | 92933 | | | |
| 4-Nitrophenol | 100027 | | ● | ● |
| 5-Nitro-o-anisidine | 99592 | | | |
| 5-Nitro-o-toluidine | 99558 | | ● | |
| Abamectin | 71751412 | | | |
| Acephate | 30560191 | | | |
| Acetaldehyde | 75070 | ● | ● | |
| Acetamide | 60355 | | | |
| Acetonitrile | 75058 | | ● | ● |
| Acetophenone | 98862 | | ● | ● |
| Acifluorfen sodium salt | 62476599 | | | |
| Acrolein | 107028 | ● | ● | ● |
| Acrylamide | 79061 | | ● | |
| Acrylic acid | 79107 | ● | ● | |
| Acrylonitrile | 107131 | ● | ● | ● |
| Alachlor | 15972608 | | | ● |
| Aldicarb | 116063 | | ● | ● |
| Aldrin | 309002 | | ● | ● |
| Allyl alcohol | 107186 | | ● | |
| Allyl chloride | 107051 | | | ● |
| Allylamine | 107119 | | | |
| alpha-Hexachlorocyclohexane | 319846 | | | ● |
| alpha-Naphthylamine | 134327 | | ● | |
| Aluminum (fume or dust) | 7429905 | ● | | ● |
| Aluminum oxide (fibrous forms) | 1344281 | | | |
| Aluminum phosphide | 20859738 | | ● | |
| Ametryn | 834128 | | | |
| Amitraz | 33089611 | | | |
| Amitrole | 61825 | | ● | |
| Ammonia | 7664417 | ● | | ● |
| Anilazine | 101053 | | | |
| Aniline | 62533 | ● | ● | ● |

B-5

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Anthracene | 120127 | ● | | ● |
| Antimony | 7440360 | ● | | ● |
| Arsenic | 7440382 | ● | | ● |
| Asbestos (friable) | 1332214 | | | ● |
| Atrazine | 1912249 | | | |
| Barium | 7440393 | ● | | ● |
| Bendiocarb | 22781233 | | | |
| Benfluralin | 1861401 | | | |
| Benomyl | 17804352 | | | |
| Benzal chloride | 98873 | | ● | |
| Benzamide | 55210 | | | |
| Benzene | 71432 | ● | ● | ● |
| Benzidine | 92875 | | ● | ● |
| Benzoic trichloride | 98077 | | ● | |
| Benzoyl chloride | 98884 | | | |
| Benzoyl peroxide | 94360 | | | |
| Benzyl chloride | 100447 | ● | ● | |
| Beryllium | 7440417 | ● | ● | ● |
| beta-Naphthylamine | 91598 | | ● | |
| beta-Propiolactone | 57578 | | | |
| Bifenthrin | 82657043 | | | |
| Biphenyl | 92524 | ● | | |
| Bis(2-chloro-1-methylethyl)ether | 108601 | | ● | ● |
| Bis(2-chloroethoxy) methane | 111911 | | ● | ● |
| Bis(2-chloroethyl) ether | 111444 | | ● | ● |
| Bis(chloromethyl) ether | 542881 | | ● | ● |
| Bis(tributyltin) oxide | 56359 | | | |
| Boron trichloride | 10294345 | | | |
| Boron trifluoride | 7637072 | | | |
| Bromacil | 314409 | | | |
| Bromacil lithium salt | 53404196 | | | |
| Bromine | 7726956 | ● | | |
| Bromochlorodifluoromethane {Halon 1211} | 353593 | | | |
| Bromoform | 75252 | | ● | ● |
| Bromomethane | 74839 | | ● | ● |
| Bromotrifluoromethane {Halon 1301} | 75638 | | | |
| Bromoxynil | 1689845 | | | |

B-6

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Bromoxynil octanoate | 1689992 | | | |
| Brucine | 357573 | | ● | |
| Butyl acrylate | 141322 | ● | | |
| Butyraldehyde | 123728 | ● | | |
| C.I. Acid Green 3 | 4680788 | | | |
| C.I. Acid Red 114 | 6459945 | | | |
| C.I. Basic Green 4 | 569642 | | | |
| C.I. Basic Red 1 | 989388 | | | |
| C.I. Direct Black 38 | 1937377 | | | |
| C.I. Direct Blue 218 | 28407376 | | | |
| C.I. Direct Blue 6 | 2602462 | | | |
| C.I. Direct Brown 95 | 16071866 | | | |
| C.I. Disperse Yellow 3 | 2832408 | | | |
| C.I. Food Red 15 | 81889 | | | |
| C.I. Food Red 5 | 3761533 | | | |
| C.I. Solvent Orange 7 | 3118976 | | | |
| C.I. Solvent Yellow 14 | 842079 | | | |
| C.I. Solvent Yellow 3 | 97563 | | | |
| C.I. Solvent Yellow 34 | 492808 | | ● | |
| C.I. Vat Yellow 4 | 128665 | | | |
| Cadmium | 7440439 | ● | | ● |
| Calcium cyanamide | 156627 | | | |
| Captan | 133062 | | | |
| Carbaryl | 63252 | | | |
| Carbofuran | 1563662 | | | ● |
| Carbon disulfide | 75150 | ● | ● | ● |
| Carbon tetrachloride | 56235 | ● | ● | ● |
| Carbonyl sulfide | 463581 | | | |
| Carboxin | 5234684 | | | |
| Catechol | 120809 | | | |
| Chinomethionat | 2439012 | | | |
| Chloramben | 133904 | | | |
| Chlordane | 57749 | | ● | ● |
| Chlorendic acid | 115286 | | | ● |
| Chlorimuron ethyl | 90982324 | | | |
| Chlorine | 7782505 | ● | | ● |
| Chlorine dioxide | 10049044 | | | |

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Chloroacetic acid | 79118 | | | |
| Chlorobenzene | 108907 | ● | ● | ● |
| Chlorobenzilate | 510156 | | | |
| Chlorodifluoromethane (HCFC-22) | 75456 | ● | | ● |
| Chloroethane | 75003 | ● | | ● |
| Chloroform | 67663 | ● | ● | ● |
| Chloromethane | 74873 | ● | ● | ● |
| Chloromethyl methyl ether | 107302 | | ● | |
| Chloropicrin | 76062 | | | |
| Chloroprene | 126998 | ● | | |
| Chlorotetrafluoroethane | 63938103 | | | |
| Chlorothalonil | 1897456 | | | ● |
| Chlorotrifluoromethane (CFC-13) | 75729 | ● | | |
| Chlorpyrifos methyl | 5598130 | | | |
| Chlorsulfuron | 64902723 | | | |
| Chromium | 7440473 | ● | | ● |
| Cobalt | 7440484 | ● | | ● |
| Copper | 7440508 | ● | | ● |
| Creosote | 8001589 | ● | ● | |
| Cresol (mixed isomers) | 1319773 | ● | ● | ● |
| Crotonaldehyde | 4170303 | | ● | |
| Cumene | 98828 | ● | ● | ● |
| Cumene hydroperoxide | 80159 | | ● | |
| Cupferron | 135206 | | | |
| Cyanazine | 21725462 | | | |
| Cycloate | 1134232 | | | |
| Cyclohexane | 110827 | ● | ● | ● |
| Cyclohexanol | 108930 | | | |
| Cyfluthrin | 68359375 | | | |
| Cyhalothrin | 68085858 | | | |
| d-trans-Allethrin | 28057489 | | | |
| Dazomet | 533744 | | | |
| Dazomet sodium salt | 53404607 | | | |
| Decabromodiphenyl oxide | 1163195 | | | |
| Desmedipham | 13684565 | | | |
| Di(2-ethylhexyl) phthalate | 117817 | | ● | ● |
| Diallate | 2303164 | | ● | |

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Diaminotoluene (mixed isomers) | 25376458 | | ● | |
| Diazinon | 333415 | | | ● |
| Diazomethane | 334883 | | | |
| Dibenzofuran | 132649 | | | |
| Dibromotetrafluoroethane {Halon 2402} | 124732 | | | |
| Dibutyl phthalate | 84742 | ● | ● | ● |
| Dicamba (3,6-Dichloro-2-methyoxybenzoic acid) | 1918009 | | | |
| Dichloran (2,6-Dichloro-4-nitroaniline) | 99309 | | | |
| Dichloro-1,1,2-trifluoroethane | 90454185 | | | |
| Dichlorobenzene (mixed isomers) | 25321226 | | | ● |
| Dichlorobromomethane | 75274 | | | ● |
| Dichlorodifluoromethane (CFC-12) | 75718 | ● | ● | ● |
| Dichlorofluoromethane (HCFC-21) | 75434 | | | |
| Dichloromethane | 75092 | ● | ● | ● |
| Dichlorophene (2,2'-Methylenebis(4-chlorophenol) | 97234 | | | |
| Dichlorotetrafluoroethane (CFC-114) | 76142 | ● | | |
| Dichlorotrifluoroethane | 34077877 | | | |
| Dichlorvos | 62737 | | | |
| Diclofop methyl | 51338273 | | | |
| Dicofol | 115322 | | | |
| Dicyclopentadiene | 77736 | | | |
| Diepoxybutane | 1464535 | | | |
| Diethanolamine | 111422 | | | |
| Diethatyl ethyl | 38727558 | | | |
| Diethyl sulfate | 64675 | | | |
| Diflubenzuron | 35367385 | | | |
| Diglycidyl resorcinol ether | 101906 | | | |
| Dihydrosafrole | 94586 | | | |
| Dimethipin | 55290647 | | | |
| Dimethoate | 60515 | | ● | |
| Dimethyl chlorothiophosphate | 2524030 | | | |
| Dimethyl phthalate | 131113 | ● | ● | ● |
| Dimethyl sulfate | 77781 | | ● | |
| Dimethylamine | 124403 | | ● | |
| Dimethylamine dicamba | 2300665 | | | |
| Dimethylcarbamyl chloride | 79447 | | ● | |
| Dimethyldichlorosilane | 75785 | | | |

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Dinitrobutyl phenol (Dinoseb) | 88857 | | ● | ● |
| Dinitrotoluene (mixed isomers) | 25321146 | | | |
| Dinocap | 39300453 | | | |
| Diphenamid | 957517 | | | |
| Diphenylamine | 122394 | | | |
| Dipotassium endothall | 2164070 | | | |
| Dipropyl isocinchomeronate | 136458 | | | |
| Disodium cyanodithioimidocarbonate | 138932 | | | |
| Diuron | 330541 | | | |
| Dodine (Dodecylguanidine monoacetate) | 2439103 | | | |
| Epichlorohydrin | 106898 | ● | ● | ● |
| Ethoprop | 13194484 | | | |
| Ethyl acrylate | 140885 | ● | ● | |
| Ethyl chloroformate | 541413 | | | |
| Ethyl dipropylthiocarbamate (EPTC) | 759944 | | | |
| Ethylbenzene | 100414 | ● | | ● |
| Ethylene | 74851 | ● | | |
| Ethylene glycol | 107211 | ● | | ● |
| Ethylene oxide | 75218 | ● | ● | |
| Ethylene thiourea | 96457 | | ● | |
| Ethyleneimine | 151564 | | ● | |
| Ethylidene dichloride | 75343 | | ● | ● |
| Famphur | 52857 | | ● | |
| Fenarimol | 60168889 | | | |
| Fenbutatin oxide | 13356086 | | | |
| Fenoxaprop ethyl | 66441234 | | | |
| Fenoxycarb | 72490018 | | | |
| Fenpropathrin | 39515418 | | | |
| Fenthion | 55389 | | | |
| Fenvalerate | 51630581 | | | |
| Ferbam | 14484641 | | | |
| Fluazifop butyl | 69806504 | | | |
| Fluometuron | 2164172 | | | |
| Fluorine | 7782414 | ● | ● | |
| Fluorouracil (5-Fluorouracil) | 51218 | | | |
| Fluvalinate | 69409945 | | | |
| Folpet | 133073 | | | |

B-10

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Fomesafen | 72178020 | | | |
| Formaldehyde | 50000 | ● | ● | ● |
| Formic acid | 64186 | ● | ● | |
| Freon 113 | 76131 | ● | | ● |
| Heptachlor | 76448 | | ● | ● |
| Hexachloro-1,3-butadiene | 87683 | | ● | ● |
| Hexachlorobenzene | 118741 | | ● | ● |
| Hexachlorocyclopentadiene | 77474 | | ● | ● |
| Hexachloroethane | 67721 | | ● | ● |
| Hexachloronaphthalene | 1335871 | | | |
| Hexachlorophene | 70304 | | ● | |
| Hexamethylphosphoramide | 680319 | | | ● |
| Hexazinone | 51235042 | | | |
| Hydramethylnon | 67485294 | | | |
| Hydrazine | 302012 | | ● | ● |
| Hydrazine sulfate | 10034932 | | | |
| Hydrochloric acid | 7647010 | | | |
| Hydrogen cyanide | 74908 | | ● | |
| Hydrogen fluoride | 7664393 | | ● | |
| Hydrogen sulfide | 7783064 | ● | ● | ● |
| Hydroquinone | 123319 | | | ● |
| Imazalil | 35554440 | | | |
| Iron pentacarbonyl | 13463406 | | | |
| Isobutyraldehyde | 78842 | ● | | |
| Isodrin | 465736 | | ● | |
| Isofenphos | 25311711 | | | |
| Isopropyl alcohol (manufacturing-strong acid process) | 67630 | ● | | ● |
| Isosafrole | 120581 | | ● | |
| Lactofen | 77501634 | | | |
| Lead | 7439921 | ● | | ● |
| Lindane | 58899 | | ● | ● |
| Linuron | 330552 | | | |
| Lithium carbonate | 554132 | | | |
| m-Cresol | 108394 | | | |
| m-Dinitrobenzene | 99650 | | | |
| m-Xylene | 108383 | ● | | |
| Malathion | 121755 | | | ● |

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Maleic anhydride | 108316 | ● | ● | |
| Malononitrile | 109773 | | ● | |
| Maneb | 12427382 | | | |
| Manganese | 7439965 | ● | | ● |
| Mecoprop | 93652 | | | |
| Mercury | 7439976 | ● | | ● |
| Merphos | 150505 | | | |
| Methacrylonitrile | 126987 | | ● | |
| Metham sodium (Sodium methyldithiocarbamate) | 137428 | | | |
| Methanol | 67561 | ● | ● | |
| Methazole | 20354261 | | | |
| Methiocarb | 2032657 | | | |
| Methoxone | 94746 | | | |
| Methoxone sodium salt | 3653483 | | | |
| Methoxychlor | 72435 | | ● | ● |
| Methyl acrylate | 96333 | ● | | |
| Methyl chlorocarbonate | 79221 | | ● | |
| Methyl ethyl ketone | 78933 | ● | ● | ● |
| Methyl hydrazine | 60344 | | ● | |
| Methyl iodide | 74884 | | ● | |
| Methyl isobutyl ketone | 108101 | ● | ● | ● |
| Methyl isocyanate | 624839 | | ● | |
| Methyl isothiocyanate | 556616 | | | |
| Methyl mercaptan | 74931 | | ● | |
| Methyl methacrylate | 80626 | ● | ● | ● |
| Methyl parathion | 298000 | | ● | |
| Methyl tert-butyl ether | 1634044 | | | |
| Methylene bromide | 74953 | ● | ● | |
| Methyltrichlorosilane | 75796 | | | |
| Metiram | 9006422 | | | ● |
| Metribuzin | 21087649 | | | |
| Mevinphos | 7786347 | | | |
| Michler's ketone | 90948 | | | |
| Molinate | 2212671 | | | |
| Molybdenum trioxide | 1313275 | | | |
| Monochloropentafluoroethane {CFC-115} | 76153 | ● | | |
| Monuron | 150685 | | | |

B-12

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| **Chemical Name** | **CAS Number** | **AFS** | **BRS** | **PCS** |
| Mustard gas | 505602 | | | |
| Myclobutanil | 88671890 | | | |
| N,N-Dimethylaniline | 121697 | | | ● |
| N,N-Dimethylformamide | 68122 | ● | | |
| n-Butyl alcohol | 71363 | ● | ● | |
| n-Hexane | 110543 | ● | | |
| N-Methyl-2-pyrrolidone | 872504 | | | |
| N-Methylolacrylamide | 924425 | | | |
| N-Nitroso-N-ethylurea | 759739 | | ● | |
| N-Nitroso-N-methylurea | 684935 | | ● | |
| N-Nitrosodi-n-butylamine | 924163 | | ● | |
| N-Nitrosodi-n-propylamine | 621647 | | ● | ● |
| N-Nitrosodiethylamine | 55185 | | ● | |
| N-Nitrosodimethylamine | 62759 | | ● | ● |
| N-Nitrosodiphenylamine | 86306 | | | ● |
| N-Nitrosomethylvinylamine | 4549400 | | | |
| N-Nitrosomorpholine | 59892 | | | |
| N-Nitrosonornicotine | 16543558 | | | |
| N-Nitrosopiperidine | 100754 | | | |
| Nabam | 142596 | | | |
| Naled | 300765 | | | |
| Naphthalene | 91203 | ● | ● | ● |
| Nickel | 7440020 | ● | | ● |
| Nitrapyrin | 1929824 | | | |
| Nitric acid | 7697372 | | | |
| Nitrilotriacetic acid | 139139 | | | |
| Nitrobenzene | 98953 | ● | ● | ● |
| Nitrofen | 1836755 | | | |
| Nitrogen mustard | 51752 | | | |
| Nitroglycerin | 55630 | | ● | ● |
| Norflurazon | 27314132 | | | |
| Octachloronaphthalene | 2234131 | | | |
| ortho-Anisidine | 90040 | | | |
| ortho-Anisidine hydrochloride | 134292 | | | |
| ortho-Cresol | 95487 | | | |
| ortho-Dinitrobenzene | 528290 | | | |
| ortho-Toluidine | 95534 | | ● | |

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|:---:|:---:|:---:|
| **Chemical Name** | **CAS Number** | **AFS** | **BRS** | **PCS** |
| ortho-Toluidine hydrochloride | 636215 | | ● | |
| ortho-Xylene | 95476 | ● | | |
| Oryzalin | 19044883 | | | |
| Osmium tetroxide | 20816120 | | ● | |
| Oxydemeton methyl | 301122 | | | |
| Oxydiazon | 19666309 | | | |
| Oxyfluorfen | 42874033 | | | |
| Ozone | 10028156 | | | |
| p-Anisidine | 104949 | | | |
| p-Chloro-o-toluidine | 95692 | | | |
| p-Chloroaniline | 106478 | | ● | |
| p-Chlorophenyl isocyanate | 104121 | | | |
| p-Cresidine | 120718 | | | |
| p-Cresol | 106445 | | | ● |
| p-Dinitrobenzene | 100254 | | | |
| p-Nitroaniline | 100016 | | ● | |
| p-Nitrosodiphenylamine | 156105 | | | |
| p-Phenylenediamine | 106503 | | | |
| p-Xylene | 106423 | ● | | |
| Paraldehyde | 123637 | | ● | |
| Paraquat dichloride | 1910425 | | | |
| Parathion | 56382 | | ● | ● |
| Pebulate | 1114712 | | | |
| Pendimethalin | 40487421 | | | |
| Pentachloroethane | 76017 | | ● | |
| Pentachlorophenol | 87865 | | | ● |
| Pentobarbital sodium | 57330 | | | |
| Peracetic acid | 79210 | | | |
| Perchloromethyl mercaptan | 594423 | | | |
| Permethrin | 52645531 | | | |
| Phenanthrene | 85018 | ● | | ● |
| Phenol | 108952 | ● | ● | ● |
| Phenothrin | 26002802 | | | |
| Phenytoin | 57410 | | | |
| Phosgene | 75445 | | ● | |
| Phosphine | 7803512 | | ● | |
| Phosphoric acid | 7664382 | | | |

B-14

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Phosphorus (yellow or white) | 7723140 | ● | | ● |
| Phthalic anhydride | 85449 | ● | ● | |
| Picloram | 1918021 | | | |
| Picric acid | 88891 | | | |
| Piperonyl butoxide | 51036 | | | |
| Pirimiphos methyl | 29232937 | | | |
| Polychlorinated biphenyls | 1336363 | | | |
| Potassium bromate | 7758012 | | | |
| Potassium dimethyldithiocarbamate | 128030 | | | |
| Potassium N-methyldithiocarbamate | 137417 | | | |
| Profenofos | 41198087 | ` | | |
| Prometryn | 7287196 | | | |
| Pronamide | 23950585 | | ● | |
| Propachlor | 1918167 | | | ● |
| Propane sultone | 1120714 | | ● | |
| Propanil | 709988 | | | |
| Propargite | 2312358 | | | |
| Propargyl alcohol | 107197 | | ● | |
| Propetamphos | 31218834 | | | |
| Propiconazole | 60207901 | | | |
| Propionaldehyde | 123386 | ● | | |
| Propoxur | 114261 | | | |
| Propylene (Propene) | 115071 | ● | | |
| Propylene oxide | 75569 | ● | | |
| Propyleneimine | 75558 | | ● | |
| Pyridine | 110861 | | ● | ● |
| Quinoline | 91225 | | | |
| Quinone | 106514 | | ● | |
| Quintozene | 82688 | | ● | |
| Quizalofop-ethyl | 76578148 | | | |
| Resmethrin | 10453868 | | | |
| S,S,S-Tributyltrithiophosphate (DEF) | 78488 | | | |
| Saccharin (manufacturing) | 81072 | | ● | |
| Safrole | 94597 | | | |
| sec-Butyl alcohol | 78922 | ● | | |
| Selenium | 7782492 | ● | | ● |
| Sethoxydim | 74051802 | | | |

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Silver | 7440224 | ● | | ● |
| Simazine | 122349 | | | |
| Sodium azide | 26628228 | | ● | |
| Sodium dicamba | 1982690 | | | |
| Sodium dimethyldithiocarbamate | 128041 | | | |
| Sodium fluoroacetate | 62748 | | ● | |
| Sodium nitrite | 7632000 | | | ● |
| Sodium o-phenylphenoxide | 132274 | | | |
| Sodium pentachlorophenate | 131522 | | | |
| Styrene | 100425 | ● | | ● |
| Styrene oxide | 96093 | | | |
| Sulfuric acid | 7664939 | | | |
| Sulfuryl fluoride (Vikane) | 2699798 | | | |
| Sulprofos | 35400432 | | | |
| Tebuthiuron | 34014181 | | | |
| Temephos | 3383968 | | | |
| Terbacil | 5902512 | | | |
| tert-Butyl alcohol | 75650 | ● | | |
| Tetrachloroethylene | 127184 | ● | ● | ● |
| Tetrachlorvinphos | 961115 | | | |
| Tetracycline hydrochloride | 64755 | | | |
| Tetramethrin | 7696120 | | | |
| Thallium | 7440280 | | | ● |
| Thiabendazole | 148798 | | | |
| Thioacetamide | 62555 | | ● | |
| Thiobencarb | 28249776 | | | |
| Thiodicarb | 59669260 | | | |
| Thiophanate ethyl | 23564069 | | | |
| Thiophanate-methyl | 23564058 | | | |
| Thiosemicarbazide | 79196 | | ● | |
| Thiourea | 62566 | | ● | |
| Thiram | 137268 | | ● | |
| Thorium dioxide | 1314201 | | | |
| Titanium tetrachloride | 7550450 | | | |
| Toluene | 108883 | ● | ● | ● |
| Toluene-2,4-diisocyanate | 584849 | | | |
| Toluene-2,6-diisocyanate | 91087 | | | |

B-16

October, 2003

| TRI Listed Chemicals Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Name | CAS Number | AFS | BRS | PCS |
| Toluenediisocyanate (mixed isomers) | 26471625 | | ● | |
| Toxaphene | 8001352 | | ● | ● |
| trans-1,3-Dichloropropene | 10061026 | | | ● |
| trans-1,4-Dichloro-2-butene | 110576 | | | |
| Triadimefon | 43121433 | | | |
| Triallate | 2303175 | | | |
| Triaziquone | 68768 | | | |
| Tribenuron methyl | 101200480 | | | |
| Tributyltin fluoride | 1983104 | | | |
| Tributyltin methacrylate | 2155706 | | | |
| Trichlorfon | 52686 | | | |
| Trichloroacetyl chloride | 76028 | | | |
| Trichloroethylene | 79016 | ● | ● | ● |
| Trichlorofluoromethane {CFC-11} | 75694 | ● | ● | ● |
| Triclopyr triethylammonium salt | 57213691 | | | |
| Triethylamine | 121448 | | | |
| Trifluralin | 1582098 | | | |
| Triforine | 26644462 | | | |
| Trimethylchlorosilane | 75774 | | | |
| Triphenyltin chloride | 639587 | | | |
| Triphenyltin hydroxide | 76879 | | | |
| Tris(2,3-dibromopropyl) phosphate | 126727 | | ● | |
| Trypan blue | 72571 | | ● | |
| Urethane | 51796 | | ● | |
| Vanadium (fume or dust) | 7440622 | ● | | ● |
| Vinclozolin | 50471448 | | | |
| Vinyl acetate | 108054 | ● | | ● |
| Vinyl bromide | 593602 | | | |
| Vinyl chloride | 75014 | ● | ● | ● |
| Vinylidene chloride | 75354 | | ● | ● |
| Xylene (mixed isomers) | 1330207 | ● | ● | ● |
| Zinc (fume or dust) | 7440666 | ● | | ● |
| Zineb | 12122677 | | | |
| Source: *Economic Analysis of the Final Rule to Add Certain Industry Groups to EPCRA Section 313* | | | | |

October, 2003

**Attachment B-2**

| TRI Listed Chemical Categories Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Category/Constituent | CAS Number/TRI Reference | AFS | BRS | PCS |
| Antimony Compounds | N010 | | | |
| Arsenic Compounds | N020 | | | |
| Barium Compounds | N040 | | | |
| Beryllium Compounds | N050 | | | |
| Cadmium Compounds | N078 | | | |
| Chlorophenols | N084 | | | |
| Chromium Compounds | N090 | | | |
| Cobalt Compounds | N096 | | | |
| Copper Compounds | N100 | | | |
| Cyanide Compounds | N106 | | | |
| Diisocyanates | N120 | | | |
| 1,3-Bis(methylisocyanate)-cyclohexane | 38861722 | | | |
| 1,4-Bis(methylisocyanate)-cyclohexane | 10347543 | | | |
| 1,4-Cyclohexane diisocyanate | 25563671 | | | |
| Diethyldiisocyanatobenzene | 134190377 | | | |
| 4,4'-Diisocyanatodiphenyl ether | 41287384 | | | |
| 2,4'-Diisocyanatodiphenyl sulfide | 757908732 | | | |
| 3,3'-Dimethoxybenzidine-4,4'-diisocyanate | 91930 | | | |
| 3,3'-Dimethyl-4,4'-diphenylene diisocyanate | 91974 | | | |
| 3,3'-Dimethyldiphenylmethane-4,4'-diisocyanate | 139253 | | | |
| Hexamethylene-1,6-diisocyanate | 822060 | | | |
| Isophorone diisocyanate | 4098719 | | | |
| 4-Methyldiphenylmethane-3,4-diisocyanate | 75790840 | | | |
| 1,1-Methylene bis(4-isocyanatocyclohexane) | 5124301 | | | |
| Methylene bis(phenylisocyanate) (MDI) | 101688 | | | |
| 1,5-Naphthalene diisocyanate | 3173726 | | | |
| 1,3-Phenylene diisocyanate | 123615 | | | |
| 1,4-Phenylene diisocyanate | 104494 | | | |
| Polymeric diphenylmethane diisocyanate | 9016879 | | | |
| 2,2,4-Trimethylhexamethylene diisocyanate | 16938220 | | | |
| 2,4,4-Trimethylhexamethylene diisocyanate | 15646965 | | | |
| Ethylenebisdithiocarbamic acid, salts and esters | N171 | | | |
| Glycol Ethers | N230 | | | |

October, 2003

| TRI Listed Chemical Categories Directly Reporting to AFS, BRS, and/or PCS | | | | |
|---|---|---|---|---|
| Chemical Category/Constituent | CAS Number/TRI Reference | AFS | BRS | PCS |
| Lead Compounds | N420 | | | |
| Manganese Compounds | N450 | | | |
| Mercury Compounds | N458 | | | |
| Nickel Compounds | N495 | | | |
| Nicotine and salts | N503 | | | |
| Nitrate compounds (water dissociable) | N511 | | | ● |
| Polybrominated Biphenyls (PBBs) | N575 | | | |
| Polychlorinated alkanes | N583 | | | |
| Polycyclic aromatic compounds (following chemicals only) * | N590 | | | |
| Benz(a)anthracene | 56553 | ● | ● | ● |
| Benzo(a)phenanthrene | 218019 | | ● | ● |
| Benzo(a)pyrene | 50328 | ● | ● | ● |
| Benzo(b)fluoranthene | 205992 | ● | | ● |
| Benzo(j)fluoranthene | 205823 | | | |
| Benzo(k)fluoranthene | 207089 | ● | | ● |
| Benzo(rst)pentaphene | 189559 | | ● | |
| Dibenz(a,h)acridine | 226368 | | | |
| Dibenz(a,j)acridine | 224420 | | | |
| Dibenzo(a,h)anthracene | 53703 | | ● | ● |
| Dibenzo(a,e)fluoranthene | 5385751 | | | |
| Dibenzo(a,e)pyrene | 192654 | | | |
| Dibenzo(a,h)pyrene | 189640 | | | |
| Dibenzo(a,l)pyrene | 191300 | | | |
| 7H-Dibenzo(c,g)carbazole | 194592 | | | |
| 7,12-Dimethylbenz(a)anthracene | 57976 | | ● | |
| Indeno[1,2,3-cd]pyrene | 193395 | | | |
| 5-Methylchrysene | 3697243 | ● | ● | ● |
| 1-Nitropyrene | 5522430 | | | |
| Selenium Compounds | N725 | | | |
| Silver Compounds | N740 | | | |
| Strychnine and salts | N746 | | | |
| Thallium Compounds | N760 | | | |
| Warfarin and salts | N874 | | | |
| Zinc Compounds | N982 | | | |
| Source: Source: *Economic Analysis of the Final Rule to Add Certain Industry Groups to EPCRA Section 313* | | | | |

B-19

October, 2003

October, 2003

**ATTACHMENT B-3**
**Public Access to EPA Databases**

---

This section describes some of the various avenues of access available to public users of TRI and other databases. Electronic as well as conventional information sources are included in the discussion.

## TOXICS RELEASE INVENTORY (TRI)

EPA has spent considerable effort and resources to make TRI available to the public. The various methods through which a concerned citizen can access TRI include:

*On-Line Resources*

Internet access to TRI data is available from the EPA World Wide Web (WWW) server at http://www.epa.gov/, through the ENVIROFACTS system (described below). The Right-to-Know Computer Network (RTK NET) provides free public access to TRI as well as several other environmental and governmental databases (and is also described below). The National Library of Medicine (NLM) TOXNET System is an on-line system offering on-line searching of the TRI database. TOXNET was designed to be easy to use by persons with limited computer experience, and can be reached via either dial-up or Internet.

*Electronic media*

The TRI CD-ROM contains the complete national TRI, starting with the first inventory in 1987. Chemical Fact Sheets (formerly TRI-FACTS) containing reference material on the health and ecological effects of the regulated substances are also available on the same CD-ROM. Contact/Availability: NTIS, Government Printing Office (GPO), EPA National Service Center for Environmental Publications (NSCEP), Federal Depository Libraries, EPA Regional Offices.

The NESE-DB (National Economics, Social and Environmental Data Bank) CD-ROM includes the TRI state data and the national public data file on CD-ROM. The disc is produced quarterly by the Department of Commerce and provides access to socio-economic as well as environmental statistics and information. The data are gathered from over 15 federal agencies. Contact/Availability: Department of Commerce, selected federal depository libraries.

Diskettes: Requesters can select diskettes by state or for the entire US in DBASE III format. Diskettes are accompanied by documentation. Contact/Availability: GPO, EPA Internet site.

*Printed media*

TRI Reports: EPA assembles several detailed annual reports providing summaries, analyses, and comparison of TRI data by year. The reports summarize data on total releases and transfers of TRI

October, 2003

chemicals; geographic distribution of TRI releases and transfers; industrial patterns of releases and transfers; the interstate and intrastate transport of wastes and other kinds of analyses. Contact: EPCRA Information Hotline, NSCP, EPA Internet site.

## OTHER ENVIRONMENTAL DATABASES

*On-Line Resources*

The Environmental Protection Agency (EPA) created the Envirofacts Warehouse (http://www.epa.gov/enviro/index_java.html) to provide the public with direct access to the Agency's databases. The Envirofacts Warehouse allows users to retrieve environmental information from EPA databases on Air, Chemicals, Facility Information, Grants/Funding, Hazardous Waste, Spatial Data, Superfund, Toxic Releases, and Water Permits and Drinking Water. Users may retrieve information from several databases at once, or from one database at a time. They may use online queries to retrieve data from these sources and create reports, or generate maps of environmental information by selecting from several mapping applications available through EPA's Maps On Demand.

ENVIROFACTS is a relational database that integrates data from several major EPA program systems, as well as the Facility Indexing System (FINDS) and the ENVIROFACTS Master Chemical Integrator (ECMI), which is a cross reference index of chemical data reported in the program systems. ENVIROFACTS allows the user to perform queries that integrate facility data from the multiple databases based on their FINDS IDs.[14] ENVIROFACTS includes monthly-updated data available under the Freedom of Information Act. No enforcement or budget-sensitive information is contained in ENVIROFACTS. Databases include:

> AFS
> BRS
> PCS
> CERCLIS[15]
> TRIS
> RCRIS[16]
> SDWIS[17]
> FINDS
> ENVIROFACTS Master Chemical Integrator (EMCI)

---

[14] See Section 5(a) of this supporting statement for a more detailed discussion of FINDS.

[15] CERCLIS, or the Comprehensive Environmental Response Compensation and Liability Information System, tracks information collected under CERCLA. CERCLIS contains Superfund data on hazardous waste site assessment and remediation, including data on active sites from point of discovery to listing on the National Priorities List through completion of remedial and response actions. (U.S. EPA, 1995f)

[16] RCRIS, or the Resource Conservation and Recovery Information System, is used primarily to track entities regulated under RCRA Subtitle C (hazardous waste handlers). RCRIS includes data on general handler information, permit or closure status, compliance with federal and state regulations, and cleanup activities. (U.S. EPA, 1995f)

[17] SDWIS, or the Safe Drinking Water Information System contains information about public water systems and their violations of EPA's drinking water regulations. These statutes and accompanying regulations establish maximum contaminant levels, treatment techniques, and monitoring and reporting requirements to ensure that water provided to customers is safe for human consumption.

October, 2003

In addition to ENVIROFACTS, The EPA World Wide Web (WWW) site provides access to other release and transfer databases, including:

AIRS Executive: AIRS Executive is a software package designed for easy access and presentation of some of the most frequently used data in AIRS. The whole software package and the monthly data updates are downloadable from the EPA WWW site (http://www.epa.gov/airs/aexec.html). However, it does not contain the extensive air pollution data found in AIRS proper, which is available on the EPA mainframe.

BRS Hazardous Waste Reports and Data Files: The BRS data is contained in self-extracting zipped flat files and are also downloadable from the EPA WWW site. At the time of this writing, the most current version of the report is based on the 1997 BRS data, and can be accessed at http://www.epa.gov/docs/OSWRCRA/hazwaste/data/. The data files themselves are also available on the WWW site, although expanding a year's worth of BRS data requires over 200 MB of disk space. In addition, a software package such as SAS is necessary for manageable data manipulation. Hard copies of the National Biennial RCRA Hazardous Waste Report are also available from NTIS.

The Right-to-Know Computer Network (RTK NET) is an online service run by OMB Watch and the Unison Institute. RTK NET offers free access to multiple health and environmental databases, including:

| | |
|---|---|
| ARIP | Accidental Release Information Program |
| BRS | |
| Biennial Reporting System | |
| DOCKET | |
| Criminal and Enforcement Dockets | |
| FINDS | Facility Indexing System |
| PCS | |
| Permit Compliance System | |
| TRI | |
| Toxics Release Inventory | |
| CERCLIS | CERCLA Information System |
| ERNS | Emergency Response Notification System |
| TSCATS | Toxic Substances Control Act Submissions |
| RCRIS | Resource Conservation and Recovery Act Information System |

Data within RTK Net is only that which is publicly accessible by other means. In other words, no CBI is included. Access is free. RTK NET can be reached via dialup or Internet (www.rtk.net).

Resources on the EPA Mainframe include the following databases:

| | |
|---|---|
| AFS | AIRS Facility Subsystem |
| BRS | Biennial Reporting System |
| CERCLIS | CERCLA Information System |
| DOCKET | Criminal and Enforcement Dockets |

B-23

October, 2003

| DUNS | Dun and Bradstreet Marketing Services -- Identifier File |
|------|-----------------------------------------------------------|
| ERNS | Emergency Response Notification System |
| FFIS | Federal Facilities Information System |
| FINDS | Facility Indexing System |
| PCS | Permit Compliance System |
| RCRIS | Resource Conservation and Recovery Information System |
| TRI | Toxics Release Inventory |

Selected data fields from these and other databases are linked together at the facility level through IDEA (Integrated Data for Enforcement Analysis).  A more detailed description of IDEA can be found in Section 5(a) of this supporting statement.

ERNS can also be reached through the Department of Transportation's (DOT) VAX minicomputer in Cambridge MA.  Online access is restricted to EPA and other authorized federal governmental personnel. EPA's Emergency Response Division in the Office of Emergency and Remedial Response provides fact sheets, hard copies, diskettes, or tapes of requested information.


*Other Resources*

The Freedom of Information Act (FOIA) is another mechanism that can be utilized by the public to request information from EPA.  A FOIA is a written request for records held or believed to be held by EPA where a record is defined as any existing document, memorandum, report, photograph, sound or magnetic recording, computer tape, drawing, or other medium in which information has been preserved. FOIAs are usually utilized when there are not other direct methods, such as hotlines or clearinghouses, available through which the public can request the information. EPA will release the requested information unless it falls under one of the following nine exemptions:

> Matters of national defense or foreign policy.
> Internal Agency rules.
> Information exempted by other statutes.
> Trade secrets, commercial, or financial information--Confidential Business Information (CBI).
> Privileged inter- or intra-Agency memoranda.
> Personal privacy.
> Records or information compiled for law enforcement purposes.
> Records of financial institutions.
> Geographical or geophysical information and data concerning wells.

FOIA authorizes EPA to charge requesters the direct cost for any searching, reviewing, and duplication required to respond to the request if these costs exceed $25.00.

The National Technical Information Service (NTIS), a component of the Department of Commerce, is used extensively by many EPA system managers to make information available to the public. NTIS, by law, is self-supporting and sells its products and services to users on a cost-recovery basis. NTIS reproduces and sells the material created by EPA which includes publications, diskettes, CD ROMs,

October, 2003

magnetic tapes, and video tapes.  To search online for environmental reports, NTIS's Bibliographic Database is offered through various commercial services. In addition, NTIS publishes a twice monthly subscription, the NTIS Alert on Environmental Pollution & Control. This subscription provides summaries of newly issued environmental reports and studies released by Government agencies. NTIS offers several EPA databases on computer tape and CD-ROM.  Some of the databases are text only, requiring the user to provide their own search and retrieval software.

Available databases include:

| | |
|---|---|
| CERCLIS | CERCLA Information System (text only) |
| ERNS | Emergency Response Notification System (text only) |
| FINDS | Facility Indexing System (text only) |
| ISI | Information Systems Inventory (an inventory of inventories) |
| IRIS | Integrated Risk Information System |
| PCS | Permit Compliance System |
| RCRIS Extracts | RCRA Information System |
| TRI | Toxics Release Inventory (CD-ROM) |
| TSCA Inventory | Toxic Substances Control Act Chemical Substances Inventory |

B-25

October, 2003

**ATTACHMENT C**
**Emergency Planning and Community Right to Know Act of 1986, Section 313**
**(42 U.S.C.A. Section 1023)**

October, 2003

**EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT SECTION 313**

**UNITED STATES CODE**
**TITLE 42 - THE PUBLIC HEALTH AND WELFARE**
**CHAPTER 116 - EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW**

**SUBCHAPTER I - EMERGENCY PLANNING AND NOTIFICATION**

**§ 11023. Toxic chemical release forms**

(a) Basic requirement

The owner or operator of a facility subject to the requirements of this section shall complete a toxic chemical release form as published under subsection (g) of this section for each toxic chemical listed under subsection (c) of this section that was manufactured, processed, or otherwise used in quantities exceeding the toxic chemical threshold quantity established by subsection (f) of this section during the preceding calendar year at such facility. Such form shall be submitted to the Administrator and to an official or officials of the State designated by the Governor on or before July 1, 1988, and annually thereafter on July 1 and shall contain data reflecting releases during the preceding calendar year.

(b) Covered owners and operators of facilities

(1) In general

(A) The requirements of this section shall apply to owners and operators of facilities that have 10 or more full-time employees and that are in Standard Industrial Classification Codes 20 through 39 (as in effect on July 1, 1985) and that manufactured, processed, or otherwise used a toxic chemical listed under subsection (c) of this section in excess of the quantity of that toxic chemical established under subsection (f) of this section during the calendar year for which a release form is required under this section.

(B) The Administrator may add or delete Standard Industrial Classification Codes for purposes of subparagraph (A), but only to the extent necessary to provide that each Standard Industrial Code to which this section applies is relevant to the purposes of this section.

(C) For purposes of this section -

(i) The term "manufacture" means to produce, prepare, import, or compound a toxic chemical.

(ii) The term "process" means the preparation of a toxic chemical, after its manufacture, for distribution in commerce - (I) in the same form or

physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such chemical, or (II) as part of an article containing the toxic chemical.

C-1

October, 2003

(2) Discretionary application to additional facilities

The Administrator, on his own motion or at the request of a Governor of a State (with regard to facilities located in that State), may apply the requirements of this section to the owners and operators of any particular facility that manufactures, processes, or otherwise uses a toxic chemical listed under subsection (c) of this section if the Administrator determines that such action is warranted on the basis of toxicity of the toxic chemical, proximity to other facilities that release the toxic chemical or to population centers, the history of releases of such chemical at such facility, or such other factors as the Administrator deems appropriate.

(c) Toxic chemicals covered

The toxic chemicals subject to the requirements of this section are those chemicals on the list in Committee Print Number 99-169 of the Senate Committee on Environment and Public Works, titled "Toxic Chemicals Subject to Section 313 of the Emergency Planning and Community Right-To-Know Act of 1986" (42 U.S.C. 11023) (including any revised version of the list as may be made pursuant to subsection (d) or (e) of this section).

(d) Revisions by Administrator

(1) In general

The Administrator may by rule add or delete a chemical from the list described in subsection (c) of this section at any time.

(2) Additions

A chemical may be added if the Administrator determines, in his judgment, that there is sufficient evidence to establish any one of the following:
(A) The chemical is known to cause or can reasonably be anticipated to cause significant adverse acute human health effects at concentration levels that are reasonably likely to exist beyond facility site boundaries as a result of continuous, or frequently recurring, releases.
(B) The chemical is known to cause or can reasonably be anticipated to cause in humans -
    (i) cancer or teratogenic effects, or
    (ii) serious or irreversible - (I) reproductive dysfunctions, (II) neurological disorders, (III) heritable genetic mutations, or (IV) other chronic health effects.
(C) The chemical is known to cause or can reasonably be anticipated to cause, because of -
    (i) its toxicity,

C-2

October, 2003

(ii) its toxicity and persistence in the environment, or
(iii) its toxicity and tendency to bioaccumulate in the environment, a
significant adverse effect on the environment of sufficient seriousness, in
the judgment of the Administrator, to warrant reporting under this section.
The number of chemicals included on the list described in subsection C
of this section on the basis of the preceding sentence may constitute in the
aggregate no more than 25 percent of the total number of chemicals on
the list. A determination under this paragraph shall be based on generally
accepted scientific principles or laboratory tests, or appropriately
designed and conducted epidemiological or other population studies,
available to the Administrator.

(3) Deletions

A chemical may be deleted if the Administrator determines there is not sufficient
evidence to establish any of the criteria described in paragraph (2).

(4) Effective date

Any revision made on or after January 1 and before December 1 of any
calendar year shall take effect beginning with the next calendar year. Any
revision made on or after December 1 of any calendar year and before
January 1 of the next calender year shall take effect beginning with the
calendar year following such next calendar year.

(e) Petitions

(1) In general

Any person may petition the Administrator to add or delete a chemical
from the list described in subsection (c) of this section on the basis of the
criteria in subparagraph (A) or (B) of subsection (d)(2) of this section.
Within 180 days after receipt of a petition, the Administrator shall take one
of the following actions:
(A) Initiate a rulemaking to add or delete the chemical to the list, in accordance with
subsection (d)(2) or (d)(3) of this section.
(B) Publish an explanation of why the petition is denied.

(2) Governor petitions

A State Governor may petition the Administrator to add or delete a
chemical from the list described in subsection (c) of this section on the
basis of the criteria in subparagraph (A), (B), or (c) of subsection (d)(2) of
this section. In the case of such a petition from a State Governor to delete a
chemical, the petition shall be treated in the same manner as a petition
received under paragraph (1) to delete a chemical. In the case of such a

C-3

October, 2003

petition from a State Governor to add a chemical, the chemical will be added to the list within 180 days after receipt of the petition, unless the Administrator -

(A) initiates a rulemaking to add the chemical to the list, in accordance with subsection (d)(2) of this section, or

(B) publishes an explanation of why the Administrator believes the petition does not meet the requirements of subsection (d)(2) of this section for adding a chemical to the list.

(f) Threshold for reporting

(1) Toxic chemical threshold amount

The threshold amounts for purposes of reporting toxic chemicals under this section are as follows:

(A) With respect to a toxic chemical used at a facility, 10,000 pounds of the toxic chemical per year.

(B) With respect to a toxic chemical manufactured or processed at a facility -

(i) For the toxic chemical release form required to be submitted under this section on or before July 1, 1988, 75,000 pounds of the toxic chemical per year.

(ii) For the form required to be submitted on or before July 1, 1989, 50,000 pounds of the toxic chemical per year.

(iii) For the form required to be submitted on or before July 1, 1990, and for each form thereafter, 25,000 pounds of the toxic chemical per year.

(2) Revisions

The Administrator may establish a threshold amount for a toxic chemical different from the amount established by paragraph (1). Such revised threshold shall obtain reporting on a substantial majority of total releases of the chemical at all facilities subject to the requirements of this section. The amounts established under this paragraph may, at the Administrator's discretion, be based on classes of chemicals or categories of facilities.

(g) Form

(1) Information required

Not later than June 1, 1987, the Administrator shall publish a uniform toxic chemical release form for facilities covered by this section. If the Administrator does not publish such a form, owners and operators of facilities subject to the requirements of this section shall provide the information required under this subsection by letter postmarked on or before the date on which the form is due. Such form shall -

(A) provide for the name and location of, and principal business activities at, the facility;

C-4

October, 2003

(B) include an appropriate certification, signed by a senior official with management responsibility for the person or persons completing the report, regarding the accuracy and completeness of the report; and

(C) provide for submission of each of the following items of information for each listed toxic chemical known to be present at the facility:

(i) Whether the toxic chemical at the facility is manufactured, processed, or otherwise used, and the general category or categories of use of the chemical.

(ii) An estimate of the maximum amounts (in ranges) of the toxic chemical present at the facility at any time during the preceding calendar year.

(iii) For each waste stream, the waste treatment or disposal methods employed, and an estimate of the treatment efficiency typically achieved by such methods for that waste stream.

(iv) The annual quantity of the toxic chemical entering each environmental medium.

(2) Use of available data

In order to provide the information required under this section, the owner or operator of a facility may use readily available data (including monitoring data) collected pursuant to other provisions of law, or, where such data are not readily available, reasonable estimates of the amounts involved. Nothing in this section requires the monitoring or measurement of the quantities, concentration, or frequency of any toxic chemical released into the environment beyond that monitoring and measurement required under other provisions of law or regulation. In order to assure consistency, the Administrator shall require that data be expressed in common units.

(h) Use of release form

The release forms required under this section are intended to provide information to the Federal, State, and local governments and the public, including citizens of communities surrounding covered facilities. The release form shall be available, consistent with section 11044(a) of this title, to inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; to aid in the development of appropriate regulations, guidelines, and standards; and for other similar purposes.

(i) Modifications in reporting frequency

(1) In general

The Administrator may modify the frequency of submitting a report under this section, but the Administrator may not modify the frequency to be any

C-5

October, 2003

more often than annually. A modification may apply, either nationally or in a specific geographic area, to the following:

(A) All toxic chemical release forms required under this section.

(B) A class of toxic chemicals or a category of facilities.

(C) A specific toxic chemical.

(D) A specific facility.

(2) Requirements

A modification may be made under paragraph (1) only if the Administrator -

(A) makes a finding that the modification is consistent with the provisions of subsection (h) of this section, based on -

(i) experience from previously submitted toxic chemical release forms, and

(ii) determinations made under paragraph (3), and

(B) the finding is made by a rulemaking in accordance with section 553 of title 5.

(3) Determinations

The Administrator shall make the following determinations with respect to a proposed modification before making a modification under paragraph (1):

(A) The extent to which information relating to the proposed modification provided on the toxic chemical release forms has been used by the Administrator or other agencies of the Federal Government, States, local governments, health professionals, and the public.

(B) The extent to which the information is (i) readily available to potential      users from other sources, such as State reporting programs, and (ii) provided to the Administrator under another Federal law or through a State program.

(C) The extent to which the modification would impose additional and unreasonable burdens on facilities subject to the reporting requirements under this section.

(4) 5-year review

Any modification made under this subsection shall be reviewed at least once every 5 years. Such review shall examine the modification and ensure that the requirements of paragraphs (2) and (3) still justify continuation of the modification. Any change to a modification reviewed under this paragraph shall be made in accordance with this subsection.

(5) Notification to Congress

The Administrator shall notify Congress of an intention to initiate a rulemaking for a modification under this subsection. After such

October, 2003

notification, the Administrator shall delay initiation of the rulemaking for at least 12 months, but no more than 24 months, after the date of such notification.

(6) Judicial review

In any judicial review of a rulemaking which establishes a modification under this subsection, a court may hold unlawful and set aside agency action, findings, and conclusions found to be unsupported by substantial evidence.

(7) Applicability

A modification under this subsection may apply to a calendar year or other reporting period beginning no earlier than January 1, 1993.

(8) Effective date

Any modification made on or after January 1 and before December 1 of any calendar year shall take effect beginning with the next calendar year. Any modification made on or after December 1 of any calendar year and before January 1 of the next calendar year shall take effect beginning with the calendar year following such next calendar year.

(j) EPA management of data

The Administrator shall establish and maintain in a computer data base a national toxic chemical inventory based on data submitted to the Administrator under this section. The Administrator shall make these data accessible by computer telecommunication and other means to any person on a cost reimbursable basis.

(k) Report

Not later than June 30, 1991, the Comptroller General, in consultation with the Administrator and appropriate officials in the States, shall submit to the Congress a report including each of the following:

(1) A description of the steps taken by the Administrator and the States to implement the requirements of this section, including steps taken to make information collected under this section available to and accessible by the public.

(2) A description of the extent to which the information collected under this section has been used by the Environmental Protection Agency, other Federal agencies, the States, and the public, and the purposes for which the information has been used.

(3) An identification and evaluation of options for modifications to the requirements of this section for the purpose of making information collected under this section more useful.

C-7

October, 2003

(l) Mass balance study

(1) In general

The Administrator shall arrange for a mass balance study to be carried out by the National Academy of Sciences using mass balance information collected by the Administrator under paragraph (3). The Administrator shall submit to Congress a report on such study no later than 5 years after October 17, 1986.

(2) Purposes

The purposes of the study are as follows:
(A) To assess the value of mass balance analysis in determining the accuracy of information on toxic chemical releases.
(B) To assess the value of obtaining mass balance information, or portions thereof, to determine the waste reduction efficiency of different facilities, or categories of facilities, including the effectiveness of toxic chemical regulations promulgated under laws other than this chapter.
(C) To assess the utility of such information for evaluating toxic chemical management practices at facilities, or categories of facilities, covered by this section.
(D) To determine the implications of mass balance information collection on a national scale similar to the mass balance information collection carried out by the Administrator under paragraph (3), including implications of the use of     such collection as part of a national annual quantity toxic chemical release program.

(3) Information collection

(A) The Administrator shall acquire available mass balance information from States which currently conduct (or during the 5 years after October 17, 1986 initiate) a mass balance-oriented annual quantity toxic chemical release     program. If information from such States provides an inadequate representation of industry classes and categories to carry out the purposes of the study, the Administrator also may acquire mass balance information necessary for the study from a representative number of facilities in other States.
(B) Any information acquired under this section shall be available to the public, except that upon a showing satisfactory to the Administrator by any person     that the information (or a particular part thereof) to which the Administrator or any officer, employee, or representative has access under this section if made public would divulge information entitled to protection under section 1905 of  title 18, such information or part shall be considered confidential in accordance with the purposes of that section, except that such information or part may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this section.

C-8

October, 2003

    (C) The Administrator may promulgate regulations prescribing procedures for collecting mass balance information under this paragraph.
    (D) For purposes of collecting mass balance information under subparagraph (A), the Administrator may require the submission of information by a State or facility.

   (4) Mass balance definition

For purposes of this subsection, the term "mass balance" means an accumulation of the annual quantities of chemicals transported to a facility, produced at a facility, consumed at a facility, used at a facility, accumulated at a facility, released from a facility, and transported from a facility as a waste or as a commercial product or byproduct or component of a commercial product or byproduct.

October, 2003

**ATTACHMENT D**
**Pollution Prevention Act (42 U.S.C.A. Sections 13101-13109)**

October, 2003

# POLLUTION PREVENTION ACT SECTION 6607
## UNITED STATES CODE
## TITLE 42 - THE PUBLIC HEALTH AND WELFARE
## CHAPTER 133 - POLLUTION PREVENTION

### § 13106. Source reduction and recycling data collection

(a) Reporting requirements

Each owner or operator of a facility required to file an annual toxic chemical release form under section 11023 of this title for any toxic chemical shall include with each such annual filing a toxic chemical source reduction and recycling report for the preceding calendar year. The toxic chemical source reduction and recycling report shall cover each toxic chemical required to be reported in the annual toxic chemical release form filed by the owner or operator under section 11023(c) of this title. This section shall take effect with the annual report filed under section 11023 of this title for the first full calendar year beginning after November 5, 1990.

(b) Items included in report

The toxic chemical source reduction and recycling report required under subsection (a) of this section shall set forth each of the following on a facility-by-facility basis for each toxic chemical:

. (1) The quantity of the chemical entering any waste stream (or otherwise released into the environment) prior to recycling, treatment, or disposal during the calendar year for which the report is filed and the percentage change from the previous year. The quantity reported shall not include any amount reported under paragraph (7). When actual measurements of the quantity of a toxic chemical entering the waste streams are not readily available, reasonable estimates should be made based on best engineering judgment

(2) The amount of the chemical from the facility which is recycled (at the facility or elsewhere) during such calendar year, the percentage change from the previous year, and the process of recycling used.

(3) The source reduction practices used with respect to that chemical during such year at the facility. Such practices shall be reported in accordance with the following categories unless the Administrator finds other categories to be more appropriate.

(A) Equipment, technology, process, or procedure modifications.

(B) Reformulation or redesign of products.

(C) Substitution of raw materials.

(D) Improvement in management, training, inventory control, materials handling, or other general operational phases of industrial facilities.

(4) The amount expected to be reported under paragraph (1) and (2) for the two calendar years immediately following the calendar year for which the report is filed.

October, 2003

Such amount shall be expressed as a percentage change from the amount reported in paragraphs (1) and (2).

(5) A ratio of production in the reporting year to production in the previous year. The ratio should be calculated to most closely reflect all activities involving the toxic chemical. In specific industrial classifications subject to this section, where a feedstock or some variable other than production is the primary influence on waste characteristics or volumes, the report may provide an index based on that primary variable for each toxic chemical. The Administrator is encouraged to develop production indexes to accommodate individual industries for use on a voluntary basis.

(6) The techniques which were used to identify source reduction opportunities.

Techniques listed should include, but are not limited to, employee recommendations, external and internal audits, participative team management, and material balance audits. Each type of source reduction listed under paragraph (3) should be associated with the techniques or multiples of techniques used to identify the source reduction technique.

(7) The amount of any toxic chemical released into the environment which resulted from a catastrophic event, remedial action, or other one-time event, and is not associated with production processes during the reporting year.

(8) The amount of the chemical from the facility which is treated (at the facility or elsewhere) during such calendar year and the percentage change from the previous year. For the first year of reporting under this subsection, comparison with the previous year is required only to the extent such information is available.

(c) SARA provisions

The provisions of sections 11042, 11045(c), and 11046 of this title shall apply to the reporting requirements of this section in the same manner as to the reports required under section 11023 of this title. The Administrator may modify the form required for purposes of reporting information under section 11023 of this title to the extent he deems necessary to include the additional information required under this section.

(d) Additional optional information

Any person filing a report under this section for any year may include with the report additional information regarding source reduction, recycling, and other pollution control techniques in earlier years.

(e) Availability of data

Subject to section 11042 of this title, the Administrator shall make data collected under this section publicly available in the same manner as the data collected under section 11023 of this title.

D-3

October, 2003

# ATTACHMENT E
**40 CFR Part 372**
**Toxic Chemical Release Reporting: Community Right-to-Know**

October, 2003

# TITLE 40--PROTECTION OF ENVIRONMENT

## CHAPTER I--ENVIRONMENTAL PROTECTION AGENCY

## PART 372--TOXIC CHEMICAL RELEASE REPORTING: COMMUNITY RIGHT-TO-KNOW

### Subpart A--General Provisions

**Sec. 372.10  Recordkeeping.**

(d) Each owner or operator who determines that the owner operator may apply the alternate threshold as specified under Sec. 372.27(a) must retain the following records for a period of 3 years from the date of the submission of the certification statement as required under Sec. 372.27(b):

(1) A copy of each certification statement submitted by the person under Sec. 372.27(b).

(2) All supporting materials and documentation used by the person to make the compliance determination that the facility or establishment is eligible to apply the alternate threshold as specified in Sec. 372.27.

(3) Documentation supporting the certification statement submitted under Sec. 372.27(b) including:

(i) Data supporting the determination of whether the alternate threshold specified under Sec. 372.27(a) applies for each toxic chemical.

(ii) Documentation supporting the calculation of annual reportable amount, as defined in Sec. 372.27(a), for each toxic chemical, including documentation supporting the calculations and the calculations of each data element combined for the annual reportable amount.

(iii) Receipts or manifests associated with the transfer of each chemical in waste to off-site locations.

E-1

October, 2003

**Subpart B--Reporting Requirements**

**Sec. 372.27   Alternate threshold and certification.**

(a) With respect to the manufacture, process, or otherwise use of a toxic chemical, the owner or operator of a facility may apply an alternate threshold of 1 million pounds per year to that chemical if the owner or operator calculates that the facility would have an annual reportable amount of that toxic chemical not exceeding 500 pounds for the combined total quantities released at the facility, disposed within the facility, treated at the facility (as represented by amounts destroyed or converted by treatment processes), recovered at the facility as a result of recycle operations, combusted for the purpose of energy recovery at the facility, and amounts transferred from the facility to off-site locations for the purpose of recycle, energy recovery, treatment, and/or disposal. These volumes correspond to the sum of amounts reportable for data elements on EPA Form R (EPA Form 9350-1; Rev. 12/4/93) as Part II column B or sections 8.1 (quantity released), 8.2 (quantity used for energy recovery on-site), 8.3 (quantity used for energy recovery off-site), 8.4 (quantity recycled on-site), 8.5 (quantity recycled off-site), 8.6 (quantity treated on-site), and 8.7 (quantity treated off-site).

(b) If an owner or operator of a facility determines that the owner or operator may apply the alternate reporting threshold specified in paragraph (a) of this section for a specific toxic chemical, the owner or operator is not required to submit a report for that chemical under Sec. 372.30, but must submit a certification statement that contains the information required in Sec. 372.95. The owner or operator of the facility must also keep records as specified in Sec. 372.10(d).

(c) Threshold determination provisions of Sec. 372.25 and exemptions pertaining to threshold determinations in Sec. 372.38 are applicable to the determination of whether the alternate threshold has been met.

(d) Each certification statement under this section for activities involving a toxic chemical that occurred during a calendar year at a facility must be submitted to EPA and to the State in which the facility is located on or before July 1 of the next year.

E-1

October, 2003

**Subpart E--Forms and Instructions**

**Sec. 372.95  Alternate threshold certification and instructions.**

(a) Availability of the alternate threshold certification statement and instructions. Availability of the alternate threshold certification statement and instructions is the same as provided in Sec. 372.85(a) for availability of the reporting form and instructions.

(b) Alternate threshold certification statement elements. The following information must be reported on an alternate threshold certification statement pursuant to Sec. 372.27(b):

(1) Reporting year.

(2) An indication of whether the chemical identified is being claimed as trade secret.

(3) Chemical name and CAS number (if applicable) of the chemical, or the category name.

(4) Signature of a senior management official certifying the following: pursuant to 40 CFR 372.27, ``I hereby certify that to the best of my knowledge and belief for the toxic chemical listed in this statement, the annual reportable amount, as defined in 40 CFR 372.27(a), did not exceed 500 pounds for this reporting year and that the chemical was manufactured, or processed, or otherwise used in an amount not exceeding 1 million pounds during this reporting year.''

(5) Date signed.

(6) Facility name and address.

(7) Mailing address of the facility if different than paragraph (b)(6) of this section.

(8) Toxic chemical release inventory facility identification number if known.

(9) Name and telephone number of a technical contact.

(10) The four-digit SIC codes for the facility or establishments in the facility.

(11) Latitude and longitude coordinates for the facility.

(12) Dun and Bradstreet Number of the facility.

(13) EPA Identification Number(s) (RCRA) I.D. Number(s) of the facility.

(14) Facility NPDES Permit Number(s).

(15) Underground Injection Well Code (UIC) I.D. Number(s) of the facility.

(16) Name of the facility's parent company.

(17) Parent company's Dun and Bradstreet Number.

E-1

October, 2003

**ATTACHMENT F**

**Toxic Chemical Release Inventory Reporting Forms and Instructions
Revised 2001 Version (EPA 260-B-02-001)**

(Note: This document is available only electronically on the TRI website at
http://www.epa.gov/tri/report/index.htm#updates, )

October, 2003

**ATTACHMENT G**
**Proposed Form R (OMB 2070-0093)**

# TOXIC CHEMICAL RELEASE INVENTORY

## ALTERNATE THRESHOLD FOR LOW ANNUAL REPORTABLE AMOUNTS; TOXIC CHEMICAL RELEASE REPORTING

### INFORMATION COLLECTION REQUEST
### SUPPORTING STATEMENT

### OMB CONTROL NO. 2070-0143
### EPA ICR #1704.07

### October, 2003

1       IDENTIFICATION OF THE INFORMATION COLLECTION . . . . . . . . . . . . . . . . . . 1
        1(a) Title and Number of the Information Collection . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        1(b) Short Characterization/Abstract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2       NEED FOR AND USE OF THE COLLECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        2(a) Need/Authority for the Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        2(b) Practical Utility/Users of the Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3       NON-DUPLICATION, CONSULTATIONS, AND OTHER COLLECTION
        CRITERIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        3(a) Non-Duplication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        3(b) Increasing Public Awareness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        3(c) Effects of Less Frequent Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        3(d) General Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        3(e) Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        3(f) Sensitive Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4       THE RESPONDENTS AND THE INFORMATION REQUESTED . . . . . . . . . . . . . . 6
        4(a) Respondents/SIC Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        4(b) Information Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5       THE INFORMATION COLLECTED--AGENCY ACTIVITIES, COLLECTION
        METHODOLOGY, AND INFORMATION MANAGEMENT. . . . . . . . . . . . . . . . . . . 10
        5(a) Agency Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      5(b) Collection Methodology and Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      5(c) Small Entity Flexibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      5(d) Collection Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

6       ESTIMATING THE BURDEN AND COST OF THE COLLECTION . . . . . . . . . . . 13
      6(a) Estimating Respondent Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      6(b) Respondent Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      6(c) Estimating Agency Burden and Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      6(d) Bottom Line Burden Hours and Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      6(e) Reasons for Change in Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      6(f) Burden Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>ATTACHMENTS</u>

A     RELEVANT STATUTES:  EPCRA SECTION 313 AND PPA SECTION 6607

B     MAJOR REGULATIONS SPECIFIC TO FORM A CERTIFICATION STATEMENT:
       40 CFR §372.10, §372.27 AND §372.95

C     FORM A CERTIFICATION STATEMENT (EPA Form #9350-2)

D     RESPONSE TO PUBLIC COMMENTS FOR ICR RENEWAL FOR THE FORM A
       CERTIFICATION STATEMENT (EPA Form #9350-2)

# 1    IDENTIFICATION OF THE INFORMATION COLLECTION

## 1(a)    Title and Number of the Information Collection

**Title:**    **Alternate Threshold for Low Annual Reportable Amounts; Toxic Chemical Release Reporting**

**EPA ICR No.**    **1704.07**

**OMB Control No.**    **2070-0143**

## 1(b) Short Characterization/Abstract

This Information Collection Request (ICR) covers the public reporting and record keeping requirements associated with Toxics Release Inventory (TRI) reporting based on an alternate threshold for facilities with low amounts of listed toxic chemicals in waste. EPA collects information from facilities and enters it into TRI under the authority of section 313 of the Emergency Planning and Community Right-to-Know Act (EPCRA) (42 U.S.C. 11001 *et seq.*) and section 6607 of the Pollution Prevention Act (PPA) (42 U.S.C. 11071 to 11079). EPCRA section 313 requires owners or operators of certain facilities (i.e., facilities in listed Standard Industrial Classification (SIC) codes) manufacturing, processing, or otherwise using any of over 600 listed toxic chemicals and chemical categories (hereafter "listed toxic chemicals") in excess of the applicable threshold quantities to report on their environmental releases and transfers of and waste management activities for such chemicals annually. Under section 6607 of the PPA, facilities must provide information on the quantities of the toxic chemicals in waste streams and the efforts made to reduce or eliminate those quantities. A covered facility must file a separate form for each toxic chemical manufactured, processed or otherwise used in excess of the reporting thresholds established in section 313(f)(1).

This ICR is for the Form A Certification Statement. EPA established an alternate threshold for a category of facilities with low amounts of a listed toxic chemical in wastes. A facility that meets the section 313 reporting thresholds, but estimates that the total annual reportable amount of the listed toxic chemical does not exceed 500 pounds per year, can take advantage of the alternate manufacture, process or otherwise use thresholds of 1 million pounds per year for that listed toxic chemical, provided that certain conditions are adhered to. Each qualifying facility that chooses to apply this alternate manufacture, process or otherwise use threshold must file a Form A Certification Statement certifying that they met the condition of the alternate threshold for one or more chemicals, in lieu of completing a Form R for each listed chemical for which the facility exceeded statutory thresholds. The Form A Certification Statement is submitted to both the EPCRA reporting center and the designated state recipient in the same manner that the Form R is submitted. The Form A Certification Statement provides a signed statement that the sum of the amount of the listed toxic chemical or chemicals in wastes did not exceed 500 pounds for this reporting year, and that the chemical(s) was manufactured,

1

processed, or otherwise used in an amount not exceeding 1 million pounds during this reporting year.

Responding to this information collection requires determining whether a chemical is eligible for certification under the alternate threshold, and completing the Form A Certification Statement.  A single Form A Certification Statement may contain as many listed toxic chemicals as met the conditions of the alternate threshold.

Respondent costs are related to the number of chemicals certifications reported on the Form A Certification Statements and the loaded hourly rates of the personnel who complete the reporting activities. The total reporting burden is estimated to average 84.1 hours for a facility submitting a single certification statement under EPCRA section 313 for the first time. (This includes the time required for rule familiarization, calculations/certification, Form A Certification Statement completion, and recordkeeping/submission.) The total reporting burden is estimated to average 13.7 hours for a facility submitting a single certification statement under EPCRA section 313 in subsequent reporting years. (This includes the time required for calculations/certification, Form A Certification Statement completion, and recordkeeping/submission.) By comparison, the average time required for calculations, form completion, and recordkeeping/submission for Form R is estimated to average 19.5 hours per form. Thus, for a facility filing a Form A Certification Statement for a single chemical, the alternate threshold yields an average savings of 5.8 hours in subsequent reporting years.

## 2    NEED FOR AND USE OF THE COLLECTION

### 2(a) Need/Authority for the Collection

Section 313 of EPCRA, 42 U.S.C. 11023, requires certain facilities that manufacture, process, or otherwise use listed toxic chemicals in excess of the applicable threshold quantities to report their environmental releases of such chemicals annually.  Beginning with the 1991 reporting year, such facilities also began reporting source reduction and recycling data for listed chemicals, pursuant to section 6607 of the Pollution Prevention Act, 42 U.S.C. 13106.  Copies of 42 U.S.C. 11023 and 13106 are included in Attachment A.

Each covered facility must file a separate report for each listed chemical manufactured, processed or otherwise used in excess of the reporting thresholds established in section 313(f)(1). EPA has authority to revise these threshold amounts pursuant to section 313(f)(2); however, such revised threshold amounts must obtain reporting on a substantial majority of total releases of the chemical at all facilities subject to section 313.  A revised threshold may be based on classes of chemicals or categories of facilities.

This ICR is for the Form A Certification Statement.  EPA established an alternate threshold under EPCRA section 313(f)(2) for a category of facilities with low amounts of a listed toxic chemical in wastes.  A facility that meets the appropriate reporting thresholds, but estimates that the total amount of the chemical in waste does not exceed 500 pounds per year, can take advantage of alternate manufacture, process, or otherwise use thresholds of 1 million pounds per

year for that chemical, provided that certain conditions are met. A facility that chooses to apply the alternate threshold must submit an EPA Toxic Chemical Release Inventory Form A Certification Statement (EPA Form #9350-2). EPA's regulations implementing TRI reporting are codified at 40 CFR part 372. A copy of the sections specific to the Form A Certification Statement are included in Attachment B.

The information being collected on the Form A Certification Statement is necessary to fulfill EPA's responsibilities under EPCRA section 313(f)(2). A Form A Certification Statement addresses the statutory mandates and the public's right-to-know while allowing regulatory relief for facilities having lower volumes of chemicals in wastes. A Form A Certification Statement provides appropriate information relating to the location of facilities manufacturing, processing or otherwise using these chemicals, that the chemicals are being manufactured, processed or otherwise used at current reporting thresholds, and that the sum of amounts of the chemical in waste did not exceed 500 pounds for that reporting year. The requirement to submit a Form A Certification Statement fosters continued attention to chemical management practices and provides a locational tool vital to any compliance program or other interested party. It is necessary to receive some type of specific indication that a facility is taking advantage of the alternate threshold annually to assist in any compliance monitoring and enforcement efforts.

## 2(b) Practical Utility/Users of the Data

The Paperwork Reduction Act, 44 U.S.C. 3502(11), states that "the term 'practical utility' means the ability of an agency to use information, particularly the capability to process such information in a timely and useful fashion." EPA has demonstrated that it can process and utilize TRI information in a timely and useful fashion, as well as make the information available in a timely fashion for a variety of further useful purposes. This information is collected annually and is subsequently disseminated within a year of its receipt. Further information on Agency activities is summarized in Section 4(a).

According to EPCRA section 313(h), the data submitted in the forms are intended to "inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; to aid in the development of appropriate regulations, guidelines, and standards; and for other similar purposes." The purpose of the Agency's collection of this information is therefore to facilitate the availability of this information to the public.

TRI data made available as a result of this information collection is used by many different individuals and organizations, including concerned citizens, environmental and public interest groups, journalists, government agencies, the financial and business community, the regulated community, and educational and research institutions. Government agencies, researchers and environmental and public interest groups use data collected under EPCRA section 313 to produce national, regional, state and local level reports. Governments use the data to set priorities, target

3

voluntary initiatives, and evaluate the development of regulations. Citizens and local interest groups use TRI data to assess the status of toxic chemicals in their community and to determine priorities for concern. Investment analysts use TRI data to provide recommendations to clients seeking to make investments on an environmental basis. Insurance companies and lenders look to TRI data as an indication of potential environmental liabilities. Many reporting companies use TRI data in preparing annual environmental reports, similar to annual reports on financial performance. The ICR for Form R (OMB #2070-0093, EPA #1363) provides specific examples of some of the actual uses of TRI data.

The Form A Certification Statement provides information that a section 313 listed chemical is being manufactured, processed or otherwise used at threshold levels specified in 40 CFR part 372.25. Through the use of the Form A Certification Statement, the individuals and groups described above will continue to have knowledge that the sum of the amounts in waste for a particular facility did not exceed a specified amount for the chemical for which the alternate threshold was applied.


# 3    NON-DUPLICATION, CONSULTATIONS, AND OTHER COLLECTION CRITERIA

### 3(a) Non-Duplication

The information requested by the Form A Certification Statement represents a subset of information requested by Form R. To the extent that this reporting option is used, corresponding data will not be reported under Form R. Information comparing TRI reporting to information available under other statutes is available in the ICR for Form R (OMB #2070-0093, EPA #1363).

### 3(b)  Increasing Public Awareness

EPA has emphasized the Form A Certification Statement during training sessions, directly contacted potentially eligible facilities, and made some modifications to the reporting package to make the Form A Certification Statement easier to identify and use. These actions, in addition to the additional time for which the Form A Certification Statement option has been available, have increased the level of use of the Form A Certification Statement.

### 3(c)  Effects of Less Frequent Collection

Section 313 requires annual reporting. Section 313(i) permits EPA to modify the reporting frequency by rulemaking, after submitting a notification to Congress. As Form A Certification Statements are required to be submitted on or before July 1 following the year in which the facility's activities occur, and as the national data are available from EPA within a year after EPA receives data, a less frequent collection of information would delay the availability of

the data to the public.  Since TRI represents the best available database tracking multimedia releases, transfers and other handling of listed toxic chemicals, changes in reporting frequency would have profound impacts on the quality and value of the data for purposes of planning, establishing baselines and tracking performance.

EPA's Office of Enforcement and Compliance Assurance (OECA) has stressed the need to continue to collect information on an annual basis that a facility is manufacturing, processing, or otherwise using a listed section 313 chemical in threshold amounts set out in 40 CFR part 372.25.  Submission of the Form A Certification Statement allows EPA and other data users to identify facilities applying the alternate threshold.  In order to target facilities effectively and efficiently for compliance inspections, EPA must be able to distinguish between facilities that did not report under EPCRA section 313 because they took advantage of this regulatory amendment, and facilities that did not report for other reasons.

In addition, the State and many of the Regional TRI program offices have submitted comments that echo enforcement concerns raised by OECA to the effect that the submission of a Form A Certification Statement is "paramount" to the ability of EPA and states to readily verify compliance with the regulation or to enforce against violations.  Additionally, a report may provide sufficient information to citizens and interest groups and prevent unnecessary legal actions that might otherwise be pursued if there was a complete absence of information for a given facility.

By requiring the Form A Certification Statement on an annual basis, any compliance assistance or enforcement program, as well as other interested parties, are able to determine that the facility is continuing to manufacture, process, or otherwise use a listed section 313 chemical and that the amounts associated with these activities are in excess of current reporting thresholds.

### 3(d) General Guidelines

This information collection is consistent with the requirements of 5 CFR 1320.6, except that respondents may be required to submit information that is confidential.  Specifically, reporting facilities are required to identify the chemical for which reports are submitted.  Respondents can, however, claim the chemical identity as a trade secret, although they must provide a generic name as part of the information that is made available to the public.  EPA securely stores and maintains the true identity of the chemical.  EPA will disclose information that is covered by a claim of confidentiality only to the extent permitted by, and in accordance with, the procedures in 40 CFR part 2.

EPA actively encourages the use of automated techniques, most notably PC-based report generating programs produced both by the Agency and by the private sector and other submissions on magnetic media.  EPA recognizes that not all reporting facilities are able to or are interested in investing the time and funds necessary to employ such automated techniques.  The final decision on how to report is ultimately the reporting facility's.

### 3(e) Confidentiality

Respondents may designate the specific chemical identity of a substance as a trade secret. Procedures for submission and review of trade secret claims under section 313 are set forth in 40 CFR part 350 and are covered by another EPA ICR (EPA ICR #1428; OMB #2050-0078).

### 3(f) Sensitive Questions

This collection does not request any sensitive information.

## 4    THE RESPONDENTS AND THE INFORMATION REQUESTED

### 4(a) Respondents/SIC Codes

A facility must report to TRI if it meets all three of the following criteria:

(1)    Has a primary Standard Industrial Classification (SIC) code covered by the regulations;

(2)    Has 10 or more full-time employees (or the hourly equivalent of 20,000 hours); and

(3)    Manufactures, processes, or otherwise uses any of the listed toxic chemicals or chemical categories above the applicable threshold. Currently, the thresholds are 25,000 pounds for chemicals manufactured (including imported) or processed, and 10,000 pounds for chemicals otherwise used.

The industries currently subject to reporting under EPCRA section 313 include SIC major groups 10 (metal mining), except SIC code 1011, 1081, and 1094; 12 (coal mining), except SIC code 1241; 20 through 39 (manufacturing); as well as industry codes 4911, 4931, 4939 (electricity generating facilities), limited to facilities that combust coal and/or oil for the purpose of generating power for distribution in commerce; 4953 (refuse systems), limited to facilities regulated under RCRA Subtitle C; 5169 (chemicals and allied products wholesaling, not elsewhere classified); 5171(petroleum bulk stations and terminals); and 7389 (limited to facilities primarily engaged in solvent recovery services on a contract or fee basis). Qualifying federal facilities also report to TRI as a result of Executive Orders12856 and 13148.

Under the final PBT (Persistent Bioaccumulative Toxic Chemicals) Rule, published October 29, 1999, all PBT chemicals are excluded from eligibility for alternate threshold reporting (i.e., the Form A Certification Statement cannot be used to report PBT chemicals).

With the exception of the PBT chemicals, the Form A Certification Statement can be

submitted by those facilities that would otherwise be required to submit a Form R, but determine that they are eligible to apply the alternate threshold based on the sum of amounts in waste. Therefore, the alternate threshold does not bring additional facilities into EPCRA section 313 regulation that are not already part of the regulated community.

### 4(b) Information Requested

(I)    Data Items

The following information must be reported on a Form A Certification Statement pursuant to 40 CFR part 372:

(1)    Reporting year.
(2)    An indication of whether the chemical identified is being claimed as trade secret.
(3)    Chemical name or names and CAS number(s) (if applicable) of the chemical(s), or the category(ies) or the generic chemical name(s).
(4)    Signature of a senior management official certifying the following: pursuant to 40 CFR part 372.27, " hereby certify that to the best of my knowledge and belief for the toxic chemical listed in this statement, the sum of reportable wastes did not exceed 500 pounds for this reporting year and that the chemical was manufactured, or processed, or otherwise used in an amount not exceeding 1 million pounds during this reporting year."
(5)    Date signed.
(6)    Facility name and address.
(7)    Mailing address of the facility if different than (6).
(8)    Toxic chemical release inventory facility identification number if known.
(9)    Name and telephone number of a Technical Contact.
(10)    The four-digit SIC codes for the facility or establishments in the facility.
(11)    Latitude and longitude coordinates for the facility.
(12)    Dun and Bradstreet Number of the facility.
(13)    EPA Identification Number(s) (RCRA I.D. Number(s) of the facility).
(14)    Facility NPDES Permit Number(s).
(15)    Underground Injection Well Code (UIC) I.D. Number(s) of the facility.
(16)    Name of the facility's Parent Company.
(17)    Parent Company's Dun and Bradstreet Number.

These 17 elements are a subset of the information collected on Form R. Beyond the change to element 3, which allows for multiple chemicals to be reported on a single Form A Certification Statement, the only element unique to the Form A Certification Statement is element 4. Element 4 of the Form A Certification Statement corresponds to the certification statement on Form R and represents a signed statement by a facility owner/operator or senior management official. Unlike Form R, the signed statement on the Form A Certification Statement certifies that the sum of amounts of the listed chemical in waste did not exceed 500 pounds and that the amounts manufactured, or processed, or otherwise used did not exceed 1 million pounds for that

year.

A copy of the Form A Certification Statement (EPA Form #9350-2) is included as Attachment C.  The most recent version of the Toxic Chemical Release Inventory Reporting Forms and Instructions can be found online at the TRI website: www.epa.gov/tri.

Justification for elements requested:

Elements 1 through 6 relate to the conditions being met in order to claim eligibility for the submission of a Form A Certification Statement.  These elements are essential in meeting the statutorily mandated requirement of continuing to capture a substantial majority of releases for each listed EPCRA section 313 chemical.

Elements 7 through 17 are requested for identification purposes.  Of these, elements 7 through 9 are necessary to determine which facility is claiming the alternate threshold along with the information needed to contact the claimant.  Elements 10 through 17 are requested in order to cross-reference the facility and level of activity being certified with other reporting systems in addition to more accurately tracking the facility's TRI reporting history.  These data elements are essential for enforcement purposes and have proven to be useful for cross program multimedia investigations.

(ii)    Respondent Activities

The regulated community is expected to comply with the reporting requirements by completing the Form A Certification Statement and mailing it to EPA and the appropriate state agency.  Section 313(g)(2) provides that a "facility may use readily available data (including monitoring data) collected pursuant to other provisions of law, or where data are not readily available, reasonable estimates of the amounts involved."  Respondents are not required to develop new information.

The same level of assistance presently available to Form R respondents is available to those facilities applying the alternate threshold and completing the Form A Certification Statement.  Instructions and guidance documents are available, and a toll-free hotline is available to handle general and technical inquiries from the regulated community.  The following steps will be completed by a facility using the alternate threshold:

Compliance Determination
Calculations (Compliance)
Completion of Form (Disclosure)
Substantiation of a Trade Secret Claim (not performed by all respondents)
Record keeping
Supplier Notification (not performed by all respondents)
Petition Submission (not a requirement)

Compliance Determination.  Facilities must first determine if they are eligible to apply the alternate threshold, and/or provide supplier notification.  The determination is based on the SIC code(s) for the facility, the number of full-time employees or equivalents, the chemicals manufactured, processed or otherwise used at the facility, and the quantity of those chemicals.

Calculations (Compliance).  A facility has to calculate the annual reportable amount for a chemical in order to determine if the facility is eligible to apply the alternate threshold.  The annual reportable amount is calculated as the combined total of the amounts released at the facility (including disposal), treated at the facility (as represented by amounts destroyed or converted by treatment processes), recovered at the facility as a result of recycling operations, combusted for the purpose of energy recovery at the facility, and transferred from the facility to off-site locations for the purpose of recycling, energy recovery, treatment, or disposal.  In addition, the facility must also determine that it did not manufacture, process, or otherwise use more than 1 million pounds of the listed chemical.

Completion of Form (Disclosure).  Each facility taking advantage of the alternate threshold must complete the Form A Certification Statement described under section 3(b)(I).

Substantiation of a Trade Secrecy Claim.  Respondents wanting to make a trade secrecy claim for the chemical identity should refer to documentation requirements discussed in the Trade Secrecy ICR for EPCRA (EPA #1428, OMB #2050-0078).

Record keeping.  Each facility taking advantage of the alternate threshold is required to maintain records for a period of three years from the date of the submission of the Form A Certification Statement, and to make them available upon request.  These records provide substantiation that an appropriate threshold determination was made and that the sum of amounts in total waste did not exceed 500 pounds for that chemical for that reporting year.  This documentation is necessary for any compliance effort verifying the claims made by a facility taking advantage of the alternate threshold.  Facilities must maintain a copy of each Form A Certification Statement and Form R submitted, as well as the documents, calculations, and other information they collected for developing the reports submitted.

Supplier Notification.  No additional supplier notification requirements are associated with the Form A Certification Statement.

Petition Submission.  No additional procedures relating to petition submissions are required by the Form A Certification Statement.

9

**5      THE INFORMATION COLLECTED--AGENCY ACTIVITIES, COLLECTION METHODOLOGY, AND INFORMATION MANAGEMENT.**

**5(a) Agency Activities**

EPA activities for this ICR parallel requirements established for reporting TRI releases on Form R (OMB #2070-0093, EPA #1363), approved March, 2003, including:

> Assistance to Respondents
> Data Management
> Data Processing and Quality Control
> Systems Maintenance and Operation
> Making the Data Available to the Public
> List Revisions and Petition Reviews
> Trade Secrecy Reviews

Assistance to Respondents.  Assistance to respondents is offered in the same manner as described by the Form R ICR (OMB #2070-0093, EPA #1363).  These assistance efforts extend to facilities for completion of a Form A Certification Statement.

Data Processing and Quality Control.  Once a Form A Certification Statement is submitted and received by the EPCRA Reporting Center, the information is recorded into the TRIS Oracle database.  If submitted electronically (floppy disk), the information is automatically read into TRIS; if the Form A Certification Statement was submitted in hardcopy, the information is manually keyed into TRIS.  Automated data quality checks and field verifications are built into the electronic reporting software (ATRS - Automated TRI Reporting Software).  Additional data quality checks, field verifications, and reconciliations are performed sequentially once the electronic submission is read into TRIS or for the first time once the hardcopy is completely keyed in.

Systems Maintenance and Operations.  The TRIS database is maintained on an Oracle server on an isolated, secure local area network at the EPCRA Reporting Center.  Standard database management activities are routinely preformed to maintain data and system integrity.  Tape backups of the TRIS database are made nightly.

Availability of the Data.  In accordance with statute, a copy of the database is publicly available in electronic format using the Agency's internet site (the data is also maintained on the Agency's intranet site).  Users can access the data using either Envirofacts or TRI Explorer.  Both tools allow the user to view individual chemical submissions, all submissions for a given facility, or summary information by Zip Code, city, county, state, EPA Region, or nationally.  Searches can be conducted in numerous ways, including on a chemical basis or by industry SIC code.

In addition to the public electronic database, EPA has also made the TRI information

10

available through a variety of other electronic and non-electronic means. EPA prepares a national data release report that describes the annual data received and presents extensive summary information in text, charts, and graphics. Electronic versions of the database are available in .dbf and comma delimited format from the Agency's web site or NTIS. Versions of the Oracle TRIS database are available upon special request.

      <u>Trade Secrecy Reviews</u>. A respondent may claim a chemical as trade secret on the Form A Certification Statement in the same manner as when filing a Form R. When a respondent claims a chemical identity as a trade secret, a substantiation must be included. Respondents often claim trade secret status on Form R but do not provide substantiation. In those cases, EPA must review the claim and contact the respondent to determine the true intent. In many cases, the trade secret claim was not intended and no substantiation is made. Trade Secrecy reviews, including the costs to EPA, are discussed in greater detail in the ICR for the Trade Secrecy Rule for EPCRA (EPA #1428, OMB #2050-0078).

### 5(b) Collection Methodology and Management

      The Form A Certification Statement can be submitted using EPA's magnetic media reporting program, and EPA encourages the submission of Form A Certification Statements electronically. The use of electronic reporting serves to reduce the reporting burden on industry. It also reduces both the cost and the time required for EPA to enter, process, and make the data available. For the 2000 TRI reporting cycle, approximately 80% of Form Rs and Form A Certification Statements were submitted electronically.

### 5(c)  Small Entity Flexibility

      Small entities, as defined by the statute, are exempt from reporting. In addition, the alternate threshold is advantageous to those entities which might be classified as small under other definitions. The range established by the 500 pound category may apply proportionally higher to smaller entities, thereby resulting in greater regulatory relief for these facilities. EPA considered a number of different threshold levels when it promulgated this rule. This alternate threshold was chosen because it best balanced burden reduction with the need for data and information, and is consistent with the requirements of EPCRA section 313.

      Furthermore, EPA has prepared various materials to assist facilities in reporting to TRI, thereby lowering the cost of reporting. These materials include detailed reporting instructions, a question and answer document, magnetic media reporting, general technical guidance, and industry specific guidance documents. In addition, EPA maintains a toll-free hotline to answer regulatory and technical questions to assist facilities.

      Through the development of the Form A Certification Statement (in conjunction with the petition process, electronic reporting, efforts to review the original list of TRI chemicals to determine whether any of those chemicals do not meet the listing criteria, and other mechanisms),

EPA has reduced, to the extent practicable and appropriate at this time, the burden on persons providing the information being collected under EPCRA section 313.  EPA continues to work with affected parties to identify opportunities for further burden reduction.

**5(d) Collection Schedule**

Section 313 requires annual reporting for the Form R.  The respondent and Agency schedule of activities associated with the collection and processing of information under EPCRA section 313 is unchanged for the alternate threshold.  Whether making a Form R submission or submitting a Form A Certification Statement based on the alternate threshold, respondents must submit their forms to EPA for any given reporting year on or before July 1 of the succeeding year.

## 6.      ESTIMATING THE BURDEN AND COST OF THE COLLECTION

### 6(a)      Estimating Respondent Burden

This section presents the burden of this information collection activity on respondents in terms of the time required for facility personnel to perform the activities outlined in Section 4 of this document. These burden estimates are based on previous ICRs and economic analyses, respondent experience as reflected in comments to EPA and other parties, and information acquired through site visits and telephone interviews.

The burden to respondents is estimated for Form A Certification Statement requirements. Burden estimates are developed for the compliance activities and then multiplied by the number of facilities or reports (as appropriate) to estimate the total burden to respondents. The burden estimates used by EPA are national average values. As with any average, some facilities will be above the average, and others will be below it. Large, complex facilities may require more than the average time to comply. However, there are many other facilities subject to the rule that are not large or complex. Therefore, EPA believes that its burden estimates represent reasonable national averages. The tasks associated with the alternate threshold reporting include report calculations and certification, form completion, and recordkeeping and submission.[1] Specifically:

- **Rule Familiarization:** Facilities that are reporting under section 313 for the first time must read the reporting package and become familiar with the reporting requirements. This includes the time needed to review instructions, and the time needed to train personnel to be able to respond to a collection of information.

- **Calculations/Certification:** Facilities must gather data and perform calculations to determine eligibility for the alternate threshold. This includes the time to search data sources, and the time to complete and review the information.

- **Form Completion:** Facilities must complete the form. Facilities use a single Form A Certification Statement to submit certifications for all chemicals that are eligible for the alternate threshold.

- **Recordkeeping/Submission:** Facilities must maintain recordkeeping systems and submit the completed Form A Certification Statement to EPA and the states.

Each of these activities is described in more detail below.

---

[1]  Facilities must also determine whether they are within a covered Standard Industrial Classification (SIC) code; have the equivalent of 10 or more full-time employees; and manufacture, process or use any of the listed toxic chemicals above the threshold quantity. The time required for compliance determination at all facilities in covered SIC codes with 10 or more employees is already accounted for in the Form R information collection request (OMB #2070-0093).

13

Rule Familiarization

If a facility will be reporting under the section 313 requirements for the first time, facility staff must review and comprehend the reporting requirements. At a minimum, this effort will involve reading the instructions to the Toxic Release Inventory Reporting Forms, however, it may also involve consulting EPA guidance documents, attending a training course, and/or calling the EPCRA technical hotline. The cost associated with rule familiarization occurs only in the first year that a facility becomes subject to reporting. In subsequent years, staff are assumed to be familiar with the requirements that apply to their facility. Thus, the facility would no longer bear this cost. Similarly, facilities that already report on one or more existing TRI chemicals will not incur a rule familiarization cost.

Calculations/Certification

To certify that a listed toxic chemical qualifies for the alternate threshold, a facility must estimate its annual reportable amount and the amount manufactured, processed, or otherwise used. If a facility's annual reportable amount for a listed toxic chemical is 500 pounds or less, the facility is eligible to apply the alternate threshold of 1 million pounds manufactured, processed or otherwise used.

Recordkeeping/Submission

After a facility has certified a listed toxic chemical as eligible for the alternate threshold, it incurs additional labor costs for recordkeeping and submission. Recordkeeping allows a facility to use the information in making calculations in subsequent years, and as documentation in the event it receives a compliance audit. Facilities may maintain such records as estimation methodology and calculations, engineering reports, inventory, incident and operating logs, and any other supporting materials needed to document eligibility for the alternate threshold. Facilities must transmit Form A Certification Statements to EPA and State authorities.

Form A Certification Statement Completion

If a facility is eligible to apply the alternate threshold, it must complete the Form A Certification Statement. The facility completes one Form A Certification Statement that contains certifications for all the listed toxic chemicals to which it is applying the alternate threshold.

Respondent Burden

The calculations needed to determine eligibility for the Form A Certification Statement are a subset of the calculations necessary to complete Form R. Thus, the time required to calculate the annual reportable amount was estimated in previous ICRs by aggregating EPA's estimates of the time required to calculate each of the sections of Form R that are relevant to determining annual reportable amount. According to this estimate, calculations for a Form A Certification

14

Statement take approximately 64 percent of the time of calculations for the Form R.[2]

For the purposes of this ICR, first-year reporting burden hour estimates have not been modified from previous ICRs. However, based on EPA's recent revision to the unit burden estimates for Form R calculations, EPA now estimates that calculating an annual reportable amount for a Form A Certification Statement will require an average of 9.3 hours for each listed toxic chemical that the facility must report under EPCRA section 313.[3] EPA's estimates by activity and labor category are shown in Table 1.

**Table 1**
**Average Annual Burden Hour Estimates for Form A**

| Activity | Management | Technical | Clerical | Total Hours |
|---|---|---|---|---|
| **First-year activities** | | | | |
| Rule Familiarization - first-time filers | 12 | 22.5 | 0 | 34.5 |
| Calculations/ Certification - first-time filers | 16.3 | 26 | 2.2 | 44.5 |
| Form A Completion - first-time filers | 0.15 | 1.8 | 0.15 | 2.1 |
| Recordkeeping/Submission | 0 | 2.4 | 0.6 | 3 |
| **Total** | **28.45** | **52.7** | **2.95** | **84.1** |
| **Subsequent year activities** | | | | |
| Calculations/ Certification - subsequent year filers | 3.4 | 5.5 | 0.4 | 9.3 |
| Form A Completion - subsequent year filers | 0.1 | 1.2 | 0.1 | 1.4 |
| Recordkeeping/Submission | 0 | 2.4 | 0.6 | 3 |
| **Total** | **3.5** | **9.1** | **1.1** | **13.7** |

In April 2002, EPA contacted nine facilities that file Form A Certification Statements to gather information on the typical facility level burden associated with using the reporting form. The total facility level burden estimates were reported in ranges. Depending on whether the midpoint or maximum of the range was used, the average of facility-level burden hours per chemical certification was reported at 11.2 to 15.5 hours. EPA's revised estimate of 13.7 hours for a facility certifying one chemical on a Form A Certification Statement falls within this range.[4]

---

[2] USEPA/OPPT, *Regulatory Impact Analysis of the EPCRA Section 313 Alternate Threshold Final Rule*, November 18, 1994.

[3] USEPA/OEI, *Estimates of Burden Hours for Economic Analyses of the Toxics Release Inventory*, June 10, 2002.

[4] USEPA/OEI, *Estimates of Burden Hours for Economic Analyses of the Toxics Release Inventory*, June 10, 2002. Note that one of the 9 facilities reported a much higher per chemical burden than the other 8 facilities. Without this outlier, the average of facility-level burden hours per chemical certification would be 3.8 to 4.9 hours per chemical certified.

15

### 6(b)    Estimating Respondent Costs

Respondent costs are related to the number of chemicals certifications reported on the Form A Certification Statements and the loaded hourly rates of the personnel who complete the reporting activities. The total reporting burden is estimated to average 84.1 hours for a facility submitting a single certification statement under EPCRA section 313 for the first time. (This includes the time required for rule familiarization, calculations/certification, Form A Certification Statement completion, and recordkeeping/submission.) The total reporting burden is estimated to average 13.7 hours for a facility submitting a single certification statement under EPCRA section 313 in subsequent reporting years. (This includes the time required for calculations/certification, Form A Certification Statement completion, and recordkeeping/submission.) By comparison, the average time required for calculations, form completion, and recordkeeping/submission for Form R is estimated to average 19.5 hours per form. Thus, for a facility filing a Form A Certification Statement for a single chemical, the alternate threshold yields an average savings of 5.8 hours in subsequent reporting years.

For a facility that certifies multiple chemicals on a Form A Certification Statement, the burden per reported chemical is reduced. An average of 2.4 chemicals per facility were reported to EPA using Form A Certification Statements for the 2000 reporting year. About 50 percent of the facilities using the Form A Certification Statement reported on one chemical, another 20 percent reported on two chemicals, 15 percent on three chemicals, and the remaining 15 percent of facilities reported on 4 or more chemicals. The typical per facility burden and cost for certifying one to three chemicals is shown in Table 2. The loaded hourly rates used in Table 2 correspond with the loaded hourly rates for the relevant labor categories in the Form R ICR renewal.[5]

---

[5]  USEPA/OEI, *Wage Rates for Economic Analyses of the Toxics Release Inventory Program*, June 10, 2002. Note that the wage rates used in this supporting statement have been updated to June 2003. The loaded hourly rates are $52.91 for management labor, $45.81 for technical labor, and $24.27 for clerical labor.

**Table 2**
**Annual Burden and Cost per Facility (Assuming 1, 2, or 3 Chemicals)**

| Activity | Number of Chemicals Reported on Each Form A | | | | | |
|---|---|---|---|---|---|---|
| | 1 Chemical | | 2 Chemicals | | 3 Chemicals | |
| | hours | cost | hours | cost | hours | cost |
| **First-year filers** | | | | | | |
| Rule Familiarization - first-time filers | 34.5 | $1,666 | 34.5 | $1,666 | 34.5 | $1,666 |
| Calculations/ Certification - first-time filers | 44.5 | $2,107 | 89 | $4,214 | 133.5 | $6,321 |
| Form A Completion - first-time filers | 2.1 | $94 | 2.1 | $94 | 2.1 | $94 |
| Recordkeeping/Submission | 3 | $125 | 6 | $250 | 9 | $375 |
| Total per Facility | 84.1 | $3,992 | 131.6 | $6,224 | 179.1 | $8,456 |
| Average per Chemical | 84.1 | $3,992 | 65.8 | $3,112 | 59.7 | $2,819 |
| **Subsequent year filers** | | | | | | |
| Calculations/ Certification - subsequent year filers | 9.3 | $442 | 18.6 | $884 | 27.9 | $1,326 |
| Form A Completion - subsequent year filers | 1.4 | $63 | 1.4 | $63 | 1.4 | $63 |
| Recordkeeping/Submission | 3 | $125 | 6 | $250 | 9 | $375 |
| Total per Facility | 13.7 | $630 | 26 | $1,197 | 38.3 | $1,764 |
| Average per Chemical | 13.7 | $630 | 13 | $599 | 12.8 | $588 |

## 6(c)    Estimating Agency Burden and Cost

EPA will incur costs to process the Form A Certification Statements, perform outreach and training, disseminate information, develop policy and guidance, respond to petitions, and perform compliance and enforcement audits. EPA measures its resource requirements in terms of the number of forms that must be processed. EPA employees (as measured by full time equivalents, or FTEs) and extramural costs are separated into a fixed component and an variable component. The fixed component of EPA FTEs and costs is described in the Form R ICR (OMB #2070-0093). The variable component is the amount that varies depending on the number of forms. The variable component reflects total extramural data processing costs divided by the total number of reports processed in the 2000 reporting year. EPA expends $26 in variable costs for each form processed. A total of 5,000 Form A Certification Statements are expected to be filed. Thus, the total annual burden to EPA is estimated to be $130,000 in variable costs for the Form A Certification Statement.

## 6(d)    Bottom Line Burden Hours and Costs

Total respondent burden is related to the number of chemicals certifications reported on the Form A Certification Statements and the number of facilities that file Form A Certification Statements. The number of respondents and responses is based on the actual numbers of facilities making chemical certifications on Form A Certification Statements in the latest reporting year. As shown in Table 3, the number of facilities using the Form A Certification Statement has increased

since 1995, the first year the form was available. Starting in 1998, non-manufacturing industries began reporting to TRI using both the Form A Certification Statement and Form R. Also starting in 1998, respondents were allowed to make multiple chemical certifications on a single Form A Certification Statement. Note that electronic submissions allow some companies to report for multiple facilities on a single Form A Certification Statement, which is why there are fewer facilities than Form A Certification Statements. Note also that facilities can file both Form Rs and Form A Certification Statements, so the total number of TRI reporting facilities is less than the sum of facilities filing Form Rs and facilities filing Form A Certification Statements. For the purposes of bottom line burden hours and costs in this ICR supporting statement, EPA is using the number of facilities and responses in reporting year 2001 rounded to the next highest hundred or thousand as appropriate (in this case, 5,200 facilities and 5,000 responses on 13,000 chemicals).

**Table 3**
**Usage of Form A vs. Form R**

| Reporting Year | Form A | | | Form R | |
|---|---|---|---|---|---|
| | Facilities | Responses | Chemicals | Facilities | Responses |
| 1994 | N/A | N/A | N/A | 23,663 | 77,941 |
| 1995 | 3,231 | 6,865 | 6,865 | 21,373 | 70,749 |
| 1996 | 3,618 | 7,720 | 7,720 | 20,757 | 67,713 |
| 1997 | 5,185 | 10,947 | 10,947 | 19,594 | 64,148 |
| 1998 | 5,822 | 5,627 | 13,942 | 21,089 | 75,978 |
| 1999 | 5,444 | 5,085 | 12,894 | 20,167 | 72,450 |
| 2000 | 5,451 | 5,121 | 13,209 | 20,669 | 78,304 |
| 2001 | 5,136 | 4,929 | 12,295 | 22,359 | 83,218 |

In an effort to reduce reporting burden, EPA has developed intelligent software for the desktop computer called TRI–Made Easy (TRI-ME) to assist facilities in determining and completing their reporting obligations. For the purposes of this ICR, EPA uses an estimate of 85 percent of Form A reports being filed using TRI-ME. For reporting year 2001, 78 percent of Form A Certification Statement responses were received electronically, and 36 percent of Form A Certification Statement responses were filed using TRI-ME. In the supporting statement for the previous ICR renewal, EPA had predicted a 40 percent TRI-ME adoption rate for reporting year 2001, which is very close to the actual level. Preliminary results from reporting year 2002 show 77 percent of the chemicals on Form A responses were reported electronically, and 86 percent of the chemicals on Form A responses were reported using TRI-ME (TRI-ME output for submission can be paper or electronic). For the purposes of this ICR, EPA uses an estimate of 85 percent of chemicals reported on Form As being reported using TRI-ME.

Based on responses from facilities that tested TRI-ME in reporting year 2000 and facilities that used TRI-ME in 2001, EPA expects that TRI-ME will result in a burden reduction of 15

18

percent.[6] For the Form A Certification Statement ICR, this burden reduction estimate is applied to the activities of Calculations/Certification and Recordkeeping/Submission.

Total respondent burden and cost for the Form A Certification Statement, including an adjustment for TRI-ME, is shown in Table 4.[7]

**Table 4**
**Total Annual Respondent Burden and Cost**

| ACTIVITY | Hours | Number of Facilities | Number of Chemicals | Total Burden |
|---|---|---|---|---|
| Rule Familiarization - First-year filers | 34.5 | 244 | N/A | 8,432 |
| Calculations/Certification - First-year filers | 44.5 | N/A | 585 | 26,033 |
| Form A Completion - First-year filers | 2.1 | 244 | N/A | 513 |
| TRI-ME Reduction - First-year filers | (7.1) | N/A | 497 | (3,530) |
| Calculations/Certification - Subsequent year filers | 9.3 | N/A | 12,415 | 115,460 |
| Form A Completion - Subsequent year filers | 1.4 | 4,956 | N/A | 6,938 |
| TRI-ME Reduction - Subsequent year filers | (1.8) | N/A | 10,553 | (18,995) |
| Recordkeeping/Submission - All filers | 3 | N/A | 13,000 | 39,000 |
| **Total Burden** | | | | **173,850** |
| ACTIVITY | Cost | Number of Facilities | Number of Chemicals | Total Cost |
| Rule Familiarization - First-year filers | $1,666 | 244 | N/A | $407,170 |
| Calculations/Certification - First-year filers | $2,107 | N/A | 585 | $1,232,595 |
| Form A Completion - First-year filers | $94 | 244 | N/A | $22,974 |
| TRI-ME Reduction - First-year filers | ($335) | N/A | 497 | ($166,579) |
| Calculations/Certification - Subsequent year filers | $442 | N/A | 12,415 | $5,487,430 |
| Form A Completion - Subsequent year filers | $63 | 4,956 | N/A | $312,203 |
| TRI-ME Reduction - Subsequent year filers | ($85) | N/A | 10,553 | ($897,005) |
| Recordkeeping/Submission - All filers | $125 | N/A | 13,000 | $1,625,000 |
| **Total Cost** | | | | **$8,023,788** |

Total annual respondent burden and cost for completing the Form A Certification Statement are estimated at 173,850 burden hours with a loaded labor cost of approximately $8 million per year. Total EPA cost for processing the Form A Certification Statements is estimated at $130,000 per year.

---

[6] EPA contacted 9 TRI-ME users in 2002 and 9 TRI-ME users in 2003 to obtain estimates of the burden reduction attributable to TRI-ME. The burden reduction estimate is based on the average burden reduction reported by first-time users of TRI-ME.

[7] Between RY1994 and RY2001, there have been three reporting years with no major programmatic changes. Based on reporting for 1996, 1997, and 1999, the average rate of facilities that file using new TRIFIDs is 4.7%. These facilities filed an average of 4.5% of the Form A Certification Statements. For the purposes of this ICR, these facilities represent "first-time filers."

19

**6(e)    Reasons for Change in Burden**

The estimated burden described above differs from what is currently in OMB's inventory for alternate threshold reporting: 5,121 responses (Form A Certification Statements) and 463,670 burden hours. The burden estimated in this supporting statement differs from OMB's inventory as a result of adjustments to estimates of number of responses (from 5,121 responses to 5,000 responses), changes to subsequent year unit reporting burden estimates (from 30.2 to 9.3 burden hours per chemical certified on a Form A Certification Statement), and an adjustment for use of TRI-ME for those forms completed using TRI-ME. Table 5 summarizes the major program changes and adjustments that have been made over the last several years, as well as changes due to adjustments in this ICR supporting statement.

**6(f)    Burden Statement** (To appear on Collection Instrument)

The annual public burden for this collection of information, which is approved under OMB Control No. 2070-0143, is estimated to average 13.7 hours for a facility that certifies one chemical per Form A Certification Statement. Responding to this information collection requires 1) determining whether a listed toxic chemical is eligible for certification under the alternate threshold, and 2) completing the Form A Certification Statement. The burden of determining eligibility for certification and associated recordkeeping is estimated to average 12.3 hours for each chemical that is certified. The burden of completing the Form A Certification Statement is estimated to average 1.4 hours, regardless of the number of chemicals being certified. The total burden per response is the combination of these two, and will vary depending on the number of listed toxic chemicals being certified.

Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations are listed in 40 CFR Part 9 and 48 CFR Chapter 15.

To comment on the Agency's need for this information, the accuracy of the provided burden estimates, and any suggested methods for minimizing respondent burden, including the use of automated collection techniques, EPA has established a public docket for this ICR under Docket ID No. OEI-2003-0026, which is available for public viewing at the Office of Environmental Information Docket in the EPA Docket Center (EPA/DC), EPA West, Room

20

B102, 1301 Constitution Ave., NW, Washington, DC. The EPA Docket Center Public Reading Room  is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Reading Room is (202) 566-1744, and the telephone number for the Office of Environmental Information Docket is (202) 566-1752.  An electronic version of the public docket is available through EPA Dockets (EDOCKET) at http://www.epa.gov/edocket. Use EDOCKET to submit or view public comments, access the index listing of the contents of the public docket, and to access those documents in the public docket that are available electronically. Once in the system, select "search," then key in the docket ID number identified above.  Also, you can send comments to the Office of Information and Regulatory Affairs, Office of Management and Budget, 725 17th Street, NW, Washington, DC 20503, Attention: Desk Office for EPA. Please include the EPA Docket ID No. OEI-2003-0026 and OMB control number 2070-0143 in any correspondence.

        The completed forms should be submitted in accordance with the instructions accompanying the form, or as specified in the corresponding regulation.

**Table 5**
**Changes in Form A Burden**

| Activity - Explanation | # 1704 - Form A (OMB #2070-0143) | | # 1784 - Industry Expansion (OMB #2070-0157) | |
|---|---|---|---|---|
| | Responses | Burden Hours | Responses | Burden Hours |
| **1995 Program Change - Alternate Threshold:** This rule established an alternate report for low reportable amounts and had its own ICR. | 23,288 | 803,436 | — | — |
| **1995 Program Change - Petition Delistings:** EPA granted several petitions to delist chemicals from the list of chemicals subject to reporting. | -2,241 | -77,539 | — | — |
| **1996 Program Change - Petition Delistings:** | -533 | -18,442 | — | — |
| **1996 Adjustment - Form A ICR Renewal:** Minor adjustment to burden. | — | + 2,328 | — | — |
| **1997 Program Change - Industry Expansion:** This rule expanded the list of industries subject to reporting under TRI. | — | — | +45,415 | +2,704,085 |
| **1997 Adjustment - ICR Amendments:** The burden hours for the industry expansion rule (with minor adjustment to burden) were incorporated into the Form R and Form A ICRs by OMB. | *+7,121* | *+281,517* | -45,415 | -2,704,085 |
| **1998 Form A ICR. Program Change:** Reporting change to allow submission of multiple chemicals on a single Form A. | *-14,478* | *-82,264* | — | — |
| **1999 Adjustment - Form A ICR renewal** | *- 4,085* | *- 262,161* | — | — |
| **2000 Form A ICR Renewal** | *+5,721* | *-2,114* | — | — |
| **January 2003 Form A ICR Renewal** - Incorporates accounting adjustments to more accurately reflect actual number of responses. | *-9,672* | *-181,091* | — | — |
| **October 2003 Form A ICR Renewal** - This request incorporates accounting adjustments to more accurately reflect reporting burden and actual number of responses. | *-121* | *-289,820* | | |
| **CURRENT TOTALS ---------------------** | *5,000* | *173,850* | *0* | *0* |

**ATTACHMENT A**

**RELEVANT STATUTES:  EPCRA SECTION 313 AND PPA SECTION 6607**

EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT SECTION 313

UNITED STATES CODE
TITLE 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 116 - EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW

SUBCHAPTER I - EMERGENCY PLANNING AND NOTIFICATION

§ 11023. Toxic chemical release forms

(a) Basic requirement

The owner or operator of a facility subject to the requirements of this section shall complete a toxic chemical release form as published under subsection (g) of this section for each toxic chemical listed under subsection (c) of this section that was manufactured, processed, or otherwise used in quantities exceeding the toxic chemical threshold quantity established by subsection (f) of this section during the preceding calendar year at such facility. Such form shall be submitted to the Administrator and to an official or officials of the State designated by the Governor on or before July 1, 1988, and annually thereafter on July 1 and shall contain data reflecting releases during the preceding calendar year.

(b) Covered owners and operators of facilities

(1) In general

(A) The requirements of this section shall apply to owners and operators of facilities that have 10 or more full-time employees and that are in Standard Industrial Classification Codes 20 through 39 (as in effect on July 1, 1985) and that manufactured, processed, or otherwise used a toxic chemical listed under subsection (c) of this section in excess of the quantity of that toxic chemical established under subsection (f) of this section during the calendar year for which a release form is required under this section.
(B) The Administrator may add or delete Standard Industrial Classification Codes for purposes of subparagraph (A), but only to the extent necessary to provide that each Standard Industrial Code to which this section applies is relevant to the purposes of this section.
(C) For purposes of this section -
(i) The term "manufacture" means to produce, prepare, import, or compound a toxic chemical.
(ii) The term "process" means the preparation of a toxic chemical, after its manufacture, for distribution in commerce - (I) in the same form or

physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such chemical, or (II)

A- 2

as part of an article containing the toxic chemical.

(2) Discretionary application to additional facilities

The Administrator, on his own motion or at the request of a Governor of a State (with regard to facilities located in that State), may apply the requirements of this section to the owners and operators of any particular facility that manufactures, processes, or otherwise uses a toxic chemical listed under subsection (c) of this section if the Administrator determines that such action is warranted on the basis of toxicity of the toxic chemical, proximity to other facilities that release the toxic chemical or to population centers, the history of releases of such chemical at such facility, or such other factors as the Administrator deems appropriate.

(c) Toxic chemicals covered

The toxic chemicals subject to the requirements of this section are those chemicals on the list in Committee Print Number 99-169 of the Senate Committee on Environment and Public Works, titled "Toxic Chemicals Subject to Section 313 of the Emergency Planning and Community Right-To-Know Act of 1986" (42 U.S.C. 11023) (including any revised version of the list as may be made pursuant to subsection (d) or (e) of this section).

(d) Revisions by Administrator

(1) In general

The Administrator may by rule add or delete a chemical from the list described in subsection (c) of this section at any time.

(2) Additions

A chemical may be added if the Administrator determines, in his judgment, that there is sufficient evidence to establish any one of the following:
(A) The chemical is known to cause or can reasonably be anticipated to cause significant adverse acute human health effects at concentration levels that are reasonably likely to exist beyond facility site boundaries as a result of continuous, or frequently recurring, releases.
(B) The chemical is known to cause or can reasonably be anticipated to cause in humans -
(i) cancer or teratogenic effects, or
(ii) serious or irreversible - (I) reproductive dysfunctions, (II) neurological disorders, (III) heritable genetic mutations, or (IV) other chronic health effects.
(C) The chemical is known to cause or can reasonably be anticipated to cause,

A- 3

because of -
    (i) its toxicity,
    (ii) its toxicity and persistence in the environment, or
    (iii) its toxicity and tendency to bioaccumulate in the environment, a
significant adverse effect on the environment of sufficient seriousness, in
the judgment of the Administrator, to warrant reporting under this section.
The number of chemicals included on the list described in subsection ©
of this section on the basis of the preceding sentence may constitute in the
aggregate no more than 25 percent of the total number of chemicals on
the list. A determination under this paragraph shall be based on generally
accepted scientific principles or laboratory tests, or appropriately
designed and conducted epidemiological or other population studies,
available to the Administrator.

(3) Deletions

A chemical may be deleted if the Administrator determines there is not sufficient
evidence to establish any of the criteria described in paragraph (2).

(4) Effective date

Any revision made on or after January 1 and before December 1 of any calendar year
shall take effect beginning with the next calendar year. Any revision made on or after
December 1 of any calendar year and before January 1 of the next calender year shall
take effect beginning with the calendar year following such next calendar year.

(e) Petitions

(1) In general

Any person may petition the Administrator to add or delete a chemical from the list
described in subsection (c) of this section on the basis of the criteria in subparagraph
(A) or (B) of subsection (d)(2) of this section. Within 180 days after receipt of a
petition, the Administrator shall take one of the following actions:
    (A) Initiate a rulemaking to add or delete the chemical to the list, in accordance
with subsection (d)(2) or (d)(3) of this section.
    (B) Publish an explanation of why the petition is denied.

(2) Governor petitions

A State Governor may petition the Administrator to add or delete a chemical from the
list described in subsection (c) of this section on the basis of the criteria in
subparagraph (A), (B), or (c) of subsection (d)(2) of this section. In the case of such
a petition from a State Governor to delete a chemical, the petition shall be treated in

A- 4

the same manner as a petition received under paragraph (1) to delete a chemical. In the case of such a petition from a State Governor to add a chemical, the chemical will be added to the list within 180 days after receipt of the petition, unless the Administrator -

    (A) initiates a rulemaking to add the chemical to the list, in accordance with subsection (d)(2) of this section, or

    (B) publishes an explanation of why the Administrator believes the petition does not meet the requirements of subsection (d)(2) of this section for adding a chemical to the list.

(f) Threshold for reporting

    (1) Toxic chemical threshold amount

The threshold amounts for purposes of reporting toxic chemicals under this section are as follows:

    (A) With respect to a toxic chemical used at a facility, 10,000 pounds of the toxic chemical per year.

    (B) With respect to a toxic chemical manufactured or processed at a facility -

        (i) For the toxic chemical release form required to be submitted under this section on or before July 1, 1988, 75,000 pounds of the toxic chemical per year.

        (ii) For the form required to be submitted on or before July 1, 1989, 50,000 pounds of the toxic chemical per year.

        (iii) For the form required to be submitted on or before July 1, 1990, and for each form thereafter, 25,000 pounds of the toxic chemical per year.

    (2) Revisions

The Administrator may establish a threshold amount for a toxic chemical different from the amount established by paragraph (1). Such revised threshold shall obtain reporting on a substantial majority of total releases of the chemical at all facilities subject to the requirements of this section. The amounts established under this paragraph may, at the Administrator's discretion, be based on classes of chemicals or categories of facilities.

(g) Form

    (1) Information required

Not later than June 1, 1987, the Administrator shall publish a uniform toxic chemical release form for facilities covered by this section. If the Administrator does not publish such a form, owners and operators of facilities subject to the requirements of this section shall provide the information required under this subsection by letter

A- 5

postmarked on or before the date on which the form is due. Such form shall -
    (A) provide for the name and location of, and principal business activities at, the facility;
    (B) include an appropriate certification, signed by a senior official with management responsibility for the person or persons completing the report, regarding the accuracy and completeness of the report; and
    (C) provide for submission of each of the following items of information for each listed toxic chemical known to be present at the facility:
        (i) Whether the toxic chemical at the facility is manufactured, processed, or otherwise used, and the general category or categories of use of the chemical.
        (ii) An estimate of the maximum amounts (in ranges) of the toxic chemical present at the facility at any time during the preceding calendar year.
        (iii) For each waste stream, the waste treatment or disposal methods employed, and an estimate of the treatment efficiency typically achieved by such methods for that waste stream.
        (iv) The annual quantity of the toxic chemical entering each environmental medium.

    (2) Use of available data

    In order to provide the information required under this section, the owner or operator of a facility may use readily available data (including monitoring data) collected pursuant to other provisions of law, or, where such data are not readily available, reasonable estimates of the amounts involved. Nothing in this section requires the monitoring or measurement of the quantities, concentration, or frequency of any toxic chemical released into the environment beyond that monitoring and measurement required under other provisions of law or regulation. In order to assure consistency, the Administrator shall require that data be expressed in common units.

(h) Use of release form

    The release forms required under this section are intended to provide information to the Federal, State, and local governments and the public, including citizens of communities surrounding covered facilities. The release form shall be available, consistent with section 11044(a) of this title, to inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; to aid in the development of appropriate regulations, guidelines, and standards; and for other similar purposes.

(I) Modifications in reporting frequency

    (1) In general

The Administrator may modify the frequency of submitting a report under this section, but the Administrator may not modify the frequency to be any more often than annually. A modification may apply, either nationally or in a specific geographic area, to the following:

    (A) All toxic chemical release forms required under this section.
    (B) A class of toxic chemicals or a category of facilities.
    (C) A specific toxic chemical.
    (D) A specific facility.

(2) Requirements

A modification may be made under paragraph (1) only if the Administrator -

    (A) makes a finding that the modification is consistent with the provisions of subsection (h) of this section, based on -
        (i) experience from previously submitted toxic chemical release forms, and
        (ii) determinations made under paragraph (3), and
    (B) the finding is made by a rulemaking in accordance with section 553 of title 5.

(3) Determinations

The Administrator shall make the following determinations with respect to a proposed modification before making a modification under paragraph (1):

    (A) The extent to which information relating to the proposed modification provided on the toxic chemical release forms has been used by the Administrator or other agencies of the Federal Government, States, local governments, health professionals, and the public.
    (B) The extent to which the information is (i) readily available to potential users from other sources, such as State reporting programs, and (ii) provided        to the Administrator under another Federal law or through a State program.
    (C) The extent to which the modification would impose additional and unreasonable burdens on facilities subject to the reporting requirements under this section.

(4) 5-year review

Any modification made under this subsection shall be reviewed at least once every 5 years. Such review shall examine the modification and ensure that the requirements of paragraphs (2) and (3) still justify continuation of the modification. Any change to a modification reviewed under this paragraph shall be made in accordance with this subsection.

(5) Notification to Congress

The Administrator shall notify Congress of an intention to initiate a rulemaking for a modification under this subsection. After such notification, the Administrator shall delay initiation of the rulemaking for at least 12 months, but no more than 24 months, after the date of such notification.

(6) Judicial review

In any judicial review of a rulemaking which establishes a modification under this subsection, a court may hold unlawful and set aside agency action, findings, and conclusions found to be unsupported by substantial evidence.

(7) Applicability

A modification under this subsection may apply to a calendar year or other reporting period beginning no earlier than January 1, 1993.

(8) Effective date

Any modification made on or after January 1 and before December 1 of any calendar year shall take effect beginning with the next calendar year. Any modification made on or after December 1 of any calendar year and before January 1 of the next calendar year shall take effect beginning with the calendar year following such next calendar year.

(j) EPA management of data

The Administrator shall establish and maintain in a computer data base a national toxic chemical inventory based on data submitted to the Administrator under this section. The Administrator shall make these data accessible by computer telecommunication and other means to any person on a cost reimbursable basis.

(k) Report

Not later than June 30, 1991, the Comptroller General, in consultation with the Administrator and appropriate officials in the States, shall submit to the Congress a report including each of the following:

(1) A description of the steps taken by the Administrator and the States to implement the requirements of this section, including steps taken to make information collected under this section available to and accessible by the public.

(2) A description of the extent to which the information collected under this section has been used by the Environmental Protection Agency, other Federal agencies, the States, and the public, and the purposes for which the information has been used.

A- 8

(3) An identification and evaluation of options for modifications to the requirements of this section for the purpose of making information collected under this section more useful.

(l) Mass balance study

(1) In general

The Administrator shall arrange for a mass balance study to be carried out by the National Academy of Sciences using mass balance information collected by the Administrator under paragraph (3). The Administrator shall submit to Congress a report on such study no later than 5 years after October 17, 1986.

(2) Purposes

The purposes of the study are as follows:
    (A) To assess the value of mass balance analysis in determining the accuracy of information on toxic chemical releases.
    (B) To assess the value of obtaining mass balance information, or portions thereof, to determine the waste reduction efficiency of different facilities, or categories of facilities, including the effectiveness of toxic chemical regulations promulgated under laws other than this chapter.
    (C) To assess the utility of such information for evaluating toxic chemical management practices at facilities, or categories of facilities, covered by this section.
    (D) To determine the implications of mass balance information collection on a national scale similar to the mass balance information collection carried out by the Administrator under paragraph (3), including implications of the use of     such collection as part of a national annual quantity toxic chemical release     program.

(3) Information collection

    (A) The Administrator shall acquire available mass balance information from States which currently conduct (or during the 5 years after October 17, 1986 initiate) a mass balance-oriented annual quantity toxic chemical release     program. If information from such States provides an inadequate representation of industry classes and categories to carry out the purposes of the study, the Administrator also may acquire mass balance information necessary for the study from a representative number of facilities in other States.
    (B) Any information acquired under this section shall be available to the public, except that upon a showing satisfactory to the Administrator by any person     that the information (or a particular part thereof) to which the Administrator or     any officer, employee, or representative has access under this section if made     public would divulge information entitled to protection under section 1905 of     title 18,

such information or part shall be considered confidential in accordance     with the purposes of that section, except that such information or part may be     disclosed to other officers, employees, or authorized representatives of the     United States concerned with carrying out this section.

   (C) The Administrator may promulgate regulations prescribing procedures for collecting mass balance information under this paragraph.

   (D) For purposes of collecting mass balance information under subparagraph (A), the Administrator may require the submission of information by a State or facility.

   (4) Mass balance definition

For purposes of this subsection, the term "mass balance" means an accumulation of the annual quantities of chemicals transported to a facility, produced at a facility, consumed at a facility, used at a facility, accumulated at a facility, released from a facility, and transported from a facility as a waste or as a commercial product or byproduct or component of a commercial product or byproduct.

POLLUTION PREVENTION ACT SECTION 6607

UNITED STATES CODE
TITLE 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 133 - POLLUTION PREVENTION

### § 13106. Source reduction and recycling data collection

(a) Reporting requirements

Each owner or operator of a facility required to file an annual toxic chemical release form under section 11023 of this title for any toxic chemical shall include with each such annual filing a toxic chemical source reduction and recycling report for the preceding calendar year. The toxic chemical source reduction and recycling report shall cover each toxic chemical required to be reported in the annual toxic chemical release form filed by the owner or operator under section 11023(c) of this title. This section shall take effect with the annual report filed under section 11023 of this title for the first full calendar year beginning after November 5, 1990.

(b) Items included in report

The toxic chemical source reduction and recycling report required under subsection (a) of this section shall set forth each of the following on a facility-by-facility basis for each toxic chemical:

. (1) The quantity of the chemical entering any waste stream (or otherwise released into the environment) prior to recycling, treatment, or disposal during the calendar year for which the report is filed and the percentage change from the previous year. The quantity reported shall not include any amount reported under paragraph (7). When actual measurements of the quantity of a toxic chemical entering the waste streams are not readily available, reasonable estimates should be made based on best engineering judgment

(2) The amount of the chemical from the facility which is recycled (at the facility or elsewhere) during such calendar year, the percentage change from the previous year, and the process of recycling used.

(3) The source reduction practices used with respect to that chemical during such year at the facility. Such practices shall be reported in accordance with the following categories unless the Administrator finds other categories to be more appropriate.

(A) Equipment, technology, process, or procedure modifications.

(B) Reformulation or redesign of products.

(C) Substitution of raw materials.

(D) Improvement in management, training, inventory control, materials handling, or other general operational phases of industrial facilities.

(4) The amount expected to be reported under paragraph (1) and (2) for the two

A- 11

calendar years immediately following the calendar year for which the report is filed. Such amount shall be expressed as a percentage change from the amount reported in paragraphs (1) and (2).

(5) A ratio of production in the reporting year to production in the previous year. The ratio should be calculated to most closely reflect all activities involving the toxic chemical. In specific industrial classifications subject to this section, where a feedstock or some variable other than production is the primary influence on waste characteristics or volumes, the report may provide an index based on that primary variable for each toxic chemical. The Administrator is encouraged to develop production indexes to accommodate individual industries for use on a voluntary basis.

(6) The techniques which were used to identify source reduction opportunities. Techniques listed should include, but are not limited to, employee recommendations, external and internal audits, participative team management, and material balance audits. Each type of source reduction listed under paragraph (3) should be associated with the techniques or multiples of techniques used to identify the source reduction technique.

(7) The amount of any toxic chemical released into the environment which resulted from a catastrophic event, remedial action, or other one-time event, and is not associated with production processes during the reporting year.

(8) The amount of the chemical from the facility which is treated (at the facility or elsewhere) during such calendar year and the percentage change from the previous year. For the first year of reporting under this subsection, comparison with the previous year is required only to the extent such information is available.

(c) SARA provisions

The provisions of sections 11042, 11045(c), and 11046 of this title shall apply to the reporting requirements of this section in the same manner as to the reports required under section 11023 of this title. The Administrator may modify the form required for purposes of reporting information under section 11023 of this title to the extent he      deems necessary to include the additional information required under this section.

(d) Additional optional information

Any person filing a report under this section for any year may include with the report additional information regarding source reduction, recycling, and other pollution control techniques in earlier years.

(e) Availability of data

Subject to section 11042 of this title, the Administrator shall make data collected under this section publicly available in the same manner as the data collected under section 11023 of this title.

**ATTACHMENT B**

**MAJOR REGULATIONS SPECIFIC TO THE FORM A
CERTIFICATION STATEMENT:
40 CFR §372.10, §372.27 AND §372.95**

## TITLE 40--PROTECTION OF ENVIRONMENT

## CHAPTER I--ENVIRONMENTAL PROTECTION AGENCY

## PART 372--TOXIC CHEMICAL RELEASE REPORTING: COMMUNITY RIGHT-TO-KNOW

### Subpart A--General Provisions

### Sec. 372.10  Recordkeeping.

(d) Each owner or operator who determines that the owner operator may apply the alternate threshold as specified under Sec. 372.27(a) must retain the following records for a period of 3 years from the date of the submission of the certification statement as required under Sec. 372.27(b):

(1) A copy of each certification statement submitted by the person under Sec. 372.27(b).

(2) All supporting materials and documentation used by the person to make the compliance determination that the facility or establishment is eligible to apply the alternate threshold as specified in Sec. 372.27.

(3) Documentation supporting the certification statement submitted under Sec. 372.27(b) including:

(i) Data supporting the determination of whether the alternate threshold specified under Sec. 372.27(a) applies for each toxic chemical.

(ii) Documentation supporting the calculation of annual reportable amount, as defined in Sec. 372.27(a), for each toxic chemical, including documentation supporting the calculations and the calculations of each data element combined for the annual reportable amount.

(iii) Receipts or manifests associated with the transfer of each chemical in waste to off-site locations.

## Subpart B--Reporting Requirements

### Sec. 372.27   Alternate threshold and certification.

(a) With respect to the manufacture, process, or otherwise use of a toxic chemical, the owner or operator of a facility may apply an alternate threshold of 1 million pounds per year to that chemical if the owner or operator calculates that the facility would have an annual reportable amount of that toxic chemical not exceeding 500 pounds for the combined total quantities released at the facility, disposed within the facility, treated at the facility (as represented by amounts destroyed or converted by treatment processes), recovered at the facility as a result of recycle operations, combusted for the purpose of energy recovery at the facility, and amounts transferred from the facility to off-site locations for the purpose of recycle, energy recovery, treatment, and/or disposal. These volumes correspond to the sum of amounts reportable for data elements on EPA Form R (EPA Form 9350-1; Rev. 12/4/93) as Part II column B or sections 8.1 (quantity released), 8.2 (quantity used for energy recovery on-site), 8.3 (quantity used for energy recovery off-site), 8.4 (quantity recycled on-site), 8.5 (quantity recycled off-site), 8.6 (quantity treated on-site), and 8.7 (quantity treated off-site).

(b) If an owner or operator of a facility determines that the owner or operator may apply the alternate reporting threshold specified in paragraph (a) of this section for a specific toxic chemical, the owner or operator is not required to submit a report for that chemical under Sec. 372.30, but must submit a certification statement that contains the information required in Sec. 372.95. The owner or operator of the facility must also keep records as specified in Sec. 372.10(d).

(c) Threshold determination provisions of Sec. 372.25 and exemptions pertaining to threshold determinations in Sec. 372.38 are applicable to the determination of whether the alternate threshold has been met.

(d) Each certification statement under this section for activities involving a toxic chemical that occurred during a calendar year at a facility must be submitted to EPA and to the State in which the facility is located on or before July 1 of the next year.

## Subpart E--Forms and Instructions

### Sec. 372.95  Alternate threshold certification and instructions.

(a) Availability of the alternate threshold certification statement and instructions. Availability of the alternate threshold certification statement and instructions is the same as provided in Sec. 372.85(a) for availability of the reporting form and instructions.

(b) Alternate threshold certification statement elements. The following information must be reported on an alternate threshold certification statement pursuant to Sec. 372.27(b):

(1) Reporting year.

(2) An indication of whether the chemical identified is being claimed as trade secret.

(3) Chemical name and CAS number (if applicable) of the chemical, or the category name.

(4) Signature of a senior management official certifying the following: pursuant to 40 CFR 372.27, ``I hereby certify that to the best of my knowledge and belief for the toxic chemical listed in this statement, the annual reportable amount, as defined in 40 CFR 372.27(a), did not exceed 500 pounds for this reporting year and that the chemical was manufactured, or processed, or otherwise used in an amount not exceeding 1 million pounds during this reporting year.''

(5) Date signed.

(6) Facility name and address.

(7) Mailing address of the facility if different than paragraph (b)(6) of this section.

(8) Toxic chemical release inventory facility identification number if known.

(9) Name and telephone number of a technical contact.

(10) The four-digit SIC codes for the facility or establishments in the facility.

(11) Latitude and longitude coordinates for the facility.

(12) Dun and Bradstreet Number of the facility.

(13) EPA Identification Number(s) (RCRA) I.D. Number(s) of the facility.

(14) Facility NPDES Permit Number(s).

(15) Underground Injection Well Code (UIC) I.D. Number(s) of the facility.

(16) Name of the facility's parent company.

(17) Parent company's Dun and Bradstreet Number.

**ATTACHMENT C**
**FORM A CERTIFICATION STATEMENT (EPA FORM #9350-2)**

(A .pdf version of this form can be downloaded at www.epa.gov/tri/report/form_a.pdf)

**ATTACHMENT D**
**RESPONSE TO PUBLIC COMMENTS FOR ICR RENEWAL FOR THE**
**FORM A CERTIFICATION STATEMENT (EPA Form #9350-2)**

**EPA Response to Public Comments for EPA Public Docket OEI-2003-0026**

On Tuesday, July 1, 2003, Federal Register (FR) notices were published that began the Information Collection Request (ICR) renewal process for the TRI Reporting Form R (68 FR 39074) and the Form A Certification Statement (68 FR 39071). The TRI Program is seeking OMB approval in compliance with the Paperwork Reduction Act (PRA) for these two collection activities that are due to expire on October 31, 2003. The EPA docket for this action, OEI-2003-0026 received 8 comment submissions. The commenters and their corresponding docket identifiers are listed in a table at the end of this comment response document. Docket identification numbers -0006 and -0008 are exact duplicates of comments submitted to the Form R ICR docket (OEI-2003-0025) and have been reviewed and responded to as part of the Form R Response to Public Comments document.

The comments submitted in response to EPA's request for renewal of the ICR for the Form A Certification Statement are outlined below. Comments submitted for the Form A Certification Statement ICR renewal having to do with Form A economic burden are included in the Response to Comments for Form R.

**General Comments:** The commenters suggested a number of changes to the TRI program that they believed would reduce the burden associated with reporting. Expansion of the eligibility to use the Form A was a common suggestion.

**Some Specific Comments:**
Expand use and eligibility for using Form A Certification Statement (-0009, -0012, -0013, -0014)
Increase 500 lb. threshold to 5,000 lbs. (-0009, -0012, -0014)
Exempt "zero release" reporters (-0009)
Raise alternate threshold amount from 1 million to 10 million pounds (-0009, -0014)
Remove energy recovery and recycling from reportable amount calculation (-0009, 0012)
Institute "Enhanced Form A" for small releasers and PBT chemicals (-0009)
Restore Form A for lead and other PBT chemicals (-0013, -0014)
Institute a Form NS ("No substantial Revision Certification" (-0009)
Have the states accept online submission and certification to save time (-0005)

**Response:** Most of the suggested changes were raised in the public comments submitted in response to the proposed Form R Information Collection Request renewal and have been responded to in that documents which will be included in the EPA docket under OEI-2003-0025.

Most of the issues included in the list above will be addressed in an issue paper for an upcoming stakeholder dialogue on how to reduce TRI reporting burden. During the

D- 2

stakeholder process, EPA will solicit comments on these and any other suggestions that stakeholders may have for reducing the reporting burden of the TRI program.  EPA welcomes commenters to raise these and any other Form A burden reduction measures during the stakeholder dialogue process.

**Form A ICR Commenters**

| Commenter | OEI E-Docket Identification Number |
|---|---|
| John Parker | OEI-2003-0026-0003 (comment refers to the Form R ICR renewal and is reviewed as part of that Response to Comments document) |
| Anonymous | OEI-2003-0026-0005 |
| Center for Regulatory Effectiveness | OEI-2003-0026-0006 |
| International Dairy Foods Association | OEI-2003-0026-0008 |
| Office of Advocacy of the U.S. Small Business Administration | OEI-2003-0026-0009 |
| Consumer Specialty Products Association | OEI-2003-0026-0012 |
| IPC - Association Connecting Electronics Industries | OEI-2003-0026-0013 |
| Synthetic Organic Chemical Association (SOCMA) | OEI-2003-0026-0014 |



Note From: *Cody Rice, OIAA/EAD/ASB*
Office of Environmental Information

DATE: September 24, 2003

TO:     Judith Kendall, OEI/OIAA/TRIPD

RE:     Terms of Clearance for TRI ICR Renewal

---

This memo provides additional information on revised burden hour estimates for Toxics Release Inventory (TRI) reporting as requested by the Office of Management and Budget (OMB) in the Terms of Clearance dated March 10, 2003 for the Information Collection Requests (ICRs) for the TRI Form R (OMB No. 2070-0093) and Form A (OMB No. 2070-0143).

In the Terms of Clearance, OMB stated that "If EPA continues to believe that further adjustments [to burden hour estimates] are appropriate, they should provide additional documentation during the next ICR review cycle. This documentation should specifically address the issue of whether the revised estimates account for all categories of burden, including time for data tracking and assembly; creation, operation and maintenance of data tracking systems; training; and compliance determinations."

This memo addresses the origin and derivation of TRI burden hour estimates used in previous ICRs. This memo also documents and further describes the data that are available to revise estimates of the burden hours associated with TRI reporting.

**Existing Burden Hour Estimates**

The existing Form R burden hour estimates (*i.e.*, those in the most recent ICR renewal approved by OMB) trace their roots back to the final rule implementing TRI reporting in the late 1980s. These estimates were based primarily on the knowledge and informed judgement of federal personnel who analyzed the reporting form and its associated requirements. These types of estimates are sometimes referred to as "engineering" estimates, because they reflect expert judgement rather than burden hour data from responding facilities. This method is often employed to estimate reporting burden prior to actual reporting. Much of the TRI analysis reflected engineering estimates from an analysis of a previous reporting rule known as the Comprehensive Assessment Information Rule.

In the Regulatory Impact Analysis of the final rule implementing TRI in 1988, the burden for rule familiarization and compliance determination in the first reporting year was estimated to be 34.5 hours for facilities with 50 or more employees and 12 hours for facilities with less than 50 employees. Each subsequent year's compliance determination was assumed to require only one-fourth as much time, as facility staff became familiar with the form and its data requirements. The burden of completing a single Form R was estimated to be 33.2 hours in the first reporting

year. Based on additional expert judgement, it was assumed that subsequent year report completion burden would be 68 percent of the first-year time requirements, or 22.6 hours. Recordkeeping and mailing burden was assumed to be an additional 4 hours per form in both first and subsequent reporting years. The estimates for report completion were validated with a pretest of the proposed Form R among 28 facilities (25 large and 3 small) in the manufacturing industries who were requested to estimate the time required to provide the requested information for one chemical at their facility. The pretest average time for completing the proposed Form R was 29.7 hours per chemical (EPA 1988).

In 1993, EPA revised the burden hour estimates for TRI reporting based on several years of reporting experience and new engineering estimates of the burden associated with data elements added to the From R due to the Pollution Prevention Act of 1990. After 6 years of reporting experience, EPA determined that facilities would tend to make compliance determinations by checking for changes in reporting requirements and at their facilities. As a result, the estimate for subsequent year compliance determination was lowered to 3 hours per facility. At this time, EPA stated that "previous reporting experience and annual utilization of procedures developed by respondents to the program should tend to keep the time required for compliance determination to a minimum." For report completion, EPA adopted a revised estimate of 47 hours per Form R in subsequent reporting years based on an engineering assessment for the additional pollution prevention data requirements (EPA 1993).

For reporting year 1995, EPA added new chemicals to the list of reportable substances, and created a certification statement (Form A) as a burden reduction measure. As a result of the expansion of the chemical list, EPA raised the estimate for subsequent year compliance determination from 3 hours to 4 hours. Adopting the assumption from the original TRI RIA that subsequent year compliance determination takes one-fourth as long as first year compliance determination, EPA back-calculated the revised first year compliance determination burden at 12 hours (EPA 1994b). In the Chemical Expansion and Alternate Threshold Rules and subsequent ICRs, EPA continued to use an estimate of 47 hours per Form R for report completion in subsequent reporting years and 5 hours per Form R for recordkeeping and mailing. Based on the unit time estimates for the data elements on the Form R that are used to determine eligibility for the Form A, the burden of the Form A was estimated at 30.2 hours for calculations, 3 hours for recordkeeping/mailing, and 1.4 hours for form completion (EPA 1994a). These unit burden estimates were used to generate the total burden hour estimate that OMB approved in the last TRI ICR renewal in March 2003.

**Respondent Data Addressing TRI Reporting Burden**

As described above, the existing TRI reporting burden estimates primarily reflect a series of engineering estimates developed prior to actual reporting. Based on feedback from TRI reporters, it appears that burden hours are actually less than previously estimated. A number of factors may be contributing to the lower realized reporting burden:

- Computerization and automation of data gathering, calculations, report completion, recordkeeping, and submission.
- Increased accessibility of information to facility staff from EPA guidance, trade associations, and the internet.
- Implementation of other state and federal reporting requirements that serve as precursors to TRI reporting and can be used to fulfill TRI reporting requirements.
- Previous burden hour estimates assumed that facilities would enter data in all sections of the form, although this is not the case for most Form Rs.

A review of burden hour data collected from reporting facilities indicates that the existing burden hour estimates substantially overestimate actual reporting burden for most reporting facilities. The existing burden estimates for subsequent year compliance determination, Form R calculations and form completion, and recordkeeping/mailing are above the 95th percentile of per form burden reported by actual TRI respondents (EPA 2002).

For the ICR renewal, EPA developed a revised estimate of 14.5 hours for Form R calculations/report completion in subsequent reporting years. EPA did not change any of the existing estimates for first year reporting burdens, including those for calculations/report completion. EPA also left burden estimates unchanged for subsequent year compliance determination (4 hours per facility) and recordkeeping/submission (5 hours per Form R). For the Form A, EPA also revised the estimate for subsequent year calculations/certification burden to 9.3 hours based on the previous estimate from the Alternate Threshold RIA that calculations for a Form A take approximately 64 percent of the time of calculations for the Form R. This estimate was validated by contacting nine facilities that filed Form As in reporting year 2000. The average of facility-level burden hours per chemical certification was reported at 11.2 to 15.5 hours. EPA's estimate of 13.7 total hours (including 3 hours for recordkeeping/submission and 1.4 hours for form completion) for a facility certifying one chemical on a Form A falls within this range. EPA did not change any of the existing estimates for first year reporting burdens associated with Form A, nor did EPA change estimates of burden for subsequent year recordkeeping/submission (3 hours) and form completion (1.4 hours) for Form A. EPA's burden hour estimates are summarized in the following table. Further details are available in the current ICR supporting statements and a background memo that was prepared for the ICR renewal process (EPA 2002).

| TRI Burden Hour Estimates | | | | |
|---|---|---|---|---|
| **Activity** | **Hours per year** | | | **Comments** |
| | **Existing Estimate** | **Change** | **Revised Estimate** | |
| **First Year of Reporting** | | | | |
| **Facility** Rule Familiarization | 34.5 | 0 | 34.5 | No change in baseline estimates of first year reporting burden due to lack of data. |
| **Facility** Compliance Determination | 16 | 0 | 16 | |
| **Form R** Calculations/Form Completion | 69 | 0 | 69 | Estimates based on expert judgement, and made prior to actual reporting. |
| **Form R** Recordkeeping/Submission | 5 | 0 | 5 | |
| **Form A** Calculations/Certification | 44.5 | 0 | 44.5 | Estimates date to beginning of TRI program. |
| **Form A** Recordkeeping/Mailing | 3 | 0 | 3 | |
| **Form A** Form Completion | 2.1 | 0 | 2.1 | |
| **Subsequent Years of Reporting** | | | | |
| **Facility** Compliance Determination | 4 | 0 | 4 | As above, no change. |
| **Form R** Calculations/Form Completion | 47.1 | -32.6 | 14.5 | Revised based on data from 180 reporting facilities. |
| **Form R** Recordkeeping/Submission | 5 | 0 | 5 | As above, no change. |
| **Form A** Calculations/Certification | 30.2 | -20.9 | 9.3 | Revised based on assumptions about relative burden of Form R vs. A. Validated by contacting 9 respondents. |
| **Form A** Recordkeeping/Submission | 3 | 0 | 3 | As above, no change. |
| **Form A** Form Completion | 1.4 | 0 | 1.4 | |

<u>Note:</u> Additional burden reduction of 15% applied to forms filed with TRI-ME software based on responses from software users.

In developing the revised estimate of subsequent year burden hours for Form R calculations/report completion, EPA relied on data from 180 facilities on actual burden incurred due to TRI reporting. These data were available from the following sources:

•     1994 and 1995 Toxic Release Inventory: Data Quality Report
•     1996 Toxic Release Inventory: Data Quality Report
•     1999 Research Triangle Institute (RTI) Informal and Formal Surveys of TRI Burden

The specific interest expressed by OMB in the Terms of Clearance is the extent to which the available data, and by extension the revised burden hour estimates, account for all categories of burden, including time for data tracking and assembly; creation, operation and maintenance of data tracking systems; training; and compliance determinations. This interest can be addressed by examining the context of each data collection and questions that were asked.

*Data Quality Reports*

The Data Quality Reports for reporting years 1994-1996 were part of an EPA program of site surveys to assess the quality of TRI data and to identify areas where improved guidance would be useful for improving the accuracy of future reported data. Facilities were selected to obtain a random sample of facilities from key industries that permitted results to be scaled up to the entire industry group. The survey was conducted by the engineering staff of an EPA contractor. By design, the identities of specific facilities were never revealed to EPA. The EPA contractor conducted telephone interviews followed by site visits to review the methodology and data used by facilities to make the threshold calculations and release and transfer estimates (EPA 1998a, 1998b).

Most of each survey focused on how and where facilities obtained data on the use and waste management of TRI chemicals in their operations, and how they used these data to complete threshold determinations and release calculations. As a result, it is likely that the respondents were particularly aware of all the activities related to reporting that resulted in the expenditure of burden hours. Within the context of this reporting audit, the burden-specific question was framed broadly. Facilities were prompted to include time for familiarization with the regulation and reporting requirements, as well as activities to assemble data, make and review estimates, and document work. The burden-specific questions, which are reproduced in the following box, asked for the total time to comply with the TRI reporting requirements of EPCRA section 313.

*Data Quality Reports: Burden-specific questions*

(RY94) What is your estimate of the time needed to fulfill the reporting requirements of Section 313 for 1994? Please include familiarization with the regulation and reporting instructions, completion and internal review of the reporting forms, and documentation of all information in your reports.

(RY95) What is your estimate of the time needed to fulfill the reporting requirements of Section 313 for 1995? Please include familiarization with the regulation and reporting instructions, completion and internal review of the reporting forms, and documentation of all information in your reports.

(RY96) What is your estimate of the time needed to fulfill the reporting requirements of Section 313 for 1996? Please include familiarization with the regulation and reporting instructions, completion and internal review of the reporting forms, and documentation of all information in your reports. (This is the total time for all Form Rs.)

*RTI Surveys*

The RTI surveys were small scoping activities with the primary intent of identifying factors influencing variability in burden hours at reporting facilities. Although there was a script of questions for interactions with the facilities, the conversations with facilities were fairly open-ended. Prior to asking for a burden hour estimate, the respondents were asked questions about the typical activities involved in complying with reporting requirements, how many and what type of staff were involved in reporting, what information sources were available, and which methods of estimation were used (RTI 1999a, 1999b).

Based on the results of the first (informal) survey, the burden-specific question for the second (formal) survey was modified slightly to elicit additional information on the specific activities comprising the burden hours. This included activities that contributed to the facilities' ability to complete the reporting form, but which were the result of other regulatory authorities or routine operating procedures. The questions, which are reproduced in the box below, asked for the average time to complete a single Form R (or the time to complete all the Form Rs at a facility):

---

**RTI Surveys: Burden-specific questions**

(Informal) How long does it take on average to fill one Form R? (If the time per form can not be estimated, then how long does it take to do all the forms?)

(Formal) On average, <u>how long</u> does it take to complete one Form R? (If the time per form can not be estimated, then how long does it take to fill all the forms)?

      a)      Please list the activities that you included in deriving this estimate?

      b)      What percentage of this estimate is related to other ongoing activities *(e.g., collecting data required for compliance with NPDES permits etc)?*

---

**Additional Data and Analysis**

During the public comment period for the last TRI ICR renewal, the American Petroleum Institute (API) submitted the results of a burden study covering TRI reporting year 2001 activities for 99 facilities in the petroleum refining and petroleum terminal and bulk station industries (API 2002). API subsequently provided EPA with the survey form and the data for individual facilities. The API survey questions addressed facility- and form-specific burden categories separately. The burden-specific questions from the API data collection are reproduced in the following box:

---

**American Petroleum Institute Data Collection: Burden-specific questions**

Number of hours spent on rule familiarization, including reviewing FR notices, instructions, EPA guidance, and so forth.

Number of hours spent making compliance determinations, including determining whether reporting thresholds are met.

Total number of hours spent per Form R (Include release calculations, completing form, mailing and recordkeeping, etc. Do not include rule familiarization and compliance determination.)

---

Although EPA reviewed the API data, these data were not used in the revised burden hour estimate for the March 2002 ICR renewal because of concerns about overweighting observations from the petroleum refining and petroleum terminal and bulk station industries. API's results are also confounded somewhat by the first year of reporting on lead and lead compounds at lower thresholds, with associated higher first-year reporting burdens.

Nevertheless, the API results for total reporting burden were below or near the EPA revised estimates when similar numbers of reports were assumed.

EPA subsequently conducted a statistical analysis using the API data, along with the original data from the Data Quality Reports and the RTI surveys (see Appendix A). The analysis used a prediction-based approach to estimate the burden associated with TRI reporting. First, linear regressions for each industry were estimated using the available data. Then, the parameter estimates were applied to the census data (*i.e.*, the data on forms per facility for each industry) to derive estimates of total reporting burden, the average time per Form R, the standard errors and confidence intervals. Overall, the average reporting burden per Form R was found to be 11.7 hours plus or minus 1.8 hours (Abt 2003). This is actually lower than the revised estimate used in the ICR renewal of 19.5 hours per Form R (composed of 14.5 for calculation/report completion and 5 hours for recordkeeping/submission) plus 4 hours per facility for compliance determination. It may be appropriate to think of the difference in estimates of total hours per form as potentially addressing various industry comments about additional time spent on training, guidance review, and other activities that are not individually estimated as part of EPA's revised burden hour estimate for subsequent year reporting.

## Conclusion

Although EPA's revised estimate of 19.5 hours per Form R plus 4 hours per facility for compliance determination is more of an aggregated estimate than an estimate that is built-up from numerous discrete activities, there is little danger that the total reporting burden is underestimated. EPA's revised estimate is based on responses that reveal actual facility burden hours, and it is substantially higher than the average of these responses.

Furthermore, it should not be assumed that the only direction of possible bias in responses is downward because of incomplete specification of compliance activities. Based on previous experience interviewing facilities about compliance burden, facilities sometimes include burden that is incurred in complying with other regulations or in standard operating practices if data from those activities are ultimately used for TRI reporting. Although it is appropriate to attribute time spent arranging data and making estimates to complete Form R and A data elements to TRI compliance, it is not appropriate to attribute time spent complying with other regulations to TRI. Also, there is some possibility of strategic bias in industry responses to survey questions about the reporting burden of TRI reporting if the respondents believe that the responses may have some bearing on reporting requirements.

Although the burden-specific questions varied somewhat from data source to data source, facilities were encouraged in all cases to think comprehensively about the overall burden of TRI reporting. It seems reasonable to conclude that the available burden data are appropriate and adequate for the purpose of revising unit reporting burden estimates, especially in light of the validation provided by more recent burden data independently gathered by API. The sampled facilities reflect the experience of a broad range of industries reporting to TRI, and the data

consistently show that existing estimates of reporting burden used by EPA are not an accurate representation of current reporting burden. The revised burden estimates in the latest ICR renewal represent an improvement over the previous estimates from the 1980s, and their use would provide a more accurate representation of the burden of the TRI program on reporting facilities. The revised estimates would also provide a more accurate baseline for evaluation of potential investments in future TRI burden reduction initiatives.

# REFERENCES

Abt Associates. *Memo* from Bill Rhodes and Susan Day to Cody Rice (*USEPA/OEI*) re: Estimation of TRI Reporting Burden, September 23, 2003.

American Petroleum Institute. *Comments on Information Collection Request (ICR) for Toxic Chemical Release Reporting. EPA ICR No. 1363.12, OMB No. 2070-0093*, September 6, 2002.

Research Triangle Institute/Center for Economics Research, *Memo from Smita Brunnermeier, et al to Joe Callahan (USEPA/OPPT), Subject: Informal Survey Results*, May 7, 1999a.

Research Triangle Institute/Center for Economics Research, *Memo from Smita Brunnermeier, et al to Joe Callahan (USEPA/OPPT), Subject: Formal Survey Results*, June 15, 1999b.

U.S. Environmental Protection Agency. *Estimates of Burden Hours for Economic Analyses of the Toxics Release Inventory Program*. June 10, 2002.

U.S. Environmental Protection Agency. *Regulatory Impact Analysis in Support of Final Rulemaking under Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1996.* Prepared for Office of Toxic Substances by ICF. Inc. EPA Contract No. 68-02-4240. Task Order No. 3-3. February 1988.

U.S. Environmental Protection Agency. *Regulatory Impact Analysis of the EPCRA Section 313 Alternate Threshold Final Rule*, November 18, 1994a.

U.S. Environmental Protection Agency. *Regulatory Impact Analysis of the Final Rule to Add Various Chemicals and Chemical Categories to the EPCRA Section 313 List of Toxic Chemicals*, November 18, 1994b.

U.S. Environmental Protection Agency. *Review and Update of Burden and Cost Estimates for EPA's Toxics Release Inventory Program*, August 1993.

U.S. Environmental Protection Agency. *1994 and 1995 Toxic Release Inventory: Data Quality Report*, EPA 745-R-98-002, March 1998a.

U.S. Environmental Protection Agency. *1996 Toxic Release Inventory: Data Quality Report*, EPA 745-R-98-016, December 1998b.

**APPENDIX A:**

**Memo on Estimation of TRI Reporting Burden**



**Abt Associates Inc.**

**MEMORANDUM**

TO:         Cody Rice, US EPA

FROM:       Bill Rhodes, Susan Day

DATE:       September 23, 2003

RE:         Estimation of TRI Reporting Burden

The intent of this analysis is to estimate the average reporting burden associated with filing Form Rs and to provide a confidence interval for this burden. Two estimates are generated:  average burden per facility and average burden per Form R.

**The Data**

Data reflecting the time spent filing Form Rs comes from three sources.  They are included in Appendix A.  Each source reports:

• The total time required to complete all forms filed by a facility.  Time is either reported as a range with a lower and upper limit or as a point estimate.
• The Standard Industrial Classification (SIC) code.  Two digit SIC codes were used in this analysis with the exception of SIC 5171.
• The number of Form Rs completed.  This estimate was occasionally reported as a range with a lower and upper limit.  When reported as a range, the range was converted to a point estimate equal to the midpoint of that range.

The first data set comes from the 1994, 1995, and 1996 Data Quality Reports. It was a random sample of facilities in key industries, defined as those that are large contributors to total releases (162 observations - one observation was excluded as an outlier).  The second data set was the American Petroleum Institute (API) survey, which was limited to API members (99 observations in SIC codes 29 and 5171).  The third data set was a small survey of facilities (18 observations - one observation was excluded because there was only one facility in SIC code 34) by RTI; these facilities were selected to explore the relationship between industry, number of reports and other factors potentially related to reporting burden. These three data sets, after exclusions, are

1

collectively referred to as the *calibration data*.  They are presented in Appendix A.

The TRI data for RY2001 were also used in the analysis.  These data represent a census of TRI facilities in RY2001.  These data are referred to as the *prediction data*.  The prediction data provided information on:

• SIC code
• Number of forms completed

The calibration data came from a period that predated the prediction data.  It is assumed that the time spent per form has not changed materially between the time when the calibration data were collected and the time when the prediction data were collected.  It is also assumed that the calibration data reflects subsequent year filings.

**Estimation**

Estimation uses a prediction-based approach described by Valliant, Dorfman and Royall (2000). The authors argue that, when a sampling procedure is biased, a prediction-based approach is required to overcome the bias. Moreover, even when a sampling procedure is unbiased, a prediction-based approach can provide estimates with lower mean-squared error than are provided by traditional survey estimators. An overview of the prediction-based approach follows:

It is assumed that the relationship between burden and the number of Form Rs filed can be represented as a linear function:

$$B_{ij} = \beta_{0i} + \beta_{1i}F_{ij} + e_{ij}$$

[1]

where:

$B_{ij}$          The burden for the j[th] facility in the i[th] industry.
$F_{ij}$          The number of Form Rs completed by the j[th] facility in the i[th] industry.

The $\beta$ represents fixed parameters whose values may vary across the industries.  The $e$ are random errors terms.  They are normally and independently distributed but groupwise heteroscedastic where the industry defines the group.  In practice, model [1] is estimated by estimating separate regressions that are specific to each industry.

As noted earlier, the burden estimates were frequently reported as ranges, so model [1] could not be estimated directly.  Instead, estimates were based on a likelihood function.  When burden was reported as a range, the likelihood was written:

$$L_{ij} = \Phi\left(Z_{ij}^H\right) - \Phi\left(Z_{ij}^L\right)$$

where:

$\Phi(...)$ is the standard normal central distribution function.

$$Z_{ij}^H = \frac{B_{ij}^U - \beta_{0i} - \beta_{1i} F_{ij}}{\sigma_i}$$

$$Z_{ij}^L = \frac{B_{ij}^L - \beta_{0i} - \beta_{1i} F_{ij}}{\sigma_i}$$

and

$\beta_{ij}^U$    the upper limit reported by the j[th] respondent in the i[th] industry.

$\beta_{ij}^L$    the lower limit reported by the j[th] respondent in the i[th] industry.

However, when the burden was reported as a point estimate, the likelihood was written as the density function:

$$L_{ij} = \frac{1}{\sqrt{2\pi\sigma_i^2}} e^{-\frac{1}{2}\left(\frac{B_{ij} - \beta_{0i} - \beta_{1i} F_{ij}}{\sigma_i^2}\right)^2}$$

Parameters were estimated using maximum likelihood. The estimated parameter covariance matrix is denoted V.

To derive the average reporting burden for an industry, the above regressions were estimated using the reporting burden data (calibration sample). The parameter estimates were then applied to predict the reporting burden for the census data (prediction data). Thus the average reporting burden for a member of industry i was estimated as:

$$\hat{B}_i = \frac{\sum_{j=1}^{J_i} \hat{\beta}_{0i} + \hat{\beta}_{1i} F_{ij}}{J_i}$$

[2]

where $J_i$ is the number of facilities that are in the prediction data for industry i. The sampling

3

variance for the mean burden in industry i was estimated as:

$$\sigma_{B_i}^2 = \gamma_i' X_i \hat{V}_i X_i' \gamma_i + \frac{\hat{\sigma}_i^2}{J_i}$$

[3]

where:

$X_i$          is a matrix with ones in the first column and $F_{ij}(\, j = 1 \ldots J_i)$ in the second column.

$\gamma_i$          is a conformable column vector with every element equal to $1/J_i$.

For a derivation, see Valliant, Dorfman and Royall (2000), page 29.

Another way to express the estimation is:

$$\gamma' X_i = \begin{bmatrix} 1 & \overline{F_i} \end{bmatrix}$$

$$V = \begin{bmatrix} VAR(\beta_{0i}) & COV(\beta_{0i}, \beta_{1i}) \\ COV(\beta_{0i}, \beta_{1i}) & VAR(\beta_{i1}) \end{bmatrix}$$

so the first part of equation [3] can be rewritten as:

$$\gamma' X_i V X_i \gamma = VAR(\beta_{0i}) + VAR(\beta_{1i}) \overline{F_i}^2 + 2COV(\beta_{01}, \beta_{1i}) \overline{F_i}$$

Thus the first component of $\sigma_{B_i}^2$ depends on the precisions with which the $\beta$ parameters can be estimated. Precision will increase with the size of the calibration sample. It is not affected by the size of the prediction sample.

Another way to consider the first component of $\sigma_{B_i}^2$ is that it is the sampling variance for the expected value of $B_i$ conditional on $\overline{F_i}$. The actual mean will vary from this conditional mean because of the randomness in reporting burden from facility to facility given a constant $F_{ij}$. The difference will be smaller as the size of the census data gets larger – hence the second component of the variance term. Note that the size of this second term is not affected by the size of the calibration sample.

4

**Results**

Results from the regression analysis are summarized in appendix B table B-1. For each industry classification, the table reports regression parameter estimates and t-scores. The t-scores are the parameter estimates divided by the estimated standard errors.

Estimation of model [1] was attempted for ten SIC categories where data were available. In three cases, however, that was not possible. First, for SIC 5171, either a corporate parent or API apportioned total reporting burden across several facilities. As a result, most facilities in the data seemed to have the same reporting burden and the same number of Form Rs. There was so little variation in the number of Form Rs, in fact, that the regression indicated that $\hat{\beta}_{1i}$ was negative, an implausible result. Consequently, for SIC 5171, $\beta_{0i}$ was forced to equal zero. Second, for SIC 29, the calibration sample did not represent the prediction sample. For reasons discussed subsequently, the regression provided more plausible predictions when the constant was constrained to zero. Finally, for SIC 35, there were only two observations. Estimates for the prediction sample were based on the mean for these two observations.

Residual plots confirmed that the regressions provided a reasonable specification of the relationship between reporting burden and Form Rs filed. Furthermore, with the exception of SIC 5171, the sample appeared to be *balanced*, so that model misspecification should have little effect on the resulting estimates. On this point, see Valliant, Dorfman and Royall (2000), page: 49-61.

Table 1 summarizes the data used in the model. The second and third columns present the sample sizes for both the calibration sample and the prediction census. The prediction census shows the number of facilities that filed at least one Form R. The last two columns show the average number of Form Rs in the calibration sample and the prediction census.

| Table 1: Sample Size and Average Number of Form Rs | | | | |
|---|---|---|---|---|
| SIC Code | Sample Size | | Average Form Rs | |
| | Calibration | Prediction | Calibration | Prediction |
| 5171 | 75 | 499 | 7.6 | 7.0 |
| 28 | 52 | 3,330 | 6.2 | 5.1 |
| 33 | 29 | 1,946 | 3.2 | 3.6 |
| 29 | 26 | 511 | 26.0 | 8.1 |
| 30 | 24 | 1,828 | 3.3 | 2.2 |
| 25 | 23 | 326 | 2.5 | 2.0 |
| 37 | 20 | 1,325 | 3.7 | 3.4 |
| 36 | 14 | 1,193 | 2.9 | 2.6 |
| 26 | 12 | 525 | 6.3 | 6.2 |
| 35 | 2 | 1,086 | 1.5 | 2.5 |
| Total | 277 | 12,569 | 7.2 | 3.9 |

5

With one exception, the sample is balanced, meaning that the mean for the sample roughly equals the mean for the census. The exception is SIC 29, whose data came from the API Survey. (SIC 5171, which came from the same survey, did not suffer from the same problem.) In fact, while most of the observations from the calibration sample for SIC 29 came from facilities that filed a large number of Form Rs, most of the observations for the census came from facilities that filed fewer Form Rs.

Table 2 presents average reporting burden by SIC code. The *observed* average reporting burden by SIC code is shown in column two. This observed average was computed using the midpoint of the range when the reporting burden was reported as a range. Column three presents the *estimated* average reporting burden by SIC code. The standard error for that estimated average reporting burden is shown in column four. The weighted average reporting burden across all ten SIC codes is presented in the last row of the table. Weights are based on the number of facilities within each SIC classification.

| Table 2: Average Reporting Burden by SIC Code | | | |
|---|---|---|---|
| SIC | Calibration Sample | Prediction Census | |
| | Observed Average Time per Facility | Estimated Average Time per Facility | Standard Error |
| 5171 | 48.5 | 43.40 | 2.30 |
| 28 | 69.4 | 58.53 | 13.12 |
| 33 | 35.0 | 37.36 | 5.17 |
| 29 | 598.9 | 200.00 | 27.10 |
| 30 | 29.2 | 25.57 | 3.70 |
| 25 | 21.7 | 18.63 | 1.86 |
| 37 | 61.1 | 57.30 | 14.80 |
| 36 | 32.4 | 25.82 | 4.82 |
| 26 | 43.0 | 41.71 | 4.88 |
| 35 | 33.0 | 33.00 | 2.12 |
| Total | | 47.60 | 4.09 |

As shown in Table 2, on average, a facility spends nearly 48 hours filling out all of its Form Rs. An approximate 95 percent confidence interval, based on two standard deviations, is about 44 to 52 hours per facility. This estimate represents a weighted average where burden is weighted by the number of facilities within an SIC code. With the exception of SIC 29 and 5171, the average for the prediction sample is within two standard deviations of the average for the calibration sample. This makes sense because the samples are reasonably balanced.

For SIC 29, the average for the prediction sample is only about one-third the size of the average for the calibration sample. Furthermore, the predicted average for SIC 29 is much higher than the predicted average for all other industries. It is unclear whether this reflects reality or just the

uncertainty about estimating the average for SIC 29.

Note that the standard error for SIC 5171 is probably biased downward because of the way reporting burden estimates were collected. Specifically, total reporting burden at the corporate level was apportioned to facilities by the corporate parent or by API for several facilities. Thus, in the data set, many facilities have the same apparent reporting burden and the same apparent number of Form Rs. One implication is that while the predicted mean for industry 5171 appears to differ significantly from the calibration mean, this is probably because the sampling variance is underestimated.

Table 3 presents the estimated average reporting burden per Form R, computed by dividing the average reporting burden for the industry (from Table 2) by the average number of forms per SIC. The confidence interval shown is based on two standard deviations (approximately a 95 percent confidence interval). In the last row, the weighted average of the reporting burden across all SIC codes is presented. As before, the weights are based on the number of facilities within each SIC.

| Table 3: Average Reporting Burden Per Form R | | | | |
|---|---|---|---|---|
| SIC | Prediction Census | | | |
| | Average Time per Form R | Standard Error | 95 Percent Confidence Interval | |
| 5171 | 6.24 | 0.33 | 5.58 | 6.90 |
| 28 | 11.43 | 2.56 | 6.31 | 16.55 |
| 33 | 10.24 | 1.42 | 7.40 | 13.07 |
| 29 | 24.62 | 3.34 | 17.95 | 31.30 |
| 30 | 11.72 | 1.70 | 8.32 | 15.12 |
| 25 | 9.11 | 0.91 | 7.29 | 10.93 |
| 37 | 16.74 | 4.32 | 8.10 | 25.38 |
| 36 | 10.02 | 1.87 | 6.28 | 13.76 |
| 26 | 6.77 | 0.79 | 5.19 | 8.35 |
| 35 | 13.40 | 0.86 | 11.68 | 15.12 |
| Total | 11.65 | 0.89 | 9.87 | 13.43 |

Overall, it appears that the average reporting burden is about 11.7 hours per Form R. If SIC 29 is excluded from these calculations, the overall average would fall to about 11.1 and the standard error would not change by much. Whatever the error when estimating the reporting burden for SIC 29, there is not much affect on the overall reporting burden per Form R.

**Additional Comments**

These estimates are limited to the 10 SIC codes for which there was data.  To extend these estimates to other SIC codes would require an assumption that the ten industries observed in the calibration sample comprise a random sample of all industries that report to TRI.  Were that the case, then random error models would be appropriate, and it would be possible to extend the estimates to industries not included in the sample.  For an explanation, see McCulloch and Searle (2001).  However, making such an assumption may not be appropriate given that selection of the above sample was purposeful.  This extension was not pursued.

Note also that the covariance matrix from maximum likelihood estimation has an asymptotic justification. A sample of two (SIC = 35) probably does not comprise a sample of sufficient size that an asymptotic justification would apply.  The same might be said of other samples.  Thus, estimated variances should be treated as approximations.  Nevertheless, as shown in Appendix B, an OLS model provides variance estimates that are close to those for the maximum likelihood estimates.  This is encouraging because the OLS estimates are unbiased provided the error term is normal and identically distributed.

**References**

McCulloch, C. and Searle, S.  Generalized, Linear, and Mixed Models.  John Wiley & Sons, 2001.

Valliant, R., Dorfman, A. and Royall, R.  Finite Population Sampling and Inference.  John Wiley & Sons, 2000.

**Appendix A**
**Calibration Data Set**

| SIC | FORM_MIN | FORM_MAX | HOUR_MIN | HOUR_MAX | SOURCE |
|---|---|---|---|---|---|
| 25 | 5 | 5 | 21 | 50 | DQ94 |
| 25 | 2 | 2 | 0 | 20 | DQ94 |
| 25 | 3 | 3 | 21 | 50 | DQ94 |
| 25 | 4 | 4 | 21 | 50 | DQ94 |
| 25 | 5 | 5 | 21 | 50 | DQ94 |
| 25 | 2 | 2 | 0 | 20 | DQ94 |
| 25 | 1 | 1 | 0 | 20 | DQ94 |
| 25 | 1 | 1 | 50 | 100 | DQ94 |
| 25 | 9 | 9 | 50 | 100 | DQ94 |
| 25 | 3 | 3 | 21 | 50 | DQ94 |
| 25 | 2 | 2 | 0 | 20 | DQ94 |
| 25 | 1 | 1 | 21 | 50 | DQ94 |
| 25 | 7 | 7 | 0 | 20 | DQ94 |
| 25 | 1 | 1 | 21 | 50 | DQ94 |
| 25 | 1 | 1 | 21 | 50 | DQ94 |
| 25 | 3 | 3 | 0 | 20 | DQ94 |
| 25 | 1 | 1 | 21 | 50 | DQ94 |
| 25 | 5 | 5 | 21 | 50 | DQ94 |
| 25 | 6 | 6 | 0 | 20 | DQ94 |
| 25 | 2 | 2 | 21 | 50 | DQ94 |
| 25 | 1 | 1 | 0 | 20 | DQ94 |
| 25 | 8 | 8 | 21 | 50 | DQ94 |
| 25 | 5 | 5 | 21 | 50 | DQ94 |
| 25 | 1 | 1 | 0 | 20 | DQ94 |
| 26 | 1 | 1 | 0 | 8 | DQ95 |
| 26 | 8 | 8 | 21 | 40 | DQ95 |
| 26 | 3 | 3 | 41 | 100 | DQ95 |
| 26 | 3 | 3 | 21 | 40 | DQ95 |
| 26 | 4 | 4 | 21 | 40 | DQ95 |
| 26 | 2 | 2 | 0 | 8 | DQ95 |
| 26 | 5 | 5 | 9 | 20 | DQ95 |
| 26 | 7 | 7 | 21 | 40 | DQ95 |
| 26 | 6 | 6 | 41 | 100 | DQ95 |
| 26 | 14 | 14 | 0 | 100 | DQ95 |
| 26 | 9 | 11 | 72 | 88 | RTI-1 |
| 26 | 13 | 13 | 100 | 100 | RTI-2 |
| 28 | 1 | 1 | 21 | 50 | DQ94 |
| 28 | 3 | 3 | 0 | 20 | DQ94 |
| 28 | 7 | 7 | 0 | 20 | DQ94 |
| 28 | 5 | 5 | 21 | 50 | DQ94 |
| 28 | 1 | 1 | 0 | 20 | DQ94 |
| 28 | 3 | 3 | 0 | 20 | DQ94 |

| SIC | FORM_MIN | FORM_MAX | HOUR_MIN | HOUR_MAX | SOURCE |
|---|---|---|---|---|---|
| 28 | 9 | 9 | 50 | 100 | DQ94 |
| 28 | 4 | 4 | 0 | 20 | DQ94 |
| 28 | 4 | 4 | 21 | 50 | DQ94 |
| 28 | 9 | 9 | 50 | 100 | DQ94 |
| 28 | 5 | 5 | 0 | 20 | DQ94 |
| 28 | 7 | 7 | 100 | 200 | DQ94 |
| 28 | 14 | 14 | 50 | 100 | DQ94 |
| 28 | 2 | 2 | 21 | 50 | DQ94 |
| 28 | 4 | 4 | 0 | 20 | DQ94 |
| 28 | 5 | 5 | 0 | 20 | DQ94 |
| 28 | 3 | 3 | 0 | 20 | DQ94 |
| 28 | 8 | 8 | 21 | 50 | DQ94 |
| 28 | 2 | 2 | 0 | 20 | DQ94 |
| 28 | 2 | 2 | 21 | 50 | DQ94 |
| 28 | 5 | 5 | 21 | 50 | DQ94 |
| 28 | 4 | 4 | 21 | 50 | DQ94 |
| 28 | 8 | 8 | 100 | 200 | DQ94 |
| 28 | 1 | 1 | 0 | 20 | DQ94 |
| 28 | 9 | 9 | 0 | 20 | DQ94 |
| 28 | 1 | 1 | 0 | 20 | DQ94 |
| 28 | 6 | 6 | 21 | 50 | DQ94 |
| 28 | 2 | 2 | 0 | 20 | DQ94 |
| 28 | 6 | 6 | 0 | 20 | DQ94 |
| 28 | 1 | 1 | 21 | 50 | DQ94 |
| 28 | 4 | 4 | 21 | 50 | DQ94 |
| 28 | 2 | 2 | 0 | 20 | DQ94 |
| 28 | 4 | 4 | 0 | 20 | DQ94 |
| 28 | 1 | 1 | 0 | 20 | DQ94 |
| 28 | 3 | 3 | 0 | 20 | DQ94 |
| 28 | 2 | 2 | 0 | 20 | DQ94 |
| 28 | 5 | 5 | 41 | 100 | DQ95 |
| 28 | 11 | 11 | 41 | 100 | DQ95 |
| 28 | 19 | 19 | 0 | 100 | DQ95 |
| 28 | 5 | 5 | 41 | 100 | DQ95 |
| 28 | 15 | 15 | 41 | 100 | DQ95 |
| 28 | 1 | 1 | 0 | 8 | DQ95 |
| 28 | 2 | 2 | 21 | 40 | DQ95 |
| 28 | 2 | 2 | 0 | 8 | DQ95 |
| 28 | 13 | 13 | 41 | 100 | DQ95 |
| 28 | 13 | 13 | 41 | 100 | DQ95 |
| 28 | 29 | 29 | 400 | 400 | RTI-1 |
| 28 | 9 | 11 | 160 | 160 | RTI-1 |
| 28 | 4 | 5 | 320 | 480 | RTI-1 |
| 28 | 5 | 5 | 380 | 380 | RTI-2 |
| 28 | 10 | 10 | 480 | 480 | RTI-2 |
| 28 | 20 | 20 | 160 | 160 | RTI-2 |
| 29 | 26 | 26 | 248 | 424 | RTI-1 |
| 29 | 23 | 23 | 640 | 640 | RTI-2 |

10

| SIC | FORM_MIN | FORM_MAX | HOUR_MIN | HOUR_MAX | SOURCE |
|-----|----------|----------|----------|----------|--------|
| 29 | 36 | 36 | 1143 | 1143 | API |
| 29 | 25 | 25 | 304 | 304 | API |
| 29 | 21 | 21 | 580 | 580 | API |
| 29 | 39 | 39 | 1152 | 1152 | API |
| 29 | 18 | 18 | 188 | 188 | API |
| 29 | 18 | 18 | 654 | 654 | API |
| 29 | 26 | 26 | 488 | 488 | API |
| 29 | 12 | 12 | 173 | 173 | API |
| 29 | 43 | 43 | 1057 | 1057 | API |
| 29 | 30 | 30 | 588 | 588 | API |
| 29 | 24 | 24 | 948 | 948 | API |
| 29 | 18 | 18 | 188 | 188 | API |
| 29 | 18 | 18 | 188 | 188 | API |
| 29 | 12 | 12 | 173 | 173 | API |
| 29 | 31 | 31 | 143 | 143 | API |
| 29 | 35 | 35 | 1695 | 1695 | API |
| 29 | 37 | 37 | 319 | 319 | API |
| 29 | 12 | 12 | 173 | 173 | API |
| 29 | 45 | 45 | 1333 | 1333 | API |
| 29 | 25 | 25 | 174 | 174 | API |
| 29 | 25 | 25 | 620 | 620 | API |
| 29 | 36 | 36 | 1884 | 1884 | API |
| 29 | 24 | 24 | 242 | 242 | API |
| 29 | 18 | 18 | 188 | 188 | API |
| 30 | 1 | 1 | 0 | 20 | DQ94 |
| 30 | 1 | 1 | 0 | 20 | DQ94 |
| 30 | 2 | 2 | 0 | 20 | DQ94 |
| 30 | 3 | 3 | 21 | 50 | DQ94 |
| 30 | 6 | 6 | 21 | 50 | DQ94 |
| 30 | 3 | 3 | 0 | 20 | DQ94 |
| 30 | 1 | 1 | 0 | 20 | DQ94 |
| 30 | 1 | 1 | 0 | 20 | DQ94 |
| 30 | 15 | 15 | 50 | 100 | DQ94 |
| 30 | 1 | 1 | 0 | 20 | DQ94 |
| 30 | 2 | 2 | 0 | 20 | DQ94 |
| 30 | 2 | 2 | 21 | 50 | DQ94 |
| 30 | 1 | 1 | 0 | 20 | DQ94 |
| 30 | 3 | 3 | 0 | 20 | DQ94 |
| 30 | 3 | 3 | 21 | 50 | DQ94 |
| 30 | 2 | 2 | 0 | 20 | DQ94 |
| 30 | 1 | 1 | 21 | 50 | DQ94 |
| 30 | 2 | 2 | 21 | 50 | DQ94 |
| 30 | 1 | 1 | 0 | 20 | DQ94 |
| 30 | 2 | 2 | 0 | 20 | DQ94 |
| 30 | 1 | 1 | 21 | 50 | DQ94 |
| 30 | 3 | 3 | 21 | 50 | DQ94 |
| 30 | 1 | 1 | 0 | 20 | DQ94 |

11

| SIC | FORM_MIN | FORM_MAX | HOUR_MIN | HOUR_MAX | SOURCE |
|---|---|---|---|---|---|
| 33 | 1 | 1 | 41 | 100 | DQ96 |
| 33 | 4 | 4 | 21 | 40 | DQ96 |
| 33 | 5 | 5 | 9 | 20 | DQ96 |
| 33 | 1 | 1 | 0 | 8 | DQ96 |
| 33 | 9 | 9 | 21 | 40 | DQ96 |
| 33 | 4 | 4 | 41 | 100 | DQ96 |
| 33 | 2 | 2 | 9 | 20 | DQ96 |
| 33 | 5 | 5 | 120 | 120 | DQ96 |
| 33 | 2 | 2 | 21 | 40 | DQ96 |
| 33 | 1 | 1 | 0 | 8 | DQ96 |
| 33 | 4 | 4 | 21 | 40 | DQ96 |
| 33 | 1 | 1 | 41 | 100 | DQ96 |
| 33 | 1 | 1 | 9 | 20 | DQ96 |
| 33 | 3 | 3 | 21 | 40 | DQ96 |
| 33 | 10 | 10 | 41 | 100 | DQ96 |
| 33 | 4 | 4 | 9 | 20 | DQ96 |
| 33 | 1 | 1 | 21 | 40 | DQ96 |
| 33 | 1 | 1 | 0 | 8 | DQ96 |
| 33 | 1 | 1 | 0 | 8 | DQ96 |
| 33 | 1 | 1 | 0 | 8 | DQ96 |
| 33 | 3 | 3 | 0 | 8 | DQ96 |
| 33 | 1 | 1 | 0 | 8 | DQ96 |
| 33 | 2 | 2 | 9 | 20 | DQ96 |
| 33 | 2 | 2 | 21 | 40 | DQ96 |
| 33 | 1 | 1 | 41 | 100 | DQ96 |
| 33 | 3 | 3 | 21 | 40 | DQ96 |
| 33 | 2 | 2 | 6 | 6 | RTI-1 |
| 33 | 4 | 4 | 32 | 32 | RTI-1 |
| 33 | 13 | 13 | 160 | 160 | RTI-2 |
| 34 | 1 | 1 | 8 | 8 | RTI-2 |
| 35 | 2 | 2 | 30 | 30 | RTI-1 |
| 35 | 1 | 1 | 36 | 36 | RTI-2 |
| 36 | 1 | 1 | 0 | 8 | DQ96 |
| 36 | 7 | 7 | 21 | 40 | DQ96 |
| 36 | 1 | 1 | 9 | 20 | DQ96 |
| 36 | 6 | 6 | 41 | 100 | DQ96 |
| 36 | 2 | 2 | 9 | 20 | DQ96 |
| 36 | 4 | 4 | 9 | 20 | DQ96 |
| 36 | 1 | 1 | 0 | 8 | DQ96 |
| 36 | 1 | 1 | 21 | 40 | DQ96 |
| 36 | 4 | 4 | 41 | 100 | DQ96 |
| 36 | 5 | 5 | 9 | 20 | DQ96 |
| 36 | 4 | 4 | 21 | 40 | DQ96 |
| 36 | 1 | 1 | 9 | 20 | DQ96 |
| 36 | 3 | 3 | 41 | 100 | DQ96 |
| 36 | 1 | 1 | 41 | 100 | DQ96 |
| 37 | 2 | 2 | 0 | 8 | DQ96 |

12

| SIC | FORM_MIN | FORM_MAX | HOUR_MIN | HOUR_MAX | SOURCE |
|---|---|---|---|---|---|
| 37 | 2 | 2 | 0 | 8 | DQ96 |
| 37 | 2 | 2 | 0 | 8 | DQ96 |
| 37 | 4 | 4 | 21 | 40 | DQ96 |
| 37 | 4 | 4 | 9 | 20 | DQ96 |
| 37 | 3 | 3 | 41 | 100 | DQ96 |
| 37 | 2 | 2 | 41 | 100 | DQ96 |
| 37 | 1 | 1 | 0 | 8 | DQ96 |
| 37 | 3 | 3 | 41 | 100 | DQ96 |
| 37 | 3 | 3 | 160 | 160 | DQ96 |
| 37 | 1 | 1 | 0 | 8 | DQ96 |
| 37 | 11 | 11 | 41 | 100 | DQ96 |
| 37 | 14 | 14 | 200 | 200 | DQ96 |
| 37 | 1 | 1 | 9 | 20 | DQ96 |
| 37 | 4 | 4 | 41 | 100 | DQ96 |
| 37 | 2 | 2 | 21 | 40 | DQ96 |
| 37 | 3 | 3 | 9 | 20 | DQ96 |
| 37 | 1 | 1 | 9 | 20 | DQ96 |
| 37 | 6 | 6 | 320 | 320 | RTI-1 |
| 37 | 4 | 6 | 40 | 60 | RTI-2 |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 25 | 25 | API |
| 5171 | 8 | 8 | 25 | 25 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 25 | 25 | API |
| 5171 | 8 | 8 | 25 | 25 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 25 | 25 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 60 | 60 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 8 | 8 | 60 | 60 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 60 | 60 | API |

13

| SIC | FORM_MIN | FORM_MAX | HOUR_MIN | HOUR_MAX | SOURCE |
|---|---|---|---|---|---|
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 7 | 7 | 17 | 17 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 7 | 7 | 17 | 17 | API |
| 5171 | 9 | 9 | 22 | 22 | API |
| 5171 | 9 | 9 | 22 | 22 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 9 | 9 | 22 | 22 | API |
| 5171 | 8 | 8 | 59 | 59 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 59 | 59 | API |
| 5171 | 8 | 8 | 59 | 59 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 59 | 59 | API |
| 5171 | 8 | 8 | 59 | 59 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 9 | 9 | 22 | 22 | API |
| 5171 | 8 | 8 | 46 | 46 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 46 | 46 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 7 | 7 | 17 | 17 | API |
| 5171 | 7 | 7 | 17 | 17 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 7 | 7 | 17 | 17 | API |
| 5171 | 8 | 8 | 46 | 46 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 60 | 60 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 8 | 8 | 25 | 25 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 25 | 25 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 8 | 8 | 25 | 25 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 8 | 8 | 40 | 40 | API |
| 5171 | 7 | 7 | 66 | 66 | API |
| 5171 | 8 | 8 | 40 | 40 | API |

14

**Appendix B**
**Regression Results**

Table B-1 presents the regression results based on the calibration data.

| | |
|---|---|
| CONST | denotes that a constant entered the regression. |
| FORMS | denotes that the number of forms that entered the regression. |
| R-SQUARE | $R^2$ corrected for degrees of freedom.  NA indicates that no $R^2$ was reported when the model lacked a constant. |
| STANDARD ERROR | estimated standard error for the regression residuals. |

Results are first reported for the OLS estimates, for which measured burden was set equal to the midpoint of the reported range.  The T-score is the parameter estimate divided by its standard error.  The parameter estimate and T-score have similar interpretations for the maximum likelihood estimation, for which the T-score has an asymptotic justification.

| Table B-1:  Regression Results | | | | |
|---|---|---|---|---|
| | OLS Estimation | | Maximum Likelihood Estimation | |
| Industry | Parameter | T-score | Parameter | T-Score |
| 5171 | | | | |
| FORMS | 6.24 | 20.41 | 6.24 | 20.55 |
| STANDARD ERROR | 20.20 | | 20.06 | 6.12 |
| R-SQUARE | NA | | | |
| 28 | | | | |
| CONST | 12.18 | 0.61 | 10.20 | 0.53 |
| FORMS | 9.25 | 3.82 | 9.45 | 4.09 |
| STANDARD ERROR | 95.93 | | 91.49 | 4.98 |
| R-SQUARE | 0.21 | | | |
| 33 | | | | |
| CONST | 10.62 | 1.29 | 7.03 | 0.94 |
| FORMS | 7.68 | 4.01 | 8.31 | 4.72 |
| STANDARD ERROR | 30.10 | | 26.43 | 3.47 |
| R-SQUARE | 0.35 | | | |
| 29 | | | | |
| FORMS | 24.61 | 9.12 | 24.62 | 9.30 |
| STANDARD ERROR | 380.37 | | 372.90 | 3.60 |
| R-SQUARE | NA | | | |
| 30 | | | | |
| CONST | 23.15 | 3.59 | 22.08 | 3.97 |

15

| Industry | OLS Estimation | | Maximum Likelihood Estimation | |
|---|---|---|---|---|
| | Parameter | T-score | Parameter | T-Score |
| FORMS | 1.85 | 1.17 | 1.60 | 1.16 |
| STANDARD ERROR | 18.54 | | 14.25 | 2.87 |
| R-SQUARE | 0.02 | | | |
| 25 | | | | |
| CONST | 10.86 | 3.46 | 10.00 | 2.85 |
| FORMS | 4.30 | 5.27 | 3.73 | 2.18 |
| STANDARD ERROR | 11.35 | | 6.46 | 1.47 |
| R-SQUARE | 0.55 | | | |
| 37 | | | | |
| CONST | 10.55 | 0.46 | 9.79 | 0.44 |
| FORMS | 13.65 | 2.91 | 13.89 | 3.09 |
| STANDARD ERROR | 68.30 | | 64.87 | 3.14 |
| R-SQUARE | 0.28 | | | |
| 36 | | | | |
| CONST | 21.11 | 1.72 | 17.16 | 2.11 |
| FORMS | 3.86 | 1.12 | 3.36 | 1.43 |
| STANDARD ERROR | 26.11 | | 16.55 | 2.03 |
| R-SQUARE | 0.02 | | | |
| 26 | | | | |
| CONST | 13.16 | 0.98 | 1.85 | 0.21 |
| FORMS | 4.70 | 2.63 | 6.47 | 5.19 |
| STANDARD ERROR | 25.11 | | 15.53 | 1.94 |
| R-SQUARE | 0.35 | | | |

The maximum likelihood parameter estimates correspond to the $\beta$ parameters from equation [1] in the main text. For reasons explained in the main text, the regression specification excluded a constant (CONST) for SIC codes 5171 and 29. The t-score is the ratio of the parameter estimate and its estimated standard error. The table also reports the estimated residual standard error for the regression.

For example, for SIC code 28, the constant was 10.20 with a t-score of 0.53. The incremental burden per form was 9.45 with a t-score of 4.09. Depending on the criterion used, a t-score in excess of 1.96 might be judged as being statistically significant. The parameter associated with the FORMS variable is not significant for SIC codes 30 and 36 according to this criterion. Nevertheless, a variable does not have to have a significant parameter to be a useful predictor, so the FORMS variable is always used when making predictions.

16

An ordinary least squares regression was estimated as a check. Parameter estimates are similar between the two models. The OLS model provides a straightforward estimate of explained variance ($R^2$). Explained variance is very low in two regressions; software does not compute an $R^2$ when the model specification lacks a constant.



Note From: *Cody Rice, EETD/EPAB*
Office of Pollution Prevention and Toxics

DATE: January 20, 2004

TO:      Amy Newman, OEI/OIAA/EAD/ASB

RE:      Terms of Clearance for TRI ICR Renewal

---

This memo provides additional information on the origins of the revised burden hour estimates for subsequent year Form R Calculations/Form Completion and Form A Calculations/Certification that were negotiated by OIAA management and OMB. Since the unit burden hour estimates used in the final clearance for the 2004 TRI ICRs bear little resemblance to the estimates in the supporting statements based on the full set of respondent data, this memo attempts to explain the discrepancies.

In brief, OIAA management agreed to a compromise with OMB on the burden estimates to obtain ICR clearances. This compromise lowered the burden hour estimates for subsequent year, non-PBT chemical reporting on Form R and Form A. All other burden hour estimates were unchanged. OIAA management also agreed that EPA should not take any credit for the burden reduction attributable to the TRI-ME reporting software. The following sections explain the derivation of burden hour estimates:

•      **Subsequent Year Form R Calculations/Form Completion for non-PBT chemicals**

OIAA management and OMB negotiated an estimate of 25.2 hours for subsequent year Form R Calculations/Form Completion. This revised estimate only applies to non-PBT chemical reporting. This compares to a prior estimate of 47.1 hours per form, and a revised estimate in the ICR renewal of 14.5 hours based on respondent data from 180 facilities (EPA 2002).

The estimate of 25.2 hours is based on the average of facility per form averages from the RTI surveys in Reporting Year 1998 (RTI 1999a, 1999b). Initially, OMB argued that these data from 18 respondents represented the most recent data on respondent burden. However, OMB dropped this line of reasoning when I pointed out that we also had 99 observations for RY01 from API (API 2002) and 17 total observations from RY00 and RY01 from our contacts with TRI-ME users. If we were to base the estimate on all observations from RY98 onward, the average "per Form R" burden would be estimated at 12.5 hours per form. OMB did not like this result. Apparently, as with other recent initiatives, OMB is outcome-oriented.

The total burden estimate reflects 25.2 hours per non-PBT Form R , and an additional 5 hours for Recordkeeping/Submission.

• **Subsequent Year Form R Calculations/Form Completion for PBT chemicals**

OIAA management and OMB agreed to retain the estimate of 47.1 hours for subsequent year Form R Calculations/Form Completion for PBT chemical reports. This is the same as the prior estimate for Form R Calculations/Form Completion, and higher than the revised estimate in the ICR supporting statement of 14.5 hours.

In previous analyses, EPA has argued that the activities of reporting on PBT and non-PBT chemicals are similar enough that the same burden hour estimate should be used. OMB was persuaded by comments from trade associations that the special conditions of PBT reporting (no *de minimis* exemption, no range reporting) create higher burden for PBT reporting. Because the available burden hour data did not specifically address whether reporting was for PBT or non-PBT chemicals, OIAA management agreed to leave the subsequent year burden estimate for PBT chemicals unchanged. This affects about 20 percent of Form Rs.

This creates the appearance of a rather large relative difference in the burden of reporting a PBT chemical versus a non-PBT chemical (47.1 hours vs. 25.2) hours which is not supported by data. In fact, the API data (which include both subsequent year PBT reporting and first year reporting on lead and lead compounds) indicate a burden of 10.1 hours per Form R (API 2002).

The total burden estimate reflects 47.1 hours per PBT Form R, and an additional 5 hours for Recordkeeping/Submission.

• **Subsequent Year Form A Calculations/Certification**

OIAA management and OMB agreed to re-estimate subsequent year Form A Calculation/Certification burden based on the historical assumption that calculations for a Form A take approximately 64 percent of the time of calculations for the Form R (EPA 1994). This resulted in an estimate of 16.2 hours per chemical for the Form A. This compares to a prior estimate of 30.2 hours per chemical, and a revised estimate in the ICR supporting statement of 9.3 hours.

After adding in burden estimates for Recordkeeping/Submission (3 hours) and Form Completion (1.4 hours), the total for a facility filing a Form A for a single chemical would be 20.6 hours. Unlike the estimate in the ICR supporting statement, the revised estimate is not corroborated by data from reporting facilities (EPA 2002).

The total burden estimate reflects 16.2 hours per Form A, and an additional 3 hours for Recordkeeping/Submission and 1.4 hours for Form Completion.

- **TRI-Made Easy**

OIAA management and OMB agreed not to claim any burden reduction for the 85 to 90 percent of forms filed using the TRI-ME software. Based on responses from facilities that tested TRI-ME in reporting year 2000 and facilities that used TRI-ME in 2001, EPA had estimated that TRI-ME reduces burden by 15 percent in the activities of Form R Completion and Recordkeeping/Submission and Form A Calculations/Certification and Recordkeeping/Submission.

The total burden estimate reflects no burden reduction attributable to TRI-ME.

**Conclusion**

The burden hour estimates negotiated by OIAA management and OMB primarily reflect expediency rather than information quality. Although the negotiated burden estimates are a somewhat better reflection of actual respondent burden, adopting these estimates ignores most of a fairly substantial data set (EPA 2002, 2003) and a statistical analysis of these data (Abt 2003). Furthermore, the estimates from the ICR supporting statements were subject to public comment and an internal peer review. It is my hope that estimates that are primarily data-driven can be adopted in the next ICR renewal.

In the interim, analysts using these negotiated estimates should be aware of potential pitfalls in future efforts to characterize the burden of TRI reporting. For example, these estimates introduce an assumed relationship in the burden ratio between PBT and non-PBT reporting. Although based on a weak assumption, this ratio may drive decisions about the relative merit of burden reduction that affects PBT versus non-PBT reporting. Also, future efforts to estimate burden reduction attributable to TRI-ME or other efforts may be confounded by an artificially high baseline based on these negotiated estimates.

Following is a table that summarizes the major changes in estimates of subsequent year reporting burden from supporting statements for the ICR renewals. (None of the estimates for first-year reporting were changed.)

| TRI Burden Hour Estimates | | | | |
|---|---|---|---|---|
| **Activity** | | **Hours per year** | | **Comments** |
| | | **Existing Estimate** | **Change** | **Revised Estimate** | |
| **Subsequent Years of Reporting** | | | | | |
| **Facility** | Compliance Determination | 4 | 0 | 4 | No change. |
| **Form R**<br><br>**Non-PBT chemicals** | Calculations/Form Completion | 47.1 | -21.9 | 25.2 | Based on data from 18 facilities in RY98. |
| | Recordkeeping/Submission | 5 | 0 | 5 | No change. |
| **Form R**<br><br>**PBT chemicals** | Calculations/Form Completion | 47.1 | 0 | 47.1 | No change from existing estimate, but assumes relative difference between PBT and non-PBT reporting. |
| | Recordkeeping/Submission | 5 | 0 | 5 | No change. |
| **Form A** | Calculations/Certification | 30.2 | -14 | 16.2 | Revised based on assumptions about relative burden of Form R vs. A. |
| | Recordkeeping/Submission | 3 | 0 | 3 | No change. |
| | Form Completion | 1.4 | 0 | 1.4 | |
| <u>Note</u>: No additional burden reduction for TRI-ME software. | | | | | |

**REFERENCES**

Abt Associates. *Memo from Bill Rhodes and Susan Day to Cody Rice (USEPA/OEI) re: Estimation of TRI Reporting Burden*, September 23, 2003.

American Petroleum Institute. *Comments on Information Collection Request (ICR) for Toxic Chemical Release Reporting. EPA ICR No. 1363.12, OMB No. 2070-0093*, September 6, 2002.

Research Triangle Institute/Center for Economics Research, *Memo from Smita Brunnermeier, et al to Joe Callahan (USEPA/OPPT), Subject: Informal Survey Results*, May 7, 1999a.

Research Triangle Institute/Center for Economics Research, *Memo from Smita Brunnermeier, et al to Joe Callahan (USEPA/OPPT), Subject: Formal Survey Results*, June 15, 1999b.

U.S. Environmental Protection Agency. *Estimates of Burden Hours for Economic Analyses of the Toxics Release Inventory Program*. June 10, 2002.

U.S. Environmental Protection Agency. *Regulatory Impact Analysis in Support of Final Rulemaking under Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1996.* Prepared for Office of Toxic Substances by ICF. Inc. EPA Contract No. 68-02-4240. Task Order No. 3-3. February 1988.

U.S. Environmental Protection Agency. *Regulatory Impact Analysis of the EPCRA Section 313 Alternate Threshold Final Rule*, November 18, 1994.

U.S. Environmental Protection Agency. Note from Cody Rice to Judith Kendall re: *Terms of Clearance for TRI ICR Renewal*. September 24, 2003.

# TOXIC CHEMICAL RELEASE INVENTORY

## TOXIC CHEMICAL RELEASE REPORTING

## INFORMATION COLLECTION REQUEST
## SUPPORTING STATEMENT

### OMB CONTROL NO. 2070-0093
### EPA ICR #1363.14

### October, 2005

1   IDENTIFICATION OF THE INFORMATION COLLECTION .................................................. 2
    1(a)  Title of the Information Collection ........................................................................ 2
    1(b)  Short Characterization ........................................................................................ 2
2   NEED FOR AND USE OF THE COLLECTION ................................................................ 5
    2(a)  Need/Authority for the Collection ........................................................................ 5
    2(b)  Use/Users of the Data ........................................................................................ 6
3   THE RESPONDENTS AND THE INFORMATION REQUESTED ...................................... 29
    3(a)  Respondents/SIC Codes ..................................................................................... 29
4   THE INFORMATION COLLECTED--AGENCY ACTIVITIES, COLLECTION
    METHODOLOGY, AND INFORMATION MANAGEMENT .............................................. 30
    4(a)  Agency Activities ................................................................................................. 30
    4(b)  Collection Methodology and Management ........................................................... 34
    4(c)  Small Entity Flexibility ......................................................................................... 34
    4(d)  Collection Schedule ............................................................................................. 35
5   NONDUPLICATION, CONSULTATIONS, OTHER COLLECTION CRITERIA .............. 35
    5(a)  Nonduplication ..................................................................................................... 35
    5(b)  Consultations ....................................................................................................... 66
    5(c)  Effects of Less Frequent Collection .................................................................... 70
    5(d)  General Guidelines ............................................................................................... 70
    5(e)  Confidentiality and Sensitive Questions ............................................................. 71
6   ESTIMATING THE BURDEN AND COST OF THE COLLECTION .................................. 71
    6(a)  Estimating Respondent Burden ........................................................................... 71
    6(b)  Estimating Respondent Costs ............................................................................. 78
    6(c)  Estimating Agency Burden and Cost .................................................................. 81
    6(d)  Bottom Line Burden Hours and Costs ................................................................ 82
    6(e)  Reasons for Change in Burden ........................................................................... 86
    6(f)  Burden Statement ................................................................................................ 88

# 1     IDENTIFICATION OF THE INFORMATION COLLECTION

## 1(a)  Title of the Information Collection

TITLE:          **Toxic Chemical Release Reporting, Recordkeeping, Supplier Notification and Petitions under Section 313 of the Emergency Planning and Community Right-to-Know Act**

**EPA ICR No.:**          **1363.14**

**OMB Control No.:**

## 1(b)  Short Characterization

This Information Collection Request (ICR) is for the information collection requirements for toxic chemical release reporting under section 313 of the Emergency Planning and Community Right-to-Know Act (EPCRA) (42 U.S.C. 11001 et seq.) and the information collection in section 6607 of the Pollution Prevention Act (PPA) (42 U.S.C. 11071 to 11079).  In short, EPCRA §313 requires certain owners or operators of certain facilities (i.e., currently manufacturing facilities in Standard Industrial Classification (SIC) codes 20 through 39, and facilities in SIC codes 10 (except 1011, 1081, and 1094), 12 (except 1241), 4911, 4931, 4939 (limited to facilities that combust coal and /or oil for the purpose of generating power, 4953 (limited to facilities regulated under the Resources Conservation Recovery Act, subtitle C, 42 U.S.C. section 6921 et. seq.), 5169, 5171, 7389 (limited to facilities primarily engaged in solvent recovery services on a contract or fee basis) manufacturing, processing, or otherwise using any of over 600 listed toxic chemicals and chemical categories (hereafter "toxic chemicals") in excess of the applicable threshold quantities to report on their environmental releases and transfers of and waste management activities for such chemicals annually.  Under section 6607 of the PPA, facilities must provide information on the quantities of the toxic chemicals in waste streams and the efforts made to reduce or eliminate those quantities.

Currently, facilities subject to the Toxics Release Inventory (TRI) reporting requirements may either use the EPA Toxic Chemical Release Inventory Form R (EPA Form #9350-1), or the EPA Toxic Chemical Release Inventory Form A Certification Statement (EPA Form #9350-2), which is approved under OMB Number 2070-0093.  The Form R must be completed if a facility manufactures, processes, or otherwise uses any listed chemical above threshold quantities.  For the Form A Certification Statement, EPA established an alternate threshold for those facilities with low annual reportable amounts of a listed toxic chemical.  A facility that meets the appropriate reporting thresholds, but estimates that the total annual reportable amount of the chemical does not exceed 500 pounds per year, can take advantage of an alternate manufacture, process, or otherwise use threshold of 1 million pounds per year for that chemical, provided that certain conditions are met, and submit the Form A Certification Statement instead of the Form R.

2

October, 2005

Facilities may submit information on multiple chemicals on a single Form A Certification Statement.

Pursuant to EPCRA section 313 (and PPA section 6607 because of its linkage to EPCRA), EPA's Office of Environmental Information (OEI) collects, processes, and makes available to the public all of the information collected. The information gathered under these authorities is stored in a database maintained at EPA and is available through the Internet. The TRI is used extensively by EPA, other federal, state and local government agencies, industry, and the public. Program offices within EPA and other government agencies have used the TRI, along with other sources of data, to establish priorities, evaluate potential exposure scenarios, and for enforcement activities. Industries use TRI data to identify pollution prevention opportunities, and set goals for emissions reductions. Environmental and public interest groups use TRI data to make the public more aware of releases of chemicals in their communities, and to initiate direct negotiation and risk reduction with facilities.

EPA has developed EPA Information Quality Guidelines to ensure the utility, objectivity and integrity of information that is disseminated by the Agency. The information supporting this ICR is consistent with all appropriate EPA policies, including EPA's Information Quality Guidelines. In particular, the EPA Agency-wide Quality System helps ensure that EPA organizations maximize the quality of information disseminated by the Agency. The Quality System is documented in EPA Order 5360.1 A2, *Policy and Program Requirements for the Mandatory Agency-wide Quality System* and the *EPA Quality Manual for Environmental Programs* 5360 A1, May 2000. The information supporting this action is also consistent with *EPA's Guide to Writing Information Collection Requests Under the Paperwork Reduction Act of 1995,* revised 2/99. It is EPA's intention that collection of information under this ICR will result in information that will be collected, maintained, and used in ways consistent with both EPA's Information Quality Guidelines and the OMB Information Quality Guidelines.

With TRI, and the real gains in understanding it has produced, communities and governments know what listed toxic chemicals many industrial facilities in their area release, transfer, or otherwise manage as waste. In addition, industries have an additional tool for evaluating efficiency and progress on their pollution prevention goals.

OMB last approved this Information Collection request on October 31, 2003 with an expiration date of January 31, 2006.

4

October, 2005

## 2    NEED FOR AND USE OF THE COLLECTION

### 2(a)  Need/Authority for the Collection

This information collection activity is a statutory requirement pursuant to sections 313 of EPCRA (42 U.S.C. 11001 et seq.) and section 6607 of the PPA (42 U.S.C. 11071 to 11079).  According to EPCRA section 313(h), the data submitted in the forms are intended to "inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; to aid in the development of appropriate regulations, guidelines, and standards; and for other similar purposes."

Section 6602 of the PPA establishes a national policy that pollution should be prevented or reduced at the source whenever feasible.  To further this goal, EPA is to establish a source reduction program which, among other responsibilities, is to collect and disseminate information. The information collected under section 6607 is intended to fulfill that responsibility in part and to provide a basis for measuring progress in pollution prevention in certain industrial groups.

Annual reporting under EPCRA section 313 of toxic chemical releases and other waste management information provides citizens with a more complete picture of the total disposition of chemicals in their communities and helps focus industries' attention on pollution prevention and source reduction opportunities.  EPA believes that the public has a right to know about the disposition of chemicals within communities and the management of such chemicals by facilities in covered industries subject to EPCRA section 313 reporting.

Current TRI reporting has been successful in providing communities with important information regarding the disposition of toxic chemicals, and other waste management information on toxic chemicals from manufacturing facilities in their communities.

The information collected under EPCRA section 313, and subsequently distributed through EPA outreach and awareness programs, is provided at relatively low cost compared to the value it represents to the general public.  Through mass mailings to all facilities within the manufacturing sector of the economy, work with a wide variety of trade associations representing covered industries, local and national seminars, training courses, and enforcement activities, EPA has endeavored to locate all facilities required to report under section 313 of EPCRA and inform them of their obligations.  In addition, EPA has prepared various tools to assist facilities in complying with EPCRA.  These materials include detailed reporting instructions, a questions and answer document, magnetic media reporting instructions, general technical guidance, and 24 industry and chemical specific guidance documents.  In addition, EPA maintains a toll-free hotline to answer regulatory and technical questions to assist facilities in preparing TRI reports.

Furthermore, TRI reporting does not require a rigid, one-size fits all approach to estimating and reporting release information. EPA believes the submitters of the TRI data are best informed to

5

honestly and accurately report information, within certain parameters provided by EPA. The Agency believes in the good intent of the reporters to use the most appropriate means to accurately estimate the release information. EPA does, however, also invest in enforcement and compliance efforts to insure that reporting is being done consistently and thoroughly by regulated industries.

## 2(b) Use/Users of the Data

According to many, the TRI program is one of the most effective environmental programs ever legislated by Congress and administered by EPA. Its success is due, in large part, to the right-to-know provisions contained in the legislation itself. By requiring that the resulting data be made publicly available "by electronic and other means," Congress ensured that citizens, the media, environmental advocates, researchers, the business community, and others could influence and evaluate industry's efforts to manage toxic emissions. Consequently, data collected under EPCRA section 313 and section 6607 of the PPA is made available through EPA's Envirofacts and TRI Explorer databases. In addition, the public may also obtain TRI information through OMB Watch's Right-to-Know Network (RTK NET) at http://www.rtk.net. RTK NET provide free public access to numerous databases, text files and conferences on the environment, housing, and sustainable development.

In addition to providing information to the public via electronic means, EPA also conducts outreach activities to make key groups and the public aware of TRI. Journalists, educators, public interest, labor, and environmental groups, trade associations, and state governments continue to be key targets in these outreach efforts. In addition, libraries in communities all across the U.S. (in particular, members of the Federal Depository Library Program), are committed to providing public access to TRI data in a variety of formats. Educators are also using the data to conduct studies and courses on the environment. Labor unions are using the TRI data to improve conditions for workers. Businesses are using the data in many ways -- as a basis for reducing emissions, to cut costs, to improve operations, and for a variety of other reasons. Concerned citizens are a growing user group. These individuals, on their own and through organized groups, are using TRI to address concerns about the management and release of chemicals in their communities. Finally, states use the national data to compare chemical management and releases within industries and to set environmental priorities at the state level.

Because the value of TRI increases as more people use it, EPA encourages these organizations to acquaint new users with TRI, help people who already know about TRI to better use and understand the data, and, whenever possible, provide feedback on how to improve TRI products and services. The following are some examples of how the TRI data are used, both by EPA and others. As examples, the following information is not intended to be all inclusive.

## Use Within EPA

### Use of the Data by the Office of Pollution Prevention and Toxics

With the voluntary cooperation of respondent facilities, EPA established the Industrial Toxics Project, also known as the 33/50 Program. EPA's 33/50 Program targeted 17 priority TRI chemicals for emissions reductions from 1988 reported levels of 33% by 1992 and 50% by 1995. More than 1300 companies nationwide joined the program which provided recognition to participating companies, including Certificates of Appreciation to all companies upon enrollment, as well as Certificates of Environmental Achievement to a select group of facilities that achieved noteworthy reductions. Through collaborative partnerships between government, industry and the public, the program met its goals a year early and went on to exceed expectations by the end of 1995. EPA celebrated the program's success by hosting a national conference in September, 1996 and explored ways of building even more successful partnerships in the future with the use of the TRI data.

The Office of Pollution Prevention and Toxics (OPPT) has completed development of the Risk-Screening Environmental Indicators (RSEI) model which provides comparative information regarding the risk-related potential impacts of toxic chemical releases on human health and the environment. This multi-media, screening-level tool considers TRI release and transfer volumes, toxicity, exposure potential, and the size of receptor populations. Both generic and site-specific exposure characteristics are incorporated into the Indicators model. The Indicators may be used for trends analysis, as well as targeting and prioritization of TRI releases by chemical, release medium, industrial sector, individual facilities, geographic area, or a combination of these and other variables.

OPPT's Pollution Prevention Division (PPD) has used TRI data as a screening tool to prioritize proposed regulations and industrial source categories to promote pollution prevention in rulemaking. As a result, the Pollution Prevention Senior Policy Council identified a number of regulatory development efforts that should consider inclusion of pollution prevention measures.

OPPT uses TRI data to track environmental progress towards annual performance goals as part of GPRA. Specifically, OPPT is using RSEI data to set risk-based and pollution prevention performance goals. For example, for FY05, OPPT set a goal of 12% reduction from 2001 in the production-adjusted risk-based score of releases and transfers of toxic chemicals. Pollution prevention goals were also determined based on TRI releases; for example, one goal for FY04 was a 32% reduction in TRI reported releases at Federal Facilities.

### Use of the Data by the Office of Air and Radiation

The Office of Air and Radiation (OAR) has used the TRI data for a variety of tasks related to the implementation of the Clean Air Act (CAA). Section 112 of the CAA, as amended in 1990,

requires EPA to develop Maximum Achievable Control Technology (MACT) standards for major sources of 189 hazardous air pollutants, all but 8 of which were on the TRI list of toxic chemicals prior to EPA's expansion of the EPCRA section 313 list of toxic chemicals. TRI was used to estimate the number of major sources (greater than 10 tons per year of any single hazardous air pollutant or 25 tons per year of total toxics) of hazardous air pollutants in each of 700 source categories. This information helped to prioritize the source categories for regulatory development. In addition, the impacts of a potential lower major source definition for 47 highly toxic compounds were analyzed using TRI data.

TRI was used to help identify the 30 hazardous air pollutants to be included in the Urban Area Source Program mandated by Section 112(k) of the CAA. OAR also has used TRI to expand the coverage of the "Locating and Estimating" series of documents, which help State and local air agencies identify potential source categories of air toxics in their communities. Similar data have been incorporated into the Crosswalk database, which identifies which source categories emit which toxic compounds. OAR is developing a series of air quality indicators to track progress in implementing the CAA. Trends in the TRI data are envisioned to be a part of those indicators.

OAR's National Emission Inventory (NEI) database contains information about sources that emit criteria air pollutants and their precursors, and hazardous air pollutants. Several sources, including TRI, are used to compile information on annual air pollutant emissions from point, nonpoint, and mobile sources. Data from the NEI are used for air dispersion modeling, regional strategy development, regulation setting, air toxics risk assessment, and tracking trends in emissions over time. More information about the NEI database and its sources can be found on EPA's AirData web site, at http://www.epa.gov/air/data/neidb.html.

## Use of the Data in Enforcement Activities

Because TRI data include detailed facility identification information, as well as releases to all media and transfers to off-site locations, the Office of Enforcement and Compliance Assurance (OECA) has found that TRI is particularly well-suited to multi-media enforcement and compliance planning, priority setting and inspection targeting. The OECA and the Office of Research and Development (ORD) are developing a "Multi-Media Ranking System" to prioritize sites for enforcement actions and to evaluate the effectiveness of environmental laws in reducing risks from sites. The system ranks sites based on their multi-media releases of pollutants, their potential risk to human health and the environment, and the history of legal violations by the facility. The system combines TRI data with data from EPA air and water databases. The Office of Regulatory Enforcement (ORE) within OECA has also used TRI data in their National Enforcement Screening Strategy. Various data were incorporated including measures for risk associated with TRI releases. This strategy screened for large companies with compliance issues with a presence across EPA Regions that could potentially be targeted for enforcement.

OECA cross-checks data collected under EPCRA and other environmental statutes to identify those facilities or types of businesses which reported for some but not all of the reporting rules.

October, 2005

Enforcement personnel are able to identify additional facilities owned by the same corporation or by the same parent company that may be subject to liability, by using TRI data in conjunction with company tracking systems.

OECA also uses TRI data in the Integrated Data for Enforcement Analysis (IDEA) System. IDEA provides integrated data on individual facilities' compliance records for most of the statutes administered by EPA through access to over a dozen separate databases, including the Toxic Release Inventory System (TRIS). In the near future, RSEI will also be included in IDEA to provide metrics for risk and hazard associated with TRI data. The TRI data aid OECA in developing enforcement initiatives by providing a point of departure for distinguishing between industrial sectors based on their potential for exceeding permits as indicated by the amounts of chemicals reported as managed in waste. OECA provides web access to databases in IDEA through their Online Tracking Information System (OTIS). OTIS is open to a host of federal and state users who can use the data for targeting, cross-media comparisons, and tracking enforcement targets. Users include state environmental agencies, state attorney general offices, other state agencies, local governments, and Federal government departments and agencies (including the military).

TRI data continue to be extremely helpful in identifying pollution prevention projects. Enforcement staff use data on releases and transfers to identify (or evaluate) projects that will significantly reduce emissions, or those that will help prevent or minimize the release of extremely hazardous substances under EPCRA section 302.

OECA places a high priority on enhancing the use of TRI data among Regional field personnel. Guidance has been provided to the field offices on the resources available to their inspectors in identifying non-reporters, late reporters and data quality errors. These resources provide the inspectors with valuable information extrapolated from the TRI, such as facility reporting rates, processes, and releases. A recent OECA initiative, conducted in conjunction with the Regions, used TRI data to target facilities that submitted late reports to TRI for enforcement.

**Use of the Data by the Office of Solid Waste and Emergency Response**

TRI data assist in priority setting for waste minimization efforts by the Office of Solid Waste and Emergency Response (OSWER). Many of the 30 priority chemicals OSWER has identified as a focus for its waste minimization efforts are reported to TRI. In combination with other information OSWER collects on waste minimization, TRI data are useful in analyzing long-term trends and identifying particular industry practices that warrant attention by the program, serving OSWER pollution prevention goals.

OSWER also uses TRI data to target facilities for recruitment to voluntary waste minimization programs. Facilities are selected from TRI by Region based on their releases of priority chemicals. Each Region then determines particular facilities that may be candidates for waste reduction opportunities or for participation in the National Partnership for Environmental

9

October, 2005

Priorities (NPEP), a voluntary program managed under OSWER. There are about 40 participating facilities that make commitments to reduce wastes and releases of their hazardous chemicals.

With respect to enforcement, TRI data supplement other existing data sources and can be called on to assist in the development of OSWER enforcement priorities. TRI data also are valuable as a means to assist in establishing liability under both the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and the Resource Conservation and Recovery Act of 1976 (RCRA) statutory authorities. TRI data are also used in OSWER's RCRA annual reports. They incorporate TRI data on releases and the nature and scope of recycling, for example, of metal recycling or solvent recycling.

Another site-specific function of the TRI database relates to its role in providing emission information that can be used when developing emission inventories for the Superfund site discovery program and when undertaking Superfund preliminary assessments of sites. In the reportable quantity (RQ) program, TRI data could be used in analyses to support future rulemaking under CERCLA (e.g., designation of additional hazardous substances). In addition, states use TRI data in conjunction with other data obtained under EPCRA for local accident prevention planning. In conducting facility inspections, TRI data are used to provide a multi-media look at what chemicals are being released. Inspectors use this information to look for discrepancies.

Similar to other offices, OSWER uses TRI data to track progress being made toward EPA goals under GPRA to reduce the quantity of priority chemicals contained in regulated hazardous wastes. Specifically, TRI data are used in an annual Trends Report that discusses the progress being made toward meeting two GPRA goals: 1) a 2008 GPRA goal to reduce priority chemicals in regulated hazardous wastes by 10 percent, using a 2001 baseline, and 2) a 2005 GPRA goal to reduce priority chemicals in hazardous waste by 50 percent, using a 1991 baseline. The Trends Report shows trends concerning the generation and management of the priority chemicals by National, EPA Region, State, and industry sector levels. For example, TRI data indicated that facilities generating a priority chemical in both 1991 and 2001, achieved a 53% reduction in the amount of priority chemicals they generated as RCRA hazardous waste between these years, surpassing the GPRA goal of 50% reduction. TRI data show a declining trend overall in the quantity of the priority chemicals, although there have been some increases year to year. The most recent version of the Trends Report, for 1991 to 2001, can be seen at: www.epa.gov/epaoswer/hazwaste/minimize/trends.htm

**Use of the Data by the Office of Water**

The Office of Water (OW) is using the TRI information to support the planning process required under Section 304(m) of the Clean Water Act. As part of that planning process, OW is using the TRI data as one way of evaluating the likelihood of risk to humans (i.e., adverse human health impacts) resulting from exposure to pollutant discharges associated with a source category.

10

October, 2005

OW has used TRI data for identifying candidates for the National Primary Drinking Water Regulations. Chemicals were identified that had a dramatic overall increase (doubling or more) of discharges and releases. These discharges and releases were considered to have direct potential for drinking water contamination and are good candidates for development of regulatory controls.

TRI data were used as a screening mechanism for possible sources of wellhead contamination. Using TRI and other relevant data in a Geographic Information System (GIS), potential contamination sources have been identified. These sources may affect community ground-water systems in the development and implementation of wellhead protection programs. Regions are continuing to coordinate ground-water programs using GIS and TRI data as a cross-program tool.

OW has also used the TRI data in the development of management plans to identify the sources of toxic discharges into selected estuaries and coastal waters. In addition, the data have been used to identify sources of toxic discharges that may contaminate sediments that are proposed for ocean dumping.

Under the Watershed Protection Approach, the Regions are using TRI data along with other data in assessing loadings to their watersheds. They are identifying multi-media sources of toxic discharges to receiving waters.

TRI data serves as an input to watershed analysis software maintained by OW. BASINS (Better Assessment Science Integrating point and Nonpoint Sources) is a multipurpose environmental analysis system designed for use by regional, state, and local agencies in performing watershed and water quality-based studies. The software allows a user to analyze water quality for a selected stream site or throughout an entire watershed. Different point and nonpoint source data are modeled, including the locations of TRI facilities. The BASINS software system includes map layers showing the locations and toxic releases of TRI reporting facilities throughout the U.S.

The Office of Wastewater Management (OWM) used TRI data to identify industrial users that contributed the greatest amount of toxic pollutants to city sewer systems. Facility names were provided to the Regions for further evaluation.

OW used TRI data to identify which pollutants are released from pesticide manufacturing facilities and the pattern of releases when developing effluent limitations guidelines and standards for an industrial category. While many pollutants and industries that will be addressed by effluent guidelines are currently reported in TRI, the Effluent Guidelines Program screens for a number of pollutants not in listed in the TRI database.

OW used TRI data and other water emissions data in its National Sediment Contaminant Source Inventory, an evaluation of sources of sediment contamination in the U.S. This project identified point source pollutant discharges that may result in sediment contamination and analyzed these releases based on their potential sediment hazard. Chemical release amounts were weighted by

11

October, 2005

the relative toxicity of a compound to aquatic or human health, as well as relevant fate and transport factors.  The study identified chemicals, geographic areas, and industrial categories of greatest concern for sediment contamination.

OW is charged with reviewing and revising the effluent limitations guidelines established under the CWA.  Guidelines have been established for 55 major industrial categories.  OW identifies changes to guidelines for existing industrial categories, plus new industrial categories, if they pose a large risk from toxic discharges.  As part of the review process in 2003 and 2004, OW looked at water releases reported in TRI to help them identify industries with greater risk for potential revision or implementation of effluent limitations.  Some industries initially identified include organic and inorganic chemicals; nonferrous metals manufacturing; petroleum refining; petroleum storage; and timber and pulp processing.  TRI data were then also used to determine which industries could achieve effluent reductions through a voluntary program rather than new regulation.  Use of TRI data was helpful in identifying which industrial sectors' releases were mostly attributed to a small percentage of facilities as the releases for the sector could potentially be reduced if the largest releasers participated in voluntary pollutant reduction programs.

## Use of the Data by the Office of Policy, Economics, and Innovation

The Office of Policy, Economics, and Innovation (OPEI) launched the Sector Strategies program in 2003 as an industry-EPA partnership to promote improved environmental performance.  TRI data were used to measure environmental performance trends for participating industry sectors, for the first annual report released in 2004.  TRI data will continue to be used to measure environmental trends in subsequent annual reports.  In future years the program may also include RSEI data for each industry sector to incorporate measures of exposure and risk or specific groups of chemicals released/managed may be used to measure environmental performance trends.

OPEI's Performance Track program rewards facilities that go beyond environmental compliance and make voluntary commitments to improve performance.  Rewards include reduced regulatory burden.  The program used an analysis of TRI data conducted by the Office of Water in developing water-related regulatory incentives for its members.  In the process of developing new effluent guidelines for selected industrial sectors, OW evaluated industrial sectors' TRI data to determine sectors where a small percentage of facilities were responsible for the majority of risk related to water discharges.  If these facilities could participate in a voluntary environmental program, the sector as a whole may not require new effluent guidelines.  For sectors identified by OW, Performance Track determined the top releasers and evaluated if they would be eligible for this voluntary program.  If deemed eligible, current Performance Track facilities in these sectors would also benefit because they would not be subject to increased regulation.  However, the analysis indicated that many of the top releasers in those sectors would probably not be eligible due to their level of compliance with environmental requirements.

## Use of the Data by the National Center for Environmental Economics

12

October, 2005

The National Center for Environmental Economics (NCEE) assists EPA Program Offices, Agency economists, and regulatory policy makers with economic analyses. NCEE also conducts research projects analyzing the relationship between economic factors, environmental health, and pollution control. Some examples of their research work that have used TRI data include:

The Trade Environmental Assessment Model (TEAM), created by NCEE, is a multimedia model that allows a user to simulate changes in environmental emissions resulting from changes in industrial activity. The model incorporates economic data in addition to multi-media pollutant release data. TRI data on indirect dischargers are used as one component of modeling releases to water. The model's output measures the change in chemical emissions, by industry category, county, or chemical.

TRI data were utilized in a project examining compliance with air pollution regulations at U.S. pulp and paper mills. Several plant-level characteristics were tested for their relationship to air regulation compliance, including emissions to other media, which was measured in part with TRI data. The study hypothesized that higher emissions to various media may be one factor related to lower compliance with air pollution regulations. Results indicated that TRI air and water discharges (relative to a facility's shipments) tended not to be correlated with air regulation compliance. Although low correlation was found with environmental emissions, other plant and firm level characteristics are being evaluated, such as facility shipments, age, profitability, and compliance with other regulations.

Economists at NCEE have used TRI data in ongoing environmental justice analyses. In a study of communities in Texas, TRI locational data were used to examine relationships between various socioeconomic factors and siting of facilities. A related study used TRI emissions information to determine if there is a disproportionate burden of risk in different communities. The project incorporates data on pounds released in addition to toxicity weights for the chemicals released to look at the risk factor.

Program evaluation is another topic where NCEE has used TRI data. To assess the effectiveness of voluntary programs, NCEE is evaluating the effect of one such program, the National Metal Finishing Strategic Goals Program. The program set emissions reductions goals to be met by 2001, near the programs' end. Some of these goals can be measured using TRI, for example, one goal of the program was to reduce metals air emissions from a 1992 baseline. TRI data will be used to assess the amount of reduction achieved by participating facilities and to determine what role the voluntary program played in the reduction in comparison to other factors, by looking at reductions in similar non-participating facilities.

October, 2005

## Other Government Uses

**Environmental Solutions**

Government agencies can take a variety of actions when TRI data reveal an environmental problem in a specific state or region.  Some of these actions involve voluntary incentive programs for companies.  Although these programs are not binding commitments, they offer good publicity for participating companies.  Examples include:

Governor Frank O'Bannon of Indiana announced the Indiana Governor's Toxics Reduction Challenge in 1998.  The challenge pledged to "support the state's goal to reduce toxic chemical releases to the air and water from 1995 levels: 50% by December 31, 2000, in large urban areas for carcinogens and persistent bioaccumulative toxic chemicals; 60% by December 31, 2002 statewide for these chemicals; and, 50% by December 31, 2002, statewide for all toxic chemicals reported in the Toxics Release Inventory."  The Challenge also pledged to "energetically help the state reach these goals through efforts emphasizing pollution prevention within your organization and/or in cooperation with other organizations." As of mid-April 2000, 67 companies in Indiana had committed to the Challenge.  A list of the companies and an update on their progress is available on the Indiana state website: (http://www.in.gov/idem/). In addition, the Indiana Department of Environmental Management frequently uses TRI data to work with industries and suggest ways to reduce waste at the source, use less toxic alternatives, and identify opportunities to recycle and reuse materials.

The P2 Program of the Colorado Department of Public Health and the Environment used TRI data, in combination with other data about hazardous waste and toxic chemical releases to air and water, to identify the ten industry organizations responsible for the largest quantities of hazardous waste generation or toxic chemical releases in the state.  This research served as the basis for establishing priorities for P2 activities and for distribution of technical assistance grants.  The report also aided in targeting large companies for participation in the "Governor's P2 Challenge Program" to reduce toxic chemical releases and hazardous waste generation.

Due to the TRI reporting requirements for dioxin, the Delaware Department of Natural Resources and Environmental Control became aware of dioxin-tainted waste at DuPont's Edge Moor, DE titanium dioxide (TiO$_2$) plant.  Subsequently, DuPont agreed to pay an estimated $15 million to remediate dioxin-tainted waste at this facility.  DuPont discovered that the waste sludge was contaminated with dioxin while the company was preparing to comply with EPA's requirement that dioxin releases be reported under TRI.  In addition, DuPont agreed with the Delaware Department of Natural Resources and Environmental Control to spray a 23-acre stretch along the Delaware River with a starch-like coating to keep the dioxin from being stirred up by the wind or eroding into the river.  DuPont used the site to store waste sludge from the Edge Moor plant.  The company will also close four sludge lagoons near the plant and plans to cut dioxin formation in half by 2003 and by 90 percent by 2007.

14

October, 2005

## Environmental Targeting

Budgets to fund environmental programs and measures often do not increase in proportion to the need for these activities. Environmental targeting initiatives, such as those listed below, help governments and communities prioritize their needs and ensure that their resources are used most efficiently.

The P2 Division in Georgia's Department of Natural Resources used TRI data to identify the technical assistance needs of manufacturing sectors generating chemicals that pose the greatest risk to public health and the environment. The Division prioritized chemicals, examined manufacturing sectors releasing the highest priority chemicals, and identified particular subsectors for further assessment. The Division also conducted in-depth manufacturing sector assessments to determine which processes produce which wastes, what multi-media waste problems exist, what P2 activities were being undertaken, and what additional opportunities might exist.

The Florida Waste Reduction Assistance Program provides assistance in source reduction and waste minimization to facilities handling TRI chemicals. The Program relies on TRI and other data to target facilities for the Program.

EPA's Office of Enforcement and Compliance Assurance (OECA) uses TRI data within its Online Tracking Information System (OTIS) -- a collection of on-line search engines that enables EPA staff, state, local, and tribal governments, and federal agencies to access a wide range of data relating to enforcement and compliance. OTIS is a web application that organizes the information to facilitate cross-database analysis. OTIS can be used for many functions, including planning, targeting, analysis, data quality review, and pre-inspection review. OTIS was launched for internal Agency use in November 1999. In addition to performing data base analysis, OTIS has three other additional benefits: helps the Regions and States to identify and clean up data errors; provides report information on a cross media basis, leading to improved integration and targeting; provides the basis for a public access site for enforcement and compliance data.

OTIS is currently restricted to registered users from governmental organizations. In 2004, about 340 local, state, and federal organizations were registered. Data on the OTIS site are from OECA's Integrated Data for Enforcement Analysis (IDEA) system, which extracts and integrates information from TRI as well as the following databases: AFS (Clean Air Act -- AIRS Facility Subsystem), PCS (Clean Water Act -- Permit Compliance System), RCRAInfo (Resource Conservation and Recovery Act Information System), ICIS (Integrated Compliance Information System), National Compliance Database (NCDB), and the 2000 U.S. Census.

For the purpose of targeting exposure screening for facility employees in certain geographic areas, the U.S. Occupational Safety and Health Administration (OSHA) and local public health departments used TRI data to identify facilities that release specific chemicals. EPA has provided OSHA with all submitted toxics release inventory data for the 28 facilities that are subject to the

15

October, 2005

OSHA special inspection program. These data provide OSHA inspection teams with valuable information, such as a list of chemicals that are used in significant quantities by each facility. EPA is also provides OSHA with information concerning accidental releases.

**Legislation and Regulations**

TRI data often provide the impetus for legislative action from federal, state, and local governments.  For over a decade, TRI data has been used to influence and change environmental standards, regulations, and legislation, as shown below:

The North Carolina Environmental Management Commission set limits for 105 pollutants after a public interest organization published a report, using TRI data, on unregulated toxic chemical releases to air in the state.

In response to legislation passed in 1987 to address toxic chemical releases to the air, the Illinois EPA Bureau of Air used TRI data to determine quantities of stack and fugitive air emissions of reported substances to support continued development of regulatory proposals.

**Risk Assessment**

As the connection between toxic chemicals and human health becomes better known, public health officials are looking for ways to assess the levels of risk in their communities.  TRI data have been a crucial component in creating tools to address these assessments.  Examples follow:

The New York State Department of Health developed a risk screening protocol using TRI air release data and toxicity potency data to produce relative risk scores and rankings for facilities and chemicals within the state.  Results suggested the need for a more careful evaluation of health effects resulting from large releases of noncarcinogenic compounds.

Researchers from EPA's Office of Health Research published a study of national and regional differences in county-level TRI chemical releases to air according to the ethnicity or race and in conjunction with the household income of these populations.  Using the "Population Emissions Index," a population-weighted average release for each county, the study found that all minority groups except Native Americans tend to live in counties where levels of TRI chemical releases to air are higher.  The data also suggest that household incomes tend to be higher in counties with higher TRI chemical releases to air.

The EPA Office of Pollution Prevention and Toxics's Risk-Screening Environmental Indicators (RSEI) model provides year-to-year indicators of the potential impacts of TRI chemical releases on human health and the environment.  The indicators consider TRI release and transfer volumes, chronic toxicity, exposure potential, and the size of receptor populations.  Both generic and site-specific exposure characteristics can be incorporated in the model.  The model allows the

16

October, 2005

targeting and prioritization of chemicals, industries and geographic areas.  Facility scores can also be tracked from year to year to analyze trends.

TRI is offered as 1 of 9 toxicology and hazardous chemical-related databases accessible through the National Library of Medicine's TOXNET Web site.  TRI data can be searched by chemical, year, facility name, geographic location, type and amount of releases.  Results display facility-specific information, including facility releases and management. Other databases offered include: Hazardous Substances Data Bank (HSDB), Integrated Risk Information System (IRIS), International Toxicity Estimates for Risk (ITER), Chemical Carcinogenesis Research Information (CCRIS), and Genetic Toxicology (GENE-TOX), as well as literature databases for toxicity-related research articles.  TOXNET users cited preparation of risk assessment, improved understanding of environmental/occupational health concerns, and use in regulatory activities as some of the top uses of their searches.  The TRI TOXNET search web site is available at: http://toxnet.nlm.nih.gov/cgi-bin/sis/htmlgen?TRI.

### Quality Assurance and Control

Some states, such as Massachusetts, that require separate reporting of toxic chemical releases for their facilities, find TRI data to be a useful measure of quality assurance and control.  The Air Pollution Control Program in the Missouri Department of Natural Resources also compares fugitive and stack emissions reported to the TRI with toxic chemical release data reported on the state's Emissions Inventory Questionnaire for quality control.

### Other Government Uses

Additional governmental uses of TRI data can be found in agencies not immediately associated with environmental issues.  The U.S. Internal Revenue Service used TRI data to identify companies releasing chlorofluorocarbons (CFCs) to enforce a tax imposed on releases of CFCs and thus facilitate the phase-out of these chemicals.

## Public Use

Each year, the EPA makes TRI data available to the public on two Internet sites: TRI Explorer (www.epa.gov/triexplorer) and Envirofacts (www.epa.gov/enviro).  The EPA also provides a summary of national and state data in the annual publications Toxics Release Inventory: Public Data Release and Toxics Release Inventory: Public Data Release: State Fact Sheets.  States also release their own reports.  Community organizations, universities, workers and labor unions, local public interest organizations, and national non-governmental organizations (NGOs) also conduct analyses and risk assessments based on TRI data.  Some of these organizations also make data and analyses available to the public.

17

October, 2005

**Citizen Activists and Community Organizations**

The Oneida Environmental Resources Board in Wisconsin used TRI data to convince leaders of the Oneida Tribe to organize a conference on cleaner ways to manufacture pulp and paper.  The Board used TRI data to show that the pulp and paper industry was the largest industrial source of toxic chemical releases in Wisconsin, despite industry claims that significant release reductions in the past made further improvements unnecessary.  The conference improved industry awareness of more environmentally friendly practices and procedures.  The Board also used TRI data to alert a local labor union about possible worker health risks.  The union included requests for reductions in toxic chemical releases in its contract renewal negotiations.

California's Silicon Valley Toxics Coalition has used TRI data for over a decade.  The Silicon Valley Environmental Index (www.svep.org) shows "sustainability trends" in Santa Clara County, California.  The Index provides information about, but not limited to, hazardous materials and air and water quality.  At least five cities in Santa Clara County have referenced or relied on the Index as the basis for their "sustainable city" efforts or municipal environmental management system (EMS) initiatives.  Private-sector companies, such as IBM and Philips Semiconductor, have also used the Index in evaluating their own EMS practices.  Several universities have incorporated the Index into their environmental science course curricula.  In addition, several states (Wisconsin, South Carolina, New Jersey) and countries (Germany and the Netherlands) have developed regional environmental indicators studies modeled after the Index.

Wilma Subra, a chemical research analyst in Louisiana, has been a vocal citizen leader and an active proponent of the TRI program for 20 years, working to change regulations and policies to improve public health and the environment at the local level.  Ms. Subra has informed residents about the possible effects of toxic chemical releases and has aided their work to improve environmental conditions.  The TRI data support Ms. Subra's efforts to reduce toxic chemical releases from Louisiana's industrial facilities.  Ms. Subra gathers and analyzes TRI data, distributes information to the public, participates in legal and regulatory processes against industrial facilities, and sits on national and international advisory committees.

Citizens' Environmental Coalition (CEC) (http://cectoxic.home.igc.org/) is a statewide grassroots organization of 110 groups and 14,000 individual members working to eliminate pollution in New York State.  They also seek to empower and educate the public about environmental problems, and promote corporate accountability.  CEC uses TRI as a means to "empower, educate and assist people concerned about environmental problems."  They maintain a sister web site (http://www.ecothreatny.org/) with an interactive mapping tool for New York that allows for selection of different environmental concerns, including TRI sites, other air pollution sources, water pollution sources, and Superfund sites.  It is possible to zoom in on a particular community and also obtain information on specific locations.

Ohio Citizen Action (http://www.ohiocitizen.org/) is Ohio's largest environmental organization. They use and promote toxic chemical right-to-know laws as a means for negotiating "good

18

neighbor agreements" with industrial facilities in Ohio.  For example, the group's non-profit arm, Ohio Citizen Action Education Fund, examined TRI data for Sunoco's Toledo Refinery in Ohio to check the company's statement to the community regarding its annual environmental releases. The group found that the company's statement was based on its reporting to TRI rather than its total chemical releases, as reported to the City of Toledo.

## National Organizations

National organizations employ TRI data in many of the same ways as small community organizations, but on a larger scale.  Such organizations analyze TRI data, use it to conduct risk screening and risk assessment, and often help the public interpret the data.  National organizations often work with local public interest and community organizations to initiate discussions between citizens and industry.  Some national organizations also use TRI data to help lobby for changes in environmental policy.  Examples of the use of TRI data by national organizations include the following:

Environmental Defense (ED) launched its Scorecard website in1998 (http://www.scorecard.org). The site's "polluter locator" allows users to perform a search by ZIP code on a database containing information on more than 17,000 chemical-releasing facilities.  The Scorecard also provides data on the health effects and regulatory status of different chemicals. The site correlates TRI chemical release data with U.S. Census demographic data.  ED is currently linking TRI data with toxicological studies to create a Scorecard tool that compares the risks of different toxic chemical releases.  Logging 500,000 data requests on its first day of operation, the Scorecard website has drawn significant public interest.  In 2003, Scorecard received approximately 3 million queries related to TRI data.

The Right-to-Know Network (RTKNet) website (http://www.rtknet.org), launched in 1989 by the nonprofit organizations OMB Watch and the Unison Institute, also facilitates public access to TRI data.  Users can search the TRI data by ZIP code, city, county, state, year, or chemical.  The website also includes links to additional information about chemicals and right-to-know issues. RTKNet estimates that over 100,000 TRI searches were performed in 2003 which is about 50% of the total database searches on RTK NET for the year.

The former Environmental Information Center conducted a study of the Great Lakes in 1997. Scientists used TRI data to examine endocrine disrupters released in states bordering the Great Lakes.  The study ranked the largest emitters of various classes of toxic chemicals by region, and found the Great Lakes region to be the nation's top emitter of reportable endocrine disrupting chemicals.

In September 2000, Physicians for Social Responsibility, along with the National Environmental Trust and the Learning Disabilities Association of America, released the report, "Polluting Our Future: Chemical Pollution in the U.S. that Affects Child Development and Learning" (www.psr.org/trireport.pdf).  This report used TRI and other data to present national information

19

October, 2005

about releases of chemicals that present potential developmental and neurological risks. The report ranked states by the amount of releases of these chemicals and included information about counties, industries, and facilities with the highest toxic chemical releases.

Labor unions also have used TRI data to support demands for safer working conditions for employees. Other than citizens who live near facilities, employees of TRI reporting facilities are most at risk from toxic chemical releases because they are most likely to come in regular contact with these chemicals. Beginning in 1990, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) began training employees and managers of UAW companies to access, interpret, and utilize computer databases and programs in "critically assessing industrial emergency response activities at their facilities." Workers were trained to download and interpret environmental compliance data. TRI data was one of the main sources of information for the program. Concerning TRI, the UAW stated, "knowing about maximum amounts on-site can help people prepare for a 'worst-case scenario'. " It can help an emergency response planning group decide if there is enough response equipment and personnel to deal with an emergency involving the chemical(s) in question."

The Safe Hometowns Initiative is a group of organizations and individuals concerned about the threat to public safety posed by hazardous chemicals in American communities. They formed shortly after September 11th to encourage government and industry to protect communities by putting prevention first rather than restricting environmental information. They advocate using TRI data in their Safe Hometowns Guide (http://www.safehometowns.org/download.html) to help communities identify vulnerable facilities, organize assessments of hazardous materials used at facilities, and make recommendations on safer material and process alternatives.

**Direct Negotiation**

Through increasing their understanding of TRI data, members of the public can begin to understand potential risks associated with toxic chemical releases in their communities and can work with facilities to reduce those risks. The nation's first "right-to-act" law was enacted in September 1999 by the Passaic, N.J., Board of Chosen Freeholders, the county's governing body. The law "allows neighbors and/or employees to petition the county health officer for creation of Neighborhood Hazard Prevention Advisory Committees (NHPACs) for specific facilities." Even without the aid of this law, concerned citizens nationwide can take action in their own communities. Community organizations and citizen activists have used TRI data to negotiate with local facilities. Examples of direct negotiation agreements between citizens and facilities follow:

In the city of Richmond, California, community members were concerned about toxic chemical releases from several oil refineries and other large industrial facilities. The West County Toxics Coalition, a local environmental organization, joined with Communities for a Better Environment, a statewide environmental organization, to investigate industrial polluters in Richmond. Using the TRI and other databases, they published the report, *Richmond at Risk*, that identified the area's 20 largest industrial polluters and named the Chevron oil refinery the number one polluter. The

20

report served to initiate discussions among Chevron, the West County Toxics Coalition, and other community and environmental organizations. As a result of the meetings, the company agreed in 1994 to close down older portions of the plant and install P2 equipment to achieve zero net toxic chemical releases on its reformulated fuel project.

The Calhoun County Resource Watch (CCRW), founded by a Texas environmental activist and shrimper named Dianne Wilson, used TRI data to build community awareness about pollution of the rich shrimp and oyster breeding grounds of Lavaca Bay on the Gulf of Mexico. Calhoun County was ranked first in the nation for toxic chemical disposal to the land, based on the 1987 TRI data. Lavaca Bay was designated as a Superfund site in 1993. CCRW brought suit against the Aluminum Company of America (Alcoa) related to this pollution. In 1995, Alcoa signed an agreement designed to protect the breeding grounds. Two Alcoa firms, a chemical plant and a bauxite refinery, committed to "fund independent review of zero discharge options and to adopt the technologies where technically, economically, and environmentally sound." In return, CCRW agreed to drop its legal challenges and suspend permit interventions against the companies. According to an Alcoa operations manager, as of March 2000 the company had made considerable progress toward the goals set in 1995, including compliance with a permit that sets the "allowed total annual maximum mass loading mercury limit" at 30 pounds, development and implementation of a Best Management Practices plan, and installation of an "evaporative spray and dust control system" near the refinery.

In 1998, Butler County, PA, warned pregnant women and infants against drinking water from Connoquenessing Creek due to high levels of nitrates in the water. In its report, the Pennsylvania Public Interest Research Group (PennPIRG) used TRI data to highlight the significant quantities of nitrate compounds being released into the creek. The report identified the major source of the nitrates as the AK Steel Corporation. TRI data showed that the company had discharged approximately 29 million pounds of nitrates into the creek in 1997 and 32 million pounds in 1998. This report and several newspaper articles about these toxic chemical releases prompted the state to commit to reduce the levels of nitrates that AK Steel is permitted to release into the creek. Pennsylvania began developing a new water permit to reduce allowable nitrate releases to a level 90 percent lower than the previous level. In June 2000, EPA issued an emergency order requiring AK Steel to significantly reduce the nitrate compounds it discharges into Connoquenessing Creek. In addition, AK Steel was required to provide and pay for an alternative water source for the affected public on any day that the local water plant could not meet the federal maximum nitrate contaminant standard.

Working with The Ecology Center, a public interest organization based in Ann Arbor, Michigan, residents of the town of Flat Rock used TRI data to obtain a commitment from Auto Alliance International to enact an aggressive solvent reduction program. TRI data showed that the company's air releases of toluene had increased from 100,000 pounds in 1991 to 800,000 pounds in 1993, along with an increase in noxious odors in the community. A former Ecology Center staff member, Andrew Cormai, said, "[R]esidents who have put up with the smells since 1987

suddenly have a bone to pick with the company. The company is going to be saving some money by recapturing solvents, and they will be improving community air quality."

## Environmental Justice

The goal of environmental justice is to ensure that all people, regardless of race, national origin, or income, are protected from disproportionate impacts and environmental hazards. "The concept [of environmental justice] addresses evidence [that] in some parts of the nation, poor and minority communities live closer to factories, highways and airports and are exposed to more pollution and noise and generally more environmental risks than the population at large." TRI data have proved to be an important tool in environmental justice. Communities that were once uninformed about the toxic chemical releases in their area now have access to that information. Examples of TRI data use in environmental justice activities include:

Two areas of Louisiana have become focal points for environmental justice efforts: the Mississippi River corridor, popularly known as "Cancer Alley," and the Lake Charles region. Local groups have used TRI data to illustrate the high toxic chemical release rates in these areas compared to those in other regions. Several small communities have confronted industrial facilities about their toxic chemical releases and possibly related health effects. One illustrative dispute arose in Mossville, Calcasieu Parish, Louisiana, where some residents suspected that poor health in their community was due to the activities of 17 industrial facilities located within one half-mile of the community. Their concerns prompted numerous public interest organizations to collaborate on the report, *Breathing Poison: The Toxic Costs of Industries in Calcasieu Parish, Louisiana*. The 2000 report used TRI data and information from the Scorecard website to convey the health risks to which the community might be exposed. It stated the need for "pollution reduction, environmental health services, and a fair and just relocation for consenting residents."

The Asian Pacific Environmental Network (APEN) works with Asian and Pacific Islander communities in the San Francisco Bay Area, California. APEN created a series of maps that combined TRI and demographic data, to show that many poor Asian and Pacific Islanders live in "toxic hot spots." The maps increased awareness among community members about both their environment and environmental justice issues. APEN might add more environmental, health, and demographic information, and expand its mapping work to other nearby counties.

The Los Angeles chapter of Communities for a Better Environment used TRI data to help ensure that the communities it serves would not be exposed to higher environmental risks as a result of poverty or ethnicity. In one project, the organization combined 1996 TRI data with Geographical Information System (GIS) mapping data to show that 80 to 100 percent of facilities that release toxic chemicals in Los Angeles County were located in areas where a large majority of the residents were people of minorities. These findings led to the report, *Holding Our Breath – the Struggle for Environmental Justice in Southeast Los Angeles*.

October, 2005

# Industry Use

TRI data have also specifically benefitted regulated industrial facilities.

## Cost Reduction

A primary goal of the International Organization for Standardization (ISO 14000) is to bring environmental issues to the attention of the highest levels of corporate management. Leaving decision-making to environmental managers alone might not produce the corporate commitment necessary to achieve the best success. TRI data have been used as evidence to convince high-level management of the need for an EMS. In turn, the proactive environmental protection afforded by an EMS can reduce corporate costs.

For some industries, the creation of the TRI marked the first time that company managers and operators could be made aware of the quantity of chemicals being released from their facilities. Initially, some companies expressed surprise at their own toxic chemical release ratings and set goals to improve their environmental performance. Some companies have reduced their toxic chemical releases and increased their efficiency at the same time, leading to an increased profit. Examples of ways that industry has used TRI data to reduce costs follow:

After reporting toxic chemical releases to the TRI, Berg Electronics realized that it was releasing almost 300,000 pounds of toxic chemicals into the environment annually. By installing a new cleaning system, the company reduced its toxic chemical releases to less than 400 pounds per year. Although the initial costs for the new system were relatively high ($500,000), the company was able to save approximately $1.2 million a year by avoiding cleanup and hazardous waste disposal costs.

The Haartz Corporation, located in Acton, Massachusetts, makes coated fabrics used in automobiles. The firm once used 800,000 pounds per year of methyl ethyl ketone (MEK), a solvent that can cause dizziness, nausea, or unconsciousness when inhaled. In 1987, when the Haartz Corporation was preparing its first TRI report, the company installed a new emissions control system to capture and recycle MEK. TRI data enabled the company to track the association between reduced toxic chemical releases and reduced costs. According to the Haartz Corporation environmental manager, the company's "emissions have stayed pretty flat" despite its "double-digit sales growth" between 1993 and 1998. In addition, reducing its MEK releases saved the Haartz Corporation an estimated $200,000 annually.

## Performance Measurement

Industry uses TRI data to identify pollution prevention opportunities, set goals for toxic chemical release reductions, and demonstrate its commitment to and progress in reducing emissions. At least one industry initiative -- the American Chemistry Council's (ACC) Responsible Care

23

October, 2005

Program plans to use TRI data as a performance measure to demonstrate participating companies' environmental progress. In 2004, there were 226 companies participating in the Responsible Care Program that will report their TRI releases as a performance metric. Of the 226 responsible care companies, 33 are in the top 50 (66%) chemical companies based on sales in 2002 and will use their TRI releases, in part, as a measure of their performance.

## International Right-to-Know

The TRI has served as the model for many countries' Chemical Right-To-Know programs and laws. Within the next few years, more than 30 nations are expected to have a TRI-like system, known internationally as Pollutant Release and Transfer Registers (PRTRs). PRTRs allow the public to obtain toxic chemical release data covering a large geographic area. Countries can compare their data and share ideas about improving environmental regulations. Examples of how PRTR information is being used include:

The Commission for Environmental Cooperation (CEC), which was created by a side-agreement to the North American Free Trade Agreement (NAFTA), began its PRTR work by preparing a document that compares U.S. and Canadian PRTR systems. The CEC now develops an annual report, entitled "*Taking Stock*", that correlates data from the TRI and the Canadian National Pollutant Release Inventory to give an overall view of releases and transfers of toxic chemicals within and between countries. The CEC also has created an Internet search engine that allows the public to obtain continental PRTR data.

In 2000, the Silicon Valley Toxics Coalition attended an international conference in Croatia on public participation and community right-to-know. Participants recognized the fundamental importance of Chemical Right-To-Know and are lobbying the United Nations to promote the program and persuade nations to support the passage of community right-to-know laws modeled after the TRI.

## Investment

The public's increased awareness of environmental issues has made environmental performance an important factor in their investment decisions. Many investment companies have responded to this demand by providing socially responsible investment options. Examples of how TRI data have been used in investment decisions include:

Green Century Funds, an investment organization that specializes in socially responsible mutual funds, offers two funds committed to promoting corporate environmental responsibility. The Green Century Balanced Fund invests in "performance-driven companies that are a part of the solution to environmental problems," as well as in environmentally benign companies and "best of class" companies that are setting standards for environmental protection in their industries. The

24

October, 2005

Green Century Equity Fund screens out companies with the worst environmental and social records. The funds are monitored for environmental performance using TRI data.

KLD Research and Analytics screens companies and investments for inclusion in Domini Social Investments' "Domini 400 Social Index." Environmental performance is one aspect of their selection criteria including an evaluation of the largest emitters as reported in TRI for each state. Other environmental selection measures include compliance with EPA regulations, a company's liability for hazardous waste sites, and involvement in pollution prevention programs, among other factors.

Vanderbilt University's Owen Graduate School of Management found a correlation between a company's stock value and its P2 efforts, which were assessed using TRI data. A researcher from the University performed two separate studies comparing the progress of a company's P2 activities as reported on TRI forms to a company's stock market performance. The study reported that "companies that underperform expected pollution prevention goals are penalized in the stock market, and the stock of the companies that engage in pollution prevention activity tends to outperform the stock of companies that do not engage in pollution prevention."

Using TRI data, the Investor Responsibility Research Center (IRRC) developed an Emissions Efficiency Index® that indicates which companies have a competitive edge in environmental performance. The Index is predicated on the idea that greater toxic chemical releases are associated with higher risks of negative publicity, more tort actions, and higher costs for pollution control and waste management. IRRC's constituency uses TRI-based information to identify companies with poor environmental records. Using the index, investors can either screen such companies out of their portfolios or purchase shares and use their ownership as leverage to improve environmental performance.

Before making an investment in property, The National Association of Realtors suggests that homebuyers check information reported through TRI. On their web site, Realtor Magazine Online recommends that homebuyers and realtors evaluate an area's environmental safety by checking the pollutant release data provided at Environmental Defense's Scorecard web site.

## Academic Use

A variety of TRI data applications occur in academia, in areas ranging from doctoral theses and journal publications to teaching in the classroom.

### Research

Universities and research institutions are using TRI data as a means for "examining environmental policies and strategies, and clarifying risks associated with toxic chemicals at the state and local

25

October, 2005

level."  Students and faculty in the academic community also perform studies based on TRI data.  Examples of academic research using TRI data include:

In February 2000, the journal *Drug and Chemical Toxicology* published an article entitled, "Using GIS to Study the Health Impact of Air Emissions."  This article showed how public health professionals are able to use data (such as the TRI) on toxic chemical releases to air, air dispersion modeling, and GIS to identify and define a potentially exposed population.  In addition, such data can be analyzed to estimate the health risk burden of that population and determine correlations between point-based health outcome results and estimated health risk.

In the Journal of Environmental Economics and Management in 1998 and 1999, and in the Journal of Economic Surveys in 2001, researcher Madhu Khanna published results of research that examined the environmental, economic and investment effects of voluntary and mandatory toxic release reporting programs. One of the research studies focused on the EPA's 33/50 Program during its first three years, 1991-1993, and its impact on the U.S. chemical industry. The paper showed that Program participation led to a statistically significant decline in toxic releases over the time period, a statistically significant negative impact on current return on investment, but a positive and statistically significant impact on the expected long-run profitability of firms.

At Louisiana State University, environmental science professor Paul Templet developed a method, using TRI data, to evaluate the comparative effectiveness of pollution control strategies, policies, and programs, by calculating an "emissions to jobs ratio."  This ratio, which is the number of pounds of toxic chemical releases per job in a given industry and location, can be compared to a national or other average.  The comparison is then used to assess the relative toxic air releases associated with a certain job.  This ratio was used to modify tax exemptions granted to facilities to encourage and reward job creation.

Professor Mark Stephan used TRI in research focusing on the role of information disclosure programs in environmental policy.  One of his research projects, conducted with Michael Kraft and Troy Abel, utilized TRI data to examine correlations between measures of emissions as reported in TRI and state measures of policy, political environment, and economic resources.  The authors found that the ratio of facilities reducing toxic releases to facilities increasing them was correlated with political factors at the state level such as membership in conservation groups.  Researchers R.D. Klassen and D.C. Whybark studied management of the natural environment in manufacturing firms, given increased public awareness and scrutiny as a result of programs like the TRI.  In one of their published studies, it was found that an emphasis on pollution prevention instead of pollution control, improved delivery performance and firms' competitiveness.

Andrew King and Michael Lenox of New York University's Stern School of Business tested the relationship between "lean production" and environmental performance.  TRI data were employed as one measure of production, with lower inventories representing leaner production.  The study found that lean production was correlated to measures of waste reduction and pollution reduction.

26

October, 2005

Michael Ash of the University of Massachusetts and T. Robert Fetter of Science Applications International Corporation used TRI data in an environmental justice analysis for the contiguous United States. They incorporate measures of risk faced by different economic and racial groups by using RSEI, which combines TRI data on releases with information on transport and toxicity for each chemical. Their analysis also controls for regional variations in pollution, allowing them to identify exposure differences both within cities and between cities. They found a consistent relationship between income and pollution exposure, and determined that certain racial groups live both in more polluted cities, and in more polluted neighborhoods within cities, while others live in less polluted cities, but in more polluted areas within cities.

Linda Bui, an economics researcher at Brandeis University, has used TRI data in her work on the effect of public disclosure laws such as TRI. One such study, published in The Review of Economics and Statistics in 2003, evaluated the relationship between TRI releases and housing prices and other political economy variables. In another study, Bui examined firm-level response of petroleum refineries to public disclosure of their toxic chemicals through TRI. TRI releases to air and water were evaluated in relation to firm expenditure on abatement technology for other non-hazardous chemicals discharged. In addition, Bui looked at whether state pollution prevention policies and TRI-type programs helped to explain differences in TRI releases at the refineries across states as a measure of effectiveness of public disclosure policies. Researchers from Harvard University, Robert Stavins, Lori Snyder, and Nolan Miller, also evaluated firm-level response to TRI. Their study examines the effect of TRI and other regulatory programs on technology adoption in the chlorine manufacturing industry, particularly of adoption of membrane cell technology. The authors are also studying the effect of state-level pollution prevention regulations with some similarity to TRI.

Lori Snyder also conducted research assessing the validity of TRI data in light of the potential "truncation bias" that may be caused by TRI's reporting thresholds. She estimates the magnitude of releases for Massachusetts that may not be reported to TRI because of facilities which dropped below the reporting threshold for particular chemicals. Massachusetts's Toxic Use Reduction Act (TURA) provides comparison data for Massachusetts facilities, because it has lower thresholds and it also asks facilities why they may have stopped reporting for a chemical they previously reported. She found that truncation bias could be significant at least for releases in Massachusetts, and based on her results, she provides guidance for policy analysts in using TRI data to measure program effectiveness.

Research conducted at North Carolina State University, in conjunction with the Pew Research Center for the People and the Press and with funding from EPA, assessed the extent to which people are aware of TRI data and the impact of this information. To measure the extent of public awareness of TRI information and people's approach to environmental information, a telephone survey was carried out of 600 people in two cities. The authors also conducted more in-depth focus groups and interviews with respondents who were familiar with TRI to ascertain the level of

27

October, 2005

their knowledge and the level of their support for environmental information dissemination as a form of environmental protection.

As an extension of measuring program effectiveness, Wade E. Martin of California State University proposed a study to evaluate the economic benefit of TRI information. He proposed to study two main user groups, attorneys and citizen activist groups, to determine their "willingness to pay" for the data available through TRI. The project would entail surveying a random sample of both user groups, and asking questions about their use of TRI data and its role in their work. The end result would be an economic valuation for the TRI data, and the cost to these users of not having the data available in its current format.

**Classroom Use**

High school and university instructors have incorporated the TRI into curricula involving subjects ranging from introductory chemistry to business.

The JSI Center for Environmental Health Studies developed a field-based environmental education curriculum for high school students in Chelsea, Massachusetts, a low-income minority community near Boston. The goal was to encourage student participation in environmental assessment and protection. Students learned to inventory sources of contamination in a local creek and to work with community agencies on protecting a valuable environmental resource. TRI data were an integral part of the students' research.

TRI data are integrated into many lesson plans or activity guides for K-12 teachers and students. The National Science Teacher's Association published a resource guide for high school teachers on using environmental data, specifically TRI, to integrate science in an everyday context. The resource kit was designed with the help of EPA and helps students to conduct research into environmental issues in their own communities.
Delaware's Department of Natural Resources designed a set of lessons for a high school and middle school air quality education program. This program, which incorporates TRI data, includes a lesson on air quality impact associated with industrial sources. Students use the data to locate facilities in their area that have air emissions. They are also able to identify the types and quantity of facility emissions. They can compare businesses that report to TRI between counties and explore the health hazards posed by the reported emissions.

A 2001 workshop sponsored by the University of Arizona explored how to integrate toxicology with high school curriculum. How to obtain data from the TRI and what the data mean were included in the activities for middle and high school teachers to help them use it with their students.

Private groups also have incorporate TRI data into environmental education programs. Aquatic Research Interactive, Inc, which conducts distance learning programs online, offers a program on accessing TRI data. "Diving into Toxic Releases Inventory" reviews how students, educators, and

28

October, 2005

community members can access toxic release data from the EPA. The program demonstrates how to use EPA's TRI Explorer Web site, including how to use the different search features; generate reports; and interpret the results.

Professor Robert Hognor of Florida International University incorporated TRI data into his classes in the Department of Business and Society. In one example, students used TRI data as the basis for assessing the potential impact of toxic chemicals in the Caribbean and then issued a report on the subject.

## 3      THE RESPONDENTS AND THE INFORMATION REQUESTED

### 3(a)  Respondents/SIC Codes

The statute applied the reporting requirement to owners and operators of facilities that have 10 or more full-time employees, manufacture or process more than 25,000 pounds or otherwise use more than 10,000 pounds of a listed chemical, and are in Standard Industrial Classification (SIC) codes 20 through 39. The SIC code determination applies to all operations within each two-digit category, including all sub-categorizations to the four-digit level. In addition, in May, 1997, EPA issued a final rule that expanded the TRI reporting requirements to facilities in seven industries outside of the manufacturing sector. A detailed listing of the four-digit SIC codes and categories can be found in Table I of Attachment A (Toxic Chemical Release Inventory Reporting Forms and Instructions). The following identifies the SIC codes and corresponding categories at the two and four-digit level:

| SIC Code | Industry Group |
|---|---|
| 10 | Metal Mining (except 1011,1081 and 1094) |
| 12 | Coal Mining (except 1241) |
| 20 | Food |
| 21 | Tobacco |
| 22 | Textiles |
| 23 | Apparel |
| 24 | Lumber and Wood |
| 25 | Furniture |
| 26 | Paper |
| 27 | Printing/Publishing |
| 28 | Chemicals |
| 29 | Petroleum |
| 30 | Rubber and Plastics |
| 31 | Leather |
| 32 | Stone, Clay, and Glass |
| 33 | Primary Metals |
| 34 | Fabricated Metals |

October, 2005

| | |
|---|---|
| 35 | Machinery (ex. electrical) |
| 36 | Electrical/Electronic Equipment |
| 37 | Transportation Equipment |
| 38 | Instruments |
| 39 | Miscellaneous Manufacturing |
| 4911, 4931 or 4939 | Electric Utilities (limited to facilities that combust coal and/or oil for the purpose of generating electricity for distribution in commerce.) |
| 4953 | Commercial Hazardous Waste Treatment (limited to facilities regulated under RCRA Subtitle C, 42 U.S.C. section 6921 et seq. |
| 5169 | Chemical Allied Products-Wholesale |
| 5171 | Petroleum Bulk Terminals and Plants-Wholesale |
| 7389 | Solvent Recovery Services (limited to facilities primarily engaged in solvents recovery services on a contract or fee basis). |

Establishments that are part of a multi-establishment facility have the option to report separately, provided that all of the releases and waste management data from all of the establishments in that facility are reported.

## 4     THE INFORMATION COLLECTED--AGENCY ACTIVITIES, COLLECTION METHODOLOGY, AND INFORMATION MANAGEMENT

### 4(a)  Agency Activities

EPA engages in many activities to fulfill the requirements of EPCRA.  These activities can be grouped in the following categories which cover what the Agency does to assist the regulated community with compliance, process the data, maintain the database, and make the data available.

- Assistance to Respondents
- Data Processing and Quality Control
- Making Data Available
- List Revisions and Petition Reviews
- Trade Secrecy Reviews

**Assistance to Respondents.**  The Agency has operated a successful outreach program to assist businesses in obtaining and completing both the Form R and Form A Certification Statement.  A reporting package that is updated annually is distributed directly to all TRI respondents.  This package also is made available to potential respondents through EPA's TRI website, Regional office coordinators and the EPA publications distribution center.  The package contains reporting forms with detailed instructions along with a magnetic media software package that allows

30

reporters to submit their data on computer diskettes. General guidance has been prepared for estimating releases, including fourteen industry-specific guidance documents.

EPA also has established a training program designed to familiarize Regional personnel with the reporting requirements and to train them in providing technical assistance to respondents. Using that training, the Regions have conducted and continue to conduct numerous workshops each year to explain the reporting requirements to the regulated community. EPA also has established a training program to teach EPCRA section 313 reporting requirements to private businesses and consultants that wish to provide counsel on section 313 compliance. As previously mentioned, EPA operates a toll-free hotline to answer general questions and direct potential respondents to proper EPA personnel. In addition, the Agency maintains a website with current program-specific information and guidance (www.epa.gov/tri).

EPA has also provided guidance for persons or organizations interested in petitioning the agency to add or delete chemicals from the TRI list. In addition to this guidance, EPA also convenes pre-petition meetings to assist petitioners if they request such assistance.

**Data Processing and Quality Control.** When TRI reports are submitted on paper, the information is keyed into a database on a PC-based local area network (LAN). Automated data quality checks begin at data entry, including various edit checks and the start of normalization of some of the data fields. At this point, emphasis is placed on identifying forms that are not completed correctly. If the problem(s) identified prevent further processing of the form, EPA sends a Notice of Significant Error to the respondent. Notices of Technical Error are sent to the respondents identifying any errors and requesting corrections.

At this stage, EPA also loads data from those facilities that have provided their Form R submissions on magnetic media. Many data quality checks are incorporated into the magnetic media reporting package.

EPA continues to place a high emphasis on data entry accuracy within the TRI. EPA's internal review of approximately 4% of the records showed a data entry accuracy rate of over 99.9%. This is up from 97.5% for the 1987 reporting year. EPA continues to conduct the computerized edit checks at the point of data entry, including a high percentage of verification and data reconciliation activities. EPA now has available an electronic Facility Data Profile (FDP) that enables all reporting facilities to verify online all TRI data submitted. EPA continues to mail hard copy notices of significant reporting errors to reporting facilities.

Once on the LAN, the data are uploaded to the mainframe, where further data quality checks are made. These operations involve continued normalization of name fields, such as county names, insertion of missing latitude and longitude coordinates along with checks with other data.

Congress requires EPA to make TRI data available to the public through computer telecommunications. As a result, EPA has found it necessary to undertake a variety of activities

October, 2005

to make the data more usable. This is due to the fact that computer searches only retrieve data in exactly the format requested. Because facilities report their data in a wide variety of ways, EPA has taken steps to use a consistent name for all counties, uses a variety of nomenclature standards for names within the database, has added latitude and longitude representing the center of the zip code area in which the facility is found, and has taken other steps to assist in the normalization of the data.

EPA generates a facility identification number for newly reporting facilities at the time of data entry. This allows linkage to all years of reports for a particular facility or location. The identification number also allows easy retrieval of cross-year data, even when a facility is sold or changes its name. This number has been sent to all facilities and they are required to use it on all future submissions submitted to the Agency. Use of the facility identification number also facilitates data quality and cross-year analysis.

Under EPCRA section 313, facilities are required to submit forms both to EPA and the state in which they operate. For additional quality assurance and tracking purposes, EPA provides all states with a listing of facilities that reported to the Federal Reporting Center for each reporting year. This activity typically results in the identification of several cases where facilities had not reported to one or the other government. Many states then provide copies of forms to the EPA where EPA had not received copies, and vice-versa. This activity has provided a critical step to assist EPA in coordinating the data collection with the states and completing both data repositories.

Ensuring the accuracy of the on-site release and off-site transfer estimates is an on-going effort, and includes comparison across reporting years as well as use of data and evaluations based on facility site visits. EPA conducted a data quality site survey of 104 facilities for reporting years 1994 and 1995: 25 facilities in SIC code 25 (furniture manufacturing) for 1994; 19 facilities in SIC code 281 (inorganic chemical manufacturing) for 1994; 17 facilities in SIC code 285 (paint manufacturing) for 1994; 23 facilities in SIC code 30 (rubber and plastics manufacturing) for 1994; 10 facilities in SIC code 26 (pulp and paper manufacturing) for 1995; and 10 facilities in SIC code 286 (organic chemical manufacturing) for 1995. Following are some of the major findings of the site survey: 1) Facility and site surveyor release estimates were in good agreement, calculated to be within ±3%. 2) Facilities primarily used purchasing records to make threshold determinations. 3) Facilities in chemical manufacturing used production data more frequently to make threshold determinations. 4) Facilities in chemical manufacturing were more likely to assume thresholds were exceeded and because of that they had the highest error rate, primarily for reporting chemicals that did not exceed thresholds. 5) Container residue was the most commonly overlooked release source.

**Making TRI Data Available**. Many options are available for accessing TRI data. EPA offers the data in a variety of common computer and hard copy formats to ensure that everyone can easily use the information. TRI is available on diskette, CD-ROM, and on the Internet. While TRI data have been available from several computer-based sources, recent system conversions,

October, 2005

processing efficiencies, improvements in web-based access have created a need for a primary source for accessing TRI (and other Agency) data. Therefore, EPA has shifted its focus to the Envirofacts and TRI Explorer systems to address this need. TRI data will be updated in the Envirofacts and TRI Explorer systems at a more frequent rate than previously possible allowing the user community access to virtually "live" TRI data.

TRI reports are also available from state government offices as well as from EPA. For each reporting year, many states make their data available before EPA releases data from the national database. Persons interested in receiving state specific information may call their state EPCRA Coordinator or EPA Regional TRI Coordinator for assistance.

**List Revisions and Petition Reviews**. The list of toxic chemicals subject to reporting under section 313 of EPCRA is not static. The list can be modified by Agency-initiated reviews of chemicals or by public petition. If a listing petition is submitted by a State governor, then EPA must respond within 180 days by either publishing an explanation of denial or granting the petition. If EPA does not respond within 180 days the chemicals are automatically added to the toxic chemical list. Once a petition is received, EPA begins an intensive review that includes chemistry and toxicity analyses of the chemical or chemicals. Depending on the toxicity of the chemical or chemicals, EPA's review also may include exposure, economic, and engineering analyses. If the chemical meets the criteria for addition to the list, it is added or maintained on the list. If the criteria are not met, then the chemical is removed from the list. The criteria for inclusion on the list are stated in section 313(d)(2): the chemical is known to or can reasonably be anticipated to cause significant adverse acute human health effects at concentration levels that are reasonably likely to exist beyond facility site boundaries as a result of continuous, or frequently recurring, releases; the chemical is known to cause or can reasonably be anticipated to cause in humans cancer or teratogenic effects, or serious or irreversible reproductive dysfunctions, neurological disorders, heritable genetic mutations or other chronic health effects; or the chemical is known to cause or can reasonably be anticipated to cause a significant adverse effect on the environment because of its toxicity, its toxicity and persistence in the environment, or its toxicity and tendency to bioaccumulate in the environment.

Since the list was first published, there have been 332 additions (including 6 chemical categories) to and 19 deletions or modifications (including modifications to two chemical categories) from it, and several delisting petitions are pending. Two hundred ninety-one of these additions (including 4 chemical categories) are the result of Agency-initiated rulemakings. Four of the deletions or modification, including acetone, sodium hydroxide (solution), sodium sulfate (solution), hydrochloric acid (non-aerosol), and sulfuric acid (non-aerosol), were high production volume chemicals, which greatly reduced the reporting burden on industry. In general, previous petitions have been submitted for single chemicals, however, a recent increase in petitions for groups of chemicals has occurred. EPA may list the chemicals as a category or add only those individual chemicals which meet the section 313(d)(2) criteria. Since inception of the TRI Program, EPA has identified several existing listed chemicals as PBT chemicals as well as added new chemicals as PBT chemicals.

**Trade Secrecy Reviews.**  When a respondent claims a chemical identity as a trade secret, a substantiation must be included.  Occasionally respondents claim trade secret status on Form R, but do not provide substantiation.  In those cases, EPA must review the claim and contact the respondent to determine the true intent.  In many cases, the trade secret claim was not intended and no substantiation is made.  Trade Secrecy reviews, including the costs to EPA, are discussed in greater detail in the ICR for the Trade Secrecy Rule for EPCRA (EPA #1428, OMB #2050-0078).

### 4(b)  Collection Methodology and Management

EPA continues to encourage the use of submissions on magnetic media.  The use of magnetic media is intended to reduce both the cost and the time required to enter, process, and make available the data, although is may also reduce the reporting burden on industry. Submission by magnetic media also improves data quality because of automatic checks that highlight errors or omitted data.  As an additional step in improving user's ability to report using magnetic media, EPA has made the Form A Certification Statement available on magnetic disk and CD-ROM.  For TRI reporting, EPA has made available an automated reporting software package called TRI-ME, that simplifies the reporting process by automating calculations and compiling instructions and guidance in an electronic format.

### 4(c)  Small Entity Flexibility

The statute provides that facilities with less than 10 full-time employees (or equivalent) are not required to report.  In addition, EPA has taken several steps to minimize the burden for small businesses.  A range reporting option was added to the February 16, 1988 final rule (53 FR 4500) that codified the EPCRA section 313 reporting requirements.  Range reporting was the preferred option from the Regulatory Flexibility Act analysis to provide burden reduction for small businesses. Range reporting provides an option for releases of less than 1,000 pounds to be recorded as a code representing one of three ranges, 1 to 10 pounds, 11 to 499 pounds, or 500 to 999 pounds, rather than as a specific estimate of the release amount.  The benefit is not, however, limited to small businesses. Range reporting is not applicable for PBT chemicals.

In addition, in response to a petition from the Small Business Administration, EPA has promulgated the alternate threshold (November 30, 1994, 59 FR 61488) discussed above.  Although any reporting facility meeting the criteria may use the alternate threshold, it is thought that this alternate threshold will be most advantageous to small entities.

EPA conducted a TRI Stakeholder Dialogue between November 2002 and February 2004 to explore burden reduction opportunities. During this dialogue, improvements to the TRI reporting process were identified and a number of burden reduction options associated with TRI reporting were explored. After reviewing these improvements and reporting options, EPA has promulgated a TRI Reporting Forms Modification Rule (July 12, 2005, 70 FR 39931) that simplifies a number of TRI reporting requirements; removes some data elements from the Form R and Form A that

34

can be obtained from other EPA information collection databases, or are rarely used, and updates the regulations to provide corrected contact information and descriptions of the Forms R and A data elements. The benefit is not, however, limited to small businesses.

EPA has also developed interactive, intelligent, user-friendly software called "Toxics Release Inventory Made Easy Software (*TRI-ME*)," that asks the user simple, straightforward questions to help the user determine if the facility is subject to TRI reporting. *TRI-ME* has greatly reduced data quality errors and therefore, reduced the likelihood of a facility being in violation of the reporting requirements, or having to subsequently submit corrections. In the last five years TRI-ME usage has increased. Note that 73 percent of responses were received electronically for the 1999 reporting year. And by reporting year 2003 93% of responses were received.

### 4(d) Collection Schedule

Facilities must report their information on a calendar year bases, and submit the Form R to EPA by July 1 each year. On average, EPA has released the national TRI data set to the public approximately ten months after the annual reporting deadline, i.e., July 1. In response to public concerns about shortening the time frame for release of TRI information, EPA is instituting tighter deadlines for facilities to submit revised reports, and combining a series of automated data quality operations. The Agency expects these measures will help it to meet the ultimate goal of releasing data in the year of submission. Also, it is important to note that EPA's national database is just one avenue of access to the TRI information. Each state also makes its data available to the public, and most states are able to make their data available prior to EPA's release of the national database. For example, nearly half of the states release their state's TRI database within four months of the reporting deadline.

## 5      NONDUPLICATION, CONSULTATIONS, OTHER COLLECTION CRITERIA

### 5(a) Nonduplication

The basic information requested on the Form R is required to be reported by law. Other statutes, however, also require the reporting of information about releases of chemicals to the environment, creating the possibility of overlap or duplication of reporting requirements. EPA anticipates some overlap and provides that respondents may use readily available data collected pursuant to other provisions of law to complete the section 313 reports. However, currently available non-TRI sources of information cannot provide readily accessible release and transfer, inventory, or pollution prevention data with the scope, level of detail, and chemical coverage as data currently included in TRI.

The TRI contains information on releases, transfers, inventories, and pollution prevention activities for approximately 650 toxic chemicals and chemical categories. Although there are no national databases that are comparable to the whole of TRI, several data sources exist which contain media-specific data on releases and transfers. In theory, information from these databases

October, 2005

could be combined to form an analog of release and transfer data contained in TRI.  However, this undertaking is extremely difficult at best, and may be impossible given the currently available data sources (see Figure 1 below).  Difficulties replicating TRI data using these alternative sources include differences in chemical coverage, facility coverage, reporting frequencies, and perhaps most importantly, the integration of data from various sources at a facility level.

For example, the AIRS Facility Subsystem (AFS) contains emissions, compliance, and enforcement data on air pollution point sources emitting any of the so-called criteria pollutants at levels above defined thresholds. The Air Quality System (AQS) technical area is designed primarily for AQS users (state, tribal and local agency management, EPA Regional Offices, consultants, and environmental groups.)  It provides information about the use of the AQS application, software downloads, file formats, background project information, and events of special interest to personnel working with data for the AQS. AQS was formerly a subsystem of the Aerometric Information Retrieval System (AIRS).  AIRS also included the AIRS Facility Subsystem (AFS).  AFS is now operated and maintained by the EPA's Office of Enforcement and Compliance Assurance (OECA).

The Air Facility Subsystem (AFS) contains compliance and permit data for stationary sources regulated by the U.S. EPA and state and local air pollution agencies. AFS is used by some state and local government agencies to track permit data. For further information regarding the air permitting program, visit EPA's Air Permits page. This information is used by the states to prepare State Implementation Plans (SIPs) and to track the compliance status of point sources with various regulatory programs under the Clean Air Act. Tracking of emissions inventories has been moved to the National Emissions Inventory (NEI) database. This site is designed to keep users of the system appraised of new developments. AFS was once a part of AIRS, hence the historical utilization of that term may be incorporated within referenced documentation.

AFS data are not a good substitute for TRI air emissions data because of the lack of reporting requirements for most air toxics and the lack of rigid reporting schedules, and because there is no requirement for states to report emissions of Hazardous Air Pollutants (HAPs) to AFS.  A number of states and regional agencies do maintain their own air emissions inventories, including California, and the Great Lakes states.  In these states, difficulties replicating TRI data include variations in the types of data collected, and the fact that only some states maintain these types of inventories.

36

October, 2005

## FIGURE 1 - MAJOR RELEASE AND TRANSFER DATABASES

| Data source | Media and chemical coverage[1] | Relevant releases statistics available | Ease of database substitution for TRI data[2] |
|---|---|---|---|
| Aerometric Information Retrieval System (AIRS), Facility Subsystem (AFS) | Contains annual emissions of six criteria air pollutants for facilities above reporting thresholds. Also contains limited information on toxics. | Total annual releases; average daily releases in non-attainment areas. | Limited toxics data due to submission being voluntary. |
| Permit Compliance System (PCS) | Contains monthly discharge monitoring data and flow rates for major sources of water pollutants. | Contains concentration data; total annual releases can be calculated; average daily releases, maximum "moment" if continuous monitoring. | Only includes chemicals for which a discharge limit has been set. Difficult to link between PCS parameters and CAS #; very limited monitoring data for minor dischargers. |
| Biennial Reporting System (BRS) | Contains waste volumes by RCRA waste code reported biennially. | Total annual off-site transfers of hazardous waste for land disposal; total annual releases to POTW. | Many RCRA waste codes are not specific to an individual CAS #. Quantities of chemicals in waste can not be determined. Portion of waste stream matching each waste code can not be determined. |

Under RCRA, generators, treaters, storers, and disposers of hazardous waste are required to submit reports to the Biennial Reporting System (BRS) every two years. The Biennial Reporting System is a national system that collects data on the generation, management, and minimization of hazardous waste.(http://www.epa.gov/enviro/html/brs/index.html). This system captures detailed data on the generation of hazardous waste from large quantity generators and data on waste management practices from treatment, storage, and disposal facilities. The biennial data provide a basis for trend analyses. Data about the previous year's hazardous waste activities is reported on even years by the facilities to EPA. EPA then provides reports on hazardous waste

---

1. For additional detailed information on chemical coverage of TRI, AFS, BRS, and PCS, please refer to Attachments B-1 and B-2 at the end of this document.

2. "Ease of substitution" refers only to the potential of the information in the database to substitute for TRI reporting. It does not imply that the database is not adequate for the purposes for which it was designed.

generation and management activity that accompany the data files.  BRS cannot duplicate the information contained within TRI, as BRS waste codes do not necessarily map to unique chemicals, quantities of  specific wastes in the wastestream cannot be determined, and reporting is less frequent than that of TRI.

The Permit Compliance System (PCS) tracks permit compliance and enforcement status of facilities that discharge to surface waters. The Permit Compliance System (PCS) (http://www.epa.gov/enviro/html/pcs/) provides information on companies which have been issued permits to discharge waste water into rivers. You can review information on when a permit was issued and expires, how much the company is permitted to discharge, and the actual monitoring data showing what the company has discharged. The Water Discharge Permits Query allows you to retrieve preselected data from the PCS database in Envirofacts. You can narrow your search by selecting various options including facility name, geographic location, standard industrial classification, and chemicals.

PCS data are not a suitable substitute for TRI data due to the fact that PCS is a permit tracking system and not a loadings system.  In other words, PCS typically tracks pollutant concentrations, and not total releases.  This difference in purpose results in differences which are difficult to resolve in the amount and types of data collected.  Furthermore, PCS does not contain all TRI chemicals.

TRI also contains inventory data, which makes up a small portion of the total data.  The most likely alternatives for TRI inventory data are the Tier I/II data reported under EPCRA §312. Under EPCRA §312, regulated facilities must submit annual inventory reports of hazardous chemicals stored on site to the state.  Tier I requires reporting on broad categories of physical hazards, while Tier II requires chemical specific information by CAS number.  The information contained on the Tier I and Tier II reports surpasses the chemical inventory data requested on TRI Form R in terms of the chemicals covered and level of detail.  However, there are significant difficulties with respect to public access of Tier I and Tier II data, including the lack of a national integrated database.

In addition to release/transfer and inventory data, TRI also collects pollution prevention data from reporting facilities.  Pollution prevention data somewhat analogous to data in TRI can be found in BRS (described above) and databases administered by two state environmental agencies.  While BRS provides both qualitative and quantitative pollution prevention information, it does not have the facility or chemical coverage necessary to replace TRI pollution prevention reporting requirements.  BRS contains data on generation, transfer, and management of hazardous wastes, while pollution prevention data contained in TRI includes information on wastes or process by-products in all production phases and media.  In addition, states have come to rely on the pollution prevention data provided to them by TRI.  As a result, no state program collects all of the pollution prevention data currently available in TRI.

October, 2005

What follows is a more detailed discussion of the several information sources that currently provide pollutant release and transfer data.  The analysis is broken down by specific type of data collected under TRI.

## Fugitive/Non-Point Air Emissions and Stack/Point Air Emissions

Fugitive (non-point) air emissions and stack (point) air emissions are reported under Sections 5.1 and 5.2, respectively, of TRI Reporting Form R.  (Fugitive air emissions are defined as all releases of air pollutants to the air that are not released through stacks, vents, ducts, pipes, or any other confined air stream.  Stack air emissions are defined as all releases of air pollutants that are released through stacks, vents, ducts, pipes, or any other confined air stream.)  In the paragraphs below, several alternative data sources are compared and contrasted to TRI.  Key criteria considered in comparing the alternative data sources with TRI include: chemical coverage, industry/facility coverage, release statistics, and public accessibility to the data.

### AIRS Facility Subsystem (AFS)

The Aerometric Information Retrieval System (AIRS) is a computer-based repository of information on airborne pollution in the United States and various World Health Organization (WHO) member countries.  AIRS is comprised of four major databases - Air Quality (AQ), AIRS Facility Subsystem (AFS), Area/Mobile Source (AMS), Geo-Common (GCS) subsystems, and a mapping utility for all AIRS data called AIRS Graphics (AG). Each subsystem addresses different, but connected, aspects of the Clean Air Act regulatory requirements. AIRS is administered by EPA's Office of Air and Radiation (OAR).

The AIRS Facility Subsystem (AFS) is the database component of AIRS which tracks air emissions from industrial plants. AFS is a sub-system of the Aerometric Information Retrieval System (AIRS). AFS contains compliance and permit data for stationary sources regulated by the U.S. EPA and state and local air pollution agencies.  AFS contains emissions, compliance, and enforcement data on air pollution point sources regulated by EPA, state and local environmental regulatory agencies.

OAR manages EPA programs to improve air quality in areas where the current quality is unacceptable and to prevent deterioration in areas where the air is relatively free of contamination. To help accomplish this task, OAR uses AFS to track emissions of pollutants that have been proven to be detrimental to public health, known as *criteria pollutants*, as defined in the national ambient air quality standards.  The six criteria pollutants which states must report to AFS include: particulate matter less than 10 microns in size (PM10), carbon monoxide (CO), sulfur dioxide (SO2), nitrogen dioxide (NO2), lead (Pb), and ozone (reported as reactive volatile organic compounds, an ozone precursor).  States are required to report ambient air quality data on a quarterly basis, and point source data on a yearly basis, for the criteria pollutants listed.  In

addition, states may choose to use the AIRS system to store data on a wide variety of other pollutants and related variables.

Data in AFS is organized into four logical levels: plant, stack, point, and segment. The plant is a facility represented by its physical location, and defined by property boundaries. A stack or vent is where emissions are introduced into the atmosphere. An emission point is a physical piece of equipment or a process that produced emissions. Finally, a segment is a component of a point process (such as fuel combustion) that is used in the computation of emissions. (U.S. EPA, 1995a)

At the facility level, sources with air emissions greater than 1,000 tons per year (tpy) for CO, 100 tpy for VOC, PM-10, SOx, or NOx, or 5 tpy for lead must report actual or estimated annual emissions data. At the point level, such as a stack or any single piece of equipment or process where emissions occur, sources with air emissions greater than 25 tpy for VOC, PM-10, SOx, or NOx, 250 tpy for CO, and 5 tpy for lead must report actual or estimated annual emissions data. AFS data are utilized by states to prepare State Implementation Plans to comply with regulatory programs and by EPA as an input for the estimation of total national emissions. Data for over 100,000 point source facilities are stored in AFS.

Compliance and enforcement data are updated by states and EPA based on the data submitted by facilities. Compliance data for these plants may be recorded for the plant as a whole or for a specific point within the plant. Emissions estimates are available for facilities satisfying the emissions thresholds described above. States also are required to report emissions data for point sources which emit below the 100 ton threshold in areas where air quality does not meet federal standards (non-attainment areas).

Fugitive air emissions data are not specifically flagged within AFS. It may be possible, however, to generate fugitive emissions estimates for pollutants included within AFS by determining all Source Classification Codes (SCCs) generating fugitive air emissions, and then totaling emissions (Kleeman, 1995). SCCs are eight-character codes which represent specific processes or functions within a source category. For example, SCC 1-02-005-01 corresponds to the burning of distillate oil in an industrial boiler. SCCs allow proper identification of processes as well as proper calculation of emissions when applying AP-42 emission factors.[3] Because SCC codes are not designed to distinguish stack level emissions from fugitive air emissions, such an effort would

---

3. AP-42 Emission Factors, available from the Factor Information Retrieval (FIRE) System, and emission factors in general, are representative values that attempt to relate the quantity of a pollutant released with a given activity associated with the release of that pollutant. Emission factors are typically expressed as the weight of pollutant divided by a unit weight, volume, distance, or duration of the activity emitting the pollutant (EPA, 1995b). Generally, AP-42 emission factors are simply averages of available emissions rates that can be used to facilitate the estimation of air emissions and are sometimes used by facilities to estimate TRI releases and transfers. A difficulty with using emissions factors is that there is a lack of facility-specific throughput data (production or activity), without which estimates cannot be made. Another difficulty is that the factors are averages and do not account for the variations between facilities.

October, 2005

require a review of all coded industrial processes in order to identify those generating fugitive emissions.

As described in more detail in following sections, AFS data are not good substitutes for TRI stack or fugitive emissions data. Problems include the lack of reporting requirements for most air toxics, and the lack of rigid reporting schedules.

Chemical coverage: States are required to report to EPA annual emissions estimates for point sources emitting greater than or equal to threshold quantities of the *criteria pollutants* (40 CFR §51: 321-326): particulate matter ($PM_{10}$ & $PM_{2.5}$), carbon monoxide, sulfur oxides, nitrogen oxides, lead, and ozone. Currently, there is no requirement for states to report hazardous air pollutants (HAPs) to AFS, although some states with toxics reporting requirements that exceed federal requirements may upload their air toxics information to AFS.[4] At this time, however, no research has been undertaken to determine which states report which HAPs. There also are no statistics on the frequency of state HAP reporting, which facilities report, or the reporting thresholds.

Because data on toxic releases in AFS are sparse, emissions can be estimated (that is, modeled) using a technique called "speciation." Speciation involves multiplying reported emissions of particulate matter (PM) and VOCs by fractions representing various compounds, according to a profile specific to the emission source. SPECIATE is EPA's repository of total organic compounds (TOC) and particulate matter (PM) speciated profiles for a variety of sources for use in source apportionment studies. OAQPS's Clearinghouse for Inventories on Emission Factors (CHIEF) website makes available SPECIATE, a windows-based speciation application with apportionment factors for 691 organic chemicals and 110 particulates in about 700 total profiles. However, there are significant limitations to the accuracy and reliability of speciation data. The speciation profiles contained in SPECIATE were developed from field sampling, engineering judgements, and other indirect techniques. The weight percentages and number of chemicals in a given profile may be heavily influenced by the particular analytical and sampling methods used to develop the profile. (U.S. EPA, 1996)

Another shortcoming of SPECIATE involves the assignment of profiles for all SCCs in AIRS. Ideally, each SCC in AIRS would have a unique profile to represent its speciation characteristics; however, there are far more SCCs than available profiles. Therefore, those categories which are not associated with original profiles are assigned profiles based on engineering judgment (Radian, 1993).

Industry/facility coverage: Because facilities are included in AFS on the basis of their emissions levels, there are no SIC or industry limitations imposed on the list of AFS-covered facilities. In

---

4. Hazardous Air Pollutants (HAPs) are defined in Section 112 of the Clean Air Act (CAA). Section 112 lists 189 HAPs, of which 181 also are listed in TRI.

contrast, TRI currently only requests data from some, but not all SIC codes, thereby excluding many other industries. It is important to note, however, that emissions thresholds play an important role in determining which facilities are covered. Facilities are covered under AFS only if they release multiple tons of criteria pollutants annually. Smaller HAP emitters that release small amounts of criteria pollutants may therefore be completely exempted from reporting to AFS. TRI, on the other hand, employs general thresholds of 25,000 pounds per year for manufacture and processing of a chemical and 10,000 pounds per year for otherwise use of a chemical. These thresholds are not tied to emissions quantities. In addition to this threshold, TRI also exempts facilities with less than the equivalent of ten full time employees.

**Release statistics/reporting frequency**: EPA requests that states upload information to AFS on an annual basis. However, because there are no defined reporting schedules and no real penalties for not reporting, in practice there is "rolling receipt" of information, with some states failing to report for various reasons in some years. Although AFS notes that most states report regularly, and some facility-specific emissions data are available from AFS across all reporting years (Wakefield, 1995), the looseness of the reporting structure makes comparisons across states, industry, facilities, or years difficult.

**Accessibility**: AFS data are accessible through the EPA Mainframe and to a limited degree, through AIRS Executive, a self-contained updatable and downloadable program which digests and summarizes AIRS data. There are no access restrictions for AIRS Executive which is available through the EPA World Wide Web site (http://www.epa.gov/airs/aexec.html). The EPA Mainframe, however, is password protected and is not accessible by the general public.

<u>State Air Emissions Inventories</u>

Several states and regional agencies maintain their own air emissions inventories, including the inventory set up under California's "Hot Spots" Information and Assessment Act (Assembly Bill 2588), and the Great Lakes Regional Air Toxics Emissions Inventory. Approximately half the states have implemented some kind of air toxics reporting system (Pope, 1995). However, the amount of data as well as the types of data elements collected varies widely from state to state. The Great Lakes inventory merits special attention because other states and countries (including Louisiana; Texas; Ontario, Canada; and Mexico) use it as a model for their own inventories. A number of other states have active programs or are in the process of developing them. A number of other states have active programs or are in the process of developing them. Two are discussed below in terms of their coverage and accessibility characteristics.

**Chemical coverage**: Chemicals covered under state and regional inventories vary widely in the number of chemicals covered, data elements required, and reporting thresholds used. While some inventories collect detailed, facility level information on many chemicals, others are designed only to track very specific pollutants for specific applications.

**Industry/facility coverage**:  States often develop their own toxics inventories due to perceived gaps in TRI's industry coverage.

The Great Lakes Regional Air Toxics Emissions Inventory does not require emissions reporting by industry.  Rather, state agencies will use best available emission factors (FIRE) or source-specific emission factors and throughput information to estimate emissions from a much larger catalog of sources than TRI, including area sources such as dry cleaners, asphalt plants, and wood stoves (Ratza, 1995).

**Release statistics/reporting frequency**:  The type of data collected and data collection frequency among states and regions also varies widely.  For example:

**Accessibility**:  Because each state or region which maintains a HAPs database does so more or less independently of the federal government, there currently is no central repository of this information.  Because the states and regions also use different database formats and applications to maintain their data, building a multi-state/region air emissions inventory from the existing databases would be a challenging task.  However, OAQPS is in the process of developing a national toxics inventory database, which will utilize a combination of TRI data and state, regional, & local databases (Pope, 1995).

Another potential partial solution to the data compatibility problem, once it is fully implemented, is the Great Lakes Regional Air Toxics Emissions Inventory, which is maintained using the Regional Air Pollutant Inventory Development System (RAPIDS).

As the principle component of the Great Lakes Regional Air Toxic Emissions Inventory project, the Regional Air Pollutant Inventory Development System (RAPIDS) is the first ever multi-jurisdictional pollutant emissions inventory software that has been developed. This software is an important product of the binational steering committee effort to design and implement a regional inventory containing sources of toxic air contaminants. RAPIDS was originally tested by Illinois, Indiana, and Wisconsin in their joint development of the Southwest Lake Michigan Pilot Study. The focus of the study was on the Commission defined list of 49 toxic pollutants in addition to several other important nontoxic compounds. Now, RAPIDS is used by each Great Lakes state and Province of Ontario. The eight Great Lakes states and Ontario province working together through the Great Lakes Commission are currently in the process of developing a regional emission inventory for airborne toxic pollutants. This regional emission inventory is focused on 49 toxic air pollutants which have been identified as significant contributors to the contamination of the Great Lakes. The development of the regional emission inventory has included the development of technical specifications for a regional air toxic database (Phase I); the development of an automated Regional Air Pollutant Inventory Development System (RAPIDS), an emission factor database, and an emission inventory protocol for inventorying hazardous air pollutants (Phase II); and the full implementation of the protocol and emission inventory software to complete an eight state point and area source toxic air emission

43

October, 2005

inventory (Phase III). To date, this inventory system has been developed to estimate emissions from point and area sources only. RAPIDS, a state-of-the-art client/server software for the estimation of emissions from point and area sources is designed to run on a personal computer. Each State will create its own statewide inventory that will be uploaded to the regional RAPIDS repository, an Oracle database, at the USEPA's Great Lakes National Program Office (GLNPO). RAPIDS uses the Great Lakes State-approved USEPA emission factor database, the Factor Information Retrieval System (FIRE) to estimate emissions, and also accepts source-specific emissions data. The RAPIDS design has focused on flexibility and versatility, and is built upon an innovative data model.

The latest release of RAPIDS (Version 2.1) has been updated to include, among other things, the ability to export emissions data in a format compatible with the U.S. EPA's National Emissions Inventory (NEI). For the 1999 national inventory, all states were required to submit emissions data in this format, which makes RAPIDS one of the most progressive emissions inventory systems available. According to the Great Lakes Commission, RAPIDS is the "first-ever multi-state pollutant emissions estimation software," and handles sophisticated relational data management as well as emissions estimations.

### Title V Part 70 Operating Permits

Under the 1990 Clean Air Act Amendments (CAAA), facilities designated as "major sources" and facilities otherwise subject to Section 112 and Title IV must apply for a Title V Part 70 Operating Permit. Although a facility can meet the criteria for a major source in any of several ways, particularly relevant are those facilities which attain major source status by emitting 10 tons per year (tpy) or more of any HAP or 25 tpy total combined HAPs. As part of the application for a Title V permit, some facilities may have to report emissions of air toxics (see discussion on chemical coverage below). There is significant overlap between the 189 HAPs regulated under the CAA and the 650+ chemicals in TRI. Compared to TRI, however, the information provided in the permit applications has very different characteristics in terms of chemical coverage, completeness, and accessibility.

**Chemical coverage**: Title V requires that all permit applicants provide qualitative descriptions of their emissions, including all criteria pollutants and all 189 toxic pollutants. Quantitative emissions estimates are usually required by the permitting authorities only when more information is needed to resolve a dispute over applicable requirements, such as whether or not the facility should be classified as a major source. In the event that there is no dispute, no emissions estimates are required. In situations where estimates are required, facilities are allowed to use "available information," which includes EPA emission factors documents, "reasonable engineering projections," as well as test data. EPA's policy, as outlined in the "White Paper for Streamlined Development of Part 70 Permit Applications," is to request just enough information to convince the permitting authorities that the facility meets all emissions requirements. According to the White Paper, "emissions information for these purposes does not always need to be detailed or

44

precise." (U.S. EPA, 1995c)  For most pollutants, it is not likely that Title V Part 70 emissions data could substitute for TRI release reporting.

**Industry/facility coverage**:  There are no SIC or industry limitations for major facilities.  For non-major sources, decisions on permit applicability are made on a source category by source category basis.  Decisions are currently being made on Title V Part 70 permit requirements for non-major sources as to which source categories will be exempted, deferred, or required to obtain permits (Seitz, 1995).  However, as stated above in the chemical coverage discussion, actual emissions estimates are required only when attempting to settle a dispute over facility status or other applicable requirements.  Therefore, the majority of Title V permit applicants are not required to furnish any quantitative data.  Title V's facility coverage is likely to be different from TRI's facility coverage, due to the differences in applicability criteria between the two systems.  While TRI has a manufacture, process, or use threshold for toxic chemicals, Title V has applicability criteria based on HAPs emissions (see above).

**Release statistics/reporting frequency**: Emissions information is required at the time of permit application, renewal, and modification.  Since permits are typically renewed every five years, most facilities will report their information every five years (Swanson, 1995).  Other possible situations for emissions information updates include new applicable requirements not requiring permit modifications, and changed compliance status of facilities.  Even if the information was as complete as TRI, the duration between reports is much longer than the one year timespan between TRI reports.

**Accessibility**: The U.S. EPA does not maintain a central inventory of the emissions data contained in the permit applications (Southerland, 1995).  This information is kept at the state and regional levels, making it difficult to access, especially in comparison to TRI.

<u>Summary of Availability of Fugitive/Non-Point and Stack/Point Air Emissions Data</u>

None of the data sources described above can be used in place of TRI fugitive or stack emissions data.  Although AFS provides good data on criteria pollutants, only one criteria pollutant (lead) is reportable as a discrete chemical substance on both AFS and TRI.  Further, AFS HAP release information is not a good substitute for TRI because data for EPCRA Section 313 toxic chemicals are generally unavailable, and speciation cannot reliably generate accurate facility-specific HAP emissions estimates.  In addition, fugitive emissions are not specifically flagged within AFS. Some state air emissions inventories such as California's may collect air emissions information that is as complete or even more detailed than TRI.  However, not all states maintain inventories, and there are still many unresolved data compatibility and accessibility issues.  The Great Lakes inventory is limited in its geographic coverage as well as the number of chemicals it contains, uses different data collection techniques than TRI, and relies on state-generated estimates in lieu of facility reported release data.  Emissions information on air toxics contained within Title V Permit

October, 2005

documents also are not a substitute for TRI emissions in terms of chemical coverage, frequency of reporting, or accessibility.

## Direct Discharges to Receiving Streams or Water Bodies

Form R requires that facilities report total direct discharges to receiving streams or water bodies. Releases are reported in pounds per year and include the name of the receiving stream or water body. The following section compares and contrasts the Permit Compliance System (PCS) with TRI to determine whether it could be used as a substitute for TRI chemical release data. In comparing and contrasting PCS with TRI, several variables are considered. Key criteria include: chemical coverage, industry and facility coverage, release statistics, reporting frequency, and accessibility.

The Permit Compliance System (PCS) tracks permit compliance and enforcement status of facilities regulated by the National Pollutant Discharge Elimination System (NPDES) under the Clean Water Act (CWA) and is managed by EPA's Office of Enforcement and Compliance Assurance (OECA). PCS tracks all point source discharges to surface waters, but does not include indirect releases such as discharges to Publicly Owned Treatment Works (POTWs). Permits are classified as major or minor based on facility discharge characteristics such as toxic pollutant potential and flow volume. Facilities are classified as "major" based upon a scoring system which considers toxic pollutant potential, flow/streamflow volume, conventional pollutant loading, public health impacts, water quality factors, and proximity to near coastal waters.

Major dischargers report compliance with their NPDES permit limits through Discharge Monitoring Reports (DMRs). DMRs are generally submitted on a monthly basis to state and regional EPA, providing detailed information on reported measurement values for those chemicals regulated within their NPDES permit. Data collected via DMRs are entered into PCS, including: concentration and quantity values for regulated pollutants, and the type of permit violation (if any). EPA uses PCS to produce the Quarterly Non-Compliance Report (QNCR), a public document listing NPDES permit violations. EPA requires monitoring data only for those permits classified as major. For minor facilities the database contains only general facility-level information. It is important to note, however, that all NPDES permittees (both major and minor) are required to file DMRs with their State or Regional NPDES authorities. Therefore, monitoring data for minor facilities are available from the files of these permitting authorities, which are open to the public. Data for minor facilities are not maintained through the national database.

There are several differences between TRI and PCS stemming primarily from the divergent purposes of the two systems. Unlike TRI, PCS is a permit tracking system rather than a toxic pollutant loadings system. The differing data needs of these two types of systems make it problematic to transfer information from one to the other. For example, although EPA requires the reporting of PCS data in mass units but allows reporting in concentration if it is impracticable to do so, the fact that PCS monitoring data can be reported in either mass units or as

46

concentrations can make comparing the releases of two facilities a complicated issue. Data in units of concentration data can be converted to mass units only if flow data also exist.

**Chemical coverage**: A facility's permit record may not include all pollutants actually being discharged by the facility. The monitoring data available through PCS for major dischargers include only those chemicals for which a monitoring requirement has been set in the permit. Federal effluent guidelines exist for many major industries and determine chemicals for which monitoring is required. However, the guidelines may not consider the same chemicals across industries. Therefore, two facilities in different industries with similar chemical releases may not necessarily both report the same set of chemicals to PCS. Also, for facilities not covered by a Federal effluent guideline, it is left to the discretion of the permit writers to decide which pollutants will be included in the permit, how often monitoring must occur, and which parameters and units of measure are to be used.

Because NPDES permit discharge limits are written in terms of PCS pollutant parameters, and not CAS numbers, much of the data contained within PCS is not chemical-specific. An example of a non chemical-specific PCS parameter is parameter 00535, Suspended Volatile Solids. It may be difficult to determine the mix of specific chemicals when data are reported using non chemical-specific parameters. In addition, in many cases, multiple parameters are reported for the same chemical, representing different measures of the same chemical. For example, PCS parameter numbers 01049, 01050, and 01051 represent dissolved, suspended, and total lead, respectively. Because there may be several parameters for a single chemical, it becomes difficult to aggregate their masses. Chemical Abstract Service (CAS) registry numbers are not reported for chemical parameters; however, parameters can sometimes be linked to a specific CAS number using an EPA database called SUPERCAS. SUPERCAS is an edited and augmented version of the CAS matching file contained in STORET, an EPA water monitoring data system. All PCS parameters are contained within SUPERCAS, and although SUPERCAS is not updated regularly, the addition of new parameters to PCS is a relatively infrequent event.

**Industry/facility coverage**: EPA requires monitoring data only from those facilities classified as major dischargers. For minor facilities, the database contains only general facility-level information. While the database tracks about 65,000 active permits, only about ten percent of these are classified as major. A state may choose to submit monitoring data for minor facilities but generally such data are unavailable. Unlike TRI, PCS does not limit reporting requirements to specific industry groups or exempt facilities with less than the equivalent of ten employees.

**Release statistics**: The release statistics reported for PCS parameters depend on the permit specifications. Often, releases are reported as concentrations in parts per million (ppm) or milligrams per liter (mg/L), as opposed to units of mass such as pounds per year (lb/yr) or kilograms per year (kg/yr) (Rubin, 1995). If discharges are reported in mass units, a maximum daily discharge also is reported. The basis for these reported data varies among facilities. For example, a facility may sample its effluent only once per month and still report a monthly

October, 2005

maximum discharge.  If discharges are reported as concentrations, a minimum, maximum, and average value may be reported, although a significant percentage of dischargers report only a maximum concentration (Rubin, 1995).  In general, flow rates are available for converting concentration units to units of mass (i.e., kg/year can be calculated by multiplying mg/L by the annual flow rate), although in some cases the flow rates are not provided.

A complex algorithm is required to estimate annual loadings from PCS data.  The algorithm must first identify facilities reporting quantities in pounds or kilograms, favoring mean values over maximum or minimum values.  For facilities with no loadings data, monthly concentration data must be linked and multiplied by each month's corresponding flow data, again favoring mean values over maximum and minimum values.  Additionally, the algorithm must convert the results to a single unit of measure.  PCS facilities report at least 26 different units of measure and 15 units of flow (e.g., gallons, thousands of gallons, and millions of gallons in terms of minutes, hours, days, and years).  This step is repeated for each month and summed to produce an annual loadings estimate.  If twelve months of data are not available, an average value can be used to produce an annual estimate.

Facility releases may be overestimated for several reasons: 1) facilities that release chemicals below their detection limit (e.g., between 0-6 ppm) will sometimes report releases at the detection limit (e.g., 6 ppm) in order to indicate the likely presence of a chemical; 2) facilities with episodic releases may be required to report releases at their peak level and not an average annual quantity; and 3) Facilities might have multiple monitoring points along the same outfall route, resulting in double counting.  Such reporting specifications may be appropriate given the purpose of the NPDES permit; however, PCS data will not always be appropriate for estimating annual pollutant loadings.

**Reporting frequency**: Discharge Monitoring Reports are generally submitted monthly to State or Regional EPA; therefore, reporting frequency is not a limitation when compared to TRI.

**Accessibility**: PCS data are accessible through the EPA Mainframe, the ENVIROFACTS database, as well as RTK NET.  The EPA Mainframe is not accessible to the general public.

<u>Conclusion of Availability of Data on Direct Discharges to Water</u>

Because PCS is a permit tracking system, and not a pollutant loadings system, it cannot provide a suitable substitute for TRI release data.  Within PCS, release data are only available for major facilities, and are reported in terms of PCS parameters, not specific chemicals.  These chemical parameters cannot always be easily converted into CAS numbers.  In addition, only those chemical parameters actually specified in the facility permit have monitoring requirements.  In some cases, data may be reported in units of concentration rather than units of mass.  If flow rates also are reported, concentration data can be used to estimate total releases, although there are several complicating factors in producing such an estimate.

48

October, 2005

## Underground Injection and Land Disposal On-Site

Section 313 gives EPA the authority to require reporting of on-site surface and subsurface (i.e., underground injection) releases to land. On-site surface releases to land include the following subcategories: RCRA subtitle C landfills, other landfills, land treatment/application farming, RCRA subtitle C surface impoundment, other surface impoundment, and other disposal. The Biennial Reports (part of the RCRAInfo database) require reporting of both underground injection and other on-site releases to land. The following analysis compares and contrasts Biennial Reports with TRI to determine whether it can be used as a substitute for TRI underground injection and on-site releases to land data.

Under Section 3002(a)(6) of the Resource Conservation and Recovery Act, facilities that generate an amount of hazardous waste that exceeds a defined threshold are required to submit biennial reports on that waste to EPA (or to state agencies that run RCRA programs). These reports include information on the quantity and nature of hazardous waste, the disposition of all hazardous waste, efforts undertaken to reduce volume and toxicity of waste generated, and the changes in volume and toxicity of waste actually achieved during the year. Facilities that treat, store, or dispose of hazardous wastes must provide information on the methods of treatment, storage or disposal. Data are reported to the states and regions, which then provide it to EPA headquarters. Information is entered into RCRAInfo, which is maintained by the Office of Solid Waste and Emergency Response (OSWER).

RCRAInfo is EPA's comprehensive information system, providing access to data supporting the Resource Conservation and Recovery Act (RCRA) of 1976 and the Hazardous and Solid Waste Amendments (HSWA) of 1984. RCRAInfo replaces the data recording and reporting abilities of the Resource Conservation and Recovery Information System (RCRIS) and the Biennial Reporting System (BRS).

The RCRAInfo system allows tracking of many types of information about the regulated universe of RCRA hazardous waste handlers. RCRAInfo characterizes facility status, regulated activities, and compliance histories and captures detailed data on the generation of hazardous waste from large quantity generators and on waste management practices from treatment, storage, and disposal facilities.

Using cutting-edge technology and a simple architecture, RCRAInfo provides a convenient user interface for the program staff and managers of the EPA and its State and Tribal partners. RCRAInfo data is made available to the public through EPA's Envirofacts Data Warehouse through monthly extracts or through the Right to Know Network.

Biennial Reports provide an overview of the progress of the RCRA program through tracking trends in hazardous waste generation and management. Large quantity generators (LQGs) and

treatment, storage, and disposal facilities (TSDFs) are required to report every two years.  Large quantity generators are defined as facilities that generate 2,200 pounds of total RCRA hazardous waste per month; generate 2.2 pounds of RCRA acute hazardous waste a month, or accumulate this amount during the year; or generate or accumulate more than 220 pounds annually of spill cleanup material contaminated with RCRA acute hazardous waste.  Biennial Reports contain data for about 23,000 LQGs and 4,000 TSDFs.

There are several important differences between Biennial Reports and TRI.  Although Biennial Reports maintain a large amount of useful data, it nevertheless cannot duplicate the information contained within TRI.  Waste codes used in Biennial Reports do not necessarily map to unique chemicals, quantities of specific chemicals in a wastestream cannot be determined, and reporting is less frequent than for TRI.  As detailed below, for these reasons Biennial Reports are not a reasonable substitute for TRI.

**Chemical coverage**: Biennial Reports contain data on hazardous wastes as defined by RCRA.  RCRA hazardous waste is designated as either "listed waste" or "characteristic waste".  Listed wastes have been identified as hazardous as a result of EPA investigations of particular industries or because EPA has specifically recognized a commercial chemical waste's toxicity.  Listed wastes appear in 40 CFR Part 261.  Characteristic wastes are determined hazardous because they exhibit one or more of the following "characteristics": ignitability, corrosivity, reactivity, or toxicity.

The primary difficulty with waste codes is that not all waste codes used in Biennial Reports reporting map directly to a single, unique chemical.  For example, waste code F004 is defined as:

*The following spent non-halogenated solvents: cresols, cresylic acid, and nitrobenzene; all spent solvent mixtures/blends containing, before use, a total of ten percent or more (by volume) of one or more of the above non-halogenated solvents or those solvents listed in F001, F002, and F005; and still bottoms from the recovery of these spent solvents and spent solvent mixtures.*

Listed wastes that are categorized as non-specific source waste (the F wastes, such as F004 defined above), specific source wastes (the K wastes), and three of the characteristic waste categories (D001, D002, and D003) cannot be matched to a specific chemical.  Listed wastes categorized as commercial chemical products (the P and U wastes), and characteristic wastes meeting the toxicity characteristic (D004-D043) each may represent a single, unique chemical, but they also may represent a mixture of various materials of which the identified chemical is but a small proportion.

**Industry/facility coverage**: Biennial Report requirements do not require that specific industries or SIC codes report; however, certain waste categories are excluded (40 CFR §§261.4 and 261.3(c)(2)(ii)).  For example, the so-called the Bevill exemption (40 CFR §261.4(b)(7)) classifies solid wastes resulting from the extraction, beneficiation, and processing of ores and minerals

October, 2005

(including coal, phosphate rock and overburden from the mining of uranium ore) as non-hazardous solid wastes and therefore not subject to reporting a Biennial Report.[5]  Extraction and beneficiation wastes, plus 20 special mineral processing wastes (listed under 40 CFR §261.4(b)(7)), fall under RCRA Subtitle D classification.  TRI now requires reporting from the mining industry.  In addition, emission control wastes, which are prominent wastes within the electric utilities industry, are excluded from Biennial Report requirement.  Electric utilities represent an industrial group being considered for addition to TRI.  The full list of wastes that are excluded from Biennial Reports include the following:

| | |
|---|---|
| Acid | Mining, Overburden |
| Agriculture, Irrigation | Nuclear |
| Cement Kiln Dust | Petroleum-contaminated Media and Debris |
| Chromium, Leather Tanning | Precipitation Runoff |
| Drilling Fluid | Pulping Liquor |
| Emission Control Waste | Sewage, Domestic |
| Fertilizer | Sewage, Mixture |
| Household | Wastewater, Point Source Discharge |
| Mining | Wood, Wood Products |
| Mining, In situ | |

**Release statistics**: While some of the waste codes used in Biennial Reports to identify waste streams may refer to a single, unique chemical (i.e., a specific CAS number), others do not.  In addition, a waste stream can be identified by multiple waste codes (e.g., a waste stream can simultaneously be ignitable, contain spent halogenated solvents, contain benzene, etc.).  At present, there is no mechanism to apportion the waste stream volume to particular waste codes where multiple codes are reported.

---

5. As defined under §261.4(b)(7), the beneficiation of ores and minerals includes but is not limited to activities such as the following: crushing, grinding, washing, sizing, drying, solvent extraction, and magnetic separation.  For a complete list refer to §261.4(b)(7).

51

October, 2005

The "mixture rule" and "derived-from" rule were adopted by EPA in 1980 and affect the data reported to Biennial Reports.[6]  The derived-from rule provides that wastes derived from a listed hazardous waste (such as the ash from incineration of a listed waste) also are deemed hazardous waste.  The mixture rule provides generally that any mixture of listed hazardous and non-hazardous waste are considered hazardous waste (although there are important exceptions).  RCRA waste streams are often a mixture of one or more toxic chemicals contained at various concentrations in a non-hazardous matrix (e.g., railroad gravel or water).  From the reported data, it is not possible to determine the fraction of the entire waste stream that is composed of a particular hazardous chemical.  While it is evident that the chemical concentration is adequate to result in the waste stream being defined as hazardous (e.g., the chemical concentration exceeds a certain threshold), no more detailed determination regarding the quantity of the hazardous component released can be drawn.

Reporting frequency: LQGs and TSDFs submit Biennial Reports data on a biennial basis.  In contrast, TRI reporting occurs on an annual basis.

**Accessibility**:  Biennial Reports are accessible through the EPA Mainframe, the ENVIROFACTS database, as well as RTK NET (See Attachment B-3).   The EPA Mainframe is not accessible to the general public.

<u>Conclusion on Availability of Data on On-Site Releases to Land</u>

Biennial Reports require individual reporting of underground injections on-site as well as on-site releases to land, as does TRI.  However, only half of the waste codes used in Biennial Reports can be assumed to identify individual chemicals.  In addition, the waste classification system, including the "mixture rule" and "derived-from" rules, results in waste quantities being reported to Biennial Reports that do not identify quantities of the individual chemicals. The quantity reported to Biennial Reports represents the quantity of the entire waste stream, and not individual chemicals.  Therefore, Biennial Reports are not a good substitute for TRI because it is not possible to reliably estimate the releases of a particular toxic chemical to underground injection on-site or releases to land on-site from Biennial Reports.

**Discharges to a POTW**

Section 313 of EPCRA gives EPA the authority to require that facilities report information on annual discharges to POTWs (Public Owned Treatment Works), including the name and location of the POTW.  Although Biennial Reports require some reporting of discharges to POTWs, and PCS allows for reporting of indirect discharges to water, neither system provides information about POTW discharges at TRI's level of detail and completeness.

---

6. The "mixture rule" and the "derived-from" rule were struck down by a 1991 D.C. Circuit Court ruling, but at the court's suggestion, EPA has temporarily reenacted the rules on an interim basis while it develops a new rule to consider them.

October, 2005

The RCRAInfo system, which contains data from the biennial reports of large quantity generators (LQGs) and treatment, storage and disposal facilities (TSDFs), also requires reporting of some discharges to POTWs. Several limitations associated with Biennial Reports data, however, are described above. In addition, hazardous waste, once mixed with domestic sewage and sent to a POTW for treatment, is no longer considered a hazardous waste and is therefore not reported to RCRAInfo.

Section 1004(27) of the Resource Conservation and Recovery Act (RCRA) provides that once hazardous waste is discharged directly or indirectly to surface waters, the waste is not subject to Biennial Report requirements. Hazardous waste must be reported only if it receives on-site treatment or is stored in a RCRA permitted unit prior to discharge. If it receives treatment or is stored in an exempt unit (e.g., tanks or totally enclosed treatment units), the waste is reported only if the generator qualifies as a large quantity generator, although the exempt waste is not counted when determining whether a facility is a Large Quantity Generator. TRI provides no exemption for discharges to POTWs which receive no prior treatment.

Although the Permit Compliance System (PCS) includes indirect discharge data elements, PCS does not require reporting of indirect discharges (i.e., discharges that pass through a POTW before entering a waterbody, in contrast to waste discharged directly to a waterbody). States have the option of including indirect discharge data, although very few require that this data be reported (Rubin, 1995).

## Transfers to Other Off-Site Locations

EPCRA Section 313 gives EPA the authority to require that facilities reporting to TRI report transfers to off-site locations, including the name, location, and RCRA ID number of the off-site location. The Biennial Reports, which contain hazardous waste data from large quantity generators (LQGs) and treatment, storage and disposal facilities (TSDFs), also require reporting of off-site transfers on its Form GM. Information requested by RCRAInfo includes the EPA ID of the facility to which the waste was shipped, the processes used to treat, recycle, or dispose of the waste at the off-site facility, the off-site availability code, and the total quantity of waste shipped during the report year (see discussion above of underground injection and land disposal for a more complete description of Biennial Reports). Biennial Reports also provide data on the volume of hazardous waste shipped off-site for land disposal, a release end-point of relevance to TRI.

There are several difficulties associated with comparing Biennial Reports data to TRI data, which are described above in the section covering on-site releases to land.

53

October, 2005

**Review of State Right-to-Know Programs**

Under the TRI program, data is submitted to both the U.S. Environmental Protection Agency and to the state or tribal entity in whose jurisdiction the reporting facility is located. With the advent of the federally mandated TRI reporting requirements and the influx of this new information, states with release and transfer reporting requirements of their own changed their programs to minimize program costs to industry and government. In New Jersey, for example, where TRI overlapped with state toxics reporting requirements under the New Jersey Right-To-Know (RTK) program, the RTK reporting requirements were removed to minimize reporting overlap. For more information on state-expanded TRI reporting, a detailed discussion is presented in the "Status of State TRI Programs" section of the TRI Public Data Release, State Fact Sheets. (U.S. EPA, 1999g) This section of the Public Data Release contains a survey administered by the National Conference of State Legislatures to all states on their TRI data use and expansion activities.

As of 1994, only Arizona, Massachusetts, Minnesota, and Wisconsin required or were planning to require expanded state TRI reporting to include non-manufacturing facilities (NCSL, 1995). Under the expanded state requirements, non-manufacturing facilities are required to file Form Rs with the state, but are not required to file with the federal EPA. In addition, some states require facilities to report release information beyond that required by the federal TRI program. Overall, however, the additional data collected by states are far less complete and uniform than would be available under an expanded federal TRI program. Descriptions of how state programs differ from federal TRI requirements are given below.

Massachusetts

The Massachusetts Toxics Use Reduction Act of 1989 (TURA) requires companies to report on their toxic chemical use, while TRI requires companies to report their toxic chemical releases. TURA covers facilities in the following SIC codes:

October, 2005

mining (SIC codes 10-14)
manufacturing (SIC codes 20-39),
transportation, communications, utilities (SIC 40, 44-49),
wholesale trade (SIC 50 and 51),
personal services (SIC 72),
business services (SIC 73),
automotive repair, services, and parking (SIC 75),
and miscellaneous repair services (SIC 76).

Initially, TURA covered the same facilities and chemicals as the federal TRI program.  As of 1995, TURA requirements expanded to include facilities under the above SIC codes which use chemicals that are listed as hazardous substances under §101(14) and §102 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).  (These chemicals are listed at 40 CFR §302.4). Also, substances found on the federal Comprehensive Environmental Response and Compensation Liability Act (CERCLA) list are subject to TURA reporting and planning, except for chemicals that are delisted. There are over 1400 chemicals that are subject to reporting, although only about 250 have been used and reported in Massachusetts. Massachusetts otherwise uses the same employee and manufacture/process/use thresholds and chemical list as the federal TRI program  (TURI, 1994).  Federal facilities are exempt from TURA reporting

Facilities covered under TURA must file an annual report called a Form S (similar to Form R) which identifies the listed chemicals used during the year in each production process, the percentage reduction of toxic by-products and toxic emissions compared to a defined base year, and the toxic use reduction techniques used to reduce the wastes.  Data from the Form Ss are entered into the state Toxics Use Reduction Inventory.  In addition, as of 1995, facilities are required to prepare a detailed toxic use reduction plan every two years (MA DEP, 1993).

Wisconsin

In 1996, Wisconsin required mining operations (SIC codes 10 through 13) to file Form Rs to the state.  In addition, public agencies, public and private educational facilities, and public and private research facilities in Wisconsin are subject to federal TRI reporting requirements.  Aside from the additional SIC codes, Wisconsin's Right-To-Know reporting requirements are identical to those of the federal TRI program (NCSL, 1995; BNA, 1995; Dunst, 1995)

Conclusion of Availability of TRI-like Data at the State Level

Although some states have built on the foundation of TRI data with additional state reporting requirements, their data do not have major redundancies with, and therefore are not substitutes for, the current TRI or the proposal to expand TRI.  The advent of federally mandated TRI reporting has resulted in many states adopting Form R for their state reporting, and provided a strong impetus for states to remove redundancies in their own reporting in order to minimize

55

October, 2005

costs to facilities in their jurisdictions. Information collected by states above and beyond federal reporting requirements may be available in piecemeal fashion.

**Inventory Data**

For each listed toxic chemical, a regulated facility must complete data element 4.1 of Part II of Form R, which asks for the "Maximum Amount of the Toxic Chemical On-Site at Any Time During the Calendar Year." Maximum amounts (in pounds) are reported in ranges that increase by powers of ten. Alternative sources of "maximum amount on site" chemical inventory data include EPCRA Section 312 Tier I and II reports.

Section 311 and 312 of EPCRA require that states establish plans for local chemical emergency preparedness and that inventory information on hazardous chemicals be reported by facilities to state and local authorities. "Hazardous chemicals" are defined under the Occupational Safety and Hazard Administration's (OSHA) requirements -- essentially any chemical that poses physical or health hazards. The relevant regulations are detailed in 40 CFR section 370. Data elements similar to both TRI and Tier I/II reports make EPCRA Tier I/II the best candidate for an alternative source of TRI "maximum amount on site" inventory information.

EPCRA Section 312 outlines a "two-tier" approach for annual inventory reporting. All facilities that store hazardous or extremely hazardous substances must submit at least a Tier I and often a Tier II form as well. Tier I requires reporting on broad categories of physical hazards such as fire, sudden release of pressure, and reactivity, as well as acute and chronic health hazards. Upon request by a Local Emergency Planning Committee (LEPC), State Emergency Response Commission (SERC), or fire department, a facility may be required to submit the more detailed Tier II form (which may be submitted instead of the Tier I form). Tier II requires chemical specific information by CAS number. For example, a Tier I report might state that a facility stores 3,000 pounds of chemicals that pose chronic health hazards, while a Tier II form for the same facility would report 1,000 pounds of toluene and 2,000 pounds of benzene on-site. Approximately 33 states require regulated facilities to submit Tier II forms, and most of the remaining states recommend that facilities submit Tier II forms.

A regulated facility is required to submit this information to each of the following groups: LEPCs, SERCs, and the local fire department with jurisdiction over the facility. A facility must submit an annual report for every chemical which requires an MSDS and which exceeds certain reporting thresholds for the amount of chemical stored on site at any one time. The reporting threshold for chemicals listed under EPCRA section 302 as Extremely Hazardous Substances (EHSs) is the threshold planning quantity (TPQ), or 500 pounds, whichever is lower.[7] For all other chemicals with MSDSs, the threshold is 10,000 pounds. In general terms, the inventories contain information about the maximum quantity stored, the average quantity on-site at any given time, the location of the chemicals at the facility, and the number of days on-site.

---

7 The Extremely Hazardous Substances and their TPQs are listed in 40 CFR Part 355, Appendices A and B.

October, 2005

Chemical coverage:  The chemicals covered under Section 312 are all those defined as hazardous or extremely hazardous substances in Section 311 (essentially any substance that poses a health or physical hazard).  All of these substances, for which facilities must submit MSDSs, are covered under OSHA's Hazard Communication Standard regulations.  OSHA's definition of "hazardous chemical" not only includes toxic chemicals but also chemicals which are considered health hazards, irritants, sensitizers, corrosive, fire hazards, explosive, as well as reactive.  Consequently, many more chemicals are included under OSHA's rule than under TRI.

**Industry/facility coverage:**  Facilities that are required to submit MSDSs to the state authorities for hazardous chemicals on site also must submit Tier I and/or Tier II forms.  While there are no SIC exemptions for facilities that are covered under the reporting threshold requirements, facilities not included under OSHA's Hazard Communication Standard (e.g., mines) do not have to file reports. Because the Section 312 thresholds cannot be used to determine whether a facility covered under Section 312 also would be covered under Section 313 (e.g., whether a facility which stores 10,000 lbs. of a toxic chemical listed under TRI also meets Section 313 thresholds), the extent to which facilities potentially subject to TRI reporting would be captured by Section 312 is unknown.

**Release statistics/reporting frequency**:  Facilities covered under EPCRA Section 312 must submit their Tier I and/or Tier II reports containing data with respect to the preceding calendar year to their respective states annually on or before March 1.

When completing a Tier II form, a covered facility must report the following information:

The chemical name or the common name of the chemical and the CAS registry number (as it appears on the MSDS);

- Indication of whether the hazardous chemical is an extremely hazardous substance;

- Indication of whether the hazardous chemical is present at the facility in its pure state or in a mixture, and whether it is a solid, liquid, or gas;

- The applicable health and physical hazard categories;

- An estimate (in ranges) of the maximum amount of the hazardous chemical present at the facility at any time during the preceding calendar year (e.g., 10,000 to 99,999 pounds);

- An estimate (in ranges) of the average daily amount of the hazardous chemical present at the facility at any time during the preceding calendar year;

- The number of days the hazardous chemical was found on-site at the facility;

- A brief description of the manner of storage of the hazardous chemical at the facility;

October, 2005

- A brief description of the precise location of the hazardous chemical at the facility, and

- An indication of whether the owner or operator of the facility elects to withhold location information on a specific hazardous chemical from disclosure to the public.

Facilities that choose to withhold from the public certain data on hazardous chemicals must nevertheless provide the information to the relevant authorities via the Tier II Confidential Location Information Sheet. The information contained on these sheets is not made available to the public.

**Accessibility**: The general public may access Tier I and Tier II information on a facility by facility basis by forwarding a written request to either the SERC or the LEPC. Tier II information on facilities which do not meet the reporting threshold requirements also may be obtained from the SERC or the LEPC if a "general need" can be demonstrated on the part of the requester. In these cases, the relevant authorities will request that the relevant facility or facilities fill out Tier II forms.

The ability to access state EPCRA data at a higher level of aggregation depends partly on the information technology resources of the state authority responsible for maintaining the data. Approximately one half of all the states have some type of computerized database, and of those, five states (Arkansas, Maryland, New Jersey, Oregon, and Rhode Island) store full Tier II data in a modem-accessible format. However, because these databases were created using different software and possess different database structures, it is a considerable challenge to aggregate the data contained within them.

In some states that do not yet maintain computerized databases of Tier I and Tier II information, the parties requesting information are required to cover the copying and administrative costs of the data retrieval. Because some EPCRA reporting programs are unfunded, fees charged for this service range from low to substantial. In other states, the requesting parties must go to the office and perform the copying themselves (ICF, 1996).

<u>Conclusion on the Availability of Inventory Data</u>

Tier I forms only request information based on possible health and physical hazards, and do not ask for chemical-specific data. The level of detail and the number of chemicals covered in Tier II "maximum amount on site" inventory data surpasses the chemical inventory data requested on TRI Form R. Not all states, however, require submission of Tier II forms. Therefore, some of the facilities that are covered under TRI do not have to report as detailed inventory information under EPCRA Section 312.

October, 2005

There also are significant difficulties with respect to public access of Tier I and Tier II data. All information is reported to state authorities; there is no national integrated database. In addition, because not all states have set up computerized databases to manage this information, extensive data retrieval and analysis is often both cumbersome and expensive.

## Pollution Prevention Data (P2)

Form R requires that facilities report a variety of information that can be used for pollution prevention analyses, including non-quantitative reporting of pollution prevention activities, production ratios, and chemical-specific amounts of materials treated, recycled, released (one-time, and for the entire year), and shipped off-site in wastes.

### EPA Databases with Pollution Prevention Data

Besides TRI, waste prevention and management data are collected at the federal-level through RCRA Biennial reports. RCRA biennial report data are compiled in the RCRAInfo database, as discussed below. The level of chemical specificity and flowthrough estimates for waste prevention and management information in RCRAInfo and TRI are not available in other federal data sources.

Biennial Reports contains pollution prevention information on hazardous waste large quantity generators and treatment, storage, or disposal facilities. Data are collected primarily by states, and are collated by EPA into the RCRAInfo database system. States are not required to use official Biennial Reports forms for the submission of data; EPA transfers data on state forms into the RCRAInfo system as necessary (ICF, 1993).

All large quantity generators must submit the following facility-specific information to RCRAInfo:

•    whether any source reduction or recycling activities took place during the reporting year, and

•    limiting factors that have affected source reduction and/or recycling activities.


In addition, for each hazardous waste generated, a generator must specify the following pollution-prevention related data:

•    RCRA waste code and hazardous waste quantity generated;

•    efforts to reduce the volume and toxicity of wastes, and

•    reductions in volume and toxicity actually achieved compared with those achieved in previous years.

59

October, 2005

If a hazardous waste has been minimized as the result of new activities implemented in the reporting year, the generator also must report the following pollution-prevention related information:

- quantity of waste recycled;
- source reduction quantity; and
- waste minimization activity implemented (e.g., waste segregation, inventory control).

RCRA Biennial reports provide some qualitative and quantitative pollution prevention information, but, at a systems level, do not have the same facility or chemical coverage as TRI. The Biennial Reports system is not a substitute for TRI pollution prevention data. RCRA Biennial reports only include hazardous wastes; pollution prevention data contained in TRI includes information on wastes or process by-products in all production phases and media. In addition, the chemical reporting universe is different between the two systems. The universe of toxic chemicals regulated under TRI differs from the universe of listed hazardous wastes or chemicals with hazardous waste characteristics regulated by RCRA.

Also, the facility universes captured by the two systems are not the same. RCRA Biennial reports are only completed by RCRA large quantity generators, while TRI reports are required by facilities in manufacturing industries that exceed employee as well as chemical manufacturing, process, and use thresholds. The Biennial Reports facility universe is also different due to RCRA waste exclusions and exemptions. For example, wastes mixed with domestic sewage that are excluded from Biennial Report requirements can be an indirect water discharge that may be covered under TRI reporting.

The pollution prevention reporting in Biennial Reports contains information on hazardous waste minimization and recycling efforts. Where this information does overlap with TRI pollution prevention reporting, it does not contain the same level of detail. For example, in some cases Biennial Reports pollution prevention information applies to wastestreams consisting of chemical mixtures, while TRI pollution prevention data are chemical specific. Since Biennial Report waste codes are more general in nature than CAS numbers, a facility's waste mixture could change from year to year, and yet it might report the same waste code. Lack of precision in reporting of waste contents also could result in a situation where a facility reduces the aqueous quantity of its wastes, and thus appear to be preventing pollution. However, by changing its waste mixture, the facility might even increase the amount of toxic material entering the wastestream without modifying its Biennial Report. That the exact contents of a facility's waste mixture cannot always be determined may make it difficult to extract chemical-specific data from Biennial Reports.

### State Environmental Agency Databases

As required by section 313 (a) of EPCRA, facilities send copies of all TRI reports to both state and federal agencies. Many states currently rely on the pollution prevention data received from TRI for planning and targeting purposes (U.S. EPA, 1993), and do not require additional

60

October, 2005

reporting. However, two states, New Jersey and Massachusetts, have passed laws to collect materials accounting pollution prevention data that exceeds that found in Section 8 of Form R. Twelve other states have pollution prevention planning requirements in place, but only Massachusetts and New Jersey currently have mandatory materials accounting.[8]

**Massachusetts Pollution Prevention Reporting**:  The Massachusetts Toxics Use Reduction Act (TURA) has required firms to report on toxic use for individual "production units" at their facilities since July of 1991. Facilities submit annual Toxics Use Reports (Form S) to the Massachusetts Department of Environmental Protection (MDEP) as a supplement to the TRI Form R. With the exception of qualitative source reduction pollution prevention reporting requirements and production ratios, TURA pollution prevention reporting requirements are additional to those collected by TRI.

Form S records information on the quantity of the toxic substance used on a facility-wide and production unit basis. Form S is divided into two parts: 1) cover sheet and 2) chemical reports. The cover sheet contains general facility information, a certification statement, and an identification of production units at the facility. Form S chemical reports must be filed on each listed toxic chemical manufactured, processed, or otherwise used at greater than 10,000 pounds per year (ICF, 1993). The form contains the following information on chemical use and pollution prevention: facility-wide and production unit data for each chemical, year-to-year reporting changes, and production unit reports.

**New Jersey Pollution Prevention Reporting**:  New Jersey has collected toxic chemical release and pollution prevention data longer than the TRI program has been in existence. Since 1979, New Jersey has collected toxic chemical release and pollution prevention data through a variety of separate programs and activities, gradually narrowing down the scope of these reporting requirements as TRI was introduced and expanded to include pollution prevention. In fact, the results of an Industrial Survey, which collected release and throughput data from 15,000 New Jersey facilities, were used to develop the list of SARA Title III chemicals (U.S. EPA, 1995d). For these reasons, New Jersey data, unlike data collected in Massachusetts, still overlaps somewhat with data collected on TRI Form R. New Jersey pollution prevention data also contain detailed throughput information which exceeds that currently contained in TRI. These throughput data require facilities to account for all amounts of the chemical brought or produced on-site, shipped off-site in products, destroyed on-site through treatment, recycled on-site, and released to the environment or shipped off-site in wastes.

---

8.  For a detailed comparison of materials accounting data elements reported to TRI, New Jersey, and Massachusetts, see (U.S. EPA, 1995d).

October, 2005

New Jersey's additional reporting requirements apply to all TRI chemicals and all facilities covered by TRI (SIC codes 20-39). Originally, New Jersey required facilities manufacturing, processing, or using an Environmentally Hazardous Substance (EHS) to report toxic chemical release information (U.S. EPA, 1995d). The original EHS list was comparable to the list of chemicals generated by the Industrial Survey mentioned above, and therefore similar to the original SARA Title III list. The list of chemicals for which New Jersey now collects toxic chemical release and pollution prevention information has been expanded to contain those in the national TRI listing.

October, 2005

**Alternative Sources of Emergency Release Data**

TRI Form R requires that facilities report the quantity of TRI listed chemicals released to the environment as a result of remedial actions, catastrophic events, or one-time events not associated with production processes. Accidental release data reported to TRI also are potentially reported to the National Response Center (NRC). However, as discussed below, the NRC is a database of initial notifications, made during or immediately after a release occurs. For this reason, data within NRC may be incomplete or inaccurate and will not substitute for TRI emergency release data.

Emergency Response Notification System (ERNS)

The Emergency Response Notification System (ERNS) is a computer database containing information on release notifications of oil and hazardous substances that have occurred throughout the United States and have been reported to the National Response Center (NRC) and or one of the 10 EPA Regions. Initial notifications, which comprise most of the information in ERNS, supply preliminary information on a release and are cited as unverified data. Depending on the severity of the release and any response actions taken, the EPA or Coast Guard On-scene Coordinator (OSC) may obtain further information at the site of the release or through discussions with state and local officials. Data has been collected into ERNS since 1987.

ERNS contains many types of information on specific notifications of releases of oil and hazardous substances, including the following: discharger information, date of release, material released, cause of release, damage/injuries/deaths, amount released, source of release, incident location, response actions taken, authorities notified, and environmental medium into which the release occurred.

ERNS serves as a mechanism to document and verify incident-location information as initially reported and is utilized as a direct source of easily accessible data needed for analyzing releases of oil and hazardous substances. ERNS information is used for guidance and regulatory development, Congressional inquiries, response preparedness, compliance and enforcement support, statistical and trend analyses, program planning and management, and responses to requests for information from the public.

ERNS supports the release notification requirements of section 103(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended; section 311(j) of the Clean Water Act; and sections 300.300 and 300.405 of the National Oil and Hazardous Substances Contingency Plan, which begins at 40 CFR Part 300.

ERNS is a database of initial notifications, made during or immediately after a release occurs. Because the data are reported at such an early stage, the exact details of the release are often unknown and are therefore not reported. It is estimated that two-thirds of the 193 data fields in

63

October, 2005

ERNS are not completed for most release notifications. In addition, duplicate reports may appear in the database because of follow up calls that are not identified as such or observers reporting a release that has already been reported. Approximately five percent of ERNS records are estimated to be duplicates. (U.S. EPA, 1995e)

### Integrated Management Information System (IMIS)

IMIS is an OSHA database that contains records of workplace inspections conducted by OSHA industrial hygienists. Two general types of inspections are conducted by OSHA: 1) Scheduled or planned inspections which are on-site enforcement inspections to verify compliance with OSHA standards, and 2) Unplanned inspections which are investigations of workplace incidents where there is one fatality or three or more worker hospitalizations (five or more worker hospitalizations were required to trigger an inspection before 1993). Inspection data are input and stored within IMIS, providing a record of OSHA activities at each workplace that has been inspected.

OSHA is estimated to add more than 120,000 inspection records per year, of which 4,000-5,000 are related to accidents. Accident inspections include a short description of the incident, information regarding each worker that is injured, and any hazardous substances that may be involved. It is estimated that 100 incidents reported each year involve hazardous substances. A four digit hazardous substance code is entered into IMIS rather than a CAS number. The quantity of hazardous material released is not entered. In addition, it can not be assumed that the reported death or injury was a result of an accidental release even in cases where a hazardous substance was involved. For example, if a maintenance person cleans the inside of a storage tank and is asphyxiated by the nitrogen rich environment, the death is not the result of an "accidental release." (U.S. EPA, 1995e)

### Summary on Availability of Pollution Prevention and Accidental Release Data

The data systems discussed above cannot replace TRI's pollution prevention and accidental release data. Difficulties exist in chemical and facility coverage, reporting frequency, and the level of data detail. Specifically, RCRA Biennial reports cannot easily be used as a substitute for TRI pollution prevention data. While Biennial Reports provides some qualitative and quantitative pollution prevention information, it does not have the same facility or chemical coverage as TRI. Biennial Reports only include hazardous wastes, while TRI pollution prevention data includes information on wastes or process by-products in all production phases and media. Because Biennial Reports collect data organized by Biennial Reports waste codes, they also lacks the chemical-specific detail that TRI contains. In addition, the facility and chemical reporting universes are different between the two systems.

Overlap of State pollution prevention data with that found in TRI is minimal; state data could not be used to replace current TRI pollution prevention reporting requirements. As required by section 313 (a) of EPCRA, facilities send copies of all TRI reports to both state and federal

October, 2005

agencies.  Many states have come to rely on this easily available source of pollution prevention data.  As Massachusetts and New Jersey demonstrate, even those states that had taken a proactive role in collecting toxics release and pollution prevention data scaled back their programs with the introduction of mandatory TRI reporting.  No state program collects all of the pollution prevention data currently contained in Form R, though some states (e.g., New Jersey and Massachusetts) augment TRI pollution prevention data with requirements additional to those contained in Section 8 of Form R.  These data, such as materials accounting data, are used at the state level for a variety of purposes, including benchmarking of facility pollution prevention efforts and the determination of toxic material flows in production processes.

In addition, accidental release data reported to ERNS does not substitute for TRI accidental release data.  ERNS is a database of initial notifications, made during or immediately after a release occurs.  For this reason, data within ERNS may be incomplete or inaccurate.

**Value Added from the TRI Reporting System**

In addition to containing data not available through other sources, TRI enhances the usefulness and functionality of the data by allowing public access to the data, linking release data across media (e.g., water, air, land), and providing definitional consistency for the units of measurement.  These features give TRI additional advantages over any emissions data system that might be assembled from non-TRI sources.

Perhaps the most important advantage TRI possesses over non-TRI sources is the information that can only be found in TRI.  As described, data unique to TRI include chemical-specific multimedia release information as well as important pollution prevention information.  For example, AFS currently only tracks a limited amount of HAP emissions, and Biennial Reports do not track hazardous waste treatment, transfer, or disposal at a chemical-specific level.  TRI can provide this as well as other types of information not available elsewhere.

Because an important part of TRI's mission is to provide emissions data to the public, many different methods of access to TRI have been implemented.  Data analysis difficulties aside, access issues make it very difficult for the general public to assemble non-TRI data into a TRI-like form.  Current methods of accessing TRI include on-line resources such as EPA's Envirofacts, TRI Explorer, the National Library of Medicine's TOXNET, RTK NET, electronic media such as CD-ROM, and printed media.  TRI places all of the information in one location, and providing many avenues of access to that data.

The lack of definitional consistency also can result in difficulties in understanding information aggregated across non-TRI databases.  A substantial amount of effort would be required to overcome discrepancies in units of measure, chemical coverage, reporting thresholds, reporting exemptions, and reporting frequencies in the various databases.  TRI overcomes many of these problems by allowing the user to view cross-media data using a single set of reporting definitions and requirements.

65

October, 2005

The different units and data aggregation methodologies used by various non-TRI sources can lead to data incompatibilities. For example, because PCS data are reported in terms of PCS *parameters* (usually chemical concentrations as opposed to units of mass), some fairly involved calculations must take place before that data can be converted into TRI-like units. For Biennial Reports, facilities report their hazardous waste throughput in terms of aggregated waste *codes*, which cannot always be easily broken down to specific chemicals. Discrepancies between the way chemical information is reported to the various non-TRI databases can make it difficult or even impossible to accurately sum totals of pollutants across databases. Because all TRI release and transfer data are reported in a uniform fashion, no such difficulty exists in TRI.

Databases often also have different reporting frequencies, which can make it difficult to assemble high quality historical data at the facility level. Biennial Reports require facilities to report data every two years, whereas AFS requires but does not enforce annual reporting. Because TRI requires annual reporting from all covered facilities, TRI effectively overcomes this problem.

In summary, the value which TRI alone adds to the community at large is significant. The many technical, access-related, and data coverage problems associated with attempting to use non-TRI sources for TRI data makes impractical the substitution of these sources for TRI.

### 5(b)  Consultations

EPA has consulted with a large number of individuals and organizations throughout all segments of the public in the development and continued implementation of the TRI program. Since the initial development of the program, feedback through EPA's outreach efforts have been received from various organizations, including environmental and public interest groups, trade associations, and individual representatives. This feedback is continually sought and incorporated in the ongoing evolution of the 313 program.

During the initial development of the TRI program, EPA consulted with a large number of individuals and organizations throughout all segments of the public in developing the rule, form, and instructions. This consultation has continued throughout the operation of the program, and has been expanded due to the proposed expansion of TRI to include additional industry groups. Among the industry-oriented organizations that are or have been involved with the TRI program are:

> American Association of Exporters and Importers
> American Chemistry Council
> American Chemical Society
> American Coke and Coal Chemical Institute
> American Gas Association
> American Iron and Steel Institute

66

October, 2005

American Petroleum Institute
American Pharmaceutical
American Public Power Association
American Textile Manufacturers Institute
American Trucking Association
American Warehouse Association
Air Transport Association
American Wood Preservers Institute
Associated Gas Distributors
Association of Metropolitan Sewerage Agencies
Cement Kiln Recycling Coalition
Chemical Manufacturers Association
Chemical Producers and Distributors Association
Chemical Specialties Manufacturers Association
Chem-Tex Solvents Corporation
Chlorine Institute
Domestic Petroleum Council
Dry Color Manufacturers Association
Edison Electric Institute
Electric Power Institute
Environmental Industries Association
Environmental Technology Council
Fertilizer Institute
Hazardous Material Advisory Council
Independent Lubricant Manufacturers Association
Independent Liquid Terminals Association
Independent Petroleum Association of America
International Precious Metals Institute
Interstate Mining Compact Commission
Interstate Oil and Gas Compact Commission
Lead Industries Association
Metal Powder Industries Federation
National Agricultural Chemicals Association
National Air Transport Association
National Association of Chemical Distributors
National Association of Chemical Recyclers
National Association of Manufacturers
National Association of Printing Ink Manufacturers, Inc.
National Electrical Manufacturers Association
National Food Processors Association
National Mining Association
National Rural Electric Cooperative Association
National Screw Machine Products Association
National Solid Waste Management Association
Petroleum Marketers Association of America

October, 2005

Silver and Gold Institute
Small Business Administration
Society for Mining, Metallurgy and Exploration
Solid Waste Association of North America
Steel Service Centers Institute
Synthetic Organic Chemical Manufacturers Association
The Society of the Plastics Industry, Inc.
U.S. Chamber of Commerce

With the addition of Federal facilities to TRI in 1993 (Executive Order 12856), other Federal agencies such as the Department of Defense and Department of Energy now play an active role in TRI, including as participants in Interagency Workgroups.  In addition to the industry-oriented groups, EPA has also worked with public interest groups in the development of the TRI program.  Environmental and public interest groups assisted in the development of the Form R, testing of the NLM database, and have provided feedback on a wide range of public access issues.  Among the environmental and public interest organizations that have been, or are, involved with TRI are:

AFL-CIO
American Library Association
Environmental Defense Fund
Environmental Law Institute
INFORM
Information Industry Association
Mineral Policy Center
National Wildlife Association
Natural Resources Defense Council
OMB Watch
Sierra Club
U.S. Public Interest Research Group
Working Group on Community Right-to-Know

Discussions with all of the above groups have resulted in changes to the program which have had beneficial effects, including burden reduction.

Over the course of the past decade, EPA has used the regularly-held public meetings of the Forum on State and Tribal Toxics Action (FOSTTA), which represents state environmental agencies, and the National Advisory Council on Environmental Policy and Technology (NACEPT), which includes representatives from industry, environmental organizations, states, and academia, as public venues to consult on TRI and related issues.  Major issues discussed through these groups include the expansion of TRI to include both additional chemicals and facilities; implementation of PPA requirements; redesign of the Form R; and development of the Alternate Reporting Threshold Modification.  EPA officials routinely meet with representatives

from industries, states, local governments, environmental organizations, and community groups on specific issues related to TRI, as the need for consultation arises.

EPA also makes a concerted effort to receive input from small businesses. Many trade associations and other industry organizations with which EPA has held discussions include small businesses as members or participants. These groups have represented the interests of some small businesses to EPA, and have helped to inform businesses about TRI. In addition, EPA has addressed forums such as the Small Business Roundtable regarding its initiatives, and has briefed officials of the Small Business Administration as well as EPA's Small Business Omsbudsman and Regional Small Business Liaisons.

EPA has conducted a series of Stakeholder meetings over time, with the most recent being in October of 2004 to address issues concerning reporting requirements and possible changes to the Form R. Specific issues discussed at these meetings included ways of improving the TRI program, ways of reducing the burden of TRI reporting, and possible improvements to the TRI reporting form. These meetings have resulted in a series of separate rulemakings to address burden that are currently under development.

October, 2005

### 5(c)  Effects of Less Frequent Collection

Section 313 requires annual reporting.  Section 313(i) permits EPA to modify the reporting frequency by rulemaking, however, EPA must first notify Congress and then wait to initiate the rulemaking to propose the modification for at least 12 months.  In addition, EPA must find:

(A) ...that the modification is consistent with the provisions of subsection (h) of [section 313] based on -
    (i) experience from previously submitted toxic chemical release forms,
    (ii) determinations made under paragraph (3).]

Paragraph (3), in turn, provides that EPA must determine

  (A) The extent to which information relating to the proposed modification provided on the toxic chemical release forms has been used by the Administrator or other agencies of the Federal government, States, local governments, health professionals and the public.

  (B) The extent to which information is (i) readily available to potential users from other sources, such as State reporting programs, and (ii) provided to the Administrator under another Federal law or through as State program.

  (C) The extent to which the modification would impose additional and unreasonable burdens on facilities subject to the reporting requirements under this section.

However, EPA may not permit less frequent reporting unless it can find that such modification is consistent with the purposes of the Act, as determined by previously submitted Form Rs.  Since TRI represents the best available database tracking toxic chemical releases in the U.S., changes in reporting frequencies would have profound impacts on the quality and value of these data for purposes of planning and establishing baselines in both government and industry.

Less frequent reporting would also significantly delay the availability of the data to the public.  Form Rs are required to be submitted on or before July 1 following the year in which the reported releases and transfers occur, and then national data are available from EPA within a year after that.  Public access to the most current toxic chemical release data and other waste management information possible could then be severely limited if reporting were to occur less frequently.

### 5(d)  General Guidelines

This ICR adheres to the guidelines stated in the 1980 Paperwork Reduction Act, as amended, OMB's implementing regulations, and all applicable OMB guidance.

70

October, 2005

Although reporting facilities are required to identify the chemical for which reports are submitted, they can claim the chemical identity as a trade secret. A generic name must be provided as part of the information made available to the public. EPA securely stores and maintains the true identity of the chemical. This is further discussed in 5(e)(i).

EPA is actively encouraging the use of automated techniques, most notably PC-based report generating programs produced both by the Agency and by the private sector and other submissions on magnetic media. EPA recognizes that not all reporting facilities are able to or are interested in investing the time and funds necessary to employ such automated techniques. The final decision on how to report is ultimately the reporting facility's.

Small facilities (less than 10 full-time employees or equivalent) are exempt from reporting under section 313. An optional range reporting provision and an alternate threshold have been promulgated that afford burden reduction to all facilities but are particularly beneficial to smaller facilities with small releases and wastes.

### 5(e) Confidentiality and Sensitive Questions

#### (i) Confidentiality

Respondents may designate the specific chemical identity of a substance as a trade secret. Procedures for submission and review of trade secret claims under section 313 are set forth in 40 CFR 350. This rule implements the general trade secret provisions of EPCRA. When a respondent claims the chemical identity to be a trade secret, EPA, upon substantiation of the claim, will not disclose the identity of the chemical to the public. EPA securely stores forms with trade secret information and allows access to those documents only to persons with Trade Secret clearance. Data made available to the public through any means does not include trade secret information.

#### (ii) Sensitive Questions

This collection does not request any sensitive information.

## 6    ESTIMATING THE BURDEN AND COST OF THE COLLECTION

### 6(a) Estimating Respondent Burden

This section presents the burden of this information collection activity to respondents in terms of the time required for facility personnel to perform the activities outlined in Section 3 of this document. These burden estimates are based on previous ICRs and economic analyses,

71

October, 2005

respondent experience as reflected in comments to EPA and other parties, best professional judgement and information acquired through site visits and telephone interviews.

The burden to respondents is estimated for Form R requirements (including compliance determination and supplier notification) and petitions. Burden estimates are developed for the compliance activities and then multiplied by the number of facilities or reports (as appropriate) to estimate the total burden to respondents. The burden estimates used by EPA are national average values. As with any average, some facilities will be above the average, and others will be below it. Large, complex facilities may require more than the average time to comply. However, there are many other facilities subject to the rule that are not large or complex. Therefore, EPA believes that its burden estimates represent reasonable national averages.

<u>Form R Requirements</u>

The tasks associated with TRI reporting during the period of this ICR include the following:

• **Compliance Determination:** Facility staff must determine whether they meet the criteria for Section 313 reporting. This task includes the time required to become familiar with the definitions, exemptions, and threshold requirements under the TRI program, to review the list of TRI chemicals, and to conduct preliminary threshold determinations to determine if the facility is required to report.

• **Rule Familiarization:** Facility staff that are reporting under section 313 for the first time must read the reporting package and become familiar with the reporting requirements. This includes the time needed to review instructions, and the time needed to train personnel to be able to respond to a collection of information.

• **Calculations and Report Completion:** Facility staff must gather data and perform calculations to provide the information required on the form. This task includes the time required to search data sources and the time to complete and review the information.

• **Recordkeeping and Submission:** Facility staff must maintain recordkeeping systems and mail the report to EPA and the State in which the facility the facility is located. This task includes the time required to transmit or otherwise disclose the information.

• **Supplier Notification:** Certain suppliers of mixtures or trade name products containing reportable substances must annually notify their customers of the product's composition, if the customer is subject to Section 313 reporting. This task includes the time required to inform customers, either by letter or through the materials safety data sheet (MSDS) for the product.

This ICR reflects one change from the last TRI Form R ICR. Due to the TRI Reporting Forms Modification Rule, both first and subsequent form completion time is slightly reduced. Previously, EPA estimated that form completion would require 69 hours in the first year for

PBT and Non-PBT chemicals. In subsequent years, form completion would require 47.1 hours for PBT chemicals and 25.2 hours for Non-PBT chemicals. Currently, EPA estimates that form completion will require 66.8 hours for PBT chemicals and 67.6 hours for Non-PBT chemicals in the first year and 46.3 hours for PBT chemicals and 24.6 hours for Non-PBT chemicals in subsequent years.

The remainder of this section discusses the unit burden hour estimates for each specific industry activity. Activities are organized into two categories: those performed at the facility level and those that must be performed for each Form R submitted. The estimated hours required to complete each activity are summarized in Table 1 by labor category. Table 2 presents the annual estimated burden hours according to type of facility for facilities that submit 3 Form Rs each.[9] This represents the burden on a "typical" facility, although many facilities file fewer Form Rs and some file more. The total annual burden to all facilities is discussed in Section 6(d). Note that the total annual burden estimate is based on unit reporting burdens multiplied by the total number of facilities or forms (as appropriate); it is not based on the "typical" facility burdens shown in Table 2.

**Table 1**
**Average Annual Burden Hour Estimate by Activity**

| Category | Activity | Management | Technical | Clerical | Total Hours |
|---|---|---|---|---|---|
| Facility Level | Compliance Determination - all facilities | 1 | 3 | 0 | 4 |
| | Rule Familiarization - first-time filers | 12 | 22.5 | 0 | 34.5 |
| | Supplier Notification | 0 | 7 | 17 | 24 |
| Per Form R | Calculations and Report Completion - first-time filers - PBTs | 20.3 | 43.9 | 2.7 | 66.8 |
| | Calculations and Report Completion - first-time filers - Non-PBTs | 20.5 | 44.4 | 2.8 | 67.6 |
| | Calculations and Report Completion - subsequent year filers - PBTs | 14.1 | 30.4 | 1.9 | 46.3 |
| | Calculations and Report Completion - subsequent year filers - Non-PBTs | 7.5 | 16.1 | 1.0 | 24.6 |
| | Recordkeeping/Submission -all filers | 0 | 4 | 1 | 5 |

9. Approximately 70 percent of affected facilities file 3 or fewer Form Rs in reporting year 2002. The most common number of reports filed is 1.

October, 2005

**Table 2**
**Average Annual Burden Hour Estimate per Facility in Each Subsequent Year**

| Type of Facility | Average Annual Hours Burden | | | |
|---|---|---|---|---|
| | Management | Technical | Clerical | Total Hours |
| Compliance Determination Only | 1 | 3 | 0 | 4 |
| Compliance Determination and 3 PBT Form Rs | 43.3 | 106.1 | 8.6 | 157.9 |
| Compliance Determination and 3 Non-PBT Form Rs | 23.6 | 63.2 | 6.1 | 92.9 |
| Compliance Determination, 3 PBT Form Rs, and Supplier Notification | 43.3 | 113.1 | 25.6 | 181.9 |
| Compliance Determination, 3 Non-PBT Form Rs, and Supplier Notification | 23.6 | 70.2 | 23.1 | 116.9 |

<u>Activities Performed at the Facility Level</u>

*Compliance Determination* - A facility must report under Section 313 if it: (1) is within an SIC code or industry group covered by the TRI program; (2) has ten or more full-time equivalent (FTE) employees; and (3) manufactures, processes or otherwise uses any of the listed chemicals above the threshold quantities. All facilities must determine if they meet these criteria. Most facilities incur little burden to make determinations regarding the first two criteria. Many facilities require time for the management and technical staff to determine the types of chemicals used at the facility and whether these chemicals are manufactured, processed, or otherwise used above threshold levels, in order to make the determination under the third criterion.

To make the determination, a facility will typically review whether it manufactures, processes, or otherwise uses any of the chemicals in any quantity, and then determine whether it exceeds a threshold quantity. In many cases, particularly at facilities that do not manufacture, process or otherwise use any listed chemicals, this first activity should be completed within a relatively short period of time. The second activity may involve a more detailed set of calculations.

The average burden for compliance determination is estimated to be 4 hours per facility per year. This average reflects the time requirements of facilities that do not have listed chemicals on-site, have very large or small quantities of listed chemicals (*i.e.*, are significantly above or below the thresholds and thus do not require a significant amount of time to make the determination), or have not had significant changes from the prior year, as well as facilities that have more complex and time-consuming compliance determination requirements.

74

October, 2005

*Rule Familiarization* - If a facility will be reporting under the section 313 requirements for the first time, facility staff must review and comprehend the reporting requirements. At a minimum, this effort will involve reading the instructions to the Toxic Release Inventory Reporting Form R, however, it may also involve consulting EPA guidance documents, attending a training course, and/or calling the EPCRA technical hotline. The cost associated with rule familiarization occurs only in the first year that a facility becomes subject to reporting. In subsequent years, staff are assumed to be familiar with the requirements that apply to their facility.  Thus, the facility would no longer bear this cost.  Similarly, facilities that already report on one or more existing TRI chemicals will not incur a rule familiarization cost.

It is estimated that facilities reporting under section 313 for the first time will need to make a one-time expenditure of 34.5 hours for rule familiarization. This burden estimate is comprised of 12 hours of management time and 22.5 hours of technical time.

*Supplier Notification* - Certain suppliers of mixtures or trade name products containing reportable substances must annually notify their customers of the product's composition if the customer is subject to Section 313 reporting or sells the product to another company that is subject to reporting. Facilities may be subject to the supplier notification requirements even if they are not covered by the Section 313 reporting requirements. For example, a facility with less than ten full-time employees or that does not meet reporting thresholds may still be required to notify certain customers. Supplier notification is required so that customers can make threshold determinations and complete reports for their own facilities. The notification can be provided by a letter identifying the chemical by name and CAS number and indicating its percentage by weight in the formulation. It can also be provided on the materials safety data sheet (MSDS) for the product. On average, approximately 24 hours per facility are estimated for compliance with this requirement.

Activities Specific to Completing the Form R

*Calculations and Report Completion* - Facilities that determine they must report under Section 313 will incur additional burden to retrieve, process, review, and transcribe information to complete each report. Most of the time required for form completion is to calculate releases, transfers, and other waste management practices; relatively little time is required to copy information to the form. The facility must complete one Form R for each listed chemical it is reporting to TRI.

The burden is estimated to average 46.3 hours per PBT Form R and 24.6 hours per Non-PBT Form R for on-going, annual reporting. This estimate is based on the most recent estimate of reporting burden negotiated by EPA and OMB.[10] It has also been adjusted downward to reflect burden savings associated with the recently promulgated TRI Reporting Forms Modification Rule.  To complete the Form R, facilities will need to verify and update data, review previous

---

10  USEPA/OEI, *Terms of Clearance for TRI ICR Renewal*, January 20, 2004.  Memo from Cody Rice OPPT/EETD/EPAB to Amy Newman OEI/OIAA/EAD/ASB.

October, 2005

calculations, and modify the information reported on the previous year's Form R. For a facility completing 3 forms in subsequent years, this results in an average estimated burden of 138.9 hours per PBT Form R and 73.8 hours per Non-PBT Form R. The estimate for first year calculations and report completion is 66.8 hours per Form R for a PBT chemical and 67.6 hours per Form R for a Non-PBT chemical.

*Recordkeeping and Submission* - After a facility has completed the form, it incurs additional burden for recordkeeping and submission associated with filing a Form R report. Recordkeeping allows a facility to use the information in making calculations in subsequent years and as documentation in the event it receives a compliance audit. Facilities must maintain records used to provide the information required on the Form R; those records may include estimation methodology and calculations, engineering reports, inventory, incident and operating logs, and other supporting materials. Recordkeeping and submission are estimated to take an average of 5 hours per Form R, which works out to 15 hours for a facility filing 3 Form Rs.

### Average Burden per Respondent

The estimated burden per respondent depends on the type of respondent and the number of reports submitted. For example, the burden for facilities that only perform compliance determination is estimated to average 4 hours per facility. For facilities required to file 3 Form Rs, but not required to comply with supplier notification, the burden is estimated to be 157.9 hours if all 3 reports are for PBT chemicals and 92.9 hours if all 3 reports are for Non-PBT chemicals. For facilities submitting 3 Form Rs that are also required to comply with supplier notification, the average burden is estimated at 181.9 and 116.9 hours per facility for PBT chemicals and Non-PBT chemicals, respectively.

### Petitions

The activities required to prepare and file a petition are listed below. Included is a discussion of the burden associated with each activity. The time needed to complete these activities is presented in Table 3. The total annual burden for all petitions is estimated in Section 6(d).

76

October, 2005

**Table 3**
**Average Burden Hour Estimate per Petition**

| Activity | Average Annual Hours Burden | | | Total Hours Burden |
|---|---|---|---|---|
| | Management | Technical | Clerical | |
| 1. Read EPA Policy and Guidance | 4 | 0 | 0 | 4 |
| 2. Plan Activities | 2 | 1 | 0 | 3 |
| 3. Prepare Literature Search | 2 | 7 | 0 | 9 |
| 4. Conduct Literature Search | 0 | 48 | 0 | 48 |
| 5. Process, Review, and Focus Information | 12 | 74 | 0 | 86 |
| 6. Write Petition | 4 | 8 | 6 | 18 |
| 7. Review and Edit petition | 4 | 8 | 2 | 14 |
| 8. Submit to EPA and File | 0 | 0 | 3 | 3 |
| **Total Hours per Petition** | 28 | 146 | 11 | **185** |

These estimates assume prior knowledge by the respondent of the issues prompting the listing of specific chemicals. An additional assumption was made that the petitioners had no in-house library facilities and, consequently, that they would have to use a university library or similar facility. Based upon the experience of the previous reporting years, fewer than 5 petitions per year are expected. Following are specific descriptions of the activities associated with preparing and filing a petition for chemical listing or de-listing.

Read EPA guidance document and consult with EPA. The reading and interpretation of EPA policy and guidance notice is conducted by management and involves four hours per petition.

Plan activities. The planning activities are conducted jointly by management and technical personnel. Three hours per petition are required to complete these activities.

Prepare literature search. This activity would be conducted by both management and technical personnel, involving about nine hours.

Conduct literature search. The technical staff member conducts this activity, which requires about 48 hours per petition.

Process, review, and focus information. This activity would be completed by both technical and management personnel, involving a total of 86 hours per petition.

77

October, 2005

<u>Write petition</u>. This activity would be completed by a combination of technical, management, and clerical personnel. About 18 hours are required per petition to complete the writing. <u>Review and edit petition</u>. A combination of management, technical, and clerical personnel would be involved in this activity, requiring a total of 14 hours per petition.

<u>Submit petition to EPA and file</u>. These activities would be done by the clerical personnel, requiring approximately three hours per petition.

<u>Total respondent burden</u>. The total burden of submitting a petition is estimated to average 185 hours.

### 6(b) Estimating Respondent Costs

The cost to respondents is based on the time needed to complete the tasks listed in Section 6(a) and the hourly cost of labor at appropriate levels (loaded labor rates). There are no specific capital costs associated directly with this information collection activity. There may be some small additional costs for mailing and supplies. Total annual costs for all facilities are discussed in Section 6(d).

#### Form R Requirements

To determine the per-facility costs for typical respondents, the unit burden hour estimates for compliance activities are multiplied by fully loaded hourly rates for the appropriate categories of labor conducting these activities.[11] Loaded hourly rates are the product of wages, benefits, and overhead. Hourly wage rates are divided into three categories: managerial, technical, and clerical. Average wage and salary data for these categories are obtained from the Employer Costs for Employee Compensation (ECEC) report from the Bureau of Labor Statistics (BLS) for all goods-producing, private industries. The additional cost of benefits, such as paid leave and insurance, is also derived from information provided in the ECEC report. Loading factors for benefits are calculated separately for managerial, technical, and clerical labor by dividing the benefits percentage of total compensation by the wage percentage of total compensation. Based on information provided by the chemical industry and chemical industry trade associations, an additional loading factor of 17 percent is applied for general overhead. This loading factor is added to the benefits loading factor, then applied to the base wage. The new wage rates are calculated using current data on salaries and benefits for these three labor categories. The fully loaded 2004 hourly wage rates are shown in Table 4.

---

11 USEPA/OEI, *Wage Rates for Economic Analyses of the Toxics Release Inventory Program*, June 10, 2002. The wage rates used in this supporting statement have been updated to 2004 dollars.

October, 2005

**Table 4**
**Loaded Hourly Wage Rates by Labor Category**
**2004**

| Labor Category | Average Hourly Wage | Benefit (% wages) | Overhead (% wages) | Loaded Hourly Rate |
|---|---|---|---|---|
| Managerial | $33.61 | 40.85% | 17% | $53.05 |
| Technical | $28.52 | 40.06% | 17% | $44.79 |
| Clerical | $14.70 | 43.68% | 17% | $23.62 |

Average costs are summarized by activity in Table 5 and per facility in Table 6. The average cost per facility for those completing only compliance determination is $187. Based on the burden hour estimates in Table 1 and the loaded hourly rates in Table 4, the average subsequent year cost for a facility performing compliance determination and submitting 3 PBT forms is $7,251.  The average subsequent year cost for a facility submitting 3 Non-PBT forms is $4,229. For facilities that must also comply with supplier notification, the average subsequent year cost increases to $7,966 for PBT reports and $4,944 for Non-PBT reports.

**Table 5**
**Average Annual Cost Estimate by Activity**

| Category | Activity | Management | Technical | Clerical | Total Cost |
|---|---|---|---|---|---|
| Facility Level | Compliance Determination - all facilities | $53 | $134 | $0 | $187 |
| | Rule Familiarization - first-time filers | $637 | $1,008 | $0 | $1,644 |
| | Supplier Notification | $0 | $314 | $402 | $715 |
| Per Form R | Calculations and Report Completion - first-time filers - PBTs | $1,076 | $1,965 | $63 | $3,104 |
| | Calculations and Report Completion - first-time filers- Non-PBTs | $1,088 | $1,986 | $66 | $3,140 |
| | Calculations and Report Completion - subsequent year filers - PBTs | $748 | $1,360 | $44 | $2,152 |
| | Calculations and Report Completion - subsequent year filers - Non-PBTs | $400 | $720 | $24 | $1,144 |
| | Recordkeeping/Submission - all filers | $0 | $179 | $24 | $203 |

October, 2005

**Table 6**
**Average Annual Cost Estimate per Facility in Each Subsequent Year**

| Type of Facility | Management | Technical | Clerical | Total Cost |
|---|---|---|---|---|
| Compliance Determination Only | $53 | $134 | $0 | $187 |
| Compliance Determination and 3 Form Rs - PBTs | $2,297 | $4,752 | $202 | $7,251 |
| Compliance Determination and 3 Form Rs - Non-PBTs | $1,254 | $2,832 | $143 | $4,229 |
| Compliance Determination, 3 Form Rs and Supplier Notification - PBTs | $2,297 | $5,066 | $604 | $7,966 |
| Compliance Determination, 3 Form Rs and Supplier Notification - Non-PBTs | $1,254 | $3,145 | $545 | $4,944 |

Petitions

The primary cost to respondents for developing and submitting petitions under Section 313(e) will be the labor costs associated with the activities outlined in Section 6(a) of this document. These costs are the product of the labor hours expended to prepare the average petition, the wage rates for the employees involved in preparing the petitions, and the average number of petitions submitted annually. Based on the burden hour estimates in Table 3 and the loaded hourly rates in Table 4, the cost estimate for the preparation of a petition is presented in Table 7.

**Table 7**
**Average Cost per Petition**

| Activity | Management | Technical | Clerical | Total Cost |
|---|---|---|---|---|
| 1. Read EPA Policy and Guidance | $212 | $0 | $0 | $212 |
| 2. Plan Activities | $106 | $45 | $0 | $151 |
| 3. Prepare Literature Search | $106 | $314 | $0 | $420 |
| 4. Conduct Literature Search | $0 | $2,150 | $0 | $2,150 |
| 5. Process, Review, and Focus Information | $637 | $3,314 | $0 | $3,951 |
| 6. Write Petition | $212 | $358 | $142 | $712 |
| 7. Review and Edit petition | $212 | $358 | $47 | $618 |
| 8. Submit to EPA and File | $0 | $0 | $71 | $71 |
| **Total Cost per Petition** | $1,485 | $6,539 | $260 | **$8,285** |

October, 2005

Based upon prior years of implementation of EPCRA Section 313, it is assumed that fewer than 5 petitions will continue to be submitted annually (in recent years, only 1 or 2 petitions have been submitted each year). The total average unit cost to prepare a petition is estimated to be $8,285.

### 6(c) Estimating Agency Burden and Cost

This section estimates the burden and costs to EPA to process Form R reports based on information characterizing the resources used in previous years. Burden and costs are incurred by EPA for five categories of activities: data processing, outreach and training, information dissemination, policy and petitions, and compliance and enforcement. These activities are described in detail in Table 8.

**Table 8**
**EPA Activities for Form R**

| Category | Description |
|---|---|
| Data Processing | Data entry – entering the information into the database, microfilming or microfiching the reports, and filing all reports;<br><br>Data quality – reviewing reports for completeness, errors, and inconsistencies; making inquiries to resolve discrepancies; and reentering corrected data;<br><br>Magnetic media support – distributing computer program for electronic submissions; creation and updating of intelligent reporting software;<br><br>Programming and operating the EPA mainframe and local area network;<br><br>Data analysis – developing tools to use TRI data, analyzing data to support EPA needs, and preparing data for use by others; and<br><br>EPCRA Reporting Center fixed costs – rent and form storage. |
| Outreach and Training | Providing EPCRA technical hotline, technical guidance, industry outreach, and regional, state, and public training; and<br><br>Responding to requests for information through TRI User Support. |
| Information Dissemination | Public data release, Internet, data access tools. |
| Policy and Petitions | Analysis to support petitions, list revisions, trade secret claims, and rulemakings. |
| Compliance and Enforcement | Technical assistance, compliance outreach, facility inspections, issuance of cases and creation of Supplemental Environmental Projects (SEPs). |

October, 2005

To estimate EPA burden and cost, EPA employees (as measured by full time equivalents, or FTEs) and extramural costs are separated into a fixed component and a variable component. Activities and expenses that are not greatly affected by marginal changes in numbers of reports are treated as fixed. These include rent for the EPCRA reporting center, development costs for data access tools, compliance assistance measures, and other activities and expenses. The variable component is the amount that varies depending on the number of forms. The variable component reflects total extramural data processing costs divided by the total number of reports processed in the 2003 reporting year. $0.8 million in fixed costs and 26.3 FTEs are required to conduct the EPA activities described above plus an additional $35 in variable costs for each form processed.

As discussed in the following section, approximately 82,000 Form R reports are expected to be filed per year. Thus, the total annual burden to EPA is estimated to be $2.88 million in variable costs, along with the $0.8 million in fixed costs and 26.3 FTEs (or 55,000 hours at $3.2 million in loaded labor costs). The analysis assumes that half of the fixed FTE requirement is met by EPA employees at the general pay scale grade GS-12, step 5 (at a loaded salary of $99,776) and half by employees at grade GS-13, step 5 (at a loaded salary of $118,651), using a loading factor of 1.4 that includes wages and benefits but not overhead which is included in the fixed costs portion of the Agency burden estimate.

### 6(d) Bottom Line Burden Hours and Costs

<u>Estimated Total Annual Burden for All Respondents</u>

This section presents the total annual burden hours for all respondents including both those complying with Section 313 and submitting petitions. The total burden hours for all respondents to comply with Section 313 is estimated by multiplying the unit burden estimate for each compliance activity by the relevant units: facilities or reports. It is estimated that 201,785 facilities must determine compliance each year, of which approximately 22,000 facilities are expected to also perform the report completion and recordkeeping activities for 82,000 Form Rs.[12]

As a result, 179,785 facilities are estimated to complete only the compliance determination procedure. An additional 22,000 facilities are expected to complete compliance determination, form completion and recordkeeping, and of these, 3,734 facilities are expected to also conduct supplier notification. Of the 22,000 facilities that file Form Rs, it is expected that 1,031 facilities will be reporting to TRI for the first-time as they exceed applicable thresholds, and that these

---

12 The Bureau of Census's *County Business Patterns - 1997* indicates that there are 191,745 facilities with 10 or more employees in SIC codes 20 to 39. There are an additional 10,040 facilities in the seven non-manufacturing industries that are estimated to perform compliance determination, for a total of 201,785 facilities performing compliance determination. For the 2002 reporting year, 21,941 facilities submitted 81,429 Form Rs. The number of facilities and forms has been rounded up to the nearest thousand for this ICR.

October, 2005

facilities will file 1,629 of the Form Rs.[13] Table 9 presents the total annual burden hours based on these estimates.

**Table 9**
**Total Annual Burden Hour Estimate For Form R**

| Activity | Hours | Number of Facilities | Number of Reports | Total Burden |
|---|---|---|---|---|
| Compliance Determination - all facilities subject to EPCRA 313 | 4 | 201,785 | N/A | 807,140 |
| Rule Familiarization - first-time filers only | 34.5 | 1,031 | N/A | 35,570 |
| Form R Completion - reports from first-time filers - PBTs | 66.8 | N/A | 311 | 20,779 |
| Form R Completion - reports from first-time filers - Non-PBTs | 67.6 | N/A | 1,318 | 89,144 |
| Form R Completion - reports from subsequent year filers - PBTs | 46.3 | N/A | 15,232 | 705,477 |
| Form R Completion - reports from subsequent year filers - Non-PBTs | 24.6 | N/A | 64,568 | 1,590,794 |
| Recordkeeping/Submission - all reports | 5 | N/A | 81,429 | 407,145 |
| Supplier Notification | 24 | 3,734 | N/A | 89,616 |
| **Total** | | | | **3,745,665** |

The annual hours burden for all petitions is calculated by multiplying the per-petition burden estimate for each activity by the expected number of petitions per year. A total of 5 petitions are estimated to be filed annually. Table 10 presents the total annual hours burden for all petitions. The total annual hours burden for all petitions submitted is expected to be 925 hours.

---

13 Between RY1994 and RY2001, there have been three reporting years with no major programmatic changes. Based on reporting for 1996, 1997, and 1999 the average rate of facilities that file using new TRI Facility IDs is 4.7%. These facilities filed an average of 2% of the Form Rs. For the purposes of this ICR, these facilities represent "first-time filers."

83

October, 2005

**Table 10**
**Total Annual Burden Hour Estimate For All Petitions (5 petitions per year)**

| Activity | Annual Hours Burden | | | |
|---|---|---|---|---|
| | **Management** | **Technical** | **Clerical** | **Total Hours** |
| 1. Read EPA Policy and Guidance | 20 | 0 | 0 | 20 |
| 2. Plan Activities | 10 | 5 | 0 | 15 |
| 3. Prepare Literature Search | 10 | 35 | 0 | 45 |
| 4. Conduct Literature Search | 0 | 240 | 0 | 240 |
| 5. Process, Review, and Focus Information | 60 | 370 | 0 | 430 |
| 6. Write Petition | 20 | 40 | 30 | 90 |
| 7. Review and Edit petition | 20 | 40 | 10 | 70 |
| 8. Submit to EPA and File | 0 | 0 | 15 | 15 |
| **Total Annual Hours Burden** | **140** | **730** | **55** | **925** |

Estimated Total Annual Cost for All Respondents

The total annual reporting cost for all respondent facilities is determined by multiplying the unit cost estimates by the relevant units (facilities or reports) for each compliance activity. Table 11 presents the annual reporting cost for Form R.

October, 2005

**Table 11**
**Total Annual Cost Estimate For Form R**
**(2004 dollars)**

| Activity | Cost | Number of Facilities | Number of Reports | Total Cost |
|---|---|---|---|---|
| Compliance Determination - all facilities subject to EPCRA 313 | $187.42 | 201,785 | N/A | $37,818,545 |
| Rule Familiarization - first-time filers | $1,644.38 | 1,031 | N/A | $1,695,351 |
| Form R Completion - reports from first-time filers - PBTs | $3,103.82 | N/A | 311 | $965,102 |
| Form R Completion - reports from first-time filers - Non-PBTs | $3,139.76 | N/A | 1,318 | $4,138,389 |
| Form R Completion - reports from subsequent year filers - PBTs | $2,151.72 | N/A | 15,232 | $32,775,139 |
| Form R Completion - reports from subsequent year filers - Non-PBTs | $1,144.29 | N/A | 64,568 | $73,884,580 |
| Recordkeeping/Submission - all reports | $202.78 | N/A | 81,429 | $16,512,173 |
| Supplier Notification | $715.07 | 3,734 | N/A | $2,670,071 |
| **Annual Total** | | | | **$170,459,349** |

The annual cost for all petitions is calculated by multiplying the per-petition cost for each activity by the expected number of petitions per year. A total of 5 petitions are assumed to be filed annually. The total annual cost for all petitions submitted is shown in Table 12.

October, 2005

**Table 12**
**Total Annual Cost Estimate for All Petitions**
**(2004 dollars)**

| Activity | Management | Technical | Clerical | Total Cost |
|---|---|---|---|---|
| 1. Read EPA Policy and Guidance | $1,061 | $0 | $0 | $1,061 |
| 2. Plan Activities | $531 | $224 | $0 | $754 |
| 3. Prepare Literature Search | $531 | $1,568 | $0 | $2,098 |
| 4. Conduct Literature Search | $0 | $10,750 | $0 | $10,750 |
| 5. Process, Review, and Focus Information | $3,183 | $16,572 | $0 | $19,755 |
| 6. Write Petition | $1,061 | $1,792 | $709 | $3,561 |
| 7. Review and Edit petition | $1,061 | $1,792 | $236 | $3,089 |
| 8. Submit to EPA and File | $0 | $0 | $354 | $354 |
| **Total Cost per Petition** | **$7,427** | **$32,697** | **$1,299** | **$41,423** |

The previous tables have detailed the total burden and cost for complying with Section 313 and for submitting a petition independently. Table 13 presents the total burden and cost for both activities.

**Table 13**
**Total Annual Respondent Burden and Cost**

| Activity | Annual Burden Hours | Annual Costs (millions of 2004 dollars) |
|---|---|---|
| Form Rs | 3,745,665 | $170.46 |
| Petitions | 925 | $0.04 |
| **Total** | **3,746,590** | **$170.50** |

**6(e) Reasons for Change in Burden**

As a result of OMB's October, 2003 approval of the last ICR renewal, OMB's inventory reflects 84,000 responses and 3,888,752 hours for this information collection. This ICR supporting statement is for 82,000 responses and 3,746,590 hours. The reduction in the estimate of total burden of approximately 142 thousand hours is due to 1) the fact that approximately 2,000 fewer forms were filed in RY2002 than in RY2001 and 2) Form R has been modified to eliminate certain data elements and to simplify others. Table 14 summarizes the major program changes and adjustments that have been made over the last several years.

October, 2005

**TABLE 14**
**Recent Changes in TRI Form R Burden**

| Activity - Explanation | TRI Form R ICR ( EPA # 1363, OMB #2070-0093) | | | |
|---|---|---|---|---|
| | Change | | Total | |
| | # Responses | Burden Hours | Total Responses | Total Burden Hours |
| **1997 Baseline** | — | — | 90,362 | 5,538,727 |
| **1997 Program Change - Industry Expansion:** This rule added 7 new industries to the list of industries subject to TRI reporting beginning in RY98. | 39,033 | 2,467,463 | 129,395 | 8,006,190 |
| **1999 Adjustment - Form R Correction Worksheet:** This adjustment revised the number of responses to be more consistent with actual reporting levels. However, it did not correct for overestimation of expected reporting from the Industry Expansion rule. | (13,226) | (665,666) | 116,169 | 7,340,524 |
| **1999 Program Change - PBT Rule:** This rule lowered reporting thresholds for certain PBT chemicals, and added other PBT chemicals at lower thresholds beginning in RY00. | 19,990 | 1,485,411 | 136,159 | 8,825,935 |
| **2000 Program Change - Lead Rule:** This rule lowered reporting thresholds for lead and lead compounds beginning in RY01. | 9,813 | 786,169 | 145,972 | 9,612,104 |
| **January 2003 Form R ICR Renewal:** This request incorporated accounting adjustments to reflect actual number of responses. | (57,855) | (4,045,540) | 88,117 | 5,566,564 |
| **October 2003 Form R ICR Renewal:** This request reflects actual number of responses and accounts for a lower subsequent year reporting burden for non-PBT chemicals. | (4,117) | (1,677,812) | 84,000 | 3,888,752 |
| **May 2005 Form R ICR Renewal:** This request reflects actual number of responses. | (2,000) | (91,413) | 82,000 | 3,797,339 |
| **2005 Program Change - TRI Reporting Forms Modification Rule:** This rule eliminates certain data elements and simplifies others beginning in RY2005. | — | (50,749) | 82,000 | 3,746,590 |
| **CURRENT TOTALS** | — | — | **82,000** | **3,746,590** |

October, 2005

**6(f) Burden Statement**  (To appear on Collection Instrument)

The annual public burden related to the Form R for form completion and recordkeeping, which is approved under OMB Control No. 2070-0093, is estimated to average 51.3 hours per response for PBT chemicals and 29.6 for Non PBT chemicals.  There is additional burden associated with rule familiarization, compliance determination and supplier notification as described in Table 9.

Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations are listed in 40 CFR Part 9 and 48 CFR Chapter 15.

        To comment on the Agency's need for this information, the accuracy of the provided burden estimates, and any suggested methods for minimizing respondent burden, including the use of automated collection techniques, EPA has established a public docket for this ICR under Docket ID No. OEI-2003-025, which is available for public viewing at the Office of Environmental Information Docket in the EPA Docket Center (EPA/DC), EPA West, Room B102, 1301 Constitution Ave., NW, Washington, DC. The EPA Docket Center Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Reading Room is (202) 566-1744, and the telephone number for the Office of Environmental Information Docket is (202) 566-1752.  An electronic version of the public docket is available through EPA Dockets (EDOCKET) at http://www.epa.gov/edocket. Use EDOCKET to submit or view public comments, access the index listing of the contents of the public docket, and to access those documents in the public docket that are available electronically.  Once in the system, select "search," then key in the docket ID number identified above.  Also, you can send comments to the Office of Information and Regulatory Affairs, Office of Management and Budget, 725 17th Street, NW, Washington, DC 20503, Attention: Desk Office for EPA.  Please include the EPA Docket ID No. OEI-2003-025 and OMB control number 2070-0093 in any correspondence.

The completed forms should be submitted in accordance with the instructions accompanying the form, or as specified in the corresponding regulation.

October, 2005

# REFERENCES

Certain references cited are available in EPA docket # OPPTS-400104; other references are readily available.

Arbuckle, J. Gordon, et al., 1993.  Environmental Law Handbook, Twelfth Edition. Government Institutes, Inc., Rockland MD.

Bureau of National Affairs, 1995. "State Pollution Prevention Laws & Programs and Document Submissions Chart."

Burke, Lauretta M., 1993.  Environmental Equity in Los Angeles (Santa Barbara:  University of California Center for Geographic Information and Analysis, July).

California Air Resources Board, Technical Support Division, 1993. Emissions Inventory Criteria and Guidelines Regulation Pursuant to the Air Toxics "Hot Spots" Information and Assessment Act of 1987 (as amended June 1990, September 1990, June 1991, and June 1993).

California Air Resources Board, undated. "Overview of the Air Toxics 'Hot Spots' Information and Assessment Act."

Chikkala, John,  1995.  Minnesota Department of Public Safety Emergency Response Commission.  Conversation with Abt Associates.  November 13.

Chines, Peter (1994).  Investor Responsibility Research Center, Inc. Letter to Samuel Sasnett, U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, April 21, 1994; and attachment, "How to Read IRRC's Corporate Environmental Profiles," pp. 18-19.

Citizens Fund, 1993.  Poisons in Our Neighborhoods:  Toxic Pollution in the United States (Washington, DC:  Citizens Fund, November).

Citizens Fund, 1992.  Manufacturing Pollution (Washington, DC:  Citizens Fund, August).

Cummens, Pat, 1993.  Untitled presentation, in Proceedings:  Toxics Release Inventory (TRI) Data Use Conference (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, July).

Doer, Lisa, 1995.  "How TRI Can Drive Pollution Prevention," in Proceedings:  Toxics Release Inventory (TRI) Data Use Conference:  Building TRI and Pollution Prevention Partnerships (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, March).

89

October, 2005

Donaghue, Bob, 1995.  "Prioritizing Pollution Prevention Assistance Needs Using the 1992 Toxic Release Inventory," in  Proceedings:  Toxics Release Inventory (TRI) Data Use Conference:  Building TRI and Pollution Prevention Partnerships (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, March).

Dunst, Russ,  1995.  Wisconsin Department of Natural Resources. Conversation with Abt Associates.  November 14.

Goodenow, Dennis California Air Resources Board (CARB), 1995. Personal communication with Abt Associates, August 29, 1995.

Great Lakes Information Network, 1996. "Regional Air Pollutant Inventory Development System," Information from Great Lakes Information Network World Wide Web site: http://www.glc.org/projects/air/rapids/rapids.html   http://www.glc.org

Greene, Terry, 1995.  "JSI Community Outreach Project," in  Proceedings:  Toxics Release Inventory (TRI) Data Use Conference:  Building TRI and Pollution Prevention Partnerships (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, March).

Hartmann, Carolyn, 1993.  Troubled Waters:  Major Sources of Toxic Water Pollution (Washington, DC:  U.S. Public Interest Research Group, June).

Hausman, Rick, 1993.  "Environmental Investing:  Dollars and Change," Online:  The RTK NET Newsletter, Vol. 3, No. 2 (Fall).

Herring, Jeff, OAQPS, 1995. Personal communication with Abt Associates, August 21, 1995.

ICF Incorporated, 1996. Fax transmission from Maravene Edelstein to John Ferris dated 5/8/96, with table containing information of Tier II (EPCRA Section 312) data availability by state.

ICF Incorporated, 1993. Data Gaps and Redundancies in Pollution Prevention Reporting; A Compendium of Memoranda. Prepared for U.S. EPA, Office of Prevention, Pesticides, and Toxics, Pollution Prevention Division.

Kleeman, Jane, AFS Emissions Coordinator, 1995 Personal communication with Abt Associates, September 5, 1995.

Kolwey, Neil and Margery Lynch, 1994.  Pollution Prevention Priorities:  A Study of Priorities for Pollution Prevention Activities in Colorado (Colorado Pollution Prevention Advisory Board, May).

90

October, 2005

MacLean, Alair and Paul Orum, 1992.  Progress Report:  Community Right-to-Know (Washington, DC:  OMB Watch and Working Group on Community Right-to-Know, July).

MacLean, Alair and Rich Puchalsky, 1994.   Where the Wastes Are:  Highlights from the Records of the More Than 5,000 Facilities that Receive Transfers of TRI Chemicals (Washington, DC:  OMB Watch and Unison Institute, April).

Massachusetts Toxics Use Reduction Institute, 1994.  Toxics Use Reduction:  Fact Sheet 1. Lowell, MA:  University of Massachusetts Lowell.  February.

Massachusetts Department of Environmental Protection, 1993.  An Overview of the Toxics Use Reduction Act.  Prepared by Manik Roy.  February.

McLure, Pam, 1994.  "Georgia on My Mind",  Online:  The RTK NET Newsletter, Vol. 4, No. 1 (Summer).

Memorandum from J. Karnes to Brian Muehling (EPA/OTS) on Updating of Unit Labor Costs to Reflect Inflation and Industry Comments for CAIR, Centaur Associates Inc.  May 28, 1987.

National Conference of State Legislatures (NCSL), 1995. "1995 State TRI Program Assessment."

"Notes from the Field:  Students Use SARA Title III Data to Conduct Local Toxic Waste Audits,"  Hazardous Materials Dialogue, Vol. 4, No. 1, 1992.

Orum, Paul and Beth Wohlberg, 1994.  "Reports Using Toxics Release Inventory (TRI) Data," Working Notes on Community Right to Know, July-August.

Pope, Anne, OAQPS, 1995. Personal communication with Abt Associates, September 6, 1995.

Quinn, Bill.  1995.  Arizona Department of Environmental Quality.  Conversation with Abt Associates.  November 14.

Radian Corporation, 1993. Volatile Organic Compound (VOC)/Particulate Matter (PM) Speciation Data System (SPECIATE) User's Manual Version 1.5 Final Report, February 1993.

Ratza, Carol, Great Lakes Information Network (GLIN) Director, 1995.  Email communication with Abt Associates, August 30, 1995.

Recer, Gregg, and Thomas Johnson, 1995.  "Risk Screening in New York State Using Toxic Release Inventory Data," in Proceedings:  Toxics Release Inventory (TRI) Data Use Conference: Building TRI and Pollution Prevention Partnerships (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, March).

91

October, 2005

Rice, Faye, 1993.  "Who Scores Best on the Environment," Fortune, Vol. 128, No. 2 (July 26, 1993).

Rubin, Steve, Data Management Branch OECA, 1995.  Personal communication with Abt Associates, November 3, 1995.

Seitz, John S., Director OAQPS, 1995. Memorandum: "Title V Permitting for Non-major Sources in Recent Section 112 Maximum Achievable Control Technology (MACT) Standards," May 16, 1995.

Settina, Nita and Paul Orum, 1991.  Making the Difference, Part II:  More Uses of Right-to-Know in the Fight Against Toxics (Washington, DC:  Center for Policy Alternatives and Working Group on Community Right-to-Know, October).

Smith, Ted, 1992.  Untitled presentation, in Proceedings:  Toxic Release Inventory (TRI) Data Use and Pollution Prevention Conference (Washington, DC:  U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, June).

Southerland, Jim, OAQPS, 1995. Personal communication with Abt Associates, August 29, 1995.

Swanson, Joanna, OAQPS, 1995. Personal communication with Abt Associates, August 21, 1995.

Templet, Paul H., 1993.  "The Emissions to Jobs Ratio,"  Environmental Science and Technology, Vol. 27, No. 5 (May).

Texas Network for Environmental and Economic Justice, 1993.  Toxics in Texas and their Impact on Communities of Color  (Austin, TX:  Texas Network for Environmental and Economic Justice, March).

Tryens, Jeffrey, Richard Schrader, and Paul Orum, undated.  Making the Difference:  Using the Right-to-Know in the Fight Against Toxics  (Washington, DC:  Center for Policy Alternatives and Working Group on Community Right-to-Know).

U.S. Department of Commerce, Bureau of the Census.  *County Business Patterns - 1997*. Washington, D.C.: Government Printing Office, 1999.

U.S. Department of Labor, Bureau of Labor Statistics.  *Employer Costs for Employee Compensation — March 1997*.  U.S. Department of Labor, Washington, D.C.  1997.

U.S. Department of Labor, Bureau of Labor Statistics. *USDL News Release: 97-371*, Table 11, U.S. Department of Labor, Washington D.C., October 21, 1997.

October, 2005

U.S. Department of Labor, Bureau of Labor Statistics.  *Employment Cost Index—March 1998.*
U.S. Department of Labor, Washington D.C. 1998.

U.S. Department of Labor, Bureau of Labor Statistics. *USDL News Release 98-170,* Table 6.
U.S. Department of Labor, Washington D.C., April 30, 1998.

U.S. Department of Labor, Bureau of Labor Statistics.  *Occupational Compensation Survey,
National Summary 1996.*  U.S. Department of Labor, Washington, D.C., 1996.

U.S. Department of Labor, Bureau of Labor Statistics.  Occupational Compensation Survey,
National Summary 1996 (1998).  U.S. Department of Labor, Washington, D.C., March. Bulletin
2497, Tables A-1, D-1 and D-3, 1998.

U.S. EPA, 1991.  1991 Hazardous Waste Report: Instructions and Forms. EPA Form 8700-
13A/B (5-80) revised 8-91.

U.S. EPA, 1993.  "Proceedings: Toxics Release Inventory (TRI) Data Use Conference." July
1993.

U.S. EPA, 1993b.  <u>State Directory:  33/50 and Voluntary Pollution Prevention Programs, 1993</u>.
(Washington, DC:  U.S. Environmental Protection Agency, Office of Prevention, Pesticides and
Toxic Substances, October).

U.S. EPA, 1994.  "National Analysis: The Biennial RCRA Hazardous Waste Report (Based on
1991 Data)." September 1994.

U.S. EPA, 1995a.  Information from the AIRS AFS Home Page on the U.S. EPA World Wide
Web site: (http://www.epa.gov/docs/airs/afs.html).

U.S. EPA, 1995b.  "Compilation of Air Pollutant Emission Factors:  Volume I: Stationary Point
and Area Sources," Office of Air Quality Planning and Standards (OAQPS), January 1995.

U.S. EPA, 1995c. "White Paper for Streamlined Development of Part 70 Permit Applications,"
Office of Air Quality Planning and Standards (OAQPS), July 10, 1995.

U.S. EPA, 1995d.  "Report to President Clinton: Expansion of Community Right-to-Know
Reporting to Include Chemical Use Data: Phase III of the Toxics Release Inventory."

U.S. EPA, 1995e.  "User's Guide to Federal Accidental Release Databases," Office of Solid
Waste and Emergency Response, September 1995.

U.S. EPA, 1995f.  Information from the ENVIROFACTS database on the U.S. EPA World
Wide Web site http://intranet.epa.gov/enviro/html/tris/tris_query.html.

October, 2005

U.S. EPA, 1999g. "1997 Toxics Release Inventory Public Data Release: State Fact Sheets, Office of Pollution Prevention and Toxics, EPA 745-F-99-001, March 1995.

U.S. EPA 1995h. "An Overview of the Toxics Release Inventory Data in the U.S.," Environmental Assistance Division, Office of Pollution Prevention and Toxics, June, 1995.

U.S. EPA, 1996. SPEC.TXT, document on CHIEF (Clearing House for Inventories and Emissions Factors) BBS on the Technology Transfer Network (TTN) BBS. Dialup (919-541-5742) or ftp (ttnftp.rtpnc.epa.gov).

U.S. EPA, 1999. "Economic Analysis of the Final Rule to Modify Reporting of Persistent Bioaccumulative Toxic Chemicals Under EPCRA Section 313". Economics, Exposure and Technology Division, Office of Pollution Prevention and Toxics. October 1999. Wakefield, Mary Jean, AFS Helpline 1-800-367-1044, 1995. Conversation with Abt Associates. November 28, 1995.

U.S. EPA, . Toxic Release Inventory Chemicals Reported to Non-TRI Databases. U.S. EPA World Wide Web site http://www.epa.gov/tri/chemical/index.htm.

U.S. EPA, 1986. Emergency Planning and Community Right-to-Know Act of 1986, Section 313 (42 U.S.C.A. Section 1023. U.S. EPA World Wide Web site http://www.epa.gov/tri/lawsandregs/index.htm.

U.S. EPA, 1990. Pollution Prevention Act (42 U.S.C.A. Sections 13101-13109. U.S. EPA World Wide Web site http://www.epa.gov/tri/lawsandregs/index.htm.

U.S. EPA, . 40 CFR Part 372 Toxic Chemical Release Reporting: Community Right-to-Know. U.S. EPA World Wide Web site http://www.epa.gov/tri/lawsandregs/index.htm.

October 2005

# TOXIC CHEMICAL RELEASE INVENTORY

## ALTERNATE THRESHOLD FOR LOW ANNUAL REPORTABLE AMOUNTS; TOXIC CHEMICAL RELEASE REPORTING

### INFORMATION COLLECTION REQUEST
### SUPPORTING STATEMENT

### OMB CONTROL NO. 2070-0143
### EPA ICR #1704.08

### October 2005

1    IDENTIFICATION OF THE INFORMATION COLLECTION.....................................1
     1(a) Title and Number of the Information Collection.......................................1
     1(b) Short Characterization/Abstract...........................................................1

2    NEED FOR AND USE OF THE COLLECTION .........................................................2
     2(a) Need/Authority for the Collection...........................................................2
     2(b) Practical Utility/Users of the Data..........................................................3

3    NON-DUPLICATION, CONSULTATIONS, AND OTHER COLLECTION
     CRITERIA...................................................................................................4
     3(a) Non-Duplication....................................................................................4
     3(b) Increasing Public Awareness ................................................................4
     3(c) Effects of Less Frequent Collection .......................................................5
     3(d) General Guidelines ...............................................................................5
     3(e) Confidentiality.......................................................................................6
     3(f) Sensitive Questions ..............................................................................6

4    THE RESPONDENTS AND THE INFORMATION REQUESTED..............................6
     4(a) Respondents/SIC Codes ......................................................................6
     4(b) Information Requested .........................................................................7

5    THE INFORMATION COLLECTED--AGENCY ACTIVITIES, COLLECTION
     METHODOLOGY, AND INFORMATION MANAGEMENT. ....................................10

October 2005

5(a) Agency Activities ........................................................................... 10
5(b) Collection Methodology and Management .................................... 11
5(c) Small Entity Flexibility .................................................................. 12
5(d) Collection Schedule ...................................................................... 12

6      ESTIMATING THE BURDEN AND COST OF THE COLLECTION ......................... 13
6(a) Estimating Respondent Burden ..................................................... 13
6(b) Respondent Costs ......................................................................... 16
6(c) Estimating Agency Burden and Cost ............................................ 17
6(d) Bottom Line Burden Hours and Costs ........................................... 18
6(e) Reasons for Change in Burden ..................................................... 20
6(f) Burden Statement .......................................................................... 21

October 2005

<u>ATTACHMENTS</u>

A    RELEVANT STATUTES:  EPCRA SECTION 313 AND PPA SECTION 6607

B    MAJOR REGULATIONS SPECIFIC TO FORM A CERTIFICATION STATEMENT:
      40 CFR §372.10, §372.27 AND §372.95

C    FORM A CERTIFICATION STATEMENT (EPA Form #9350-2)

D    TOXIC CHEMICAL RELEASE INVENTORY REPORTING FORMS AND
      INSTRUCTIONS - REVISED 2001 VERSION (EPA 260-B-02-001)

October 2005

# 1    IDENTIFICATION OF THE INFORMATION COLLECTION

### 1(a)    Title and Number of the Information Collection

**Title:**    **Alternate Threshold for Low Annual Reportable Amounts; Toxic Chemical Release Reporting**

**EPA ICR No. 1704.08**

**OMB Control No.    2070-0143**

### 1(b) Short Characterization/Abstract

This Information Collection Request (ICR) covers the public reporting and record keeping requirements associated with Toxics Release Inventory (TRI) reporting based on an alternate threshold for facilities with low amounts of listed toxic chemicals in waste.  EPA collects information from facilities and enters it into TRI under the authority of section 313 of the Emergency Planning and Community Right-to-Know Act (EPCRA) (42 U.S.C. 11001 *et seq.*) and section 6607 of the Pollution Prevention Act (PPA) (42 U.S.C. 11071 to 11079).  EPCRA section 313 requires owners or operators of certain facilities (i.e., facilities in listed Standard Industrial Classification (SIC) codes) manufacturing, processing, or otherwise using any of over 650 listed toxic chemicals and chemical categories (hereafter "listed toxic chemicals") in excess of the applicable threshold quantities to report on their environmental releases and transfers of and waste management activities for such chemicals annually.  Under section 6607 of the PPA, facilities must provide information on the quantities of the toxic chemicals in waste streams and the efforts made to reduce or eliminate those quantities.  A covered facility must file a separate form for each toxic chemical manufactured, processed or otherwise used in excess of the reporting thresholds established in section 313(f)(1).

This ICR is for the Form A Certification Statement.  EPA established an alternate threshold for a category of facilities with low amounts of a listed toxic chemical in wastes.  A facility that meets the section 313 reporting thresholds, but estimates that the total annual reportable amount of the listed toxic chemical does not exceed 500 pounds per year, can take advantage of the alternate manufacture, process or otherwise use thresholds of 1 million pounds per year for that listed toxic chemical, provided that certain conditions are adhered to.  Each qualifying facility that chooses to apply this alternate manufacture, process or otherwise use threshold must file a Form A Certification Statement certifying that they met the condition of the alternate threshold for one or more chemicals, in lieu of completing a Form R for each listed chemical for which the facility exceeded statutory thresholds.  The Form A Certification Statement is submitted to both the EPCRA reporting center and the designated state recipient in the same manner that the Form R is submitted.  The Form A Certification Statement provides a signed statement that the sum of the amount of the listed toxic chemical or chemicals in wastes

1

October 2005

did not exceed 500 pounds for this reporting year, and that the chemical(s) was manufactured, processed, or otherwise used in an amount not exceeding 1 million pounds during this reporting year.

Responding to this information collection requires determining whether a chemical is eligible for certification under the alternate threshold, and completing the Form A Certification Statement. A single Form A Certification Statement may contain as many listed toxic chemicals as met the conditions of the alternate threshold. For a facility certifying for a single listed toxic chemical, the burden is estimated to average 20.5 hours for facilities submitting a certification statement under EPCRA section 313. (This includes the time required for calculations, Form A Certification Statement completion, and record keeping.) By comparison, the average time required for calculations, form completion, and record keeping for Form R is estimated to average 29.6 hours per form for a non-PBT chemical and 51.3 hours for a PBT chemical. Note that these Form R and A burden estimates incorporate the burden savings that will result from the TRI Reporting Forms Modification Rule. Thus, for a facility filing a Form A Certification Statement for a single chemical, the alternate threshold yields an average savings of 9.1 hours for a non-PBT chemical and 30.8 hours for a PBT chemical.

For a facility certifying multiple chemicals on a Form A Certification Statement, the per chemical burden on the facility is reduced. An average of 2.4 chemicals per facility were reported to EPA using Form A Certification Statements for the 2002 reporting year. About 48 percent of the facilities using the Form A Certification Statement reported on one chemical, another18 percent reported on two chemicals, 17 percent on three chemicals, and the remaining 17 percent of facilities reported on 4 or more chemicals.

## 2    NEED FOR AND USE OF THE COLLECTION

### 2(a) Need/Authority for the Collection

Section 313 of EPCRA, 42 U.S.C. 11023, requires certain facilities that manufacture, process, or otherwise use listed toxic chemicals in excess of the applicable threshold quantities to report their environmental releases of such chemicals annually. Beginning with the 1991 reporting year, such facilities also began reporting source reduction and recycling data for listed chemicals, pursuant to section 6607 of the Pollution Prevention Act, 42 U.S.C. 13106. Copies of 42 U.S.C. 11023 and 13106 are included in Attachment A.

Each covered facility must file a separate report for each listed chemical manufactured, processed or otherwise used in excess of the reporting thresholds established in section 313(f)(1). EPA has authority to revise these threshold amounts pursuant to section 313(f)(2); however, such revised threshold amounts must obtain reporting on a substantial majority of total releases of the chemical at all facilities subject to section 313. A revised threshold may be based on classes of chemicals or categories of facilities.

2

October 2005

This ICR is for the Form A Certification Statement.  EPA established an alternate threshold under EPCRA section 313(f)(2) for a category of facilities with low amounts of a listed toxic chemical in wastes.  A facility that meets the appropriate reporting thresholds, but estimates that the total amount of the chemical in waste does not exceed 500 pounds per year, can take advantage of alternate manufacture, process, or otherwise use thresholds of 1 million pounds per year for that chemical, provided that certain conditions are met.  A facility that chooses to apply the alternate threshold must submit an EPA Toxic Chemical Release Inventory Form A Certification Statement (EPA Form #9350-2).  EPA's regulations implementing TRI reporting are codified at 40 CFR part 372.  A copy of the sections specific to the Form A Certification Statement are included in Attachment B.

The information being collected on the Form A Certification Statement is necessary to fulfill EPA's responsibilities under EPCRA section 313(f)(2).  A Form A Certification Statement addresses the statutory mandates and the public's right-to-know while allowing regulatory relief for facilities having lower volumes of chemicals in wastes.  A Form A Certification Statement provides appropriate information relating to the location of facilities manufacturing, processing or otherwise using these chemicals, that the chemicals are being manufactured, processed or otherwise used at current reporting thresholds, and that the sum of amounts of the chemical in waste did not exceed 500 pounds for that reporting year.  The requirement to submit a Form A Certification Statement fosters continued attention to chemical management practices and provides a locational tool vital to any compliance program or other interested party.  It is necessary to receive some type of specific indication that a facility is taking advantage of the alternate threshold annually to assist in any compliance monitoring and enforcement efforts.

**2(b) Practical Utility/Users of the Data**

The Paperwork Reduction Act, 44 U.S.C. 3502(11), states that "the term 'practical utility' means the ability of an agency to use information, particularly the capability to process such information in a timely and useful fashion."  EPA has demonstrated that it can process and utilize TRI information in a timely and useful fashion, as well as make the information available in a timely fashion for a variety of further useful purposes.  This information is collected annually and is subsequently disseminated within a year of its receipt.  Further information on Agency activities is summarized in Section 4(a).

According to EPCRA section 313(h), the data submitted in the forms are intended to "inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; to aid in the development of appropriate regulations, guidelines, and standards; and for other similar purposes."  The purpose of the Agency's collection of this information is therefore to facilitate the availability of this information to the public.

3

October 2005

TRI data made available as a result of this information collection is used by many different individuals and organizations, including concerned citizens, environmental and public interest groups, journalists, government agencies, the financial and business community, the regulated community, and educational and research institutions. Government agencies, researchers and environmental and public interest groups use data collected under EPCRA section 313 to produce national, regional, state and local level reports. Governments use the data to set priorities, target voluntary initiatives, and evaluate the development of regulations. Citizens and local interest groups use TRI data to assess the status of toxic chemicals in their community and to determine priorities for concern. Investment analysts use TRI data to provide recommendations to clients seeking to make investments on an environmental basis. Insurance companies and lenders look to TRI data as an indication of potential environmental liabilities. Many reporting companies use TRI data in preparing annual environmental reports, similar to annual reports on financial performance. The ICR for Form R (OMB #2070-0093, EPA #1363) provides specific examples of some of the actual uses of TRI data.

The Form A Certification Statement provides information that a section 313 listed chemical is being manufactured, processed or otherwise used at threshold levels specified in 40 CFR part 372.25. Through the use of the Form A Certification Statement, the individuals and groups described above will continue to have knowledge that the sum of the amounts in waste for a particular facility did not exceed a specified amount for the chemical for which the alternate threshold was applied.

## 3    NON-DUPLICATION, CONSULTATIONS, AND OTHER COLLECTION CRITERIA

### 3(a) Non-Duplication

The information requested by the Form A Certification Statement represents a subset of information requested by Form R. To the extent that this reporting option is used, corresponding data will not be reported under Form R. Information comparing TRI reporting to information available under other statutes is available in the ICR for Form R (OMB #2070-0093, EPA #1363).

### 3(b)  Increasing Public Awareness

EPA has emphasized the Form A Certification Statement during training sessions, directly contacted potentially eligible facilities, and made some modifications to the reporting package to make the Form A Certification Statement easier to identify and use. These actions, in addition to the additional time for which the Form A Certification Statement option has been available, have increased the level of use of the Form A Certification Statement.

4

October 2005

### 3(c)  Effects of Less Frequent Collection

Section 313 requires annual reporting.  Section 313(I) permits EPA to modify the reporting frequency by rulemaking, after submitting a notification to Congress.  As Form A Certification Statements are required to be submitted on or before July 1 following the year in which the facility's activities occur, and as the national data are available from EPA within a year after EPA receives data, a less frequent collection of information would delay the availability of the data to the public.  Since TRI represents the best available database tracking multimedia releases, transfers and other handling of listed toxic chemicals, changes in reporting frequency could have potential impacts on the quality and value of the data for purposes of planning, establishing baselines and tracking performance.

EPA's Office of Enforcement and Compliance Assurance (OECA) has stressed the need to continue to collect information on an annual basis that a facility is manufacturing, processing, or otherwise using a listed section 313 chemical in threshold amounts set out in 40 CFR part 372.25.  Submission of the Form A Certification Statement allows EPA and other data users to identify facilities applying the alternate threshold.  In order to target facilities effectively and efficiently for compliance inspections, EPA must be able to distinguish between facilities that did not report under EPCRA section 313 because they took advantage of this regulatory amendment, and facilities that did not report for other reasons.

In addition, the State and many of the Regional TRI program offices have submitted comments that echo enforcement concerns raised by OECA to the effect that the submission of a Form A Certification Statement is "paramount" to the ability of EPA and states to readily verify compliance with the regulation or to enforce against violations.  Additionally, a report may provide sufficient information to citizens and interest groups and prevent unnecessary legal actions that might otherwise be pursued if there was a complete absence of information for a given facility.  By requiring the Form A Certification Statement on an annual basis, any compliance assistance or enforcement program, as well as other interested parties, are able to determine that the facility is continuing to manufacture, process, or otherwise use a listed section 313 chemical and that the amounts associated with these activities are in excess of current reporting thresholds.

### 3(d) General Guidelines

This ICR adheres to the guidelines stated in the 1980 Paperwork Reduction Act, as amended, by OMB's implementing regulations, and all applicable OMB guidance.

Although reporting facilities are required to identify the chemical for which reports are submitted, they can claim the chemical identity as a trade secret.  A generic name must be provided as part of the information made available to the public.  EPA securely stores and maintains the true identity of the chemical.

5

October 2005

EPA will disclose information that is covered by a claim of trade secrecy or confidentiality only to the extent permitted by, and in accordance with, the procedures in 40 CFR part 350 and 40 CFR part 2.

EPA actively encourages the use of automated techniques, most notably PC-based report generating programs produced both by the Agency and by the private sector and other submissions on magnetic media. EPA recognizes that not all reporting facilities are able to or are interested in investing the time and funds necessary to employ such automated techniques. The final decision on how to report is ultimately that of the reporting facility.

### 3(e) Confidentiality

Respondents may designate the specific chemical identity of a substance as a trade secret. Procedures for submission and review of trade secret claims under section 322 are set forth in 40 CFR part 350 and are covered by another EPA ICR (EPA ICR #1428; OMB #2050-0078).

### 3(f) Sensitive Questions

This collection does not request any sensitive information.

## 4    THE RESPONDENTS AND THE INFORMATION REQUESTED

### 4(a) Respondents/SIC Codes

A facility must report to TRI if it meets all three of the following criteria:

(1)    Has a primary Standard Industrial Classification (SIC) code covered by the regulations;

(2)    Has 10 or more full-time employees (or the hourly equivalent of 20,000 hours); and

(3)    Manufactures, processes, or otherwise uses any of the listed toxic chemicals or chemical categories above the applicable threshold. Currently, the thresholds are 25,000 pounds for chemicals manufactured (including imported) or processed, and 10,000 pounds for chemicals otherwise used.

The industries currently subject to reporting under EPCRA section 313 include SIC major groups 10 (metal mining), except SIC code 1011, 1081, and 1094; 12 (coal mining), except SIC code 1241; 20 through 39 (manufacturing); as well as industry codes 4911, 4931, 4939 (electricity generating facilities), limited to facilities that combust coal and/or oil for the purpose

October 2005

of generating power for distribution in commerce; 4953 (refuse systems), limited to facilities regulated under RCRA Subtitle C; 5169 (chemicals and allied products wholesaling, not elsewhere classified); 5171(petroleum bulk stations and terminals); and 7389 (limited to facilities primarily engaged in solvent recovery services on a contract or fee basis). Qualifying federal facilities also report to TRI as a result of Executive Order 12856.

Under the final PBT (Persistent Bioaccumulative Toxic Chemicals) Rule, published October 29, 1999, all PBT chemicals are excluded from eligibility for alternate threshold reporting (i.e., the Form A Certification Statement cannot be used to report PBT chemicals).

With the exception of the PBT chemicals, the Form A Certification Statement can be submitted by those facilities that would otherwise be required to submit a Form R, but determine that they are eligible to apply the alternate threshold based on the sum of amounts in waste. Therefore, the alternate threshold does not affect facilities that are not already part of the TRI regulated community.

**4(b) Information Requested**

(I)     Data Items

The following information must be reported on a Form A Certification Statement pursuant to 40 CFR part 372:

(1)   Reporting year.
(2)   An indication of whether the chemical identified is being claimed as trade secret.
(3)   Chemical name or names and CAS number(s) (if applicable) of the chemical(s), or the category(ies) or the generic chemical name(s).
(4)   Signature of a senior management official certifying the following: pursuant to 40 CFR part 372.27, " I hereby certify that to the best of my knowledge and belief for the toxic chemical listed in this statement, the annual reportable amount as defined in 40 CFR 372.27(a) did not exceed 500 pounds for this reporting year and that the chemical was manufactured, or processed, or otherwise used in an amount not exceeding 1 million pounds during this reporting year."
(5)   Date signed.
(6)   Facility name and address.
(7)   Mailing address of the facility if different than (6).
(8)   Toxic chemical release inventory facility identification number if known.
(9)   Name and telephone number of a Technical Contact.
(10)  The four-digit SIC codes for the facility or establishments in the facility.
(11)  Dun and Bradstreet Number of the facility.
(12)  Name of the facility's Parent Company.
(13)  Parent Company's Dun and Bradstreet Number.

7

October 2005

These 13 elements are a subset of the information collected on Form R.  An additional four elements were recently removed from Form R and Form A under the TRI Reporting Forms Modification Rule.  Removed elements include:
- Latitude and longitude coordinates of the facility,
- EPA Identification Numbers(s) (RCRA ID Number(s) of the facility),
- Facility NPDES Permit Number(s), and
- Underground Injection Well Code (UIC) ID Number(s) of the facility.

Beyond element 3 which allows for multiple chemicals to be reported on a single Form A Certification Statement, the only element unique to the Form A Certification Statement is element 4.  Element 4 of the Form A Certification Statement corresponds to the certification statement on Form R and represents a signed statement by a facility owner/operator or senior management official.  Unlike Form R, the signed statement on the Form A Certification Statement certifies that the annual reportable amount as defined by 40 CFR 372.27 (a) did not exceed 500 pounds and that the amounts manufactured, or processed, or otherwise used did not exceed 1 million pounds for that year.

A copy of the Form A Certification Statement (EPA Form #9350-2) is included as Attachment C.  The most recent version of the Toxic Chemical Release Inventory Reporting Forms and Instructions can be found online at the TRI website: www.epa.gov/tri.

Justification for elements requested:

Element 4 relates to the conditions being met in order to claim eligibility for the submission of a Form A Certification Statement.  This element is essential in meeting the statutorily mandated requirement of continuing to capture a substantial majority of releases for each listed EPCRA section 313 chemical.

Elements 6 through 13 are requested for identification purposes.  Of these, elements 6 through 9 are necessary to determine which facility is claiming the alternate threshold along with the information needed to contact the claimant.  Elements 11 through 13 are requested in order to cross-reference the facility with other reporting systems. These data elements are essential for enforcement purposes and have proven to be useful for cross program multimedia investigations.

(ii)     Respondent Activities

The regulated community is expected to comply with the reporting requirements by completing the Form A Certification Statement and submitting it to EPA and the appropriate state agency.  Section 313(g)(2) provides that a "facility may use readily available data (including monitoring data) collected pursuant to other provisions of law, or where data are not readily

8

October 2005

available, reasonable estimates of the amounts involved." Respondents are not required to develop new information.

The same level of assistance presently available to Form R respondents is available to those facilities applying the alternate threshold and completing the Form A Certification Statement. Instructions and guidance documents are available, and a toll-free hotline is available to handle general and technical inquiries from the regulated community. The following steps will be completed by a facility using the alternate threshold:

> Compliance Determination
> Calculations (Compliance)
> Completion of Form (Disclosure)
> Substantiation of a Trade Secret Claim (not performed by all respondents)
> Record keeping
> Supplier Notification (not performed by all respondents)
> Petition Submission (not a requirement)

Compliance Determination. Facilities must first determine if they meet the criteria for EPCRA section 313 reporting and if they are eligible to apply the alternate threshold, and/or provide supplier notification. The determination is based on the SIC code(s) for the facility, the number of full-time employees or equivalents, the chemicals manufactured, processed or otherwise used at the facility, the quantity of those chemicals and the quantity of releases and other waste management.

Calculations (Compliance). A facility has to calculate the annual reportable amount for a chemical in order to determine if the facility is eligible to apply the alternate threshold. The annual reportable amount is calculated as the combined total of the amounts released at the facility (including disposal), treated at the facility (as represented by amounts destroyed or converted by treatment processes), recovered at the facility as a result of recycling operations, combusted for the purpose of energy recovery at the facility, and transferred from the facility to off-site locations for the purpose of recycling, energy recovery, treatment, or disposal. In addition, the facility must also determine that it did not manufacture, process, or otherwise use more than 1 million pounds of the listed chemical.

Completion of Form (Disclosure). Each facility taking advantage of the alternate threshold must complete the Form A Certification Statement.

Substantiation of a Trade Secrecy Claim. Respondents wanting to make a trade secrecy claim for the chemical identity should refer to documentation requirements discussed in the Trade Secrecy ICR for EPCRA (EPA #1428, OMB #2050-0078).

9

October 2005

  <u>Record keeping</u>.  Each facility taking advantage of the alternate threshold is required to maintain records for a period of three years from the date of the submission of the Form A Certification Statement, and to make them available upon request.  These records provide substantiation that an appropriate threshold determination was made and that the sum of amounts in total waste did not exceed 500 pounds for that chemical for that reporting year.  This documentation is necessary for any compliance effort verifying the claims made by a facility taking advantage of the alternate threshold.  Facilities must maintain a copy of each Form A Certification Statement and Form R submitted, as well as the documents, calculations, and other information they collected for developing the reports submitted.

  <u>Supplier Notification</u>.  Supplier notification requirements are associated with the Form A Certification Statement.

  <u>Petition Submission</u>.  No additional procedures relating to petition submissions are required by the Form A Certification Statement.

## 5  THE INFORMATION COLLECTED--AGENCY ACTIVITIES, COLLECTION METHODOLOGY, AND INFORMATION MANAGEMENT.

  **5(a) Agency Activities**

  EPA activities for this ICR parallel requirements established for reporting TRI releases on Form R (OMB #2070-0093, EPA #1363),including:

   Assistance to Respondents
   Data Management
   Data Processing and Quality Control
   Systems Maintenance and Operation
   Making the Data Available to the Public
   List Revisions and Petition Reviews
   Trade Secrecy Reviews

  <u>Assistance to Respondents</u>.  Assistance to respondents is offered in the same manner as described by the Form R ICR (OMB #2070-0093, EPA #1363).  These assistance efforts extend to facilities for completion of a Form A Certification Statement.

  <u>Data Processing and Quality Control</u>.  Once a Form A Certification Statement is submitted and received by the EPCRA Reporting Center, the information is recorded into the TRIM Oracle database.  If submitted electronically (floppy disk), the information is automatically read into TRIM; if the Form A Certification Statement was submitted in hardcopy, the information is manually keyed into TRIM.  Automated data quality checks and field verifications are built into the electronic reporting software (ATRS - Automated TRI Reporting Software).  Additional data

10

October 2005

quality checks, field verifications, and reconciliations are performed sequentially once the electronic submission is read into TRIM or for the first time once the hardcopy is completely keyed in.

Systems Maintenance and Operations. The TRIM database is maintained on an Oracle server on an isolated, secure local area network at the EPCRA Reporting Center. Standard database management activities are routinely preformed to maintain data and system integrity. Tape backups of the TRIM database are made nightly.

Availability of the Data. In accordance with statute, a copy of the database is publicly available in electronic format using the Agency's internet site (the data is also maintained on the Agency's intranet site). Users can access the data using either Envirofacts or TRI Explorer. Both tools allow the user to view individual chemical submissions, all submissions for a given facility, or summary information by Zip Code, city, county, state, EPA Region, or nationally. Searches can be conducted in numerous ways, including on a chemical basis or by industry SIC code.

In addition to the public electronic database, EPA has also made the TRI information available through a variety of other electronic and non-electronic means. EPA prepares a national data release report that describes the annual data received and presents extensive summary information in text, charts, and graphics. Electronic versions of the database are available in .dbf and comma delimited format from the Agency's web site or NTIS. Versions of the Oracle TRIM database are available upon special request.

Trade Secrecy Reviews. A respondent may claim a chemical as trade secret on the Form A Certification Statement in the same manner as when filing a Form R. When a respondent claims a chemical identity as a trade secret, a substantiation must be included. Respondents often claim trade secret status on Form R but do not provide substantiation. In those cases, EPA must review the claim and contact the respondent to determine the true intent. In many cases, the trade secret claim was not intended and no substantiation is made. Trade Secrecy reviews, including the costs to EPA, are discussed in greater detail in the ICR for the Trade Secrecy Rule for EPCRA (EPA #1428, OMB #2050-0078).

**5(b) Collection Methodology and Management**

The Form A Certification Statement can be submitted using EPA's magnetic media reporting program, and EPA encourages the submission of Form A Certification Statements electronically. The use of electronic reporting serves to reduce the reporting burden on industry. It also reduces both the cost and the time required for EPA to enter, process, and make the data available. For the 2002 TRI reporting cycle, approximately 90% of Form Rs and Form A Certification Statements were submitted electronically.

11

October 2005

**5(c)  Small Entity Flexibility**

EPCRA section 313 (b)(1)(A) provides that facilities with less than 10 full-time employees (or equivalent) are not required to report.  In addition, the alternate threshold is advantageous to those entities which might be classified as small under other definitions.  The range established by the 500 pound category may apply proportionally higher to smaller entities, thereby resulting in greater regulatory relief for these facilities.  EPA considered a number of different annual reportable amount levels when it promulgated this rule.  The 500 pound level was chosen because it appeared to best balance burden reduction with the need for data and information, and is consistent with the requirements of EPCRA section 313.  However, the Agency has proposed a rule that would increase the annual reportable amount for Non-PBT chemicals from 500 lbs to 5000 lbs.  In addition, the Agency is also now proposing to allow PBT chemicals to be reported on Form A for the first time ever.

Furthermore, EPA has prepared various materials to assist facilities in reporting to TRI, thereby lowering the cost of reporting.  These materials include detailed reporting instructions, a question and answer document, magnetic media reporting, general technical guidance, and industry specific guidance documents.  In addition, EPA maintains a toll-free hotline to answer regulatory and technical questions to assist facilities.

Through the development of the Form A Certification Statement (in conjunction with the petition process, electronic reporting, efforts to review the original list of TRI chemicals to determine whether any of those chemicals do not meet the listing criteria, and other mechanisms), EPA has reduced, to the extent practicable and appropriate at this time, the burden on persons providing the information being collected under EPCRA section 313.  EPA continues to work with affected parties to identify opportunities for further burden reduction.

**5(d) Collection Schedule**

Section 313 requires annual reporting for the Form R.  The respondent and Agency schedule of activities associated with the collection and processing of information under EPCRA section 313 is unchanged for the alternate threshold.  Whether making a Form R submission or submitting a Form A Certification Statement based on the alternate threshold, respondents must submit their forms to EPA for any given reporting year on or before July 1 of the succeeding year.

12

October 2005

## 6.    ESTIMATING THE BURDEN AND COST OF THE COLLECTION

### 6(a)    Estimating Respondent Burden

This section presents the burden of this information collection activity on respondents in terms of the time required for facility personnel to perform the steps outlined in Section 4 of this document.  These burden estimates are based on previous ICRs and economic analyses, respondent experience as reflected in comments to EPA and other parties, and information acquired through site visits and telephone interviews.

The burden to respondents is estimated for Form A Certification Statement requirements. Burden estimates are developed for the compliance activities and then multiplied by the number of facilities or reports (as appropriate) to estimate the total burden to respondents.  The burden estimates used by EPA are national average values.  As with any average, some facilities will be above the average, and others will be below it.  Large, complex facilities may require more than the average time to comply.  However, there are many other facilities subject to the rule that are not large or complex.  Therefore, EPA believes that its burden estimates represent reasonable national averages. The tasks associated with the alternate threshold reporting include report calculations and certification, form completion, and recordkeeping and submission.[1]  Specifically:

- **Rule Familiarization:**  Facilities that are reporting under section 313 for the first time must read the reporting package and become familiar with the reporting requirements. This includes the time needed to review instructions, and the time needed to train personnel to be able to respond to a collection of information.

- **Calculations/Certification:**  Facilities must gather data and perform calculations to determine eligibility for the alternate threshold.  This includes the time to search data sources, and the time to complete and review the information.

- **Form Completion:**  Facilities must complete the form.  Facilities use a single Form A Certification Statement to submit certifications for all chemicals that are eligible for the alternate threshold.

- **Recordkeeping/Submission:**  Facilities must maintain recordkeeping systems and submit the completed Form A Certification Statement to EPA and their state.

---

[1] Facilities must also determine whether they are within a covered Standard Industrial Classification (SIC) code; have the equivalent of 10 or more full-time employees; and manufacture, process or use any of the listed toxic chemicals above the threshold quantity.  The time required for compliance determination at all facilities in covered SIC codes with 10 or more employees is already accounted for in the Form R information collection request (OMB #2070-0093).

13

October 2005

Each of these steps is described in more detail below.

### Rule Familiarization

If a facility will be reporting under the section 313 requirements for the first time, facility staff must review and comprehend the reporting requirements. At a minimum, this effort will involve reading the instructions to the Toxic Release Inventory Reporting Forms, however, it may also involve consulting EPA guidance documents, attending a training course, and/or calling the EPCRA technical hotline. The cost associated with rule familiarization occurs only in the first year that a facility becomes subject to reporting. In subsequent years, a facility's staff are assumed to be familiar with the requirements that apply to their facility. Thus, the facility would no longer bear this cost. Similarly, facilities that already report on one or more existing TRI chemicals will not incur a rule familiarization cost.

### Calculations/Certification

To certify that a listed toxic chemical qualifies for the alternate threshold, a facility must estimate its annual reportable amount and the amount manufactured, processed, or otherwise used. If a facility's annual reportable amount for a listed toxic chemical is 500 pounds or less, the facility is eligible to apply the alternate threshold of 1 million pounds manufactured, processed or otherwise used.

### Recordkeeping/Submission

After a facility has certified a listed toxic chemical as eligible for the alternate threshold, it incurs additional labor costs for recordkeeping and submission. Recordkeeping allows a facility to use the information in making calculations in subsequent years, and as documentation in the event it receives a compliance audit. Facilities may maintain such records as estimation methodology and calculations, engineering reports, inventory, incident and operating logs, and any other supporting materials needed to document eligibility for the alternate threshold. Facilities must transmit Form A Certification Statements to EPA and State authorities.

### Form A Certification Statement Completion

If a facility is eligible and chooses to apply the alternate threshold, it must complete the Form A Certification Statement. The facility completes one Form A Certification Statement that contains certifications for all the listed toxic chemicals to which it is applying the alternate threshold.

14

October 2005

<u>Respondent Burden</u>

The calculations needed to determine eligibility for the Form A Certification Statement are a subset of the calculations necessary to complete Form R. Thus, the time required to calculate the annual reportable amount was estimated in previous ICRs by aggregating EPA's estimates of the time required to calculate each of the sections of Form R that are relevant to determining annual reportable amount. According to this estimate, calculations for a Form A Certification Statement take approximately 64 percent of the time of calculations for the Form R.[2]

This ICR reflects two changes from the last TRI Form A ICR. First, based on EPA's recent revision to the unit burden estimates for Form R calculations, EPA now estimates that calculating an annual reportable amount for a Form A Certification Statement will require an average of 16.2 hours for each listed toxic chemical that the facility must report under EPCRA section 313 compared to prior estimate of 30.2 hours per chemical. Second, due to the TRI Reporting Forms Modification Rule, both first and subsequent form completion time is slightly reduced. Previously, EPA estimated that form completion would require 2.1 hours in the first year and 1.4 hours in subsequent years. Currently, EPA estimates that form completion will require 1.6 hours in the first year and 1.3 hours in subsequent years. EPA's estimates by activity and labor category are shown in Table 1.

---

[2] USEPA/OPPT, *Regulatory Impact Analysis of the EPCRA Section 313 Alternate Threshold Final Rule*, November 18, 1994.

15

October 2005

**Table 1**
**Average Annual Burden Hour Estimates for Form A**

| Activity | Management | Technical | Clerical | Total Hours |
|---|---|---|---|---|
| **First-year activities** | | | | |
| Rule Familiarization - first-time filers | 12 | 22.5 | 0 | 34.5 |
| Calculations/ Certification - first-time filers | 16.3 | 26 | 2.2 | 44.5 |
| Form A Completion - first-time filers | 0.02 | 1.5 | 0.05 | 1.6 |
| Recordkeeping/Submission | 0 | 2.4 | 0.6 | 3 |
| **Total** | **28.3** | **52.4** | **2.9** | **83.6** |
| **Subsequent year activities** | | | | |
| Calculations/ Certification - subsequent year filers | 5.95 | 9.5 | 0.75 | 16.2 |
| Form A Completion - subsequent year filers | 0.09 | 1.2 | 0.03 | 1.3 |
| Recordkeeping/Submission | 0 | 2.4 | 0.6 | 3 |
| **Total** | **6.04** | **13.1** | **1.38** | **20.5** |

**6(b)     Estimating Respondent Costs**

Respondent costs are related to the number of chemical certifications reported on the Form A Certification Statements and the loaded hourly rates of the personnel who complete the reporting activities. The total reporting burden is estimated to average 83.6 hours for a facility submitting a single certification statement under EPCRA section 313 for the first time. (This includes the time required for rule familiarization, calculations/certification, Form A Certification Statement completion, and recordkeeping/submission.) The total reporting burden is estimated to average 20.5 hours for a facility submitting a single certification statement under EPCRA section 313 in subsequent reporting years. (This includes the time required for calculations/certification, Form A Certification Statement completion, and recordkeeping/submission.) By comparison, the average time required for calculations, form completion, and recordkeeping/submission for Form R is estimated to average between 29.6 and 51.3 hours per form. Thus, for a facility filing a Form A Certification Statement for a single chemical, the alternate threshold yields an average savings of 9.1 and 30.8 hours in subsequent reporting years.

For a facility that certifies multiple chemicals on a Form A Certification Statement, the burden per reported chemical is reduced. On average 2.4 chemicals were reported to EPA using Form A Certification Statements for the 2002 reporting year. About 48 percent of the facilities using the Form A Certification Statement reported on one chemical, another 18 percent reported

16

October 2005

on two chemicals, 17 percent on three chemicals, and the remaining 17 percent of facilities reported on 4 or more chemicals.  The typical per facility burden and cost for certifying one to three chemicals is shown in Table 2.  The loaded hourly rates used in Table 2 correspond with the loaded hourly rates for the relevant labor categories in the Form R ICR renewal.[3]

**Table 2**
**Annual Burden and Cost per Facility (Assuming 1, 2, or 3 Chemicals)**

| Activity | Number of Chemicals Reported on Each Form A | | | | | |
|---|---|---|---|---|---|---|
| | 1 Chemical | | 2 Chemicals | | 3 Chemicals | |
| | hours | cost | hours | cost | hours | cost |
| **First-year filers** | | | | | | |
| Rule Familiarization - first-time filers | 34.5 | $1,644 | 34.5 | $1,644 | 34.5 | $1,644 |
| Calculations/ Certification - first-time filers | 44.5 | $2,081 | 89 | $4,162 | 133.5 | $6,243 |
| Form A Completion - first-time filers | 1.6 | $70 | 1.6 | $70 | 1.6 | $70 |
| Recordkeeping/Submission | 3 | $122 | 6 | $244 | 9 | $366 |
| Total per Facility | 83.6 | $3,917 | 131.1 | $6,120 | 178.6 | $8,323 |
| Average per Chemical | 83.6 | $3,917 | 65.5 | $3,060 | 59.5 | $2,774 |
| **Subsequent year filers** | | | | | | |
| Calculations/ Certification - subsequent year filers | 16.2 | $759 | 32.4 | $1,518 | 48.6 | $2,277 |
| Form A Completion - subsequent year filers | 1.3 | $58 | 1.3 | $58 | 1.3 | $58 |
| Recordkeeping/Submission | 3 | $122 | 6 | $244 | 9 | $366 |
| Total per Facility | 20.5 | $939 | 39.7 | $1,820 | 58.9 | $2,701 |
| Average per Chemical | 20.5 | $939 | 19.8 | $910 | 19.7 | $900 |

**6(c)    Estimating Agency Burden and Cost**

EPA will incur costs to process the Form A Certification Statements, perform outreach

---

[3] Employer Costs for Employee Compensation, Private industry workers, Goods-producing industries, white-collar occupations, as published by the U.S. Department of Labor, Bureau of Labor Statistics.  The December 2004 values for these series are listed in Table 11 of the *Employer Costs for Employee Compensation Summary*, released March 16, 2005.

October 2005

and training, disseminate information, develop policy and guidance, respond to petitions, and perform compliance and enforcement audits. EPA measures its resource requirements in terms of the number of forms that must be processed. EPA employees (as measured by full time equivalents, or FTEs) and extramural costs are separated into a fixed component and a variable component. The fixed component of EPA FTEs and costs is described in the Form R ICR (OMB #2070-0093). The variable component is the amount that varies depending on the number of forms. The variable component reflects total extramural data processing costs divided by the total number of paper reports processed in the 2002 reporting year. EPA expends $26 in variable costs for each form processed. A total of 1800 Form A Certification Statements were filed in the 2002 reporting year. Thus, the total annual burden to EPA is estimated to be $46,800 in variable costs for the Form A Certification Statement.

### 6(d)    Bottom Line Burden Hours and Costs

Total respondent burden is related to the number of chemical certifications reported on the Form A Certification Statements and the number of facilities that file Form A Certification Statements. The number of respondents and responses is based on the actual numbers of facilities making chemical certifications on Form A Certification Statements in the latest reporting year. As shown in Table 3, the number of facilities using the Form A Certification Statement has increased since 1995, the first year the form was available. Starting in 1998, non-manufacturing industries began reporting to TRI using both the Form A Certification Statement and Form R. Also starting in 1998, respondents were allowed to make multiple chemical certifications on a single Form A Certification Statement. Note that electronic submissions allow some companies to report for multiple facilities on a single Form A Certification Statement, which is why there are fewer facilities than Form A Certification Statements. Note also that facilities can file both Form Rs and Form A Certification Statements, so the total number of TRI reporting facilities is less than the sum of facilities filing Form Rs and facilities filing Form A Certification Statements. For the purposes of bottom line burden hours and costs in this ICR supporting statement, EPA is using the latest number of facilities and responses rounded to the next highest hundred or thousand as appropriate (in this case, 4,920 facilities and 1800 paper responses on 12,000 chemicals).

18

October 2005

**Table 3**
**Usage of Form A vs. Form R**

| Reporting Year | Form A | | | Form R | |
|---|---|---|---|---|---|
| | Facilities | Responses | Chemicals | Facilities | Responses |
| 1994 | N/A | N/A | N/A | 23,663 | 77,941 |
| 1995 | 3,231 | 6,865 | 6,865 | 21,373 | 70,749 |
| 1996 | 3,618 | 7,720 | 7,720 | 20,757 | 67,713 |
| 1997 | 5,185 | 10,947 | 10,947 | 19,594 | 64,148 |
| 1998 | 5,822 | 5,627 | 13,942 | 21,089 | 75,978 |
| 1999 | 5,444 | 5,085 | 12,894 | 20,167 | 72,450 |
| 2000 | 5,451 | 5,121 | 13,209 | 20,669 | 78,304 |
| 2001 | 5,136 | 4,929 | 12,295 | 22,359 | 83,218 |
| 2002 | 4,920 | 1800 (paper) | 11,951 | 21,941 | 81,429 |

Total respondent burden and cost for the Form A Certification Statement is shown in Table 4.

19

October 2005

**Table 4**
**Total Annual Respondent Burden and Cost**

| Activity | Hours | Number of Facilities | Number of Chemicals | Total Burden |
|---|---|---|---|---|
| Rule Familiarization - First-year filers | 34.5 | 408 | N/A | 14,076 |
| Calculations/Certification - First-year filers | 44.5 | N/A | 325 | 14,463 |
| Form A Completion - First-year filers | 1.6 | 408 | N/A | 645 |
| Calculations/Certification - Subsequent year filers | 16.2 | N/A | 11,626 | 188,341 |
| Form A Completion - Subsequent year filers | 1.3 | 4,512 | N/A | 5,814 |
| Recordkeeping/Submission - All filers | 3 | N/A | 11,951 | 35,853 |
| **Total Burden** | | | | **259,192** |

| Activity | Cost | Number of Facilities | Number of Chemicals | Total Cost |
|---|---|---|---|---|
| Rule Familiarization - First-year filers | $1,644 | 408 | N/A | $670,752 |
| Calculations/Certification - First-year filers | $2,081 | N/A | 325 | $676,325 |
| Form A Completion - First-year filers | $70 | 408 | N/A | $28,560 |
| Calculations/Certification - Subsequent year filers | $759 | N/A | 11,626 | $8,824,134 |
| Form A Completion - Subsequent year filers | $58 | 4,512 | N/A | $261,696 |
| Recordkeeping/Submission - All filers | $122 | N/A | 11,951 | $1,458,022 |
| **Total Cost** | | | | **$11,919,489** |

Total annual respondent burden and cost for completing the Form A Certification Statement are estimated at 259,192 burden hours with a loaded labor cost of $11.92 million per year.  Total EPA cost for processing the Form A Certification Statements is estimated at $130,000 per year.


**6(e)    Reasons for Change in Burden**

The burden estimated in this supporting statement differs from OMB's inventory as a result of 1) adjustments to estimates of number of responses (from 5,000 responses to 4,920

20

October 2005

responses) and 2) first and subsequent year form completion burden reductions due to the TRI Reporting Forms Modification Rule (first year form completion fell from 2.1 hours to 1.6 hours and subsequent year form completion fell from 1.4 hours to 1.3 hours).

6(f)    **Burden Statement** (To appear on Collection Instrument)

The annual public burden for this collection of information, which is approved under OMB Control No. 2070-0143, is estimated to average 20.5 hours for a facility that certifies one chemical per Form A Certification Statement. Responding to this information collection requires 1) determining whether a listed toxic chemical is eligible for certification under the alternate threshold, and 2) completing the Form A Certification Statement. The burden of determining eligibility for certification and associated recordkeeping is estimated to average 19.2 hours for each chemical that is certified. The burden of completing the Form A Certification Statement is estimated to average 1.3 hours, regardless of the number of chemicals being certified. The total burden per response is the combination of these two, and will vary depending on the number of listed toxic chemicals being certified.

Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations are listed in 40 CFR Part 9 and 48 CFR Chapter 15.

To comment on the Agency's need for this information, the accuracy of the provided burden estimates, and any suggested methods for minimizing respondent burden, including the use of automated collection techniques, EPA has established a public docket for this ICR under Docket ID No. OEI-2005-0007, which is available for public viewing at the Office of Environmental Information Docket in the EPA Docket Center (EPA/DC), EPA West, Room B102, 1301 Constitution Ave., NW, Washington, DC. The EPA Docket Center Public Reading Room  is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Reading Room is (202) 566-1744, and the telephone number for the Office of Environmental Information Docket is (202) 566-1752. An electronic version of the public docket is available through EPA Dockets (EDOCKET) at http://www.epa.gov/edocket. Use EDOCKET to submit or view public comments, access the index listing of the contents of the public docket, and to access those documents in the public docket that are available electronically. Once in the system, select "search," then key in the docket ID number identified above. Also, you can send comments to the Office of Information and Regulatory Affairs, Office of Management and Budget, 725 17th Street, NW, Washington, DC 20503, Attention: Desk Office

21

October 2005

for EPA.  Please include the EPA Docket ID No. OEI-2005-0007 and OMB control number 2070-0143 in any correspondence.

The completed forms should be submitted in accordance with the instructions accompanying the form, or as specified in the corresponding regulation.

October 2005

**ATTACHMENT A**

**RELEVANT STATUTES:  EPCRA SECTION 313 AND PPA SECTION 6607**

October 2005

**EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT SECTION 313**

**UNITED STATES CODE**
**TITLE 42 - THE PUBLIC HEALTH AND WELFARE**
**CHAPTER 116 - EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW**

**SUBCHAPTER I - EMERGENCY PLANNING AND NOTIFICATION**

## § 11023. Toxic chemical release forms

(a) Basic requirement

The owner or operator of a facility subject to the requirements of this section shall complete a toxic chemical release form as published under subsection (g) of this section for each toxic chemical listed under subsection (c) of this section that was manufactured, processed, or otherwise used in quantities exceeding the toxic chemical threshold quantity established by subsection (f) of this section during the preceding calendar year at such facility. Such form shall be submitted to the Administrator and to an official or officials of the State designated by the Governor on or before July 1, 1988, and annually thereafter on July 1 and shall contain data reflecting releases during the preceding calendar year.

(b) Covered owners and operators of facilities

(1) In general

(A) The requirements of this section shall apply to owners and operators of facilities that have 10 or more full-time employees and that are in Standard Industrial Classification Codes 20 through 39 (as in effect on July 1, 1985) and that manufactured, processed, or otherwise used a toxic chemical listed under subsection (c) of this section in excess of the quantity of that toxic chemical established under subsection (f) of this section during the calendar year for which a release form is required under this section.
(B) The Administrator may add or delete Standard Industrial Classification Codes for purposes of subparagraph (A), but only to the extent necessary to provide that each Standard Industrial Code to which this section applies is relevant to the purposes of this section.
(C) For purposes of this section -
(i) The term "manufacture" means to produce, prepare, import, or compound a toxic chemical.
(ii) The term "process" means the preparation of a toxic chemical, after its manufacture, for distribution in commerce - (I) in the same form or

1

October 2005

physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such chemical, or (II) as part of an article containing the toxic chemical.

(2) Discretionary application to additional facilities

The Administrator, on his own motion or at the request of a Governor of a State (with regard to facilities located in that State), may apply the requirements of this section to the owners and operators of any particular facility that manufactures, processes, or otherwise uses a toxic chemical listed under subsection (c) of this section if the Administrator determines that such action is warranted on the basis of toxicity of the toxic chemical, proximity to other facilities that release the toxic chemical or to population centers, the history of releases of such chemical at such facility, or such other factors as the Administrator deems appropriate.

(c) Toxic chemicals covered

The toxic chemicals subject to the requirements of this section are those chemicals on the list in Committee Print Number 99-169 of the Senate Committee on Environment and Public Works, titled "Toxic Chemicals Subject to Section 313 of the Emergency Planning and Community Right-To-Know Act of 1986" (42 U.S.C. 11023) (including any revised version of the list as may be made pursuant to subsection (d) or (e) of this section).

(d) Revisions by Administrator

(1) In general

The Administrator may by rule add or delete a chemical from the list described in subsection (c) of this section at any time.

(2) Additions

A chemical may be added if the Administrator determines, in his judgment, that there is sufficient evidence to establish any one of the following:
(A) The chemical is known to cause or can reasonably be anticipated to cause significant adverse acute human health effects at concentration levels that are reasonably likely to exist beyond facility site boundaries as a result of continuous, or frequently recurring, releases.
(B) The chemical is known to cause or can reasonably be anticipated to cause in humans -
(i) cancer or teratogenic effects, or
(ii) serious or irreversible - (I) reproductive dysfunctions, (II) neurological

2

October 2005

disorders, (III) heritable genetic mutations, or (IV) other chronic health effects.

(C) The chemical is known to cause or can reasonably be anticipated to cause, because of -

(i) its toxicity,

(ii) its toxicity and persistence in the environment, or

(iii) its toxicity and tendency to bioaccumulate in the environment, a significant adverse effect on the environment of sufficient seriousness, in the judgment of the Administrator, to warrant reporting under this section. The number of chemicals included on the list described in subsection © of this section on the basis of the preceding sentence may constitute in the aggregate no more than 25 percent of the total number of chemicals on the list. A determination under this paragraph shall be based on generally accepted scientific principles or laboratory tests, or appropriately designed and conducted epidemiological or other population studies, available to the Administrator.

(3) Deletions

A chemical may be deleted if the Administrator determines there is not sufficient evidence to establish any of the criteria described in paragraph (2).

(4) Effective date

Any revision made on or after January 1 and before December 1 of any calendar year shall take effect beginning with the next calendar year. Any revision made on or after December 1 of any calendar year and before January 1 of the next calendar year shall take effect beginning with the calendar year following such next calendar year.

(e) Petitions

(1) In general

Any person may petition the Administrator to add or delete a chemical from the list described in subsection (c) of this section on the basis of the criteria in subparagraph (A) or (B) of subsection (d)(2) of this section. Within 180 days after receipt of a petition, the Administrator shall take one of the following actions:

(A) Initiate a rulemaking to add or delete the chemical to the list, in accordance with subsection (d)(2) or (d)(3) of this section.

(B) Publish an explanation of why the petition is denied.

(2) Governor petitions

October 2005

A State Governor may petition the Administrator to add or delete a chemical from the list described in subsection (c) of this section on the basis of the criteria in subparagraph (A), (B), or (c) of subsection (d)(2) of this section. In the case of such a petition from a State Governor to delete a chemical, the petition shall be treated in the same manner as a petition received under paragraph (1) to delete a chemical. In the case of such a petition from a State Governor to add a chemical, the chemical will be added to the list within 180 days after receipt of the petition, unless the Administrator -

    (A) initiates a rulemaking to add the chemical to the list, in accordance with subsection (d)(2) of this section, or

    (B) publishes an explanation of why the Administrator believes the petition does not meet the requirements of subsection (d)(2) of this section for adding a chemical to the list.

(f) Threshold for reporting

    (1) Toxic chemical threshold amount

The threshold amounts for purposes of reporting toxic chemicals under this section are as follows:

    (A) With respect to a toxic chemical used at a facility, 10,000 pounds of the toxic chemical per year.

    (B) With respect to a toxic chemical manufactured or processed at a facility -

        (i) For the toxic chemical release form required to be submitted under this section on or before July 1, 1988, 75,000 pounds of the toxic chemical per year.

        (ii) For the form required to be submitted on or before July 1, 1989, 50,000 pounds of the toxic chemical per year.

        (iii) For the form required to be submitted on or before July 1, 1990, and for each form thereafter, 25,000 pounds of the toxic chemical per year.

    (2) Revisions

The Administrator may establish a threshold amount for a toxic chemical different from the amount established by paragraph (1). Such revised threshold shall obtain reporting on a substantial majority of total releases of the chemical at all facilities subject to the requirements of this section. The amounts established under this paragraph may, at the Administrator's discretion, be based on classes of chemicals or categories of facilities.

(g) Form

    (1) Information required

October 2005

Not later than June 1, 1987, the Administrator shall publish a uniform toxic chemical release form for facilities covered by this section. If the Administrator does not publish such a form, owners and operators of facilities subject to the requirements of this section shall provide the information required under this subsection by letter postmarked on or before the date on which the form is due. Such form shall -

    (A) provide for the name and location of, and principal business activities at, the facility;

    (B) include an appropriate certification, signed by a senior official with management responsibility for the person or persons completing the report, regarding the accuracy and completeness of the report; and

    (C) provide for submission of each of the following items of information for each listed toxic chemical known to be present at the facility:

        (i) Whether the toxic chemical at the facility is manufactured, processed, or otherwise used, and the general category or categories of use of the chemical.

        (ii) An estimate of the maximum amounts (in ranges) of the toxic chemical present at the facility at any time during the preceding calendar year.

        (iii) For each waste stream, the waste treatment or disposal methods employed, and an estimate of the treatment efficiency typically achieved by such methods for that waste stream.

        (iv) The annual quantity of the toxic chemical entering each environmental medium.

  (2) Use of available data

In order to provide the information required under this section, the owner or operator of a facility may use readily available data (including monitoring data) collected pursuant to other provisions of law, or, where such data are not readily available, reasonable estimates of the amounts involved. Nothing in this section requires the monitoring or measurement of the quantities, concentration, or frequency of any toxic chemical released into the environment beyond that monitoring and measurement required under other provisions of law or regulation. In order to assure consistency, the Administrator shall require that data be expressed in common units.

(h) Use of release form

The release forms required under this section are intended to provide information to the Federal, State, and local governments and the public, including citizens of communities surrounding covered facilities. The release form shall be available, consistent with section 11044(a) of this title, to inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of

October 2005

research and data gathering; to aid in the development of
appropriate regulations, guidelines, and standards; and for
other similar purposes.

(I) Modifications in reporting frequency

(1) In general

The Administrator may modify the frequency of submitting a report under this
section, but the Administrator may not modify the frequency to be any more often
than annually. A modification may apply, either nationally or in a specific geographic
area, to the following:
(A) All toxic chemical release forms required under this section.
(B) A class of toxic chemicals or a category of facilities.
(C) A specific toxic chemical.
(D) A specific facility.

(2) Requirements

A modification may be made under paragraph (1) only if the Administrator -
(A) makes a finding that the modification is consistent with the provisions of
subsection (h) of this section, based on -
(i) experience from previously submitted toxic chemical release forms,
and
(ii) determinations made under paragraph (3), and
(B) the finding is made by a rulemaking in accordance with section 553 of
title 5.

(3) Determinations

The Administrator shall make the following determinations with respect to a
proposed modification before making a modification under paragraph (1):

(A) The extent to which information relating to the proposed modification
provided on the toxic chemical release forms has been used by the
Administrator or other agencies of the Federal Government, States, local
governments, health professionals, and the public.
(B) The extent to which the information is (i) readily available to potential
users from other sources, such as State reporting programs, and (ii) provided        to
the Administrator under another Federal law or through a State program.
(C) The extent to which the modification would impose additional and
unreasonable burdens on facilities subject to the reporting requirements under
this section.

6

October 2005

(4) 5-year review

Any modification made under this subsection shall be reviewed at least once every 5 years. Such review shall examine the modification and ensure that the requirements of paragraphs (2) and (3) still justify continuation of the modification. Any change to a modification reviewed under this paragraph shall be made in accordance with this subsection.

(5) Notification to Congress

The Administrator shall notify Congress of an intention to initiate a rulemaking for a modification under this subsection. After such notification, the Administrator shall delay initiation of the rulemaking for at least 12 months, but no more than 24 months, after the date of such notification.

(6) Judicial review

In any judicial review of a rulemaking which establishes a modification under this subsection, a court may hold unlawful and set aside agency action, findings, and conclusions found to be unsupported by substantial evidence.

(7) Applicability

A modification under this subsection may apply to a calendar year or other reporting period beginning no earlier than January 1, 1993.

(8) Effective date

Any modification made on or after January 1 and before December 1 of any calendar year shall take effect beginning with the next calendar year. Any modification made on or after December 1 of any calendar year and before January 1 of the next calendar year shall take effect beginning with the calendar year following such next calendar year.

(j) EPA management of data

The Administrator shall establish and maintain in a computer data base a national toxic chemical inventory based on data submitted to the Administrator under this section. The Administrator shall make these data accessible by computer telecommunication and other means to any person on a cost reimbursable basis.

October 2005

(k) Report

Not later than June 30, 1991, the Comptroller General, in consultation with the Administrator and appropriate officials in the States, shall submit to the Congress a report including each of the following:

(1) A description of the steps taken by the Administrator and the States to implement the requirements of this section, including steps taken to make information collected under this section available to and accessible by the public.

(2) A description of the extent to which the information collected under this section has been used by the Environmental Protection Agency, other Federal agencies, the States, and the public, and the purposes for which the information has been used.

(3) An identification and evaluation of options for modifications to the requirements of this section for the purpose of making information collected under this section more useful.

(l) Mass balance study

(1) In general

The Administrator shall arrange for a mass balance study to be carried out by the National Academy of Sciences using mass balance information collected by the Administrator under paragraph (3). The Administrator shall submit to Congress a report on such study no later than 5 years after October 17, 1986.

(2) Purposes

The purposes of the study are as follows:

(A) To assess the value of mass balance analysis in determining the accuracy of information on toxic chemical releases.

(B) To assess the value of obtaining mass balance information, or portions thereof, to determine the waste reduction efficiency of different facilities, or categories of facilities, including the effectiveness of toxic chemical regulations promulgated under laws other than this chapter.

(C) To assess the utility of such information for evaluating toxic chemical management practices at facilities, or categories of facilities, covered by this section.

(D) To determine the implications of mass balance information collection on a national scale similar to the mass balance information collection carried out by the Administrator under paragraph (3), including implications of the use of     such collection as part of a national annual quantity toxic chemical release     program.

October 2005

(3) Information collection

(A) The Administrator shall acquire available mass balance information from
States which currently conduct (or during the 5 years after October 17, 1986
initiate) a mass balance-oriented annual quantity toxic chemical release    program.
If information from such States provides an inadequate representation of
industry classes and categories to carry out the purposes of the study, the
Administrator also may acquire mass balance information necessary for the
study from a representative number of facilities in other States.

(B) Any information acquired under this section shall be available to the public,
except that upon a showing satisfactory to the Administrator by any person    that
the information (or a particular part thereof) to which the Administrator or    any
officer, employee, or representative has access under this section if made    public
would divulge information entitled to protection under section 1905 of    title 18,
such information or part shall be considered confidential in accordance    with the
purposes of that section, except that such information or part may be    disclosed to
other officers, employees, or authorized representatives of the    United States
concerned with carrying out this section.

(C) The Administrator may promulgate regulations prescribing procedures for
collecting mass balance information under this paragraph.

(D) For purposes of collecting mass balance information under subparagraph
(A), the Administrator may require the submission of information by a State or
facility.

(4) Mass balance definition

For purposes of this subsection, the term "mass balance" means an accumulation of the
annual quantities of chemicals transported to a facility, produced at a facility, consumed
at a facility, used at a facility, accumulated at a facility, released from a facility, and
transported from a facility as a waste or as a commercial product or byproduct or
component of a commercial product or byproduct.

October 2005

## POLLUTION PREVENTION ACT SECTION 6607

## UNITED STATES CODE
## TITLE 42 - THE PUBLIC HEALTH AND WELFARE
## CHAPTER 133 - POLLUTION PREVENTION

### § 13106. Source reduction and recycling data collection

(a) Reporting requirements

Each owner or operator of a facility required to file an annual toxic chemical release form under section 11023 of this title for any toxic chemical shall include with each such annual filing a toxic chemical source reduction and recycling report for the preceding calendar year. The toxic chemical source reduction and recycling report shall cover each toxic chemical required to be reported in the annual toxic chemical release form filed by the owner or operator under section 11023(c) of this title. This section shall take effect with the annual report filed under section 11023 of this title for the first full calendar year beginning after November 5, 1990.

(b) Items included in report

The toxic chemical source reduction and recycling report required under subsection (a) of this section shall set forth each of the following on a facility-by-facility basis for each toxic chemical:

> . (1) The quantity of the chemical entering any waste stream (or otherwise released into the environment) prior to recycling, treatment, or disposal during the calendar year for which the report is filed and the percentage change from the previous year. The quantity reported shall not include any amount reported under paragraph (7). When actual measurements of the quantity of a toxic chemical entering the waste streams are not readily available, reasonable estimates should be made based on best engineering judgment
> (2) The amount of the chemical from the facility which is recycled (at the facility or elsewhere) during such calendar year, the percentage change from the previous year, and the process of recycling used.
> (3) The source reduction practices used with respect to that chemical during such year at the facility. Such practices shall be reported in accordance with the following categories unless the Administrator finds other categories to be more appropriate.
> > (A) Equipment, technology, process, or procedure modifications.
> > (B) Reformulation or redesign of products.
> > (C) Substitution of raw materials.
> > (D) Improvement in management, training, inventory control, materials handling, or other general operational phases of industrial facilities.

10

October 2005

(4) The amount expected to be reported under paragraph (1) and (2) for the two calendar years immediately following the calendar year for which the report is filed. Such amount shall be expressed as a percentage change from the amount reported in paragraphs (1) and (2).

(5) A ratio of production in the reporting year to production in the previous year. The ratio should be calculated to most closely reflect all activities involving the toxic chemical. In specific industrial classifications subject to this section, where a feedstock or some variable other than production is the primary influence on waste characteristics or volumes, the report may provide an index based on that primary variable for each toxic chemical. The Administrator is encouraged to develop production indexes to accommodate individual industries for use on a voluntary basis.

(6) The techniques which were used to identify source reduction opportunities. Techniques listed should include, but are not limited to, employee recommendations, external and internal audits, participative team management, and material balance audits. Each type of source reduction listed under paragraph (3) should be associated with the techniques or multiples of techniques used to identify the source reduction technique.

(7) The amount of any toxic chemical released into the environment which resulted from a catastrophic event, remedial action, or other one-time event, and is not associated with production processes during the reporting year.

(8) The amount of the chemical from the facility which is treated (at the facility or elsewhere) during such calendar year and the percentage change from the previous year. For the first year of reporting under this subsection, comparison with the previous year is required only to the extent such information is available.

(c) SARA provisions

The provisions of sections 11042, 11045(c), and 11046 of this title shall apply to the reporting requirements of this section in the same manner as to the reports required under section 11023 of this title. The Administrator may modify the form required for purposes of reporting information under section 11023 of this title to the extent he    deems necessary to include the additional information required under this section.

(d) Additional optional information

Any person filing a report under this section for any year may include with the report additional information regarding source reduction, recycling, and other pollution control techniques in earlier years.

11

October 2005

(e) Availability of data

    Subject to section 11042 of this title, the Administrator shall make data collected under this section publicly available in the same manner as the data collected under section 11023 of this title.

October 2005

**ATTACHMENT B**

**MAJOR REGULATIONS SPECIFIC TO THE FORM A
CERTIFICATION STATEMENT:
40 CFR §372.10, §372.27 AND §372.95**

October 2005

## TITLE 40--PROTECTION OF ENVIRONMENT

## CHAPTER I--ENVIRONMENTAL PROTECTION AGENCY

## PART 372--TOXIC CHEMICAL RELEASE REPORTING: COMMUNITY RIGHT-TO-KNOW

### Subpart A--General Provisions

### Sec. 372.10  Recordkeeping.

(d) Each owner or operator who determines that the owner operator may apply the alternate threshold as specified under Sec. 372.27(a) must retain the following records for a period of 3 years from the date of the submission of the certification statement as required under Sec. 372.27(b):

(1) A copy of each certification statement submitted by the person under Sec. 372.27(b).

(2) All supporting materials and documentation used by the person to make the compliance determination that the facility or establishment is eligible to apply the alternate threshold as specified in Sec. 372.27.

(3) Documentation supporting the certification statement submitted under Sec. 372.27(b) including:

(i) Data supporting the determination of whether the alternate threshold specified under Sec. 372.27(a) applies for each toxic chemical.

(ii) Documentation supporting the calculation of annual reportable amount, as defined in Sec. 372.27(a), for each toxic chemical, including documentation supporting the calculations and the calculations of each data element combined for the annual reportable amount.

(iii) Receipts or manifests associated with the transfer of each chemical in waste to off-site locations.

October 2005

### Subpart B--Reporting Requirements

### Sec. 372.27   Alternate threshold and certification.

(a) With respect to the manufacture, process, or otherwise use of a toxic chemical, the owner or operator of a facility may apply an alternate threshold of 1 million pounds per year to that chemical if the owner or operator calculates that the facility would have an annual reportable amount of that toxic chemical not exceeding 500 pounds for the combined total quantities released at the facility, disposed within the facility, treated at the facility (as represented by amounts destroyed or converted by treatment processes), recovered at the facility as a result of recycle operations, combusted for the purpose of energy recovery at the facility, and amounts transferred from the facility to off-site locations for the purpose of recycle, energy recovery, treatment, and/or disposal. These volumes correspond to the sum of amounts reportable for data elements on EPA Form R (EPA Form 9350-1; Rev. 12/4/93) as Part II column B or sections 8.1 (quantity released), 8.2 (quantity used for energy recovery on-site), 8.3 (quantity used for energy recovery off-site), 8.4 (quantity recycled on-site), 8.5 (quantity recycled off-site), 8.6 (quantity treated on-site), and 8.7 (quantity treated off-site).

(b) If an owner or operator of a facility determines that the owner or operator may apply the alternate reporting threshold specified in paragraph (a) of this section for a specific toxic chemical, the owner or operator is not required to submit a report for that chemical under Sec. 372.30, but must submit a certification statement that contains the information required in Sec. 372.95. The owner or operator of the facility must also keep records as specified in Sec. 372.10(d).

(c) Threshold determination provisions of Sec. 372.25 and exemptions pertaining to threshold determinations in Sec. 372.38 are applicable to the determination of whether the alternate threshold has been met.

(d) Each certification statement under this section for activities involving a toxic chemical that occurred during a calendar year at a facility must be submitted to EPA and to the State in which the facility is located on or before July 1 of the next year.

October 2005

### Subpart E--Forms and Instructions

### Sec. 372.95  Alternate threshold certification and instructions.

(a) Availability of the alternate threshold certification statement and instructions. Availability of the alternate threshold certification statement and instructions is the same as provided in Sec. 372.85(a) for availability of the reporting form and instructions.

(b) Alternate threshold certification statement elements. The following information must be reported on an alternate threshold certification statement pursuant to Sec. 372.27(b):

(1) Reporting year.

(2) An indication of whether the chemical identified is being claimed as trade secret.

(3) Chemical name and CAS number (if applicable) of the chemical, or the category name.

(4) Signature of a senior management official certifying the following: pursuant to 40 CFR 372.27, ``I hereby certify that to the best of my knowledge and belief for the toxic chemical listed in this statement, the annual reportable amount, as defined in 40 CFR 372.27(a), did not exceed 500 pounds for this reporting year and that the chemical was manufactured, or processed, or otherwise used in an amount not exceeding 1 million pounds during this reporting year.''

(5) Date signed.

(6) Facility name and address.

(7) Mailing address of the facility if different than paragraph (b)(6) of this section.

(8) Toxic chemical release inventory facility identification number if known.

(9) Name and telephone number of a technical contact.

(10) The four-digit SIC codes for the facility or establishments in the facility.

(11) Latitude and longitude coordinates for the facility.

(12) Dun and Bradstreet Number of the facility.

(13) EPA Identification Number(s) (RCRA) I.D. Number(s) of the facility.

(14) Facility NPDES Permit Number(s).

(15) Underground Injection Well Code (UIC) I.D. Number(s) of the facility.

(16) Name of the facility's parent company.

(17) Parent company's Dun and Bradstreet Number.

October 2005

**ATTACHMENT C**
**FORM A CERTIFICATION STATEMENT (EPA FORM #9350-2)**

October 2005

**ATTACHMENT D**
**TOXIC CHEMICAL RELEASE INVENTORY REPORTING FORMS AND**
**INSTRUCTIONS (EPA 260-B-05-001)**

(Note: An electronic copy of this attachment is available at the TRI website: www.epa.gov/tri)